No. 25-1961

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

MUNICIPALITY OF BAYAMÓN, on behalf of themselves and others similarly situated; MUNICIPALITY OF CAGUAS, on behalf of themselves and others similarly situated; MUNICIPALITY OF LOÍZA, on behalf of themselves and others similarly situated; MUNICIPALITY OF LARES, on behalf of themselves and others similarly situated; MUNICIPALITY OF BARRANQUITAS, on behalf of themselves and others similarly situated; MUNICIPALITY OF COMERÍO, on behalf of themselves and others similarly situated; MUNICIPALITY OF CAYEY, on behalf of themselves and others similarly situated; MUNICIPALITY OF LAS MARÍAS, on behalf of themselves and others similarly situated; MUNICIPALITY OF TRUJILLO ALTO, on behalf of themselves and others similarly situated; MUNICIPALITY OF VEGA BAJA, on behalf of themselves and others similarly situated; MUNICIPALITY OF AÑASCO, on behalf of themselves and others similarly situated; MUNICIPALITY OF CIDRA, on behalf of themselves and others similarly situated; MUNICIPALITY OF AGUADILLA, on behalf of themselves and others similarly situated; MUNICIPALITY OF AIBONITO, on behalf of themselves and others similarly situated; MUNICIPALITY OF MOROVIS, on behalf of themselves and others similarly situated; MUNICIPALITY OF MOCA, on behalf of themselves and others similarly situated; MUNICIPALITY OF BARCELONETA, on behalf of themselves and others similarly situated; MUNICIPALITY OF CAMUY, on behalf of themselves and others similarly situated; MUNICIPALITY OF CATAÑO, on behalf of themselves and others similarly situated; MUNICIPALITY OF SALINAS, on behalf of themselves and others similarly situated; MUNICIPALITY OF ADJUNTAS, on behalf of themselves and others similarly situated; MUNICIPALITY OF ARROYO, on behalf of themselves and others similarly situated; MUNICIPALITY OF CULEBRA, on behalf of themselves and others similarly situated; MUNICIPALITY OF DORADO, on behalf of themselves and others similarly situated; MUNICIPALITY OF GUAYNABO, on behalf of themselves and others similarly situated; MUNICIPALITY OF HORMIGUEROS, on behalf of themselves and others similarly situated; MUNICIPALITY OF JUNCOS, on behalf of themselves and others similarly situated; MUNICIPALITY OF LAJAS, on behalf of themselves and others similarly situated; MUNICIPALITY OF MANATÍ, on behalf of themselves and others similarly situated; MUNICIPALITY OF NAGUABO, on behalf of themselves and others

similarly situated; MUNICIPALITY OF NARANJITO, on behalf of themselves and others similarly situated; MUNICIPALITY OF UTUADO, on behalf of themselves and others similarly situated; MUNICIPALITY OF VILLALBA, on behalf of themselves and others similarly situated; MUNICIPALITY OF COAMO, on behalf of themselves and others similarly situated; MUNICIPALITY OF OROCOVIS, on behalf of themselves and others similarly situated; MUNICIPALITY OF VIEQUES, on behalf of themselves and others similarly situated; MUNICIPALITY OF YABUCOA, on behalf of themselves and others similarly situated,

Plaintiffs - Appellants,

MUNICIPALITY OF SAN JUAN, on behalf of themselves and others similarly situated,

Plaintiff,

v.

EXXON MOBIL CORPORATION; SHELL PLC, f/k/a Royal Dutch Shell PLC; CHEVRON CORPORATION; BP PLC; MOTIVA ENTERPRISES LLC; OCCIDENTAL PETROLEUM CORPORATION, f/k/a Anadarko Petroleum Corp; BHP GROUP LIMITED; RIO TINTO PLC; CONOCOPHILLIPS COMPANY; AMERICAN PETROLEUM INSTITUTE; XYZ CORPORATIONS 1-100; JOHN AND JANE DOES 1-100,

Defendants - Appellees,

ARCH RESOURCES INCORPORATED, f/k/a Arch Coal, Inc., PEABODY ENERGY CORPORATION,

Defendants.

---

On appeal from the United States District Court
for the District of Puerto Rico
Case No. 322-cv-01550-HRV, Judge Silvia Carreño-Coll

---

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

Kathleen Foley
ZIMMER, CITRON & CLARKE LLP
14 Ridge Square NW, Suite 328
Washington, D.C. 20016
(240) 203-7746
kfoley@zimmercitronclarke.com

Edwina Clarke
David Zimmer
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Dr.
Cambridge, MA 02139
(617) 676-9421
eclarke@zimmercitronclarke.com

Zachary E. Howerton
MILBERG PLLC
223 Duke of Gloucester Street
Annapolis, MD 21401
(410) 269-6620
zhowerton@milberg.com

Melissa K. Sims
MILBERG PLLC
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
(516) 862-0363
msims@milberg.com

Luis V. Almeida-Olivieri
MILBERG PLLC
1311 Ponce de Leon Ave, Suite 700
San Juan, PR 00907
(866) 252-0878
lalmeida@milberg.com

Roy L. Mason
SMOUSE & MASON, LLC
223 Duke of Gloucester Street
Annapolis, MD 21401
(410) 269-6620
rlm@smouseandmason.com

Victoria J. Maniatis
MILBERG PLLC
405 E. 50th Street
New York, NY 10022
(516) 741-5600
vmaniatis@milberg.com

May 13, 2026                                    *Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ........................1

INTRODUCTION........................................................................................2

JURISDICTIONAL STATEMENT................................................................5

STATEMENT OF THE ISSUES...................................................................5

STATEMENT OF THE CASE......................................................................5

    I. FACTUAL BACKGROUND ....................................................................5

        A.  The Basics of Climate Change. ....................................................6

        B.  Defendants Engaged In a Coordinated Campaign to Deceive the Public. 7

            1.  Defendants Knew About Climate Change, and Their Role in It, Before the General Public. ..............................................................8

            2.  Defendants Launched Their Misinformation Campaign.....................11

            3.  Defendants' Lies Protected the Industry Even As Defendants Ramped Up Production..........................................................................15

        C.  Hurricanes Have Devastated Puerto Rico.................................16

        D.  Plaintiffs Discover the Connection Between Defendants' Conduct and Their Injuries. ..............................................................19

    II. PROCEDURAL BACKGROUND .........................................................21

SUMMARY OF THE ARGUMENT ........................................................24

STANDARD OF REVIEW .......................................................................27

ARGUMENT.............................................................................................27

    I. PLAINTIFFS' CLAIMS FOR DAMAGES CAUSED BY HURRICANE MARIA ARE TIMELY. ..............................................................................28

        A.  Plaintiffs' Maria-Based Federal Claims Are Timely Under the Doctrine of Fraudulent Concealment. .......................................28

            1.  Defendants Affirmatively Concealed Their Role in Causing Catastrophic Storms. ............................................................30

            2.  The Operative Facts Did Not Exist Until the Chen Report and the Maria Attribution Studies Were Published. ........................34

            3.  Plaintiffs Were Diligent.........................................................41

         B.  The Maria-Based Puerto Rico Claims in the Amended Complaint Are Timely Under Relation Back and the Discovery Rule.............................42

i

1. The Amended Complaint Relates Back Under Rule 15(c)(1)(B). .......43

    a. The Issue of Relation Back Is Properly Before This Court. ..........43

    b. The Amended Complaint Relates Back to the Complaint. ............46

2. Plaintiffs' Puerto Rico Claims for Maria's Damage Are Timely. .......47

II. PLAINTIFFS' CLAIMS ARE INDEPENDENTLY TIMELY WITH RESPECT TO HURRICANE FIONA IN 2022...................................................................49

  A. The Amended Complaint Pleads Damages from Hurricane Fiona. ........49

  B. Plaintiffs' Federal Claims for Damages from Hurricane Fiona Are Timely Without Any Tolling....................................................................51

    1. Plaintiffs' Fiona-Based RICO Claims Are Timely. ...........................51

    2. Plaintiffs' Fiona-Based Antitrust Claim Is Timely. ...........................52

  C. Plaintiffs' Fiona-Based Puerto Rico Law Claims Are Facially Timely Based on the Original Complaint. ...........................................................53

III. THE DISTRICT COURT ERRED IN HOLDING THAT IT HAD NO PERSONAL JURISDICTION OVER DEFENDANTS RIO TINTO AND BHP AS TO PLAINTIFFS' ANTITRUST CLAIM................................................................................54

  A. The Service-of-Process Clause of Section 12 of the Clayton Act Operates Independently of Its Venue Clause. .......................................................54

  B. The Court Should Reverse as to BHP and Remand for Due-Process Analysis as to Rio Tinto. ........................................................................58

**CONCLUSION.................................................................................................60**

## TABLE OF AUTHORITIES

**Federal Cases**

*Action Embroidery Corp. v. Atlantic Embroidery, Inc.*,
　368 F.3d 1174 (9th Cir. 2004) ........................................................ 55, 57, 58

*Adelson v. Hananel*,
　510 F.3d 43 (1st Cir. 2007) ............................................................... 27

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
　483 U.S. 143 (1987) ..................................................................... 29, 51

*Alaska v. Express Scripts, Inc.*
　744 F. Supp. 3d 1150 (D. Alaska 2025) .................................................. 40

*Álvarez-Maurás v. Banco Popular of Puerto Rico*,
　919 F.3d 617 (1st Cir. 2019) ................................................ 29, 35, 38, 41, 51

*Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*,
　850 F.3d 52 (1st Cir. 2017) ............................................................... 39

*Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*,
　825 F.3d 28 (1st Cir. 2016) ............................................................... 27

*Berkson v. Del Monte Corp.*,
　743 F.2d 53 (1st Cir. 1984) ........................................................... 30, 34

*City of Boston v. OptumRX, Inc.*,
　169 F.4th 58 (1st Cir. 2026) .............................................................. 40

*City of Hoboken v. Chevron Corp.*,
　45 F.4th 699 (3d Cir. 2022) .............................................................. 38

*Comer v. Murphy Oil USA, Inc.*,
　718 F.3d 460 (5th Cir. 2013) ............................................................. 38

*Dahua Tech. USA, Inc. v. Zhang*,
　138 F.4th 1 (1st Cir. 2025) ............................................................... 45

*Daniel v. American Bd. of Emergency Med.*,
　428 F.3d 408 (2d Cir. 2005) .............................................................. 56

*Delaware v. BP Am. Inc.*,
　578 F. Supp. 3d 618 (D. Del. 2022) ...................................................... 38

*Gonzolez-Perez v. Hospital Interamericano De Medicina Avanzada*,
　355 F.3d 1 (1st Cir. 2004) ............................................................... 48

iii

*Gorelik v. Costin*,
  605 F.3d 118 (1st Cir. 2010)..........................................................................27

*GTE New Media Servs., Inc. v. BellSouth Corp.*,
  199 F.3d 1343 (D.C. Cir. 2000)....................................................................56

*Hemi Grp., LLC v. City of N.Y.*,
  559 U.S. 1 (2010)..........................................................................................39

*In re Auto. Refinishing Paint Antitrust Litig.*,
  358 F.3d 288 (3d Cir. 2004) .......................................................... 55, 56, 57, 58

*In re Terrell*,
  39 F.4th 888 (7th Cir. 2022)..........................................................................44

*Jackson v. U.S. Postal Serv.*,
  149 F.4th 656 (6th Cir. 2025) ........................................................................43

*Kale v. Combined Ins. Co. of Am.*,
  861 F.2d 746 (1st Cir. 1988)..........................................................................40

*KM Enters., Inc. v. Global Traffic Techs., Inc.*,
  725 F.3d 718 (7th Cir. 2013) .........................................................................56

*Leroy v. Great W. United Corp.*,
  443 U.S. 173 (1979)........................................................................................57

*Massachusetts v. EPA*,
  549 U.S. 497 (2007)........................................................................................37

*Montalvo v. Gonzalez-Amparo*,
  587 F.3d 43 (1st Cir. 2009)............................................................................45

*National Ass'n of Soc. Workers v. Harwood*,
  69 F.3d 622 (1st Cir. 1995)............................................................................44

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
  696 F.3d 849 (9th Cir. 2012) .........................................................................38

*Neirbo Co. v. Bethlehem Shipbuilding Corp.*,
  308 U.S. 165 (1939)........................................................................................57

*O'Loughlin v. National R.R. Passenger Corp.*,
  928 F.2d 24 (1st Cir. 1991).............................................................................27

*Precision Etchings & Findings, Inc. v. LGP Gem, Ltd.*,
  953 F.2d 21 (1st Cir. 1992).............................................................................55

iv

*Rakes v. United States*,
        442 F.3d 7 (1st Cir. 2006)..................................................................41

*Rodriguez v. Banco Cent.*,
        917 F.2d 664 (1st Cir. 1990)...............................................................51

*Segal v. Gordon*,
        467 F.2d 602 (2d Cir. 1972) ...............................................................40

*Southeastern Pa. Transp. Auth. v. Orrstown Fin. Servs. Inc.*,
        12 F.4th 337 (3d Cir. 2021) ....................................................... 46, 47

*Texas v. Allan Const. Co.*,
        851 F.2d 1526 (5th Cir. 1988) .............................................................41

*United States v. Dowdell*,
        70 F.4th 134 (3d Cir. 2023) ................................................................43

*United States v. Scophony Corp.*,
        333 U.S. 795 (1948)...........................................................................58

*United States v. Swiss Am. Bank*,
        191 F.3d 30 (1st Cir. 1999)........................................................ 54, 55

*Vázquez-Ramos v. Triple-S Salud, Inc.*,
        55 F.4th 286 (1st Cir. 2022) ...............................................................39

*Villarini–García v. Hospital Del Maestro, Inc.*,
        8 F.3d 81 (1st Cir. 1993)....................................................................48

*Young v. Lepone*,
        305 F.3d 1 (1st Cir. 2002)............................................................ 27, 45, 46

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
        401 U.S. 321 (1971)....................................................... 29, 52, 53

## Federal Statutes

15 U.S.C. § 15b.....................................................................................29

15 U.S.C. § 22.............................................................................. 26, 55

28 U.S.C. § 1291 .....................................................................................5

28 U.S.C. § 1332(a) ................................................................................5

28 U.S.C. § 1337(a) ....................................................................................5

28 U.S.C. § 1391(d) ..................................................................................58

28 U.S.C. §§ 1331 .....................................................................................5

## Puerto Rico Statutes

P.R. Laws Ann. tit. 31 § 11720 (2020) ....................................................48

P.R. Laws Ann. tit. 31 § 5298 (1930) ............................................... 48, 53

## Rules

Fed. R. App. P. 4(a)(1)(A) .........................................................................5

Fed. R. Civ. P. 10(c) ................................................................................51

Fed. R. Civ. P. 11(b)(3) ...........................................................................38

Fed. R. Civ. P. 15(c)(1)(B) ................................................................ 45, 46

## Treatises

Antonin Scalia & Brian A. Gardner, *Reading Law* (2012) ......................57

Wright & Miller's Federal Practice & Procedure .............................. 46, 56

## Other Authorities

Jiarui Chen, Perrine Toledano & Martin Dietrich Brauch, *How Much Have the Oil Supermajors Contributed to Climate Change? Estimating the Carbon Footprint of the Oil Refining and Petroleum Product Sales Sectors*, Columbia Center on Sustainable Investment (Mar. 2022) ..................... 21, 35

Lisa Friedman, *Trump Administration Erases the Government's Power to Fight Climate Change*, NY Times (Feb. 12, 2026), https://www.nytimes.com/2026/02/12/climate/trump-epa-greenhouse-gases-climate-change.html..................................................................................33

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

Plaintiffs-Appellants respectfully request oral argument in this matter. This appeal raises complex, interrelated questions of timeliness, as well as a legal question that has divided this Court's sister circuits. Plaintiffs-Appellants respectfully submit that oral argument would assist the Court in making a decision.

## INTRODUCTION

Plaintiffs are Puerto Rico municipalities that sued members of the fossil-fuel industry for their scheme to deceive the public about the effects of their products on climate change—a scheme that inflicted catastrophic harms on Plaintiffs. The district court did not reach the question whether Plaintiffs adequately stated a claim for relief, instead dismissing Plaintiffs' suit entirely on statute-of-limitations grounds.

The district court's decision was based on three fundamental errors. First, the court mischaracterized what Plaintiffs knew and when they knew it—and hence when Plaintiffs' claims accrued. Of course the municipalities of Puerto Rico knew that Hurricane Maria devastated Puerto Rico in 2017, and that Hurricane Fiona did so again in 2022. Of course they were aware, as was the broader public, that climate change was a subject of ongoing scientific and political debate. What they did not—and could not—know was that the specific storms that destroyed their communities were the foreseeable product of a decades-long, carefully coordinated campaign by the world's largest fossil-fuel companies to suppress the truth about their products' contribution to planetary warming; to manufacture false doubt about the science linking fossil-fuel emissions to extreme weather; and to prevent exactly the kind of regulatory and consumer response that might have slowed the emissions driving those storms. And *this* is what they were required to know for

2

their claims to accrue, not merely the fact of the storms. The district court never grappled with that distinction.

Second, the district court did not reckon with Defendants' fraudulent concealment of their role in causing Plaintiffs' harms. The same companies now arguing that Plaintiffs should have recognized and pursued their claims sooner spent hundreds of millions of dollars obscuring the connection between fossil-fuel emissions and climate change. From the late 1980s onward, Defendants funded a relentless campaign to persuade the public, policymakers, and institutions worldwide that the relevant science was uncertain. They ran advertorials, seeded front groups with dark money, and publicly denied any link between their products and extreme weather—even though their own internal scientists confirmed that very link. The materials the district court cited as establishing Plaintiffs' constructive knowledge—news articles, opinion pieces, generalized reports— existed in an information environment that Defendants had deliberately polluted. Plaintiffs cannot be charged with notice of facts Defendants successfully concealed.

Third, the district court failed to appreciate that the science necessary to support Plaintiffs' specific claims simply did not exist until years after Hurricane Maria made landfall in 2017. The causal chain connecting these Defendants' particular conduct to the intensity of these particular storms became scientifically

3

documentable—and thus pleadable in good faith in a complaint—only recently. Similarly, only upon the recent publication of a groundbreaking study did Plaintiffs learn the extent of four Defendants' roles in climate change. Plaintiffs filed suit promptly once they possessed a non-speculative factual basis linking Defendants' conduct to their injuries.

Absent the district court's errors, there was no basis for dismissing the Amended Complaint on statute-of-limitations grounds. Plaintiffs' claims for damages from Hurricane Maria were timely based on Defendants' fraudulent concealment (for the federal claims) and the discovery rule (for the claims under Puerto Rico law). Plaintiffs' claims for damages from Hurricane Fiona were timely without any tolling at all. And the district court also erred in dismissing two Defendants on personal-jurisdiction grounds.

Plaintiffs and their counsel did just what they were supposed to do: Rather than relying on conjecture and supposition, they brought this suit when—and only when—they knew that their claims had a basis in fact. If allegations in mildly related cases and news articles on hotly disputed issues are held to start the timeliness clock, then going forward, litigants will have to file first and investigate later for fear of losing their claims. Wrongful concealment would be rewarded, and diligence punished. That is not how litigation is supposed to work.

4

This Court should therefore reverse the district court's statute-of-limitations dismissal and remand to allow the district court to address the merits of whether Plaintiffs stated a claim for relief.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1332(a), and 1337(a). It entered final judgment dismissing Plaintiffs' claims on September 11, 2025. Add. 219. Plaintiffs timely noticed this appeal on October 7, 2025. A-4407; Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether Plaintiffs' claims arising from Hurricane Maria are timely.

2.    Whether Plaintiffs' claims arising from Hurricane Fiona are timely.

3.    Whether the district court erred in holding that it does not have personal jurisdiction over Rio Tinto and BHP with respect to Plaintiffs' antitrust claim.

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

This is a suit brought by thirty-seven municipalities of Puerto Rico on behalf of a putative class of all Puerto Rico municipalities against fossil-fuel producers and their trade association. Plaintiffs seek redress for the catastrophic damage they

have suffered from hurricanes fueled by Defendants' fossil-fuel products—damage facilitated by Defendants' extended and extensive campaign of deception. A-338 (¶1). Defendants knew for decades that the products they marketed in Puerto Rico would warm the planet, fuel more powerful hurricanes, and devastate Puerto Rico—but rather than warn Plaintiffs or act to mitigate those harms in any way, they systematically concealed that knowledge and spent hundreds of millions of dollars spreading lies about it. A-339-341 (¶¶2-3, 6).

### A. The Basics of Climate Change.

Climate change is among the most consequential scientific and public-policy developments of the modern era. Climate change refers to significant, long-term shifts in global temperatures and weather patterns caused primarily by the accumulation of greenhouse gases—above all, carbon dioxide ($CO_2$)—in the Earth's atmosphere. Prior to the Industrial Revolution, atmospheric $CO_2$ levels had been stable for 800,000 years. A-397 (¶214). As fossil-fuel combustion accelerated, $CO_2$ concentrations began rising at an unprecedented rate, and by May 2023 had peaked at the highest level in three million years. A-397-398 (¶¶214-215). This buildup has raised Earth's average surface temperature by more than 1°C compared to pre-industrial levels; in Puerto Rico, average temperatures have risen 2.24°C since 1950, and surrounding sea surface temperatures have warmed by more than 1.3°C since 1901. A-399-403 (¶¶216, 218, 220).

6

The issue of climate change entered public consciousness in the summer of 1988, when NASA scientist James Hansen testified before Congress that global warming was already underway—testimony that made the front page of the New York Times.  A-457-458 (¶348).  That same year, a bill to regulate $CO_2$ emissions received bipartisan support in Congress, A-458 (¶349); President George H.W. Bush pledged in a speech at an international environmental conference to combat the greenhouse effect, A-458 (¶350); and the United Nations Environment Programme and the World Meteorological Organization founded the Intergovernmental Panel on Climate Change (IPCC), the international body established to assess climate science and its consequences, A-458 (¶351).

Over the ensuing years, international attention to climate change grew.  In December 1997, for example, the international community reached agreement on the Kyoto Protocol, committing industrialized nations to binding emissions reductions.  A-473-474 (¶387), A-492-493 (¶429).  And in 2007, the IPCC published its Fourth Assessment Report, concluding with at least 90% confidence that human activities have warmed the planet.  A-509 (¶481).

### B.    Defendants Engaged In a Coordinated Campaign to Deceive the Public.

For decades, and through today, Defendants have secretly funded a coordinated campaign to ensure that growing public awareness of climate change did not translate into regulatory action or consumer understanding of the

7

connection between Defendants' specific products and increasingly destructive storms, including those threatening and impacting Puerto Rico. A-457-506 (¶¶346-472), A-509-563 (¶¶482-619).

### 1. Defendants Knew About Climate Change, and Their Role in It, Before the General Public.

Defendants were privy to climate science decades before climate change was a New York Times headline. While public awareness of climate change was in its nascency, Defendants undertook private efforts to study the phenomenon and their products' role in it.

As early as 1954, Defendant American Petroleum Institute (API) and its member companies—including ExxonMobil, Shell, Chevron, BP, ConocoPhillips, Motiva, and Occidental's predecessor Anadarko (collectively, the Oil and Gas Defendants), A-393 (¶205)—obtained access to unpublished scientific research indicating that atmospheric $CO_2$ had measurably increased since 1840. A-437 (¶297). In 1959, API convened a symposium at which physicist Edward Teller warned the industry that the world needed to find alternative energy sources because continued $CO_2$ accumulation could melt the polar ice caps and submerge coastal cities. A-437-438 (¶298). In December 1962, the chief geologist at Shell authored a report for the National Academy of Sciences that stated, "There is evidence that the greatly increasing use of fossil fuels … is seriously contaminating the earth's atmosphere with $CO_2$." A-439 (¶302). In 1965, API's

8

own president wrote to member companies, including all the Oil and Gas Defendants, warning that "time is running out" to avoid the devastating effects of global warming. A-438 (¶299-300).

These warnings prompted Defendants to commission their own research. In 1968, API engaged the Stanford Research Institute on behalf of its member companies to study atmospheric $CO_2$; the resulting report concluded that "there seems to be no doubt that the potential damage to our environment could be severe." A-951, A-439-440 (¶303). A supplemental report API commissioned the following year concluded that fossil fuels accounted for 90% of the increase in atmospheric $CO_2$. A-440 (¶304). By January 1972, all of API's member companies—including the Oil and Gas Defendants—had received those reports, along with additional summaries of climate research. A-440 (¶304). From 1979 to 1983, scientists from many of the Oil and Gas Defendants jointly participated in a "$CO_2$ and Climate Task Force" to monitor and share industry knowledge on climate research. A-449 (¶327).

Defendants' internal conclusions were alarming. On October 16, 1979, a member of Exxon's Research and Engineering Division warned in an internal memo about the potential that "[t]he present trend of fossil fuel consumption will cause dramatic environmental effects before the year 2050," including sea-level rise, melting ice caps, and "major shifts in weather patterns." A-441 (¶307), A-

9

991, A-1000.  In 1980, API's CO₂ and Climate Task Force received a formal presentation predicting that a 2.5°C global temperature rise, expected by 2038, would produce "major economic consequences" and a 5°C rise by 2067 would be "globally catastrophic."  A-442-443 (¶¶309-310) (capitalization altered), A-1028 (capitalization altered).

Exxon's 1981 internal position statement captured the internal consensus starkly:  "Atmospheric CO₂ will double in 100 years if fossil fuels grow at 1.4%/yr.  3°C global average temperature rise and 10°C at poles if CO₂ doubles.—Major shifts in rainfall/agriculture[.]  Polar ice may melt."  A-1034, A-443 (¶312).  But there was still "time," per Exxon, "for an orderly transition to non-fossil fuel technologies[.]"  A-1034.  The director of Exxon's Theoretical and Mathematical Sciences Laboratory warned in 1981 that Exxon's models showed it was "distinctly possible" that the impacts would "indeed be catastrophic (at least for a substantial fraction of the earth's population)," A-443-444 (¶313), and summarized in 1982 the "unanimous agreement in the scientific community" that the greenhouse effect would "bring about significant changes in the earth's climate."  A-444-445 (¶315).  In November 1982, Exxon's Environmental Affairs Program Manager wrote a report—"restricted to Exxon personnel and not distributed externally"—warning that climate change could cause "potentially catastrophic events," including drastic sea-level rise and wide-spread flooding.  A-447 (¶323),

10

A-1074, A-1092-1093.  Shell similarly warned in a 1988 internal report that "[b]y the time global warming becomes detectable it could be too late to take effective countermeasures"—but "[a]n overall reduction in fossil fuel use would of course reduce $CO_2$ production."  A-455 (¶341).

### 2.    Defendants Launched Their Misinformation Campaign.

Rather than disclose their findings or otherwise protect the public from the harms they knew their products caused, Defendants followed the tobacco industry's playbook and launched a wide-ranging, coordinated campaign to mislead the public, influence policy, and minimize consequences to themselves. Defendants manufactured uncertainty and delayed public and regulatory responses—conduct that directly contributed to the harms at issue here.

In November 1979, Exxon's Henry Shaw called internally for "a very aggressive defensive program in the indicated areas of atmospheric science and climate" to "influence possible legislation … affecting our business."  A-450-451 (¶330), A-1155-1156.  A 1979 Exxon presentation to NOAA scientists acknowledged that the company's participation in climate research would provide an opportunity to "enhance the Exxon image and provide public relations value." A-451 (¶332).  In 1980, Shaw suggested edits to a draft statement of the National Commission on Air Quality $CO_2$ Workshop to characterize climate models as "quite rudimentary," emphasize "scientific uncertainties," and insert language

11

stating that experts "recommend that our energy options not be narrowed at this time."  A-451 (¶331).

After NASA scientist James Hansen gave his well-publicized testimony before Congress on June 21, 1988, stating global warming was already underway, A-457-458 (¶348), Defendants moved quickly to contain the damage.  In August 1988, Exxon's Joseph Carlson committed the company's strategy to writing in a memo, stating that the official "Exxon Position" was to "emphasize the uncertainty in scientific conclusions regarding the potential enhanced greenhouse effect" and to "resist the overstatement and sensationalization of potential greenhouse effect which could lead to noneconomic development of nonfossil fuel resources."  A-1202-1203 (capitalization altered), A-461 (¶358).  Carlson noted explicitly that "Exxon is providing leadership through API in developing the petroleum industry position."  A-461 (¶359).

In November 1989, Defendants formalized their misinformation campaign by founding the Global Climate Coalition (GCC), "an organization of business trade associations and private companies established … to coordinate business participation in the scientific and policy debate on the global climate change issue."  A-462-464 (¶¶363, 366).[1]  GCC's advocacy largely took the form of climate-change denialism.  For example, GCC declared that observed warming

---

[1] All Defendants were involved in GCC.  A-463 (¶365), A-467 (¶372).

was "part of a natural warming trend" and that there was "no convincing evidence" greenhouse gases would produce significant climate effects.  A-464 (¶366).  In 1991, shortly after GCC's founding, a group of coal utilities—with support from a Chevron subsidiary—formed the Information Council for the Environment (ICE), which launched a coordinated advertising campaign explicitly designed to "reposition global warming as theory (not fact)."  A-464-465 (¶368).  Defendant Rio Tinto, a GCC member, was also an ICE member and actively participated in its campaign.  A-464-465 (¶368).  On December 22, 1992, all Defendants, acting through GCC, caused an opinion letter by GCC's executive director to be published in the New York Times, which stated:  "There is considerable debate on whether or not man-made greenhouse gases (produced primarily by burning fossil fuels) are triggering a dangerous 'global warming' trend.'"  A-468 (¶374), A-634-635 (¶16).  Executives from Chevron and other fossil-fuel-company ICE members coordinated newspaper advertisements, radio commercials, and mailers; the mailers told consumers, "We believe it is wrong to predict that higher levels of carbon dioxide will bring a catastrophic global warming."  A-465-466 (¶369), A-1234.

In March 1998, API convened a "Global Climate Science Communications Team" (GCSCT), which included representatives from API, Exxon, and Chevron. A-481 (¶406).  The next month, API circulated its "Global Climate Science

13

Communications Action Plan" (the Victory Memo), written with the direct involvement of ExxonMobil and Chevron.  A-482 (¶ 409), A-492-493 (¶429), A-1457. The plan's five-tier structure identified API—acting on behalf of Shell, Chevron, BP, ConocoPhillips, Motiva, and Anadarko (Occidental's predecessor)— and ExxonMobil as organizers; and identified the National Mining Association (representing Rio Tinto) and API as funders, alongside all Defendants through the Business Round Table.  A-493 (¶430(b)-(c)).  The Victory Memo described a multimillion-dollar campaign designed to erode public confidence in the scientific consensus on climate change.  A-482 (¶407).  "Victory" was defined as the moment the public would "understand" the "uncertainties in climate science" and when Kyoto Protocol proponents would "appear to be out of touch with reality." A-1457.  "Victory" could be achieved only when "there [we]re no further initiatives to thwart the threat of climate change."  A-1457.

Defendants have operationalized the Victory Memo, and continued their misinformation campaign, through a network of front groups and dark-money channels.  For example, Defendants channeled donations through Donors Trust and Donors Capital Fund, which together funneled $146 million to climate-denial organizations from 2002 to 2011.  A-516 (¶503), A-519 (¶509).  In 2010, a dozen climate-denial groups received 30 to 70 percent of their funding from Donors Trust.  A-519 (¶510).

14

### 3. Defendants' Lies Protected the Industry Even As Defendants Ramped Up Production.

Even while they funded climate-change denialism (despite knowing the truth), Defendants have attempted to paint themselves as environmentally responsible and committed to combating climate change.

As early as 1999, for example, Shell promoted itself as "playing a major part in the move from oil and gas" and "planting the seeds of renewable energy." A-530 (¶538). BP rebranded itself "Beyond Petroleum" in 2000, deploying ad campaigns in which it implied a transition away from fossil fuels even while it continued to grow its oil-and-gas business. A-531-533 (¶¶541, 543). API began in 2016 to run a campaign falsely claiming that natural gas is a "clean" fuel, A-526 (¶528), and still runs a website promoting fossil-fuel companies' claimed contributions to clean energy, A-527 (¶529). Rio Tinto advertised a new mining project beginning in 2023 as a "green mine," misrepresenting it as an environmentally friendly operation. A-527 (¶531). From 2018 to 2022, Exxon ran a series of ads and advertorials championing the company's investment in alternative energy biofuels, A-661 (¶69), and in November 2021 announced plans to invest $15 billion in lower-carbon initiatives, most of which will likely *increase* carbon emissions, A-535-536 (¶549). BHP has committed to achieve net-zero emissions by 2050, A-544-545 (¶572), A-665 (¶78), even while planning to continue mining well beyond 2020, A-544-545 (¶572).

Defendants continue to deceive the public, marketing their individual fuel products as "clean," "cleaner," or "carbon neutral." A-525 (¶527), A-547 (¶577).

Even while they claim to be focused on reducing their impact on the climate, Defendants have been ramping up fossil-fuel production to maintain their market share and thus suppress alternative energy. Over the next decade, the twelve largest oil companies are projected to invest $103 million per day in new oil and gas fields. A-544 (¶570). For example, Shell was projected to invest $1.5 billion in exploration through 2025. A-544 (¶571). In 2022, BHP—which had committed to achieve net-zero emissions—allocated $2.3 billion capital expenditure to oil and gas development, including $540 million for exploration. A-665-666 (¶78-79). Exxon's oil production is projected to increase by 52% between 2019 and 2030. A-544 (¶571).

No Defendant has withdrawn from the collusive plan to mislead the public; on the contrary, Defendants' deceptive campaign continues to this day. *E.g.*, A-340-341 (¶6), A-551-552 (¶¶592-593), A-658-659 (¶¶62-65), A-665-667 (¶¶78-81).

## C.    Hurricanes Have Devastated Puerto Rico.

On September 6, 2017, Hurricane Irma, a Category 5 storm with winds up to 185 mph, tracked 30 miles north of Puerto Rico. A-411-412 (¶238). On its way past the island, Irma flooded streets, snapped trees, and leveled electrical posts. A-

411-412 (¶238).  Over a million people were left without electricity, and 134 people died.  A-411-412 (¶238).  Irma caused an estimated $77.16 billion in damages across the Caribbean.  A-411-412 (¶238).

Two weeks later, as Puerto Rico was still recovering, Hurricane Maria made direct landfall.  Driven by anomalously warm sea surface temperatures, Maria underwent rapid intensification—strengthening from a Category 1 hurricane to a Category 5 in just 18 hours—and struck Puerto Rico as a Category 4 storm with maximum wind speeds of 155 mph.  A-412-413 (¶239).  Maria produced 41 inches of rain—nearly a quarter of Puerto Rico's annual rainfall—in a single day, on September 20, 2017.  A-412-413 (¶239).  The storm killed more than 4,500 people, A-344-345 (¶10), filling morgues to capacity, A-414 (¶242).  Maria's extreme rainfall triggered over 70,000 landslides, isolating some communities for weeks.  A-414 (¶242).  Tens of thousands of homes were destroyed, and over 90% of Puerto Rico's roads were closed.  A-422 (¶258-259).  Food and clean water were scarce.  A-420 (¶253), A-422 (¶259).  Crime skyrocketed, A-420 (¶253), tourism plummeted, A-421 (¶255), and hundreds of public schools closed, A-421 (¶256).  Three months after Maria, 45% of Puerto Ricans—roughly 1.5 million people— still had no power.  A-422-423 (¶260).  Estimated damages from Maria totaled $94 billion; Puerto Rico's Economic and Disaster Recovery Plan estimated $124 billion would be necessary to recover and rebuild.  A-413 (¶240).

17

The trouble did not end with Maria.  On September 18, 2022—just weeks before this action was filed—Hurricane Fiona struck Puerto Rico, compounding the island's losses from Maria.  Fiona made landfall in southwestern Puerto Rico with wind speeds around 90 mph.  A-431 (¶278).  By the following morning, close to 2,500 Puerto Ricans had been forced to abandon their homes for storm shelters due to intense rain, severe flooding, mudslides, and fallen trees.  A-432 (¶279).  One day after Fiona made landfall, Puerto Rico's governor estimated that damages were already over $1 billion.  A-432 (¶279).  The south of the island received 12 to 20 inches of rain, with some areas receiving over 30 inches; 30 deaths were associated with the storm; and Governor Pedro Pierluisi declared the emergency catastrophic.  A-432 (¶¶279-280).

Fiona caused an island-wide power blackout affecting all 3.3 million Puerto Rico residents; two days after landfall, 89% of customers remained without power.  A-433 (¶284).  Over 750,000 Puerto Ricans—66% of the island—were left without potable water.  A-433 (¶285).  Ninety percent of the island's plantains, Puerto Rico's primary crop, were lost at the peak of the agricultural season.  A-433 (¶286).  Bridges collapsed and were swept away by floodwaters.  A-434 (¶288).  All 78 Puerto Rico municipalities were declared federal disaster zones by FEMA.  A-436 (¶ 291).  Fiona's destruction was compounded by the fact that Puerto Rico

had not fully recovered from Maria:  Over 3,000 homes still had blue tarps for roofs from Maria's damage five years earlier.  A-432 (¶281).

### D. Plaintiffs Discover the Connection Between Defendants' Conduct and Their Injuries.

It has been understood since before Hurricanes Maria and Fiona that warmer water leads to more intense hurricanes:  Warmer ocean waters provide convective energy and load storms with water vapor that falls as catastrophic rain at landfall.  A-408 (¶230).  Moreover, a doubling of atmospheric $CO_2$ was projected in 1987— the beginning of the satellite era, when accurate measurement of hurricane strength became possible—to produce hurricanes 40-50% more destructive compared to that year.  A-407-408 (¶229).  And numerous studies have established that hurricanes' increasingly intense rainfall is attributable to human-induced climate change.  A-408 (¶230).

But those general scientific principles do not enable attribution of specific storms—and the harms they caused—to human activity, let alone to the conduct of particular Defendants.  The science required to make those connections has only recently emerged.

Advances in attribution science now make it possible to quantify how climate change alters the likely severity of particular storms.  A 2019 peer-reviewed study found that Maria's peak precipitation was 4.85 times more likely in the 2017 climate than in 1956—a change linked to long-term, human-caused

19

trends, not natural variability.  A-428-429 (¶273), A-931.  Additionally, MIT climatologist Dr. Kerry Emanuel, in a 2019 report, found that the likelihood of hurricane winds in Puerto Rico of Maria's magnitude had increased by a factor of approximately eight between the mid-twentieth century and the twenty years before 2017.  A-427-428 (¶272), A-917.  As Dr. Emanuel explained, it is now "possible [to] assess the probability of weather events and to analyze how such probabilities are evolving over time as a consequence of climate change," A-917— and that novel, probabilistic science helps quantify Defendants' role in causing the hurricanes that have devastated Plaintiffs.

Also significant for this case is the recently emerging science of *rapid intensification*—the sudden, dramatic escalation of a storm's wind speeds over a short period—and its link to anomalously warm sea surface temperatures driven by climate change.  A 2021 study published in *Science Advances* found that the anomalously warm sea surface temperatures during the passage of Hurricane Maria produced a 65% greater potential for rapid intensification, and that study was itself possible only because temperature and pressure sensors had only recently been deployed off the Puerto Rican shelf; no models had predicted Maria's rapid intensification before it happened.  A-429 (¶274).

In addition to attributing particular storms to climate change, recent science has attributed climate change to particular *entities*.  In March 2022, the Columbia

20

Center on Sustainable Investment published an article entitled "How Much Have the Oil Supermajors Contributed to Climate Change?" A-362 (¶76 n.25) (citing Jiarui Chen, Perrine Toledano & Martin Dietrich Brauch, *How Much Have the Oil Supermajors Contributed to Climate Change? Estimating the Carbon Footprint of the Oil Refining and Petroleum Product Sales Sectors*, Columbia Center on Sustainable Investment (Mar. 2022) (Chen Report)).[2]  The Chen Report notes that "[f]ossil-fuel combustion … accounts for approximately 68% of cumulative global anthropogenic [i.e., human-caused] emissions of carbon dioxide," Chen Report at 8, identifies $CO_2$ as "the most prominent greenhouse gas … causing global warming," *id.*, and quantifies the carbon footprint of six companies— including Defendants ExxonMobil, Shell, BP, and Chevron—based on data from 1980 to 2019, *id.* at 58, 60.  The Chen Report was revolutionary because it accounted not just for oil companies' extraction-based activities, but also for all other steps in the supply chain, thus assessing these companies' *sum-total* contributions to climate change.  *E.g.*, Chen Report at 7.

## II.    PROCEDURAL BACKGROUND

On November 22, 2022, Plaintiffs filed a class-action complaint in the District of Puerto Rico.  A-79-325.  Plaintiffs amended their complaint on

---

[2] Available at
https://ccsi.columbia.edu/sites/ccsi.columbia.edu/files/content/docs/publications/ccsi-oil-supermajors-carbon-footprint-refining-sales-climate-change.pdf.

November 3, 2023.  A-335-626.  Both complaints asserted 14 claims: four federal

RICO claims, A-584-605 (¶¶717-763), A-292-306 (¶¶731-766); *see generally* A-627-668, and a federal antitrust claim, A-605-607 (¶¶764-771), A-306-308 (¶¶767-774), as well as claims under Puerto Rico law, A-566-584 (¶¶634-716), A-610-625 (¶¶783-834), A-275-292 (¶¶648-730), A-308-324 (¶¶775-837).  The Amended

Complaint added a Defendant (API), omitted three defendants named in the

original Complaint, and included more detailed allegations, but did not alter the

substance of the claims.

Defendants moved to dismiss the Amended Complaint.  As relevant here,

Defendants jointly argued that all of Plaintiffs' claims were time-barred based on

the filing date of the *original* Complaint.  *E.g.*, Dkt. 235 at 3, 11, 12; Dkt. 297 at 2,

4.  Only one Defendant, API, argued for untimeliness based on the date of the

Amended Complaint—and its argument depended on the fact that the original

Complaint did not name API as a defendant.  Dkt. 254 at 15.  Defendants also

argued that the court lacked personal jurisdiction.  Dkt. 234; Dkt. 240; Dkt. 245;

Dkt. 246.

As relevant here, the magistrate judge recommended that Plaintiffs' claims

be found timely, both under the continuous-tort doctrine and because equitable

tolling applied due to Defendants' fraudulent concealment.  Add. 35-41.  The

magistrate judge noted that "Plaintiffs have alleged that they pursued their rights

22

diligently, conducting investigations prior to filing," and that they "also allege that … Defendants conducted a well-organized campaign of deceit." Add. 40. The magistrate judge also recommended denial of the joint motion to dismiss for lack of personal jurisdiction, Add. 90, denial of BHP's and Rio Tinto's individual jurisdictional motions, Add. 92, and that limited jurisdictional discovery be conducted, Add. 18, 23, 26-27, 31-32. [3]

The district court rejected most of the magistrate judge's recommendations and dismissed all of Plaintiffs' claims, finding them barred by the applicable statutes of limitations. Add. 174. The district court analyzed all of Plaintiffs' claims as if they were based only on Hurricane Maria, which struck in 2017, rather than as also encompassing Hurricane Fiona. *E.g.*, Add. 95-96, 179, 182. With respect to the federal claims, the district court reasoned that Plaintiffs had the requisite information to bring suit by September 2021 (i.e., four years after Maria). Add. 182, 184. The district court held that fraudulent concealment does not apply because the Amended Complaint lacked specificity with respect to Defendants' wrongful concealment, Add. 200, and because there were "numerous lawsuits and

---

[3] The magistrate judge recommended that three of the Puerto Rico claims be dismissed for failure to state a claim, Add. 83-85—a recommendation Plaintiffs do not challenge. References to Plaintiffs' claims under Puerto Rico law are to the remaining Puerto Rico claims.

[] reports linking Defendants to climate change and, in turn, climate change to storms," Add. 203.

For the claims under Puerto Rico law, the district court *sua sponte* held that the 2023 Amended Complaint did not relate back to the original 2022 Complaint because Plaintiffs never argued for relation back. Add. 177-78. According to the court, Plaintiffs were effectively on notice more than a year before they filed the original Complaint, and were not diligent, so the district court dismissed all the Puerto Rico claims as untimely. Add. 176-182, 185-186.

The district court also held that it lacked personal jurisdiction over BHP and Rio Tinto, Add. 168, concluding as to the antitrust claims against BHP and Rio Tinto that 15 U.S.C. § 22 "requires venue that is proper under the first clause" before its worldwide-service provision can "establish personal jurisdiction," Add. 157, 159-160, and that the venue requirement was not satisfied with respect to either Defendant, Add. 161-164. Because it dismissed all of Plaintiffs' claims on statute-of-limitations grounds, the district court did not pass on Defendants' motions with respect to "the merits … of the legal theories advanced by Plaintiffs." Add. 215.

## SUMMARY OF THE ARGUMENT

**I.** Plaintiffs' federal RICO and antitrust claims for damages caused by Hurricane Maria are timely under the doctrine of fraudulent concealment, which

24

tolls the statute of limitations where defendants wrongfully concealed their conduct, the plaintiff failed to discover the operative facts within the limitations period, and the plaintiff made diligent efforts to do so.  All three elements are satisfied here.  Defendants engaged in precisely the sort of affirmative, collusive concealment the doctrine targets, the scientific studies revealing the operative facts did not exist until years after Hurricane Maria, and Plaintiffs both were diligent and could not have discovered those facts before they existed.

Plaintiffs' claims for Maria's damages under Puerto Rico law are also timely, and the district court's contrary holding was driven by two errors.  First, the district court erred in *sua sponte* holding that the Amended Complaint does not relate back to the original Complaint.  Defendants' own briefing below repeatedly treated the original Complaint's filing date as the operative date for limitations purposes; only API argued otherwise, and only as to claims newly asserted against it.  On the merits, relation back plainly applies:  Both complaints assert the same fourteen claims arising out of the same conduct, and the Amended Complaint merely restates those claims with greater particularity.  Second, with relation back established, Plaintiffs' claims under Puerto Rico law are timely under Puerto Rico's discovery rule, because the one-year limitations period did not begin to run until Plaintiffs possessed information sufficient to permit suit—which did not occur until less than a year before this action was filed.

**II.** Plaintiffs' claims are independently timely in their entirety insofar as they arise from Hurricane Fiona, which struck Puerto Rico on September 18, 2022—less than ten weeks before Plaintiffs filed the original Complaint. The district court erred in treating the 2017 hurricanes as the only relevant source of injury; the Amended Complaint expressly and repeatedly alleges damages from Fiona and incorporates those allegations into each cause of action. Plaintiffs' RICO claims arising from Fiona are timely within civil RICO's four-year limitations period. Plaintiffs' Fiona-based antitrust claims are timely under the continuing-violation doctrine. And Plaintiffs' claims under Puerto Rico law are facially timely as to Fiona on the original Complaint alone.

**III.** The district court also erred in dismissing Plaintiffs' antitrust claims against Rio Tinto and BHP for lack of personal jurisdiction. As the Third and Ninth Circuits have held, the worldwide service-of-process provision of 15 U.S.C. § 22 operates independently of its venue provision. That reading is supported by the statute's text, its legislative history, and the antitrust laws' remedial purposes. Conditioning worldwide service on the venue provision would effectively immunize foreign antitrust violators lacking a domestic presence—precisely the outcome Congress enacted that section to prevent. Because the district court stopped at the statutory question, it did not reach due process as to Rio Tinto; this

26

Court should remand for that analysis. As to BHP, which did not contest the Fifth Amendment question, the Court should simply reverse.

## STANDARD OF REVIEW

This Court reviews de novo a district court's decision to dismiss a complaint on statute-of-limitations grounds. *Gorelik v. Costin*, 605 F.3d 118, 121 (1st Cir. 2010). This Court affirms only "when the pleader's allegations leave no doubt that an asserted claim is time-barred." *Id.* (quotation marks omitted).

This Court reviews the question whether an amended complaint relates back to an earlier complaint de novo. *Young v. Lepone*, 305 F.3d 1, 14 (1st Cir. 2002); *O'Loughlin v. National R.R. Passenger Corp.*, 928 F.2d 24, 25 n.2 (1st Cir. 1991).

The Court reviews de novo the court's dismissal on the basis of personal jurisdiction. *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007). The relevant facts are drawn "from the pleadings and whatever supplemental filings (such as affidavits) are contained in the record, giving credence to [Plaintiffs'] version of genuinely contested facts." *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016).

## ARGUMENT

This Court should reverse the district court's holding that all Plaintiffs claims are time-barred. Plaintiffs bring claims based both on Hurricane Maria, which struck in 2017, and on Hurricane Fiona, which struck in 2022; as explained

27

in Sections I and II, both classes of claims are timely.  If the Court agrees that either class of Plaintiffs' antitrust claim is timely, then, as explained in Section III, it should also reverse the district court's holding that it lacked personal jurisdiction to adjudicate Plaintiffs' antitrust claim against BHP and Rio Tinto.

## I.    Plaintiffs' Claims for Damages Caused by Hurricane Maria Are Timely.

The district court erred in holding that all of Plaintiffs' claims for damages from Hurricane Maria are time-barred.  The federal claims are timely under the doctrine of fraudulent concealment, and once the Amended Complaint is held to relate back to the original Complaint, the claims based on Puerto Rico law are timely under Puerto Rico's discovery rule.

### A.    Plaintiffs' Maria-Based Federal Claims Are Timely Under the Doctrine of Fraudulent Concealment.

The district court held that, with respect to damages arising from Hurricane Maria, Plaintiffs' federal claims were time-barred.  Add. 172.  In so doing, the district court held that the doctrine of fraudulent concealment did not apply.  Add. 203.  This was error, and Plaintiffs' claims were tolled under that doctrine until March 2022.

Civil RICO claims have a four-year statute of limitations.  *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).  A civil RICO action accrues "when a plaintiff knew or should have known of his injury." *Álvarez-Maurás v. Banco Popular of Puerto Rico*, 919 F.3d 617, 625 (1st Cir.

28

2019). Antitrust claims must be filed "within four years after the cause of action accrued." 15 U.S.C. § 15b. A cause of action for antitrust violation accrues when "a defendant commits an act that injures a plaintiff[]." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971).

But the statutes of limitations for both types of claims may be tolled under the equitable doctrine of fraudulent concealment. This doctrine applies where (1) defendants wrongfully concealed their actions, and (2) plaintiffs failed to discover, within the limitations period, the operative facts that form the basis of their cause of action, (3) despite the plaintiffs' diligent efforts to discover those facts. *Álvarez-Maurás*, 919 F.3d at 626.

Plaintiffs' allegations, taken as true, establish all three elements. Defendants have engaged in a decades-long scheme specifically engineered to prevent the public, including Plaintiffs and their citizens, from connecting fossil-fuel consumption to climate change and catastrophic weather, and Plaintiffs did not— and could not—uncover the operative facts within the limitations period, despite their diligence. As explained below, the statute of limitations was tolled until March 2022. Thus, the federal, Maria-based claims set forth in both the original and Amended Complaints (filed in November 2022 and November 2023, respectively) are timely.

29

### 1.    Defendants Affirmatively Concealed Their Role in Causing Catastrophic Storms.

To establish the first element of fraudulent concealment, a complaint must allege that defendants engaged in "affirmative conduct … intended to conceal the facts upon which [a plaintiff] based his complaint or to deceive him into believing that he did not have a cause of action." *Berkson v. Del Monte Corp.*, 743 F.2d 53, 56 (1st Cir. 1984).  Wrongful concealment exists where Defendants' "affirmative conduct … would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief." *Id.*  Even "[t]he affirmative act of denying wrongdoing may constitute fraudulent concealment where the circumstances make the plaintiff's reliance upon the denial reasonable." *Id.*  This element is satisfied here, and the district court's holding to the contrary is wrong.

a. As the Amended Complaint alleges, and as described in detail above, *supra* at pp.11-16, Defendants "conducted a well-organized campaign of deceit," Add. 40—engaging in affirmative, collusive, and concerted efforts to conceal their impact on climate change, and thus the facts on which Plaintiffs' claims are based. Defendants' concealment and obfuscation not only created public confusion, but also misdirected the scientific community away from investigating each Defendant's discrete role in climate change.

Defendants' effort began in earnest in 1980, when ExxonMobil—whose own scientists had already concluded internally that continued fossil fuel use

30

would cause dramatic global warming, *e.g.* A-440-441 (¶¶306-308)—edited a National Commission on Air Quality document to emphasize scientific uncertainty. A-451 (¶331). Two years later, in November 1982, Exxon's Environmental Affairs Program Manager wrote a report warning that climate change could cause "potentially catastrophic events," including drastic sea-level rise and wide-spread flooding—and marked it for internal circulation only, deliberately withholding its findings from the public. A-447 (¶323), A-1074, A-1092-1093. On August 3, 1988, an Exxon employee wrote a memo describing the "Exxon Position" on climate change: to "emphasize the uncertainty in scientific conclusions regarding the potential enhanced greenhouse effect" and to "resist the overstatement and sensationalization of potential greenhouse effect which could lead to noneconomic development of nonfossil fuel resources." A-1202-1203 (capitalization altered), A-461 (¶358).

Defendants' active concealment became a joint enterprise by 1989, when six Defendants participated in founding the GCC, whose mission was to inject doubt into public debate around climate change, A-462-464 (¶¶363-367)—despite Defendants' internal knowledge regarding the climate risks of their own products, *e.g.* A-440-443 (¶¶306-310), A-447 (¶323), A-455 (¶341). To obscure their climate-denial funding, Defendants established Donors Trust in 1999 as an anonymous dark-money conduit, A-396 (¶211(f)), which between 2002 and 2011

31

funneled $146 million to organizations whose purpose was to deny climate change, A-518-519 (¶¶508-509).  And Defendants continued to independently deny climate change:  For example, on March 23, 2000, Exxon published an advertorial in the New York Times casting doubt on whether climate change was human-caused and whether its effects would even be negative.  A-503 (¶465 & n.533).  Exxon published a similar advertorial on January 21, 2004.  A-504 (¶467 & n.535).

Defendants have repeatedly denied any wrongdoing.  As discussed above, *supra* at pp.11-16, Defendants have for years denied that climate change is occurring, that it is human-caused, and/or that it is linked to their products.  To take just a few examples, in 1997, Mobil (ExxonMobil) ran a series of advertorials in the New York Times casting doubt on climate science and opposing international efforts to combat it, cautioning (among other things), "We still don't know what role man-made greenhouse gases might play in warming the planet." A-474-475(¶388 (listing dates)).  Defendant API (of which seven other Defendants or their predecessors in interest are or have been members, A-393 (¶205)) published an article in the Washington Post on February 15, 2019, encouraging the use of fossil fuels despite knowing their danger.  A-662 (¶71).  API also ran a campaign, on or about January 16, 2019, falsely claiming that "natural gas and oil [] powers and supports modern living … with lower emissions."  A-661-662 (¶70). And API continues to host a website that promotes fossil-fuel companies' claimed

32

contributions to clean energy while misrepresenting their actual emissions. A-527 (¶529). Indeed, as recently as December 2022, the House Oversight and Reform Committee found that Exxon, Chevron, Shell, BP, and API had actively obstructed its investigation into fossil-fuel companies' efforts to mislead the public about fossil fuels' central role in causing climate change. A-529-530 (¶536).

It was reasonable for Plaintiffs to rely on Defendants' denials, and to believe Plaintiffs did not have claims, precisely because Defendants' climate-change denialism has been so successful. After decades of Defendants' PR campaign, the jury of public opinion is very much out on the basic issues underlying Plaintiffs' claims. A substantial portion of Americans do not believe climate change is real, that it is caused by human activities, or that there is a scientific consensus on these issues. *E.g.*, A-1480-1482. Indeed, the U.S. government's current, official position is that climate change is not a danger to human health or the environment.[4] Plaintiffs should not be charged with being better able to tell truth from fiction than the federal government is. Only when much more recent scientific studies laid bare supermajor fossil-fuel companies' carbon footprints, and the close connection between Hurricane Maria and climate change, did Plaintiffs

---

[4] Lisa Friedman, *Trump Administration Erases the Government's Power to Fight Climate Change*, NY Times (Feb. 12, 2026), https://www.nytimes.com/2026/02/12/climate/trump-epa-greenhouse-gases-climate-change.html.

discover the operative facts that allowed them to make the good-faith allegations on which this suit rests.  *See infra* at pp.34-40.

b.  The district court held that Plaintiffs have not adequately pleaded fraudulent concealment's first element, Add. 200, only by ignoring numerous allegations.

In particular, the district court noted that the Amended Complaint contains only a "single conclusory allegation" of Defendants' efforts to conceal their conduct.  Add. 200 (citing A-348 (¶23)).  But the Amended Complaint alleges at considerable length, and with particularity, actions Defendants took to deceive the public about the climate impacts of their fossil-fuel products.  *E.g.*, A-634-635(¶16), A-661-662 (¶¶70-71), A-396 (¶ 211(f)), A-474-475 (¶388), A-503 (¶465 & n.533), A-504 (¶467 & n.535), A-518-519 (¶¶508-509), A-527 (¶530), A-529-530 (¶536); *supra* at pp.11-16.  The court just ignored those allegations.  Such "affirmative conduct by the [Defendants] intended to conceal the facts upon which [Plaintiffs] based [their] complaint" suffices to establish fraudulent concealment's first element.  *Berkson*, 743 F.2d at 56.

### 2.    The Operative Facts Did Not Exist Until the Chen Report and the Maria Attribution Studies Were Published.

Plaintiffs also satisfy fraudulent concealment's second element, because they "fail[ed] to discover, within the limitations period, the operative facts which form the basis of the cause of action."  *Álvarez-Maurás*, 919 F.3d at 626.  Given

34

Defendants' concealment, the operative facts underlying Plaintiffs' claims did not exist until March 2022—well after Hurricane Maria devastated Puerto Rico in 2017, and within four years of the filing of the Complaint. The district court's contrary holding is wrong.

First, prior to the publication of the Chen Report in March 2022, Plaintiffs could not have confirmed the extent of the causal link between these Defendants' conduct and climate change and thus could not have been aware of "the operative facts which form the basis of the cause[s] of action" against them. *Id.* at 626. The Chen Report was a groundbreaking study that quantified the contribution to climate change of the six largest oil companies, including Defendants ExxonMobil, Shell, BP, and Chevron. A-362 (¶76 n.25 (citing Chen Report)). Unlike prior scientific studies and articles, the Chen Report did not confine its analysis to extraction-based activities, but did a holistic analysis that accounted for the climate impact of all these companies' activities. *E.g.*, Chen Report at 7. The district court rejected the argument that the Chen Report could have provided facts essential to Plaintiffs' claims because there is not a perfect match between the Defendants and the companies whose carbon footprint the Chen Report surfaces. Add. 178. But Plaintiffs do not claim that they discovered *all* Defendants' identities and roles in

35

climate change through the Chen Report—only that the Chen Report first informed them of ExxonMobil, Shell, BP, and Chevron's role.[5]

Second, scientific studies published in 2019 and 2021—less than four years before Plaintiffs filed this case—linked Hurricane Maria's intensity to climate change for the first time. In March 2019, a peer-reviewed study found that Maria's peak precipitation was 4.85 times more likely in the 2017 climate than in 1956—a change linked to long-term, human-caused trends, not natural variability. A-428-429(¶273), A-931. In June 2019, an MIT climatologist published a study finding that the likelihood of hurricane winds in Puerto Rico like those Maria brought increased by a factor of approximately eight between the mid-twentieth century and the twenty years prior to 2017. A-427-428 (¶272), A-917. And the science of storms' rapid intensification (the sudden, dramatic escalation of a storm's wind speeds over a short period), and of that phenomenon's link to anomalously warm sea temperatures driven by climate change, has only recently emerged. A 2021 study published in *Science Advances* found that the anomalously warm sea-surface temperatures during the passage of Hurricane Maria produced a 65% greater potential for rapid intensification—and that study was itself only possible because

---

[5] Because the Chen Report was not issued until March 2022, Plaintiffs' federal claims—which carry four-year statutes of limitations, *supra* at pp.28-29—are timely even if the Amended Complaint is not found to relate back to the Complaint, *but see infra* at pp.43-47.

temperature and pressure sensors had only recently been deployed off the Puerto Rican shelf.  A-429 (¶274).  Plaintiffs could not have known prior to these studies that climate change was to blame for Hurricane Maria's intensity. [6]

In concluding that Plaintiffs failed to satisfy fraudulent concealment's second prong, the district court noted the existence of "articles, reports, and cases making the connection between Defendants and Plaintiffs' claims, including as to Puerto Rico."  Add. 179.  But none of those articles or reports was a scientific article linking Hurricane Maria to climate change.  For example, one was "a 2013 report on the impact of climate change in Puerto Rico," Add. 179 (citing A-2262-2590)—but of course this pre-Maria source could not reveal the Maria-specific data on which Plaintiffs' claims rely. [7]  Others, though post-Maria, were news articles, including one labeled as an "opinion" piece, A-2170-2176, one that cited numerous tweets, A-2180-2191, and one associated with the "Capital Weather Gang," A-2192-2196.  *See* Add. 179; *see generally* A-2159-2162.  While such articles can provide useful color to a complaint, *e.g.*, A-147 (¶240 n.217), A-154

---

[6] Because the study on rapid intensification was not published until 2021, even if the Court rejects the Chen Report as supplying necessary operative facts, Plaintiffs' federal claims are still timely if the Amended Complaint is held to relate back to the Complaint.  *See infra* at pp.43-47.

[7] For the same reason, the Supreme Court's citation in *Massachusetts v. EPA*, 549 U.S. 497 (2007), of expert testimony, *id.* at 521-22, cannot have and did not provide the necessary facts underlying Plaintiffs' claims.  *Contra* Add. 181-82.

(¶263 n.245) (citing some of these sources), they cannot constitute the necessary "evidentiary support" for "factual contentions" of a direct, causal connection between Defendants' fossil-fuel products and the devastation wrought by a major hurricane. *See* Fed. R. Civ. P. 11(b)(3).

Similarly, none of the other climate-change cases the district court cited concerned Hurricane Maria, and so they could not have alerted Plaintiffs to their claims. Indeed, most of those cases do not involve hurricanes. *E.g.*, *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 853-54 (9th Cir. 2012) ("erosion resulting from wave action and sea storms"); *Delaware v. BP Am. Inc.*, 578 F. Supp. 3d 618, 626 (D. Del. 2022), *aff'd sub nom. City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022) ("accelerating sea level rise, increased extreme weather events, ocean acidification, and elevated average air temperature"). And the one that did concern a hurricane, *Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460 (5th Cir. 2013), was disposed of at the pleading stage, *id.* at 465-66, 469, and thus did not provide *any* "facts," even generalized ones, on which Plaintiffs could rely. *See Álvarez-Maurás*, 919 F.3d at 626.

The sources on which the district court relied simply did not provide the necessary causal link between Defendants' coordinated conduct and Plaintiffs' harms. Plaintiffs bringing civil RICO claims must plead both but-for and proximate causation, and they risk having their claims dismissed if the causal link

38

is "too remote" or "indirect." *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (brackets omitted). Similarly, antitrust plaintiffs' pleadings must show that defendants' conduct was a "material cause" of plaintiffs' injuries, *Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*, 850 F.3d 52, 58 (1st Cir. 2017), and an insufficiently direct causal connection leads to dismissal, *see Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 293 (1st Cir. 2022). Those requirements cannot be satisfied by generalized public discussion of climate change, prior climate lawsuits by different plaintiffs for different injuries, or opinion pieces in the media.

The public materials cited by the district court did not provide the storm-specific attribution science (which linked particular storms to climate change) necessary to supply the operative facts required to bring the claims asserted here. Nor did publicly available information reveal the extent to which any individual Defendant's emissions contributed to climate change, further obscuring the defendant-specific causal relationships required to bring suit. Acting through a coordinated enterprise, Defendants concealed their respective roles in the causal chain. By continuing to advance misleading narratives and failing to withdraw from or correct those misrepresentations, Defendants reinforced the opacity of the causal chain, delaying Plaintiffs' ability to identify the defendant-specific conduct that substantially contributed to their injuries. What was missing—and what only recent science supplied—was a non-speculative causal linkage between

39

Defendants' coordinated conduct and the particular harms suffered by Plaintiffs. Until that linkage became scientifically and factually available, Plaintiffs could not, consistent with Rule 11, plead a viable RICO or antitrust claim.

Plaintiffs' trial counsel were under "a duty … to investigate their clients' claims before making any filings," *Kale v. Combined Ins. Co. of Am.*, 861 F.2d 746, 758 (1st Cir. 1988), and they fulfilled that duty by obtaining hard, scientific evidence for their claims before filing suit. Plaintiffs should not be punished for their counsel's scrupulousness. *Cf. Segal v. Gordon*, 467 F.2d 602, 607-08 (2d Cir. 1972) ("A complaint alleging fraud should be filed only after a wrong is reasonably believed to have occurred; it should serve to seek redress for a wrong, not to find one."). [8]

---

[8] This Court's recent decision in *City of Boston v. OptumRX, Inc.*, 169 F.4th 58 (1st Cir. 2026), is distinguishable. There, the Court affirmed the dismissal of the City of Boston's Massachusetts-law claims on statute-of-limitations grounds, rejecting the City's fraudulent-concealment argument. *Id.* at 60-63 & n.1. But the Massachusetts fraudulent-concealment statute is narrower than the federal doctrine because it imputes knowledge to a plaintiff who had the means to acquire the relevant facts. *Id.* at 60. This Court's decision turned on that facet of Massachusetts law—and distinguished federal cases on that ground. *Id.* at 63 (citing, *inter alia*, *Alaska v. Express Scripts, Inc.* 744 F. Supp. 3d 1150, 1164-67 (D. Alaska 2025) (applying federal fraudulent-concealment doctrine)). The facts of that case are also very different and included much more direct evidence that the City could have brought its claims earlier. *Id.* at 62-63.

### 3.    Plaintiffs Were Diligent.

Finally, Plaintiffs satisfy fraudulent concealment's third element because they made "diligent efforts to discover the facts." *Álvarez-Maurás*, 919 F.3d at 626. A mere eight months after the Chen Report exposed the supermajor oil companies' carbon emissions, Plaintiffs filed an extremely detailed and thoroughly investigated complaint that explains Defendants' scheme and the relevant science at length, laying bare facts that the Defendants successfully conspired for decades to hide.

Moreover, and in any event, "if even diligent investigation would have revealed nothing useful, the time for filing may be extended." *Rakes v. United States*, 442 F.3d 7, 26–27 (1st Cir. 2006); *Álvarez-Maurás*, 919 F.3d at 626 (similar); *accord Texas v. Allan Const. Co.*, 851 F.2d 1526, 1533 (5th Cir. 1988) ("[E]ven though a plaintiff might have inquiry notice of a potential claim, it does not necessarily follow that reasonable diligence will discover sufficient facts to support legal action."). Because the science underlying Plaintiffs' claims has only recently emerged, no amount of diligence could have discovered it earlier. As discussed above, the Chen Report, and the other scientific studies underlying Plaintiffs' claims, were not published until several years after Hurricane Maria. *See supra* at pp.35-37. "Plaintiffs filed suit promptly upon discovering the facts

essential to [their] claims." A-348 (¶24); *accord* Add. 40-41. The law requires no more.

*     *     *

This Court should hold that fraudulent concealment tolled the federal statutes of limitations until the Chen Report was published in March 2022, *supra* at pp.35-36, rendering all of Plaintiffs' Maria-based federal claims timely. In the alternative, the Court should hold that the statutes of limitations were tolled until (at the earliest) the March 2019 publication of the study linking Hurricane Maria's intensity to climate change. *Supra* at pp.36-37. In combination with the relation back of the Amended Complaint to the Complaint, *infra* at pp.43-47, this also renders Plaintiffs' Maria-based federal claims timely.

### B. The Maria-Based Puerto Rico Claims in the Amended Complaint Are Timely Under Relation Back and the Discovery Rule.

In holding that Plaintiffs' Puerto Rico claims were untimely as to damages caused by Hurricane Maria, the district court erred twice over: It held that the Amended Complaint did not relate back to the original Complaint because Plaintiffs forfeited the issue, and it held that Puerto Rico's discovery rule did not render Plaintiffs' claims timely. Correcting both those errors means that Plaintiffs' claims under Puerto Rico law for the damage caused by Hurricane Maria are timely.

42

### 1. The Amended Complaint Relates Back Under Rule 15(c)(1)(B).

The district court erred twice in holding that the Amended Complaint, filed November 3, 2023, does not relate back to the original Complaint, filed November 22, 2022. *See* Add. 177-178. First, the court erred in holding that Plaintiffs had somehow forfeited the argument for relation back, when Defendants' arguments assumed that the Amended Complaint *did* relate back. Second, the court is wrong on the merits: Under the applicable Federal Rule and this Court's precedent, the Amended Complaint relates back to the original Complaint because it concerns the same transactions and occurrences and merely adds detail.

### a. The Issue of Relation Back Is Properly Before This Court.

Whether this Court reviews de novo or for abuse of discretion,[9] the district court erred in holding that Plaintiffs forfeited the argument that the Amended Complaint related back to the original Complaint.

Most importantly, Plaintiffs cannot have forfeited an issue that Defendants never raised in their motion to dismiss. Defendants' opening brief on statute of limitations repeatedly treated the date of the *original Complaint* (November 22,

---

[9] This Court has not decided whether a district court's decision that an argument was forfeited is subject to de novo or abuse-of-discretion review. Other courts are divided. *Compare, e.g.*, *United States v. Dowdell*, 70 F.4th 134, 140 (3d Cir. 2023) (abuse of discretion) *with Jackson v. U.S. Postal Serv.*, 149 F.4th 656, 670 (6th Cir. 2025) (de novo).

2022) as constituting the relevant date for statutes-of-limitations purposes. *E.g.*, Dkt. 235 at 3, 11, 12; Dkt. 297 at 2, 4. Accordingly, in response, Plaintiffs had no need to argue relation back; Defendants had accepted that the Amended Complaint related back. "A litigant does not forfeit rights by remaining silent about a topic to which its adversary and the judge never adverted." *In re Terrell*, 39 F.4th 888, 892-93 (7th Cir. 2022).

Even if Plaintiffs somehow should have responded to an argument Defendants never made, the district court erred because there are exceptions to forfeiture. *National Ass'n of Soc. Workers v. Harwood*, 69 F.3d 622, 627 (1st Cir. 1995). This Court considers six factors in determining whether to overlook forfeiture: (1) "the omitted issue is purely legal in nature, and lends itself to satisfactory resolution on the existing record without further development of the facts"; (2) the belated argument "raises an issue of constitutional magnitude"; (3) "the omitted argument is highly persuasive," which is "particularly" compelling "when declining to reach" the omitted issue "threatens a miscarriage of justice" in a case "involv[ing] a discernible public interest"; (4) there is "no special prejudice or inequity" to Defendants; (5) "the omission [was] entirely inadvertent rather than deliberate," and "yielded no tactical advantage"; and (6) "the omitted issue implicates matters of great public moment," "touch[ing] upon … basic" issues like "federalism" and "comity." *Id.* at 627-28 & n.5 (quotation marks omitted). This

44

Court considers the *Harwood* factors as part of an equitable balancing test, *e.g.*, *Montalvo v. Gonzalez-Amparo*, 587 F.3d 43, 48-49 (1st Cir. 2009) (overlooking forfeiture where four *Harwood* factors were met); *Dahua Tech. USA, Inc. v. Zhang*, 138 F.4th 1, 11-12 (1st Cir. 2025) (one *Harwood* factor), and four of those six factors are present here.

First, the question of relation back, which turns on whether an amended complaint's claims "ar[i]se out of the conduct, transaction, or occurrence set out … in the original pleading," Fed. R. Civ. P. 15(c)(1)(B), is "a quintessentially legal determination, made on undisputed facts," *Young*, 305 F.3d at 14. Second, and as explained in more detail next, Plaintiffs' argument is highly persuasive, as the question can be straightforwardly resolved in Plaintiffs' favor. Moreover, declining to reach the issue threatens a miscarriage of justice in a case involving discernible public interest: This case directly concerns the ability of Puerto Rican municipalities to protect their citizens by holding major contributors to global climate change accountable for the resulting devastation—and its resolution will bear on the ability of similarly situated entities to likewise advocate for the millions of people adversely affected by climate change. Third, there is no prejudice to Defendants, who assumed below that relation back applied. Fourth, the omission was not deliberate; it was simply a response to Defendants' own framing, and it yielded no tactical advantage.

45

> **b.**     **The Amended Complaint Relates Back to the Complaint.**

On the merits, this Court should hold, on de novo review, that the Amended Complaint relates back to the original Complaint. *See Young*, 305 F.3d at 14.

The applicable federal rule provides that "[a]n amendment to a pleading relates back to the date of the original pleading when … the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out— or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Where an original and an amended complaint concern the same "conduct, transaction, or occurrence," *id.*, relation back is proper where the amendment "restates the original claim[s] with greater particularity," *Southeastern Pa. Transp. Auth. v. Orrstown Fin. Servs. Inc.*, 12 F.4th 337, 345 (3d Cir. 2021) (brackets omitted); 6A *Wright & Miller's Federal Practice & Procedure* § 1497 (3d ed. 2026) ("amendments that do no more than restate the original claim with greater particularity or amplify the details of the transaction alleged in the preceding pleading fall within Rule 15(c)(1)(B)").

The Amended Complaint relates back to the original Complaint under this standard. Both complaints assert the same fourteen claims arising out of the same "conduct, transaction, or occurrence"—namely, Defendants' contribution, via their carbon-based products, to catastrophic storms, and their collusive concealment and misrepresentation of the dangers of those products. Aside from the omission of

46

three defendants and the addition of one (API), [10] the alterations to the Amended Complaint merely add detail. For example, the Amended Complaint provides additional factual detail regarding Defendants' misleading environmental claims, A-530-548 (¶¶537-579), includes an updated discussion of climate, *e.g.*, A-398 (¶215) (noting $CO_2$ levels in the atmosphere as of May 2023), and adds allegations regarding Defendants' early knowledge of the phenomenon, *e.g.*, A-440-442 (¶¶305-309). These are the precise circumstances in which relation back is warranted. *See, e.g.*, *Southeastern Pa. Transp. Auth.*, 12 F.4th at 345 (holding that relation back applied where amended complaint "both restates claims with greater particularity and amplifies the factual circumstances surrounding the relevant conduct by adding significantly more factual detail to [plaintiff's] existing claims").

### 2. Plaintiffs' Puerto Rico Claims for Maria's Damage Are Timely.

With relation back established, the analysis tracks the same discovery principles that render the federal claims timely—Plaintiffs could not have filed suit until the Chen Report issued in March 2022.

---

[10] API was the only Defendant to argue that the Amended Complaint did not relate back to the original Complaint. *See* Dkt. 254 at 15. And Plaintiffs do not ask the Court to relate the claims against API back to the Amended Complaint.

Article 1868 of the 1930 Puerto Rico Civil Code[11] provides that actions for "fault or negligence" must be brought within one year of accrual. P.R. Laws Ann. tit. 31 § 5298 (1930). This limitations period "incorporate[s] the so-called discovery rule," such that "[t]he one-year period does not begin to run until the plaintiff possesses, or with due diligence would possess, information sufficient to permit suit"—"includ[ing] knowledge of the wrong and a causal link between the wrong and some harm." *Villarini–García v. Hospital Del Maestro, Inc.*, 8 F.3d 81, 84 (1st Cir. 1993); *accord, e.g.*, *Gonzolez-Perez v. Hospital Interamericano De Medicina Avanzada*, 355 F.3d 1, 2 (1st Cir. 2004) ("a claim accrues, and the one-year period starts to run, not at the time of the injury, but upon the discovery by the injured party of the injury and of its author").

As already explained above, Plaintiffs did not possess "information to permit suit" until the Chen Report issued in March 2022, and no amount of diligence could have permitted Plaintiffs to discover the information about the carbon footprint of the supermajor oil companies that report revealed. This suit alleges that four of those companies, among others, have contributed massively to climate change and have lied about it. Because Plaintiffs filed the original Complaint

---

[11] Because some of the acts and omissions alleged in this action occurred before the effective date of the 2020 Puerto Rico Civil Code, the statute of limitations set forth in the 1930 Puerto Rico Civil Code applies here. *See* P.R. Laws Ann. tit. 31 § 11720 (2020).

48

within one year of the issuance of the Chen Report, and because the Amended Complaint relates back to the original Complaint, Plaintiffs' Puerto Rico claims are timely.

## II. Plaintiffs' Claims Are Independently Timely With Respect to Hurricane Fiona in 2022.

Even if the Court disagrees that Plaintiffs' Maria-based claims are timely, it should still reverse. Plaintiffs' suit is premised on injuries suffered not just from Hurricane Maria in 2017, but also from Hurricane Fiona, which struck just weeks before the original Complaint was filed. Plaintiffs' claims—under both federal and Puerto Rico law—are timely at the very least for injuries arising from Hurricane Fiona.

### A. The Amended Complaint Pleads Damages from Hurricane Fiona.

The district court construed the Amended Complaint as asserting claims premised *solely* on "hurricanes in 2017," Add. 96; *see also* Add. 190, and made its timeliness rulings on that basis. But the Amended Complaint also seeks damages for subsequent storms like Fiona, which made landfall in Puerto Rico on September 18, 2022, causing massive damage. The district court erred by dismissing Plaintiffs' claims with respect to Fiona's damage on timeliness grounds.

The Amended Complaint makes clear from the start that Plaintiffs are seeking "damages that the[y] … have suffered *beginning with* the hurricanes in September 2017 and all of the ensuing impacts upon them … *including subsequent*

49

*storms*." A-345 (¶10) (emphases added); *accord* A-345 (¶11) (all claims are

brought "as a result of the devastating storms of September 2017, *all subsequent*

*storms*, and the aftermath of those storms") (emphasis added). Reference to post-

2017 and harms recurs throughout the Amended Complaint, A-344 (¶8(i)), A-346

(¶14), A-357 (¶66), A-363 (¶¶78-79), A-365-366 (¶88), A-389 (¶184), A-553-554

(¶598), and Plaintiffs' briefing below pointed to their "continuous" and "ongoing"

losses, Dkt. 280 at 6. As detailed above, the Amended Complaint specifically

pleads Fiona as a source of damages, alleging at some length how it caused over $1

billion in estimated damages. *See supra* at pp.18-19; A-431-436 (¶¶278-293).

And each of Plaintiffs' claims for relief expressly incorporates these allegations.

A-566 (¶634), A-579 (¶689), A-581 (¶701), A-589 (¶726), A-594 (¶737), A-597

(¶745), A-601 (¶756), A-605 (¶764), A-608 (¶772), A-610 (¶783), A-614 (¶798),

A-617 (¶809), A-620 (¶819), A-623 (¶829). Indeed, Defendants clearly

understood that Plaintiffs' claims for relief were not premised only on the 2017

storms, but rather encompassed subsequent storms. Dkt. 235 at 11 n.5.

The district court nevertheless treated Hurricane Maria (and Hurricane Irma,

which struck two weeks prior) as inflicting the only relevant injury—stating, for

example, that "[b]y September 2021, the 2017 hurricanes' four-year mark,

Plaintiffs knew or should have known they had suffered a cognizable injury and

who to sue." Add. 182. While the court acknowledged Plaintiffs' allegations

50

relating to later storms, it failed to consider that in its statute-of-limitations analysis, reasoning that "where Plaintiffs allege *specific* kinds of damage, it is … related to the 2017 storms."  Add. 190 (emphasis added) (citing claim-specific allegations).  That is mistaken:  Plaintiffs traced damages to both 2017 and 2022 storms, and Federal Rule of Civil Procedure 10(c) permits Plaintiffs to do precisely what they did here: "adopt[]" statements "in a pleading … elsewhere in the same pleading."  By expressly incorporating previous allegations regarding Fiona into their claims for relief, Plaintiffs alleged damage "related to," and asserted claims based on, "the [2022] storm[]."  *Contra* Add. 182.

**B.    Plaintiffs' Federal Claims for Damages from Hurricane Fiona Are Timely Without Any Tolling.**

Plaintiffs' federal claims are timely with respect to the 2022 storm without relation back or tolling.

### 1.  Plaintiffs' Fiona-Based RICO Claims Are Timely.

Civil RICO claims have a four-year statute of limitations.  *Agency Holding Corp.*, 483 U.S. at 156.  A civil RICO action accrues "when a plaintiff knew or should have known of his injury."  *Álvarez-Maurás*, 919 F.3d at 625.  "[E]ach time a plaintiff suffers an injury caused by" a civil RICO violation, "a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury."  *Rodriguez v. Banco Cent.*, 917 F.2d 664, 665-66 (1st Cir. 1990).

Plaintiffs originally filed this suit in November 2022 and filed the Amended Complaint in November 2023.  Hurricane Fiona made landfall in Puerto Rico on September 18, 2022, A-431 (¶278), devastating Plaintiffs, A-431-436 (¶¶278-293).  Even without fraudulent concealment or relation back, Plaintiffs' RICO claims premised on the 2022 storm are timely.

### 2.    Plaintiffs' Fiona-Based Antitrust Claim Is Timely.

Antitrust claims must be filed "within four years after the cause of action accrued," 15 U.S.C. § 15b, "plus any additional number of years during which the statute of limitations was tolled," *Zenith Radio Corp.*, 401 U.S. at 338.  A cause of action for antitrust violation accrues when "a defendant commits an act that injures a plaintiff[]." *Id.*  And "[i]n the context of a continuing conspiracy to violate the antitrust laws, … each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Id.*

As alleged in the Amended Complaint, Defendants are involved in a continuing conspiracy to preserve and extend their energy monopoly by deceiving the public and eliminating the threat that alternative energy would pose to their market dominance.  *E.g.*, A-340-341 (¶6), A-551-552 (¶¶592-593), A-658-659 (¶¶62-65), A-665-667 (¶¶78-81).  Defendants committed numerous acts that render Plaintiffs' Fiona-based claims timely, including their massive recent investments in

52

oil and gas development, *e.g.*, A-666 (¶79) (BHP invested $2.3 billion in 2022), A-544 (¶571) (Shell projected to invest $1.5 billion through 2025), and their continued efforts to mislead the public about the climate impact of their products, *e.g.*, A-535-536 (¶549) (in November 2021, Exxon announced plans to invest $15 billion in lower-carbon initiatives that are likely to *add* carbon emissions), A-525-526 (¶527) (Defendants continue to misleadingly market their products as "cleaner" than normal fossil-fuel products).

Because Defendants continued to deceive the public and increase production, emissions continued to rise, which contributed to Fiona and thus to Plaintiffs' injury.  Each act was injurious, and each of them is a point at which Plaintiffs' Fiona-based antitrust claim may be found to have accrued—rendering that claim timely.  *See Zenith Radio Corp.*, 401 U.S. at 338.  Plaintiffs' antitrust claim is thus timely, irrespective of fraudulent concealment and relation back.

C.    **Plaintiffs' Fiona-Based Puerto Rico Law Claims Are Facially Timely Based on the Original Complaint.**

As established above, the Amended Complaint relates back to the original Complaint.  Because only a few weeks passed between Hurricane Fiona's destructive landfall, *see* A-431 (¶278) (September 18, 2022), and the filing of the Complaint on November 22, 2022, A-324, Plaintiffs' Puerto Rico law claims are timely with respect to the damages wrought by Hurricane Fiona.  *See* P.R. Laws Ann. tit. 31 § 5298 (1930) (one-year limitations period).

**III.    The District Court Erred in Holding That It Had No Personal Jurisdiction over Defendants Rio Tinto and BHP as to Plaintiffs' Antitrust Claim.**

If the Court concludes that Plaintiffs' antitrust claim is timely with respect to the damage caused by either hurricane, it should also reverse the district court's holding that it lacked personal jurisdiction over Rio Tinto and BHP as to Plaintiffs' antitrust claim.

The question whether a court may exercise jurisdiction over defendants "depends upon whether any statute or rule authorizes the forum court to exercise its dominion over the defendants, and if so, whether the court's exercise of that jurisdiction would comport with due process." *United States v. Swiss Am. Bank*, 191 F.3d 30, 35-36 (1st Cir. 1999). With respect to the antitrust claims against Rio Tinto and BHP, the district court erroneously concluded that no "statute or rule" authorized personal jurisdiction, and it stopped there. As to Rio Tinto, this Court should reverse and remand for consideration of the due-process question. And because BHP did not contest "the constitutionality of exercising personal jurisdiction under the Fifth Amendment," Add. 108, the Court should reverse and hold that the district court has personal jurisdiction over BHP.

**A.    The Service-of-Process Clause of Section 12 of the Clayton Act Operates Independently of Its Venue Clause.**

"Personal jurisdiction is established … by proper service of process." *Precision Etchings & Findings, Inc. v. LGP Gem, Ltd.*, 953 F.2d 21, 23 (1st Cir.

1992). And Section 12 of the Clayton Act, 15 U.S.C. § 22, "provid[es] for worldwide service of process on certain corporate antitrust defendants." *Swiss Am. Bank*, 191 F.3d at 36. That statute provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. As the district court recognized, both Rio Tinto and BHP were served abroad, Add. 130, and the propriety of that service is not at issue. But the district court nevertheless declined to exercise personal jurisdiction over Rio Tinto or BHP with respect to Plaintiffs' antitrust claim because, in its view, the statute "requires venue that is proper under the first clause" for the worldwide service provided for in the second clause "to establish personal jurisdiction." Add. 157; *see also* Add. 159-160.

That is incorrect. As the Third and Ninth Circuits have both recognized, the two clauses of 15 U.S.C. § 22 operate independently such that worldwide service of process is always available to antitrust plaintiffs to establish personal jurisdiction. *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 293-97 (3d Cir. 2004); *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1177-80 (9th Cir. 2004). Wright and Miller's *Federal Practice and Procedure* favors reading Section 12's clauses independently, labeling the contrary

55

reading "suspect" and "implausible." 14D *Wright & Miller's Federal Practice & Procedure* § 3818 (4th ed. 2026). Other Circuits have disagreed, treating the clauses as integrated such that there must be venue under the first clause for plaintiffs to use worldwide service of process to establish jurisdiction under the second clause. *KM Enters., Inc. v. Global Traffic Techs., Inc.*, 725 F.3d 718, 730 (7th Cir. 2013); *Daniel v. American Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005); *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000). This Court has not yet weighed in on this split.

The Third and Ninth Circuits have the better of the argument. Most importantly, their reading aligns with the text of the statute—a reading whose strength even the Seventh Circuit (which came out the other way) acknowledged. *See KM Enters.*, 725 F.3d at 729. The phrase "in such cases" in the second clause of Section 12 most naturally refers to the antecedent noun phrase in the first—"any suit, action, or proceeding under the antitrust laws against a corporation"—rather than to the narrower subset of such suits that satisfy Section 12's venue provision, which are not described with *any* noun phrase. Standard rules of syntax support this reading: "such" typically refers to "a particular antecedent noun and any dependent adjective or adjectival clauses modifying that noun, but not to any other part of the preceding clause or sentence." *In re Auto. Refinishing Paint*, 358 F.3d at 294 n.8; *accord, e.g.*, Antonin Scalia & Brian A. Gardner, *Reading Law* 144

56

(2012) ("A pronoun, relative pronoun, or demonstrative adjective generally refers to the nearest reasonable antecedent.").

Legislative history also supports reading Section 12's clauses to each independently apply to "[a]ny suit, action, or proceeding under the antitrust laws against a corporation."  The congressional record shows that Congress "viewed the questions of venue and service of process separately, with the latter issue of subsidiary importance."  *In re Auto. Refinishing Paint*, 358 F.3d at 295; *accord Action Embroidery*, 368 F.3d at 1178.  The service-of-process provision was appended to an already-drafted venue provision without debate or objection, and with no indication that it was intended to be limited by—or conditioned on—the venue provision that preceded it.  *Action Embroidery*, 368 F.3d at 1178.

That Congress did not link venue and personal jurisdiction in Section 12 is unsurprising:  The two concepts are historically distinct.  *See Action Embroidery*, 368 F.3d at 1178-79; *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979); *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168 (1939).  Conditioning Section 12's service-of-process provision on its venue clause would marry two concepts the law has long kept separate.

The district court's integrated reading also undermines the purposes behind Section 12.  Congress enacted § 22 precisely to relieve antitrust plaintiffs from "the 'often insuperable obstacle' of resorting to distant forums for redress of wrongs

57

done in the places of their business residence." *In re Auto. Refinishing Paint*, 358 F.3d at 295 n.9 (quoting *United States v. Scophony Corp.*, 333 U.S. 795, 808 (1948)). That remedial purpose is ill-served by conditioning worldwide service of process on a venue showing that, in the case of foreign defendants with no U.S. presence, is often impossible to satisfy. The independent reading avoids that anomaly while still requiring that the defendant have sufficient contacts with the United States to satisfy due process under the Fifth Amendment. *See Action Embroidery*, 368 F.3d at 1180.

Moreover, 28 U.S.C. § 1391(d) independently permits alien corporations to be sued in any district, so Section 12's venue clause adds nothing for foreign defendants—and there is accordingly no reason to treat it as a prerequisite to worldwide service.

This Court should hold that the worldwide service of process provided in Section 12's second clause may be invoked independently of the venue provision in its first clause, and that personal jurisdiction over Rio Tinto and BHP is properly established by the extraterritorial service effected under that provision.

### B. The Court Should Reverse as to BHP and Remand for Due-Process Analysis as to Rio Tinto.

Because worldwide service of process is authorized by Section 12, and because both Rio Tinto and BHP were served, all that remains is to analyze the Fifth Amendment due-process question regarding Rio Tinto, the only defendant of

58

the two to dispute it.  *See* Add. 108.  The district court stopped at the statutory

question and therefore never resolved the due-process question as to Rio Tinto; this

Court should remand for that analysis.  As to BHP, which did not contest the Fifth

Amendment question, the Court should simply reverse.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court.

Respectfully submitted,

Dated: May 13, 2026

Luis V. Almeida-Olivieri
Milberg PLLC
1311 Ponce de Leon Ave, Suite 700
San Juan, PR 00907
(866) 252-0878
lalmeida@milberg.com

Roy L. Mason
Smouse & Mason, LLC
223 Duke of Gloucester Street
Annapolis, MD 21401
(410) 269-6620
rlm@smouseandmason.com

Zachary E. Howerton
MILBERG PLLC
223 Duke of Gloucester Street
Annapolis, MD 21401
(410) 269-6620
zhowerton@milberg.com

Victoria J. Maniatis
MILBERG PLLC
405 E. 50th Street
New York, NY 10022
(516) 741-5600
vmaniatis@milberg.com

/s/ Kathleen Foley
Kathleen Foley
ZIMMER, CITRON & CLARKE LLP
14 Ridge Square NW, Suite 328
Washington, DC 20016
(240) 203-7746
kfoley@zimmercitronclarke.com

Edwina Clarke
David Zimmer
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Dr.
Cambridge, MA 02139
(617) 676-9421
eclarke@zimmercitronclarke.com

Melissa K. Sims
MILBERG PLLC
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
(516) 862-0363
msims@milberg.com

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

I, Kathleen Foley, hereby certify that:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,807 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point font for text and footnotes.

Dated: May 13, 2026

/s/ Kathleen Foley
Kathleen Foley

**CERTIFICATE OF SERVICE**

I, Kathleen Foley, hereby certify that, on this 13th day of May 2026, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. A copy of this brief has also been served on all parties by CM/ECF.

Dated: May 13, 2026

*/s/ Kathleen Foley*
Kathleen Foley

# Addendum

# Table of Contents

| Dkt. No. | Document | Date | Page |
|----------|----------|------|------|
| 315 | Magistrate Judge's Omnibus Report and Recommendation | February 20, 2025 | Add. 1 |
| 407 | Omnibus Opinion and Order | September 11, 2025 | Add. 94 |
| 409 | Judgment | September 11, 2025 | Add. 219 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

THE MUNICIPALITIES OF BAYAMÓN, CAGUAS, LOÍZA, LARES, BARRANQUITAS, COMERÍO, CAYEY, LAS MARÍAS, TRUJILLO ALTO, VEGA BAJA, AÑASCO, CIDRA, AGUADILLA, AIBONITO, MOROVIS, MOCA, BARCELONETA, CAMUY, CATAÑO, SALINAS, ADJUNTAS, ARROYO, CULEBRA, DORADO, GUAYNABO, HORMIGUEROS, JUNCOS, LAJAS, MANATÍ, NAGUABO, NARANJITO, UTUADO, VILLALBA, COAMO, OROCOVIS, VIEQUES, and YABUCOA on behalf of themselves and others similarly situated, known as the MUNICIPALITIES OF PUERTO RICO,

Plaintiffs,

v.

EXXON MOBIL CORP., SHELL PLC F.K.A. ROYAL DUTCH SHELL PLC, CHEVRON CORP, BP PLC, CONOCOPHILLIPS, MOTIVA ENTERPRISES, LLC, OCCIDENTAL PETROLEUM F.K.A. ANADARKO PETROLEUM CORP, BHP, RIO TINTO PLC, AMERICAN PETROLEUM INSTITUTE, XYZ CORPORATIONS 1-100, and JOHN AND JANE DOES 1-100,

Defendants.

CIVIL NO. 22-1550 (SCC)(HRV)

RE:
CONSUMER FRAUD; DECEPTIVE BUSINESS PRACTICES; RACKETEER AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962; CLAYTON ACT, 15 U.S.C. § 15 ET SEQ.; PUBLIC NUISANCE; STRICT LIABILITY – FAILURE TO WARN; STRICT LIABILITY – DESIGN DEFECT; NEGLIGENT DESIGN DEFECT; PRIVATE NUISANCE; UNJUST ENRICHMENT

1

Add. 1

**MAGISTRATE JUDGE'S OMNIBUS REPORT AND RECOMMENDATION**

## I.    INTRODUCTION

Plaintiffs, the municipalities of Bayamón, Caguas, Loíza, Lares, Barranquitas, Comerío, Cayey, Las Marías, Trujillo Alto, Vega Baja, Añasco, Cidra, Aguadilla, Aibonito, Morovis, Moca, Barceloneta, Camuy, Cataño, Salinas, Adjuntas, Arroyo, Culebra, Dorado, Guaynabo, Hormigueros, Juncos, Lajas, Manatí, Naguabo, Naranjito, Utuado, Villalba, Coamo, Orocovis, Vieques, and Yabucoa (together, "Plaintiffs"), initiated this lawsuit on November 22, 2022 in their own right and on behalf of the proposed class, the 78 Municipalities of Puerto Rico. Defendants are Exxon Mobile Corporation ("Exxon"), Shell PLC ("Shell"), Chevron Corporation ("Chevron"), BP PLC ("BP"), Motiva Enterprises LLC ("Motiva"), Occidental Petroleum Corporation ("Occidental"), BHP Group Limited ("BHP"), Rio Tinto PLC ("Rio Tinto"), ConocoPhillips Company ("Conoco"), and American Petroleum Institute ("API"). Defendants are ten of the largest fossil fuel companies in the world. Plaintiffs claim that Defendants engaged in a decades-long campaign to misrepresent the dangers of carbon-based and fossil fuel products which they marketed and sold. It is alleged that Defendants conduct ultimately led to the catastrophic destruction brought about by the 2017 storms.

After Plaintiffs amended the complaint (Docket No. 205), Defendants moved for dismissal, both jointly and individually. The presiding District Judge referred the motions to dismiss as well as related motions to take judicial notice to the undersigned for report and recommendation.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the parties' pleadings. Plaintiffs initiated this lawsuit claiming that defendant's exploitation of fossil fuel products have caused extensive losses, fatalities, and property damage during the storms of September 2017 and their subsequent effects. (Docket No. 205, ¶ 1). The action seeks redress for the economic damages and detrimental effects on Puerto Rico's climate directly attributable to Defendants' activities. (Id., ¶ 9).

This is a summary of Plaintiffs' main allegations:

1. For decades, the Defendants were aware of scientific information establishing that the products they marketed and sold in Puerto Rico accelerated climate change and could likely lead to dangerous storms. (Id., ¶ 1).

2. Defendants had a duty of disclosure under Puerto Rico and United States consumer protection laws but failed to disclose: (a) that their own scientists confirmed climate change was an actual threat, (b) that their products were a direct cause of that climate change, (c) the anticipated effects upon Puerto Rico. (Id., ¶ 7(b)).

3. Rather than disclosing the information and warning the public, Defendants colluded with other fossil fuel-dependent companies to form the Global Climate Coalition ("GCC") and the American Petroleum Institute ("API") through which they funded climate change denial marketing campaigns. (Id., ¶ 2).

4. In masking the true source of their marketing, Defendants violated consumer protection laws in both Puerto Rico and the United States. (Id., ¶ 7(c)).

5. Defendants' scheme sought to maintain energy production monopoly, lower prices, and block the development of alternative energy sources. (Id., ¶ 7(d)).

6. The Plaintiffs relied on this misleading information to continue purchasing and using carbon-based products and endanger the lives of their residents and communities. (Id., ¶ 3).

3

Add. 3

7. Defendants were required by their own Best Business Practices (adopted in the 1980s) to disclose what they internally knew about upcoming super storms in the North Atlantic. (Id., ¶ 7(f)).

8. Defendants Best Business Practices also prevented them from colluding to deceive the Plaintiffs. (Id., ¶ 7(e)).

9. As publicly-traded companies, Defendants were required by their adopted Best Business Practices and corporate law to disclose to their investors that their products were contributing to the magnitude and acceleration of climate change and that these corporate acts would not only increase the ferocity of storms that hit Puerto Rico's shores but would inevitably result in a catastrophic loss of lives and property such as occurred in 2017 and since. (Id., ¶ 7(i)).

10. The Defendants have intentionally interfered with the citizens of the Municipalities of Puerto Rico's rights to life, liberty, and the enjoyment of property as guaranteed by Article II, Section 7 of the Constitution of Puerto Rico. (Id., ¶9).

11. Defendants have also interfered with Puerto Rico and its consumers' human rights as recognized in Section 20, Article II of the Puerto Rico Constitution guaranteeing citizens the right to education, to obtain employment, an adequate standard of living, social protection, and family assistance. (Id.).

Based on these allegations, the Amended Complaint asserts fourteen causes of action: common law consumer fraud (First Cause of Action), conspiracy to commit common law consumer fraud and deceptive businesses practices (Second Cause of Action), misleading practices and advertisement under Rule 7 of the Puerto Rico Rules (Third Cause of Action), violations to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961(3)("RICO")(Fourth, Fifth, Sixth and Seventh Causes of Action), antitrust violations pursuant to 15 U.S.C.§1 et seq. (Eighth Cause of Action), public nuisance pursuant to 32 L.P.R.A. §2761 (Ninth Cause of Action), strict liability – failure to warn (Tenth Cause of Action), strict liability-design defect (Eleventh Cause of

Add. 4

Action), negligent design defect (Twelfth Cause of Action), private nuisance pursuant to 32 L.P.R.A. §2761 (Thirteenth Cause of Action), restitution-unjust enrichment (Fourteenth Cause of Action).

The Defendants moved to dismiss, both jointly and on independent grounds. The Presiding Judge referred to me Defendant's Joint Motion to Dismiss for lack of personal jurisdiction (Docket No.234) and Motion to Dismiss for failure to state a claim (Docket No. 235). The Judge also referred to the undersigned Defendant's individual motions to dismiss at Docket Nos. 232 (Occidental)[1]; 236 (BP PLC's); 237 (Conoco Philips); 239 (Chevron's); 240 (Motiva); 242 (Exxon); 243 and 245 (BHP); 244 (Shell); 246 and 247 (Rio Tinto); 254 (API).

Plaintiffs opposed the Joint Motions to Dismiss, (Docket Nos. 281 and 280, respectively). [2] Defendants replied jointly (Docket No. 296, 297 and 305) and individually, Docket Nos. 290 (API); 292 (Shell); 293 (Occidental); 294 (BP P.L.C.); 295 (Conoco); 299 (Chevron); 301 (Exxon); 302 (Motiva); 303 and 304 (BHP); 306 and 307 (Rio Tinto).

Also before the Court are two motions for judicial notice at Docket Nos. 238 and 241, as well as Plaintiffs' opposition thereto, (Docket No. 282), Defendants' reply (Docket No. 298 (joint reply) and Chevron's reply (Docket No. 300).

_____

[1] Occidental later filed a notice of supplemental authority. (Docket No. 314).

[2] Subsequently, Plaintiffs supplemented their Opposition at Docket No. 280 to include two additional cases. (Docket No. 313).

5

Add. 5

### III.   APPLICABLE LAW AND DISCUSSION

#### A.   Legal Standards

Defendants claim that dismissal is warranted under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

#### 1.   *Fed. R. Civ. P. 12(b)(2)*

A party may move to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). When examining a motion to dismiss for lack of personal jurisdiction, a district court may choose from among several methods to determine whether plaintiff has met its burden to show that jurisdiction has attached. *Naicom Corp. v. DISH Network Corp.*, No. 3:21-CV-01405-JAW, 2024 WL 1363755, at *13 (D.P.R. Mar. 29, 2024)(citing *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 674 (1st Cir. 1992)). For cases in the early stages of litigation, the court employs the prima facie standard. *Rodriguez v. Dixie S. Indus., Inc.,* 113 F. Supp. 2d 242, 249 (D.P.R. 2000)(citing *Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81, 83-84 (1st Cir. 1997)). The prima facie approach is also the standard when a court rules on a motion to dismiss without holding an evidentiary hearing. *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001).

Under the prima facie approach, the Court examines whether the plaintiff "has proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 26 (1st Cir. 2008); *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992). In conducting the inquiry, the district court acts "as a data collector" rather than as a "factfinder." *Rodriguez-Rivera*

Add. 6

*v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 160 (1st Cir. 2022)(internal citations omitted)). All allegations most be construed "in the light most favorable to the plaintiff." *Santiago-González v. Motion Powerboats*, Inc., 334 F. Supp. 2d 98, 101 (D.P.R. 2004).

A plaintiff bears the burden of demonstrating personal jurisdiction over each defendant. *LP Solutions LLC v. Duchossois*, 907 F.3d 95, 102 (1st Cir. 2018). Establishing personal jurisdiction under the Fourteenth Amendment may take the form of specific, or general jurisdiction. *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 9 (1st Cir. 2009). Plaintiffs rely on specific jurisdiction which requires that their claims relate to the defendant's contacts. *Id.* (citing *Harlow v. Children's Hosp.*, 432 F.3d 50, 57 (1st Cir.2005)).[3]

"The proper exercise of specific in personam jurisdiction hinges on satisfaction of two requirements: first, that the forum in which the federal district court sits has a long-arm statute that purports to grant jurisdiction over the defendant; and second, that the exercise of jurisdiction pursuant to that statute comports with the strictures of the Constitution. *See Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994)(citing *Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 204 (1st Cir.1994); *United Elec. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1086 (1st Cir.1992); and *Hahn v. Vermont Law Sch.*, 698 F.2d 48, 51 (1st Cir.1983)). To establish specific jurisdiction, a plaintiff must show: (1) relatedness, (2) purposeful availment, and (3) reasonableness. *See Phillips Exeter*

---

[3] General jurisdiction, in contrast, requires plaintiff to show "continuous and systematic general business contacts" between defendant and the forum. *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 619 (1st Cir. 2001)(quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).

7

Add. 7

*Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 288 (1st Cir.1999)(The exercise of specific personal jurisdiction requires that: "(1) the claim underlying the litigation must directly relate to or arise out of Defendant's contacts with the forum; (2) those contacts must constitute purposeful availment of the benefits and protections afforded by the forum's laws; and (3) jurisdiction must be reasonable in light of a number of factor's touching upon fundamental fairness.") "Questions of specific jurisdiction are always tied to the particular claims asserted." *Astro-Med, Inc.,* 591 F.3d at 9 (citing *Phillips Exeter Acad.,* 196 F.3d at 289).

Notwithstanding a plaintiff's required proffer of evidence, the First Circuit has "long held that a diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of in personam jurisdiction may well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense." *Grp. of Former Emps. of Sprague Caribe v. Am. Annuity Grp., Inc.*, 388 F. Supp. 2d 3, 5 (D.P.R. 2005)(citing *Sunview Condominium Ass'n v. Flexel Int'l, Ltd.*, 116 F.3d 962, 964 (1st Cir.1997)). Also, "wide latitude must be accorded to the plaintiff to establish the minimum contacts with Puerto Rico and that defendant." *Id.* (citing *Puerto Rico v. SS Zoe Colocotroni*, 61 F.R.D. 653, 657 (D.P.R.1974)(citing *Com. Oil Refining Co. v. Houdry Process Corp.*, 22 F.R.D. 306, 308 (D.P.R.1958)); *see also Mullaly v. Sunrise Senior Living Mgmt., Inc.*, 224 F. Supp. 3d 117, 123 (D. Mass. 2016)(citing *Swiss Am. Bank*, 274 F.3d at 625 (internal quotation marks, citations and emphasis omitted)). Whether to permit such jurisdictional discovery is within the broad discretion of the district court. *Swiss Am. Bank*, 274 F.3d at 626.

8

Add. 8

Plaintiffs also assert jurisdiction under Section 1965(b) of RICO, which provides:

> In any action under section 1964 of this chapter in any district court of the United States in which it is shown that *the ends of justice require* that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S. C. § 1965(b). Section 1965 permits a court overseeing a valid RICO claim to exercise "personal jurisdiction over an out-of-state defendant [based on nationwide contacts] so long as the Court has jurisdiction established by the minimum contacts of at least one defendant [with the forum State]." *Marrero-Rolón v. Autoridad de Energía Eléctrica de P.R.*, 2015 WL 5719801, at *3 (D.P.R. Sept. 29, 2015), report and recommendation adopted, (D.P.R. Mar. 31, 2016); *see also Casio Computer Co. Ltd. v. Savo*, 2000 WL 1877516, at *26 (S.D.N.Y. Oct. 13, 2000).

### 2. *Fed. R. Civ. P. 12(b)(6)*

To determine if a complaint's allegations survive the 12(b)(6) stage, the Court must examine whether, taking the complaint's well-pled (non-conclusory, non-speculative) facts as true and drawing all reasonable inferences in the pleader's favor, the amended complaint's allegations state a plausible claim for relief. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012); *Cay-Montanez v. AXA Equitable Life Ins. Co.*, No. CV 19-1124 (SCC), 2021 WL 4251338, at *2 (D.P.R. Sept. 17, 2021). While a complaint need not give detailed factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

9

Add. 9

suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

### 3. *Judicial Notice*

A district court is generally limited to considering only facts and documents that are part of the complaint, but may also consider "maters susceptible to judicial notice." *Newton Covenant Church v. Great Am. Ins. Co.*, 956 F.3d 32, 35 (1st Cir. 2020)(internal citations omitted). Pursuant to Fed. R. Evid. 201(b), the court may take judicial notice of "a fact that is not subject to reasonable dispute because if: 1) is generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Pietrantoni v. Corcept Therapeutics Inc.*, 640 F. Supp. 3d 197, 204–05 (D. Mass. 2022).

### B. Jurisdiction

Plaintiffs claim that they have established jurisdiction over Defendants on several basis. First, in accordance with 28 U.S.C. §1332(a), because the Municipalities of Puerto Rico and the named Defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

Second, Plaintiffs assert there is special jurisdiction over defendants because they conduct business in Puerto Rico and the United States through marketing, transporting, trading, distributing, refining, manufacturing, selling, and/or consuming of oil and coal. Plaintiffs describe Defendants' purposeful activities toward Puerto Rico and the United through a campaign of deception and misinformation.

Lastly, plaintiffs aver that the Court also has personal jurisdiction over all the Defendants under 18 U.S.C. §1965(b). They argue that the Court may exercise nationwide

10

Add. 10

jurisdiction over the named Defendants where the "ends of justice" require national service and Plaintiffs demonstrate national contacts in the United States generally. Here, the ends of justice require, Plaintiffs say, that the Municipalities of Puerto Rico be permitted to bring the Defendants before the Court in a single trial.

For background, this is not the first time that an action of this nature reaches our Circuit. In *Rhode Island v. Shell Oil Prods. Co.*, 35 F.4th 44, 50 (1st Cir. 2022), the First Circuit examined whether removal to federal court was proper and ultimately affirmed the district court's order remanding the case to Rhode Island state court. This ruling follows other similar actions brought in state courts throughout the United States. *See*, e.g., *County of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934 (N.D. Cal. 2018), and *Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538 (D. Md. 2019). Judicial discourse to date has centered not around whether the companies can be held liable, but rather, whether federal or state courts should decide.

Unlike those cases, this action was filed first in federal court under both diversity and federal question jurisdiction. According to Plaintiffs, there is personal jurisdiction over each Defendant. In addition, they posit that Section 1965 of RICO only requires that they have jurisdiction over one defendant for the matter to move forward.

Because Section 1965 jurisdiction requires that the Court have jurisdiction over at least one of the RICO defendants, I will first analyze whether there is *in personam* jurisdiction over Defendants.

### 1. *In Personam* Jurisdiction

"When a district court's subject matter jurisdiction is founded upon a federal question, the constitutional limits of the court's personal jurisdiction are fixed, in the

11

Add. 11

first instance, not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment." *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1085 (1st Cir. 1992) (citing *Lorelei Corp. v. County of Guadalupe,* 940 F.2d 717, 719 (1st Cir.1991) (per curiam); *Whistler Corp. v. Solar Elecs., Inc.,* 684 F. Supp. 1126, 1128 (D.Mass.1988)). "In such circumstances, the Constitution requires only that the defendant have the requisite 'minimum contacts' with the United States, rather than with the particular forum state (as would be required in a diversity case)." *Id.* (citing *Lorelei,* 940 F.2d at 719; *Trans–Asiatic Oil Ltd. v. Apex Oil Co.,* 743 F.2d 956, 959 (1st Cir.1984)).

A federal court sitting in diversity may exercise personal jurisdiction over an out-of-state defendant only after engaging in a two-step analysis. First, the court must determine whether the state long-arm statute authorizes jurisdiction over the nonresident defendant. Second, the court must consider whether the exercise of personal jurisdiction would not deny defendant his constitutional right to due process of law. *See Omni Capital Int'l v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 104, 108 S. Ct. 404, 98 L.Ed.2d 415 (1987).

Although it is undisputed that the Defendants are nonresidents of Puerto Rico, Plaintiffs argue that all three elements of the specific jurisdiction test are met. First, all Defendants purposefully availed themselves of the privilege of conducting business activities in Puerto Rico because each of them sold, marketed and promoted fossil fuels on the island. Second, Plaintiff's claims arise out of or relate to Defendant's production, marketing, and sale of those products in Puerto Rico. Lastly, Defendants did not meet the burden to show that personal jurisdiction would be unreasonable.

12

Add. 12

I will examine each requirement in turn.

### a. *Purposeful Availment*

As per the Amended Complaint, Defendants purposefully availed themselves of the privilege of doing business in Puerto Rico by "marketing, transporting, trading, distributing, refining, manufacturing, selling, and/or consuming of oil and coal." (Docket No. 205, ¶13). In addition, the citizens of the Municipalities purchased Defendants' products and invested in the publicly traded corporate Defendants. (Id., at ¶¶15-16). Furthermore, some Defendants allegedly availed themselves of the benefits and protections of Puerto Rican law by registering an agent for service of process. (Id.). Lastly, the target of Defendants' actions included citizens and consumers in Puerto Rico. (Id., at ¶14).

"The function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous'" contacts with the forum state. *See Sawtelle v. Farrell,* 70 F.3d 1381, 1391 (1st Cir. 1995)(citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984)). The cornerstones of the analysis are "voluntariness and foreseeability." *Adelson*, 510 F.3d at 50. The contact with the forum "must be voluntary and not based on the unilateral actions of another party." *Id.* (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). As to foreseeability, the defendant's contacts in the forum state must give him notice such that he could "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S Ct. 559, 62 L.Ed.2d 490 (1980).

13

Add. 13

The Amended Complaint alleges that Puerto Rico is mostly dependent on oil and coal imports for its electricity. For the fiscal year ending in June 2017, petroleum supplied just under half of the island's electricity and coal continued to supply about one-sixth of electricity. (Docket No. 205, ¶174). Defendants, however, dispute jointly and individually, that they conduct activities on the island.

Courts have found that even if a defendant does not conduct business activities in a forum, the transportation and sale to a forum's consumers through agents and subsidiaries amounts to purposeful direction of activities on the forum. *See City of Oakland v. BP p.l.c.,* No. C 17-06011 WHA, 2018 WL 3609055, at \*3 (N.D. Cal. July 27, 2018); *City of Long Beach v. Total Gas & Power N. Am., Inc.,* 465 F. Supp. 3d 416, 438 (S.D.N.Y. 2020), *aff'd*, No. 20-2020-CV, 2021 WL 5754295 (2d Cir. Dec. 3, 2021)("It is well established that a defendant can 'purposefully avail itself of a forum by directing its agents or distributors to take action there.'").

In *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 111, 107 S. Ct. 1026, 1032, 94 L. Ed. 2d 92 (1987) the Supreme Court adopted the view that the Due Process Clause requires something more than merely placing a product into the stream of commerce to exert jurisdiction over a foreign defendant. For context, the plaintiff did no business in the United States; had no office, affiliate, subsidiary, or agent in the United States; manufactured its component parts outside the United States and delivered them to Toyota Motor Company in Japan. *Id*. at 111. In concluding that purposeful action towards the forum State was needed, the Court expressed:

> Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State,

14

Add. 14

**advertising in the forum State**, establishing channels for providing regular advice to customers in the forum State, **or marketing the product through a distributor** who has agreed to serve as the sales agent in the forum State.

*Id.* at 112 (emphasis supplied). The First Circuit has followed in line with *Asahi*.

In *Knox v. MetalForming, Inc.,* 914 F.3d 685, 691–92 (1st Cir. 2019), our appellate court concluded that "specific targeting of a forum" is not "the only means" of showing purposeful availment. Considering the facts, a defendant's "'regular flow or regular course of sale' in the [forum]" could make the exercise of jurisdiction foreseeable to the defendant. *Id.* (citing *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 10 (1st Cir. 2018)). Likewise, advertising and marketing activities may constitute purposeful activities for jurisdictional purposes. *See, e.g.*, *AARP v. Am. Fam. Prepaid Legal Corp.,* 604 F. Supp. 2d 785, 803 (M.D.N.C. 2009)(Approving the creation and purposeful direction of lead cards containing AARP references to North Carolina found to be purposeful activity directed at the forum); *Lindora, LLC v. Isagenix Int'l, LLC*, 198 F. Supp. 3d 1127, 1139 (S.D. Cal. 2016)(in finding purposeful availment in a trademark infringement action in California, Court considered that Plaintiff provided its California Associates with infringing marketing materials, held training workshops and promotional events in California using the marks in dispute, and operated a website where the infringing marks were used.); *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 216–17 (D.N.J. 2020)(Finding that Plaintiffs had established with reasonable particularity sufficient contacts between the defendants and the forum state after considering, among other factors, Defendants' marketing activities within the forum, and Plaintiff's allegations that they viewed the marketing material prior to

15

Add. 15

purchasing the product and that "each relied on the alleged misrepresentations made through Mercedes' marketing and advertisements when they purchased their Mars Red vehicles.").

Here, Plaintiffs make the following specific allegations against Defendants:

(i)    Defendants refining "upstream" operations utilize Buckeye Partners, LP to provide their oil-based products in Puerto Rico. (Docket No. 205, at ¶85).

(ii)    Esso Oil PR, a subsidiary of Exxon, had extensive presence in Puerto Rico until 2008, when it sold its 145 service stations and access to terminals and airports in Puerto Rico and St. Thomas to Total Petroleum Puerto Rico Corp. (Id., at ¶96-99.).

(iii)    Exxon's downstream operation (consisting of marketing, refining and retail operations), includes sale of its petroleum-based consumer products in Puerto Rico. (Id., at ¶97). Exxon advertises, markets, and sells its products in Puerto Rico. Plaintiffs are customers of Exxon and have invested in Exxon as a publicly traded company.

(iv)    Chevron sold its fuel distribution and storage business in PR and the USVIs in 2012 but continues to market and sell its products in Puerto Rico. (Id., at ¶¶126 and 128).

(v)    BP had an aviation business at the Luis Munoz Marin International Airport in San Juan servicing over 4 million passengers per year, which it sold to Puma Energy in 2015. BP continues to market and sell its products in Puerto Rico, including the Castrol brand for industrial and automotive lubricants. (Id., at ¶¶137-140).

(vi)    Shell branded gasoline was sold in Puerto Rico through the Sol Group ("Sol") and Sol Puerto Rico Limited ("Sol P.R."), the exclusive distributor of Shell Fuels in Puerto Rico. Shell's website reflects 121 Shell gas stations in Puerto Rico as of November 14, 2022. (Id., at ¶111).

(vii)    In July 2012 Chevron sold its fuel distribution and storage businesses in Puerto Rico and the United States Virgin Islands to Puma Energy, including 192 Texaco service

stations, an aviation fuel supply and storage tanks with a combined capacity of 430,000 barrels. Chevron continues to sell the "Delo," "Ursa," "Havoline," "IsoClean" and "Techron" heavy duty diesel engine oils, coolants/antifreeze, transmission fluids, gear oils, greases and hydraulic oils in and Puerto Rico. (Id., at ¶123, 126).

(viii)  Conoco markets and sells its products in Puerto Rico, including its Phillips 66 lubricants. (Id., at ¶150). Plaintiffs have been, and remain, customers of Conoco and have invested in Conoco as a publicly traded company. (Id., at ¶153).

(ix)  Motiva markets and sells its products in Puerto Rico through its joint ventures with codefendants. At all relevant times, The Municipalities of Puerto Rico and/or their citizens have been customers of Motiva. (Id., at ¶163).

(x)  Occidental markets and sells consumer products worldwide, including in Puerto Rico. Plaintiffs have been, and remain, customers of either Occidental or Anadarko and have invested in Occidental and previously Anadarko as a publicly traded company. (Id., at ¶169).[4]

(xi)  Defendant BHP is 1/3 owner of the Cerrejón coal mine, which imports about 1.6 million short tons of coal annually to supply Puerto Rico's coal-fired electricity generating plant at Guayama. The Municipalities of Puerto Rico and/or their citizens have invested in BHP as a publicly traded company and are customers of BHP. (Id., at ¶179).

(xii)  Defendant Rio Tinto as a publicly traded company in which the Municipalities of Puerto Rico and/or their citizens have invested in. (Id., at ¶186).

---

[4] Occidental avers that as a company engaged primarily in the upstream segment of the oil-and-gas industry, OPC's business is in states and countries where it extracts hydrocarbons, not Puerto Rico. (Docket No. 232 at pg. 1).

17

Add. 17

At this stage and relying on Plaintiffs' well-pleaded allegations claiming that Defendants marketed, promoted, and sold products in Puerto Rico, I conclude that the purposeful availment test is met. However, I understand that limited discovery on the issue of jurisdiction is proper in this case because a more developed record would assist the Court in making its jurisdictional finding.

A court has "broad discretion in determining whether to grant jurisdictional discovery." *Blair v. City of Worcester*, 522 F.3d 105, 110–11 (1st Cir. 2008)(citing *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d at 626). In general, the threshold showing to allow limited discovery "is relatively low." *Id*. (citing *Surpitski v. Hughes–Keenan Corp.*, 362 F.2d 254, 255–256 (1st Cir. 1966)(per curiam)); *see also United States v. Swiss Am. Bank, Ltd.*, 274 F.3d at 625 ) (citing *Sunview Condominium Ass'n v. Flexel Int'l, Ltd.*, 116 F.3d 962, 964 (1st Cir.1997)) ("We have long held that 'a diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of *in personam* jurisdiction *may* well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense.'"); *Orchid Biosciences, Inc. v. St. Louis Univ.*, 198 F.R.D. 670, 672–73 (S.D. Cal. 2001)(citing *America West Airlines, Inc. v. GPA Group, Ltd.,* 877 F.2d 793, 801 (9th Cir.1989)(citations omitted)("It is clear that the question of whether to allow discovery is generally within the discretion of the trial judge. [W]here pertinent facts bearing on the question of jurisdiction are in dispute, discovery should be allowed.")

### b. Relatedness

The least developed prong of the due process inquiry is the relatedness prong. *Sawtelle,* 70 F.3d at 1389 (citing *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201,

18

Add. 18

206 (1st Cir. 1994)). It focuses on whether the claim underlying the litigation is related to or directly arose out of Defendants' forum-state activities. *Id*. The First Circuit has adopted the view that a flexible approach to the jurisdictional inquiry, particularly in the early stages of a case. In that respect, the Court has expressed:

> By this approach, we intend to emphasize the importance of proximate causation, but to allow a slight loosening of that standard when circumstances dictate. We think such flexibility is necessary in the jurisdictional inquiry: relatedness cannot merely be reduced to one tort concept for all circumstances.

*Nowak v. Tak How Invs., Ltd.,* 94 F.3d 708, 716 (1st Cir. 1996). Within this framework, I analyze the contacts between the Defendants and the forum.

Plaintiffs allege that Defendants had a duty to disclose information regarding the impact of its products on the environment, particularly in the acceleration of climate change and the formation of super storms. This failure to disclose allegedly caused the Municipalities to underestimate the potential impact to their citizens and to continue purchasing Defendants' products. Both parties rely on *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,* 592 U.S. 351, 359, 141 S. Ct. 1017, 1024, 209 L. Ed. 2d 225 (2021) for support, though each offer a different reading of its holding.

*Ford* held that personal jurisdiction may exist over an out-of-state company where "[1] it serves a market for a product in the forum State and [2] the product malfunctions there" "[3] caus[ing] injury in the State to one of its residents." *Ford,* 141 S. Ct. at 1022, 1026-27. Defendants distinguish the exercise of personal jurisdiction in that case because, unlike the *Ford* plaintiffs, the Municipalities' claims are unrelated to the use and malfunction of Defendants' products within the State. Furthermore, they state

that Plaintiffs cannot tie the purported climate change injuries solely to their conduct. Climate change, they add, is a complex phenomenon that cannot be ascribed only to Defendants' actions.

For their part, Plaintiffs respond that the standard for personal jurisdiction does not require a strict but-for causal relationship between the defendant's in-forum activities and the injury. Rather, the nexus needed to establish personal jurisdiction is a "flexible, relaxed standard." *Pritzker v. Yari*, 42 F.3d 53, 61 (1st Cir. 1994). Citing to *Ford*, they argue instead that the Court rejected the causation-only approach in favor of requiring a mere "affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* at 1025.

Following those requirements, Plaintiffs claim they satisfy the relatedness factor because Defendants have conducted extensive activities in Puerto Rico that are related to this litigation and have also engaged in fraudulent acts to misinform Plaintiffs. Specifically, Plaintiffs point to the following actions: (1) Defendants "promote[d] and/or s[old] fossil fuel products throughout Puerto Rico, have done so for years, and have worked together through trade organizations, such as the API and the previously active GCC, to target consumers including Plaintiffs' residents as well as municipal officials";[5] (2) at least two of the Defendants, Exxon and Chevron, operated at some point service

---

[5] (Docket No. 205, ¶¶ 25, 207, 211(a)-(h), 362-385); Docket No. 205-1, ¶¶ 3(b), 8(b)(xii), 8(d)(ii)(a)-(c), 8(e), 9, 18, 30.

20

Add. 20

stations in Puerto Rico, through their own businesses or their subsidiaries [6]; (3) Defendants have promoted, marketed, and sold their branded fossil fuel products in Puerto Rico and to Puerto Rico consumers[7];(4) Defendants have individually and in concert failed to warn the Plaintiffs about the risks posed by the intended use of their fossil fuel products.;[8] (5) Defendants have continuously and deliberately exploited the forum for fossil fuel products. (Docket No. 281, at 28).

The First Circuit has held that in-forum effects of non-forum activities, standing alone, may be too indirect to fulfill the relatedness prong. *See, A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 60 (1st Cir. 2016)(citing *Sawtelle v. Farrell,* 70 F.3d at 1390–91). Instead, courts must "look to whether the plaintiff has established cause in fact (i.e., the injury would not have occurred 'but for' the defendant's forum-state activity) and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action)." *Scottsdale Cap. Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 20–21 (1st Cir. 2018)(citing *Mass. School of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 35 (1st Cir. 1998) (internal quotation marks and citations omitted)); *see also United States v. Swiss Am. Bank, Ltd.*, 274 F.3d at 625 (citing *Mass. Sch. of Law v. Amer. Bar Ass'n*, 142 F.3d 26, 35–36 (1st Cir.1998))("We have wrestled before with this issue of whether the in-forum effects of extra-forum activities suffice to constitute minimum contacts and

---

[6] (Docket No. 205, ¶¶ 99, 126.).

[7] (Id., ¶¶ 101-103, 111, 113, 123, 128, 137, 140- 141, 150, 153, 163, 169, 174, 176, 179, 184, 186).

[8] (Id., ¶¶ 7(d), 346, 586, 616, 643, 652, 697, 711, 783-797.)

21

Add. 21

have found in the negative."); *Vapotherm, Inc. v. Santiago*, 38 F.4th 252, 261 (1st Cir. 2022).

Entering into a contract, for example, is not in and of itself sufficient to establish minimum contacts with a forum. *Swiss Am. Bank,* 274 F.3d at 621.[9]  Neither are isolated phone and email communications. *Sawtelle*, 70 F.3d at 1389–90.

The basis of the consumer fraud, fraudulent misrepresentation, negligent misrepresentation, negligent fraudulent concealment, conspiracy to defraud, and RICO claims are that Defendants engaged in a nationwide marketing campaign with the purpose of deceiving or misleading consumers regarding the hazardous effects of their fossil fuel products. Defendants' marketing and promotional activities in Puerto Rico are conceivably related to the misrepresentations and falsities that Plaintiffs claim. So are the injuries. According to Plaintiffs, Defendants relied on those false statements to continue purchasing Defendants' products.[10]

Similarly, the RICO claim is premised on Defendants' knowingly and intentionally devising a scheme to defraud and sell their product to consumers by relying on materially false and fraudulent representations regarding the impact of fossil fuels on climate

---

[9] In contractual disputes, "the Court must examine prior negotiations and contemplated future consequences of the contract in addition to the parties' actual course of dealing." *Swiss Am. Bank*, 274 F.3d at 621; *see also Naicom Corp.,* 2024 WL 1363755, at *17; and *PREP Tours, Inc. v. Am. Youth Soccer Org.*, 913 F.3d 11, 26 (1st Cir. 2019).

[10] Defendants cite the case of *City of Oakland v. BP p.l.c.,* where the Court applied the "but for" standard to determine whether the effects of the sea level rise induced by global warming would have occurred but for the defendants' California-related activities. The Court concluded that global warning would not have stopped absent defendants' activities in the forum. *City of Oakland v. BP p.l.c.*, No. C 17-06011 WHA, 2018 WL 3609055, at *3 (N.D. Cal. July 27, 2018). This case, however, is not about emissions or accusations of global warming. The suit charges Defendants with engaging in a disinformation campaign that misled the public to continue reaping financial benefits from gas and oil sales.

22

change. These representations were allegedly made as part of the marketing and advertising disinformation campaign in Puerto Rico.

I find that, taking as true plaintiffs' allegations that defendants are conducting a sweeping marketing and promotional activities in Puerto Rico, there is sufficient relatedness. However, I recommend that further discovery would put the Court in a better position to decide these issues.

### c.      *Reasonableness*

Having found that the first two requirements were fulfilled, I next evaluate the "reasonableness" factor. This prong is analyzed using the so-called "gestalt factors" which include: (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies. *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 150 (1st Cir. 1995).

Courts must consider the inconvenience of travelling to the forum when assessing the burden of appearing. *See Ticketmaster*, 26 F.3d at 210 ("The burden associated with forcing a California resident to appear in a Massachusetts court is onerous in terms of distance, and there are no mitigating factors to cushion that burdensomeness here. This burden, and its inevitable concomitant, great inconvenience, are entitled to substantial weight in calibrating the jurisdictional scales."). The concept of burden, however, is "inherently relative, and, insofar as staging a defense in a foreign jurisdiction is almost

23

Add. 23

always inconvenient and/or costly,...this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." *Pritzker*, 42 F.3d at 64.

Defendants have not convinced me that there is an unusual burden in litigating this case in Puerto Rico.

On the second factor, and taking as true plaintiff's allegations, as I am bound to do, I find that Puerto Rico has an interest in exercising jurisdiction in this case. "The forum state has a demonstrable interest in exercising jurisdiction over one who causes tortious injury within its borders." *See Ticketmaster-New York,* 26 F.3d 211 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776, 104 S. Ct. 1473, 1479, 79 L.Ed.2d 790 (1984)).

Plaintiffs are Puerto Rico Municipalities and have chosen to litigate their claims here. In addition, several causes of action are based on Puerto Rico law. Thus, Puerto Rico demonstrably has an interest in serving as forum for a purported class action related to fraud and misinformation to its consumers. Thus, this factor weighs in favor of the exercise of specific jurisdiction.

Regarding plaintiffs' convenience, the First Circuit has held that a plaintiff's choice of forum must be given deference with respect to the issue of its own convenience. *See Sawtelle,* 70 F.3d at 1395. Certainly, it would be more convenient for the Municipalities to litigate their claims in their home state rather than elsewhere.

As to the last factor, I find that it weighs in favor of finding that jurisdiction in Puerto Rico is reasonable. All sovereigns share an interest in preventing disinformation and fraudulent communications in detriment of its cities, Municipalities and dependencies. Seeing this case would promote that goal insofar as it seeks to vindicate

24

Add. 24

the rights of Puerto Rico Municipalities against an alleged concerted misinformation campaign.

In the aggregate, these factors weigh in favor of finding that Puerto Rico has jurisdiction over the Defendants.

### 2.  18 U.S.C. § 1965(b) jurisdiction

Most courts to have interpreted the statute—including the Second, Seventh, Ninth, and Tenth Circuits—have found that Section 1965(b) is the controlling provision for jurisdictional purposes in civil RICO actions. *Dispensa v. Nat'l Conf. of Cath. Bishops*, No. 19-CV-556-LM, 2020 WL 2573013, at *9 (D.N.H. May 21, 2020).[11] Under Section 1965(b), two requirements are needed: (1) "personal jurisdiction over another civil RICO defendant otherwise exists in the forum," and (ii) "'the ends of justice require' that the court exercise personal jurisdiction over the civil RICO codefendant lacking the requisite contacts." *Id*. (citing *Cory v. Aztec Steel Bldg., Inc.,* 468 F.3d 1226, 1232 (10th Cir. 2006)).

Several cases from this district have analyzed the extent of Section 1965(b) jurisdiction. In *Marrero-Rolón*, 2015 WL 5719801, at *3, the Court applied Section 1965(b) to find personal jurisdiction, after concluding that the ends of justice requirement was satisfied. In *Naicom Corp. v. DISH Network Corp.*, however, the Court

---

[11] A minority of Courts have found instead that the controlling jurisdictional provision is Section 1965(d), which does not require an "ends of justice" inquiry. *Id*. (citing *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997) and *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997)).

Add. 25

declined to "break new ground on an unsettled jurisdictional issue" and focused instead on assessing the claims on the merits. *Id.*, 2024 WL 1363755, at *20.[12]

Other sister courts within the First Circuit, are also split. In *Dispensa*, the Court adopted the majority approach, thus deeming Section 1965(b) as the controlling statute. As to the "ends of justice" requirement, it found that it was a "flexible concept uniquely tailored to the facts of each case." *Dispensa*, 2020 WL 2573013, at *10 (citing *Cory*, 468 F.3d at 1232). Ultimately, though, the Court found that plaintiffs had not established personal jurisdiction because there was an alternative forum that had a closer relationship to the parties' dispute. *See also*, *Ayasli v. Korkmaz*, No. 19-CV-183 -JL, 2020 WL 4287923, at *16 (D.N.H. July 27, 2020), *on reconsideration in part*, 559 F. Supp. 3d 1 (D.N.H. 2020); *Ginsburg v. Dinicola*, No. 06-11509, 2007 WL 1673533, at *4 (D. Mass. Jun. 7, 2007) (Zobel, J.); *but see Bridge v. Invest Am., Inc.*, 748 F. Supp. 948, 950 (D.R.I. 1990).

Because § 1965(b) requires a finding of jurisdiction over at least one defendant, I recommend that the analysis under this section be conducted once jurisdictional discovery is completed. This recommendation falls in line with the *Naicom* decision and

---

[12] In *Naicom*, the Court did a survey of the case law regarding the central issue on how to determine the "ends of justice" requirement. *Naicom*, No. 3:21-CV-01405-JAW, 2024 WL 1363755, at *20 (D.P.R. Mar. 29, 2024). While some Courts require plaintiffs to "show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators," *Id. (citing Butcher's Union Loc. No. 498, United Food & Com. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986), others have found the ends of justice to be a "flexible concept uniquely tailored to the facts of each case"). *Id. (citing Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1232 (10th Cir. 2006)).

26

Add. 26

recognizes that the applicability of Section 1965(b) to RICO actions is not a settled matter in our Circuit.

Having examined the jurisdictional arguments presented in Defendants' joint motion, I now turn to those raised in their individual motions to dismiss.

**Occidental's Supplemental Motion to Dismiss (Docket No. 232)**

One such defendant is Occidental, which alleges that it was improperly served. (Docket No. 232 at pg. 4). According to Occidental, Plaintiffs failed to comply with Fed. R. Civ. P. 4(h), thus divesting the court of jurisdiction.

Under Rule 4(h), a corporation must be served either: (1) in the manner prescribed for serving an individual; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent authorized to receive service of process and also mailing a copy of each to the defendant. Under the first option, service can be effectuated by:

> (A) delivering a copy of the summons and of the complaint to the individual personally;
>
> (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
>
> (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e)(2). Rule 4(h), on the other hand, states that service on a corporation is proper if the service complies with the legal requirements of the state where the District Court is located (Puerto Rico), or where service is made (Texas). Fed. R. Civ. P. 4(h).

Add. 27

P.R. R. of Civ. P. 4.4(e) mirrors the provisions of Fed. R. Civ. P. 4(e)(2), stating that a corporation may be served by "delivering a copy of the summons and of the complaint to an officer, managing or general agent, or to any other agent authorized by appointment or designated by law to receive service of process." In Texas, on the other hand, proper service is in line with the state's requirements by serving the president, vice president, or registered agent of the corporation. *See* Tex. Bus. Orgs. Code §§ 5.255 (1), 5.201(a), (b).

According to Occidental, on February 13, 2023, a process server went to OPC's Houston, Texas headquarters to serve process. (Docket No. 232, at 5). However, instead of serving one of OPC's authorized agents, the server "left" the summons and complaint with an unidentified individual in its mailroom. (Id., n. 5). The box, rather than being addressed to OPC, was addressed to: "The UPS Store, 11152 Westheimer Rd, Houston, TX 77042" with a return address of "ABC Legal Services, 633 Yesler Way, Seattle, WA 98104-9678." (Docket No. 232-2). Leaving the box in Occidental's mailroom does not constitute effective service of process, it argues. Its mailroom is not an agent for service of process by law or through internal designation.

Plaintiffs respond that, as indicated in the Proof of Service, they delivered copy of the Summons and of the Complaint "to Office Services who indicated they were the person authorized to accept with identity confirmed by subject stating their name." (Docket No. 8-1). In any case, says Plaintiffs, Occidental has not been prejudiced since it has been on due notice of the claims against it and has actively participated in the case.

The Proof of Service that Plaintiffs submitted indicates that summons was served on "Office Services" and expands on the circumstances:

28

Add. 28

> I delivered the documents to Office Services who indicated they were the person authorized to accept with identity confirmed by subject stating their name. The individual tried to refuse service by refusing to take documents and did not state reason for refusal (documents left, seen by subject). The individual appeared to be a black-haired black male contact 45-55 years of age, 5'8"-5'10" tall and weighing 180-200 lbs with glasses.

(Docket No. 3-1, at 7).

In its Opposition, Plaintiffs do not expand on what division within Occidental is "Office Services" or who in Office Services indicated that they were authorized to accept the service documents. In fact, the notes state that the individual refused to take the documents and, thus, the documents were left there. (Id.) Plaintiffs have not cited any local or federal law which authorizes unnamed Office Services or—taking Occidental's version of the facts—mailroom staff, to receive process on behalf of corporation. There is no indication that the unnamed man who is mentioned in the Proof of Service was appointed to receive service of process for Occidental. Therefore, I cannot assume such appointment. For a similar analysis, *see Boateng v. Inter Am. Univ. of P.R.*, 188 F.R.D. 26, 29 (D.P.R. 1999). I thus find that Occidental was not served in accordance with the requirements of Rule 4(h).

**BHP Group Limited's Supplemental Motion to Dismiss (Docket No. 245)**

BHP claims that Cerrejón's activities cannot be considered for the minimum contacts analysis because the mines are not owned or operated by BHP, but rather by separate corporate entities of which BHP subsidiaries were only 1/3 shareholders. BHP goes into a detailed explanation of the corporate governance and structure of the entities, affiliates and subsidiaries. Furthermore, they claim that the last coal imports from the

29

Add. 29

Cerrejón mines to the coal plant in Guayama, Puerto Rico, occurred in 2009, 13 years before the Complaint was filed. In fact, they state that the BHP Subsidiaries sold their interests in the Cerrejón Entities in January 2022. For these reasons, BHP posits that Plaintiffs cannot overcome the presumption of corporate separateness between BHP's subsidiaries and these other entities.

Plaintiffs counter that BHP admitted being a 1/3 owner of the Cerrejón entities, which exported 1.6 million short tons of coal every year to Puerto Rico's coal-fired electricity plant. Plaintiffs cite to the portions of the Amended Complaint where they alleged that BHP conducted sales, marketing, and promotion activities in Puerto Rico.

The doctrine of corporate separateness provides that a corporation is legally independent from its subsidiary. *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1091 (1st Cir. 1992)(citations omitted)("Ordinarily, courts respect the legal independence of a corporation and its subsidiary when determining if a court's jurisdiction over the offspring begets jurisdiction over the parent."). That presumption, however, "[may] be overcome by clear evidence that the parent in fact controls the activities of the subsidiary." *Id.* (citing *Escudé Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 905 (1st Cir. 1980); *accord Third Nat'l Bank v. WEDGE Group Inc.,* 882 F.2d 1087, 1090 (6th Cir.1989), *cert. denied,* 493 U.S. 1058, 110 S.Ct. 870, 107 L.Ed.2d 953 (1990); *cf. Mangual v. General Battery Corp.,* 710 F.2d 15, 21 (1st Cir. 1983)).

To conduct that analysis, Courts look at the facts on the record. *Id.* Here, however, the record needs to be further developed to make such a determination. I find that, at

30

Add. 30

this stage, limited discovery is needed regarding the extent of BHP's activities in Puerto Rico to determine where it had sufficient minimum contacts on the forum.

**Motiva's Supplemental Motion to Dismiss (Docket No. 240)**

Motiva moves for dismissal on jurisdictional grounds. It alleges that the Amended Complaint improperly attributes conduct from Saudi Arabia Oil Company ("Aramco" or "Saudi Aramco") to Motiva, which is a wholly owned subsidiary of Saudi Refining, Inc. and Aramco Financial Services Co. (Docket No. 26).

Likewise relying on the corporate separateness doctrine, it argues that Aramco is not a defendant in this lawsuit and that the Complaint fails to allege facts sufficient to pierce the corporate veil between Aramco and Motiva. Further, Motiva states that the Amended Complaint's allegation that Aramco is "the world's largest contributor to global industrial GHG" is not attributable to Motiva and should not be included in the Court's analysis of the motions to dismiss. (Docket No. 205, ¶1642.).

As previously noted, these alleged grounds for dismissal should be revisited following an opportunity to conduct discovery.

**Rio Tinto's Motion to Dismiss (Docket No. 246)**

Rio Tinto alleges that Plaintiffs have failed to establish personal jurisdiction because the Amended Complaint merely alleges that Plaintiffs invested in Rio Tinto as a public company. Even taking that allegation as true, it is insufficient to establish the minimum contacts required for the exercise of jurisdiction. According to Rio Tinto, this application of the jurisdictional requirement does not consider the voluntariness factor that is key to establish purposeful availment.

31

Add. 31

To support its motion, Rio Tinto attached the Sworn Declaration of Michael Pasmore, Head Secretariat at Rio Tinto. (Docket No. 246-1). Pasmore affirms that Rio Tinto does not sell or market its products in Puerto Rico and never has, nor does it have any other contacts with Puerto Rico. (Id). Furthermore, Rio Tinto asserts that it " has never sold or marketed coal, or any other fossil fuel, in or to Puerto Rico, its municipalities, or its citizens." (Docket Nos. 246, at 7, and 246-1, at ¶ 9.) In fact, Rio Tinto affirms that none of its affiliates has produced or sold coal anywhere in the U.S. since 2013, and that it divested itself of all coal production operations globally years ago. (Id. ¶¶ 9-11).

Plaintiffs respond that Rio Tinto's membership and participation with the National Mining Association, the GCC, and the America Political Action Committee took place in the United States. (Docket No. 281, at 11-12). The actions that they carried out through those groups had a direct impact on the citizens of the U.S. and P.R. (Id., at 12, citing Docket No. 205, ¶¶ 183, 211(b), 368, 381, 430(c), 483, 575).

Without more, I am not prepared to recommend dismissal for lack of jurisdiction without further record development.

## C. Statute of limitations

Defendants' Joint Motion to Dismiss asserts that Plaintiffs' claims fail on both procedural and substantive grounds. As to the former, Defendants argue that the statute of limitations began to run on September of 2017 at the latest. It was during that time when Hurricanes Irma and Maria hit the island, which should have put Plaintiffs on notice of their injuries. Even prior to that date, Defendants claim, a plethora of articles and reports were available that tied climate change to oil companies' activities. Plaintiffs,

32

however, claim that they only became aware of Defendants' causal link to their injuries after a report published in March 2022.

### 1. *Judicial Notice*

Before delving into the statute of limitations argument, I will discuss Defendants' requests for judicial notice because the documents submitted for judicial notice are directly tied to Defendants' position on whether the claims are time-barred. Defendants move the Court to take judicial notice of several articles and reports (Docket No. 238), and a legal services contract. (Docket No. 241). Their proffer is that the articles—Exhibits A-B—are not being offered for the purported truth of their contents, but to show that information was publicly available. (Docket No. 238, at 2). Under the same rationale, the reports—Exhibits C-G—are being offered to show information was publicly available. (Id.). As to the legal services contract between the Municipality of Vega Baja and Milberg Coleman Bryson Phillips Grossman LLC, dated November 17, 2022, Defendants offer it to prove that the investigation into Plaintiffs' claims has been ongoing since at least 2019. (Docket No. 241).

Plaintiffs oppose, arguing that Defendants are using the judicial notice rule improperly to submit the documents for the truth of their contents to bolster their argument that the claims are time-barred. (Docket No. 282).

Under Rule 201(b) of the Federal Rules of Evidence, a district court can take judicial notice of a fact not subject of reasonable dispute when it: "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Regarding newspaper articles, a judge in this district has found that "[a]t the

Add. 33

motion to dismiss stage, a Court may take judicial notice of the fact that press coverage, prior lawsuits or regulatory filings contained certain information, without regard to the truth of the contents." *Gov't of Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464, 470 n. 15 (D.P.R. 2020) (citing *Rodi v. S. New England Sch. Of Law*, 389 F.3d 5, 12-19 (1st Cir. 2004) and *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)). Other sister courts in our District have ruled accordingly. *See Seguin v. Textron*, No. 13-CV-012-SJM-LM, 2013 WL 5704947, at *2 (D.R.I. Oct. 17, 2013); *Seguin v. Suttell*, No. 13-CV-095-JNL-LM, 2013 WL 5523703, at *1 (D.R.I. Oct. 3, 2013); *Crespo-Caraballo v. United States*, 200 F. Supp. 2d 73, 78 (D.P.R. 2002), aff'd sub nom, *Caraballo v. U.S. D.E.A.*, 62 Fed. Appx. 362 (1st Cir. 2003) (Taking judicial notice that The San Juan Star is a general circulation newspaper in Puerto Rico.). And the Plaintiffs have not refuted that the articles and reports were published.

I thus take judicial notice only of the fact that Exhibits A through E were published, but do not take judicial notice regarding the truth of their contents. I also take judicial notice only of the fact that Exhibit F was published by the Union of Concerned Scientists in July 2015 and made available online, and that Exhibit G was published by the Puerto Rico Climate Change Council in 2013.

Finally, with regards to the legal services contract, I can take judicial notice of information from an official government website that is "not subject to reasonable dispute." *Morales Posada v. Cultural Care*, Inc., 554 F. Supp. 3d 309, 314 n. 2 (D. Mass. 2021)(citing *Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010)(internal citations omitted.).

Add. 34

The contract in question is published on a government website as is required because one of its parties is a Municipality. However, a legal document between two parties published on a government website is not the same as official information published or posted by a government entity on its website. The cases Defendants cite from our jurisdiction all refer to information from agencies, such as the CDC. In fact, the sole case that Defendants cite where the Court takes judicial notice of a "contract" pertains to an Auction Terms and Conditions prepared and published by the City of Chicago. *See Sroga v. Laboda*, 748 Fed Appx. 77, 78 n. 1 (7th Cir. 2019).

Here, in contrast, the Contract between the Municipality and the law firm makes no mention of the purported investigation. The information that Defendants allude to is contained in a proposal and brochure that are attached to the Contract and seems to have been prepared by the law firm. (Docket No. 241-1). Therefore, I find that the information here is "subject to reasonable dispute" and I am not permitted to take judicial notice.

Therefore, I recommend that the motion at Docket 238 be granted, but only as to taking notice of the fact that the articles and reports were published. I also recommend that the motion at Docket No. 241 be denied.

### 2. Continuous tort

The statute of limitations for Plaintiffs' RICO and antitrust claims is four years[13] and one year for the Puerto Rico law claims.[14] The statute of limitations begins to run

---

[13] *See Álvarez-Maurás v. Banco Popular of P.R.*, 919 F.3d 617, 625 (1st Cir. 2019)(Although RICO does not specify a statute of limitations, the Supreme Court imported the four-year deadline from the Clayton Act's civil enforcement provisions).

[14] 10 P.R. Laws Ann. tit. 31, § 5298.

35

Add. 35

from the time the aggrieved person had notice of the injury and notice of the person who caused it. *M.R. (Vega Alta), Inc. v. Caribe Gen. Elec. Prods., Inc.*, 31 F. Supp. 2d 226, 239 (D.P.R. 1998)(citing *Colón Prieto v. Geigel*, 115 D.P.R. 232, 247 (1984); and *Rosado Serrano v. E.I. Dupont de Nemours & Co.*, 797 F .Supp. 98, 102 (D.P.R.1992)). Notice "does not require actual knowledge; it is enough that the would-be plaintiff had notice that would have led a reasonable person to investigate and so uncover the needed information." *Lopez-Flores v. Cruz-Santiago*, 526 F. Supp. 2d 188, 190 (D.P.R. 2007).

According to Defendants, Plaintiffs were aware of the RICO and antitrust injuries as of September 2017, when hurricanes Irma and Maria passed through Puerto Rico. The statute of limitations therefore expired in September 2021, more than one year before Plaintiffs filed suit.

Plaintiffs respond that they filed within one year of knowing that the Hurricanes could be tied to Defendants' activities; that Defendants' actions constitute continuous wrongful conduct; that the doctrine of equitable tolling applies; and that class actions such as this one automatically toll the statute of limitations.

The Puerto Rico Supreme Court has defined the continuous tort doctrine as a "continued, or uninterrupted, disturbance of unlawful acts or omissions which cause foreseeable lasting damages." *McMillan v. Rodriguez-Negron*, 511 F. Supp. 3d 75, 83 (D.P.R. 2020)(citing *Rivera Ruiz v. Mun. de Ponce*, 196 P.R. Dec. 410, 417 (P.R. 2016)). "Since the tortfeasor's illegal acts are continuous, the cause of action continually renews itself, for the statute of limitation purposes, until the tortfeasor ceases his harmful conduct." *Id*. A "continuous tort", however, arises from ongoing unlawful conduct, not from a continuing harmful effect. *See Torres v. Hosp. San Cristobal*, 831 F. Supp. 2d

36

Add. 36

540, 544 (D.P.R. 2011), *M.R. (Vega Alta), Inc. v. Caribe Gen. Elec. Prods., Inc.*, 31 F. Supp. 2d 226, 240 (D.P.R.1998)(citing *Arcelay v. Sanchez*, 77 D.P.R. 824, 838 (1955)). In that respect, this District has expressed:

> For there to be a continuous tort, Defendants must be continuously acting, i.e., continuing to dump pollutants on Plaintiffs' land. Defendants are not continuously acting when the pollutants entering the land are doing so without any further impetus on the part of the Defendants beyond that committed in 1988.

*Id.*

In this case, Plaintiffs pleaded a pattern of interrupted acts of deceit on Defendants' part.

> Through the GCC, Defendants funded a marketing campaign of deception that continues to this day, in violation of federal and Puerto Rico consumer protection rules, anticompetitive practices, racketeering statutes, and common law. (Docket No. 205, ¶6).

> Because Defendants continue to this day to deceive the public and harm the Plaintiffs and their injury is ongoing and extends the limitations period. (Id., ¶¶ 23-25).

> In response to this development, and to stave off approval of the treaty by the U.S. Senate and other climate action in the United States, the GCSCT's memo ("GCSCT Action Memo") mapped out a multifaceted deception strategy for the fossil fuel industry that continues to this day—outlining plans to reach the media, the public, and policy makers with a message emphasizing "uncertainties" in climate science. (Id., ¶429).

> While Defendants now outsource outright climate denial, their public-facing deception continues to this day through a variety of "greenwashing" campaigns. (Id., ¶501).

> All of these greenwashing tactics have been and continue to be used to conceal the Defendants' continuous sponsorship of climate denial and their record-breaking profits from fossil. (Id., ¶557).

37

At this stage, based on the above, I find that Plaintiffs have sufficiently alleged that Defendants engaged in a continued pattern of unlawful acts or omissions which cause foreseeable damages. Although my analysis could stop at this point, I will address Plaintiffs' other arguments regarding tolling of the statute of limitations.

### 3.  *Equitable Tolling*

Even if the Court deems that the conduct is not continuous, Plaintiffs argue, the limitations period is tolled regarding Defendants pre-2017 statements because they fraudulently concealed the nature of their disinformation campaign.

"The equitable tolling doctrine extends statutory deadlines in extraordinary circumstances for parties who were prevented from complying with them through no fault or lack of diligence of their own." *See Neves v. Holder*, 613 F.3d 30, 36 (1st Cir. 2010) (citing *Fustaguio Do Nascimento v. Mukasey*, 549 F.3d 12, 18–19 (1st Cir.2008) and *Gonzalez v. United States*, 284 F.3d 281, 291 (1st Cir. 2002)).

To receive the benefit of equitable tolling, a plaintiff must satisfy two essential elements: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Bah v. Enter. Rent-A-Car Co. of Bos., LLC*, 699 F. Supp. 3d 133, 138 (D. Mass. 2023), judgment entered, No. CV 17-12542-MLW, 2024 WL 185446 (D. Mass. Jan. 17, 2024)(citations omitted). In addition, the First Circuit has identified five criteria that courts may consider "as factors within the Supreme Court's two-part standard": (1) a lack of actual notice of a time limit; (2) a lack of constructive notice of a time limit; (3) diligence in the pursuit of one's rights; (4) an

38

Add. 38

absence of prejudice to a party opponent; and (5) the claimant's reasonableness in remaining ignorant of the time limit. *Id.* (citing *Neves*, 613 F.3d at 36 n.5.).

Plaintiffs argue that they have been diligently pursuing their rights and that they were unable to file suit before because Plaintiffs deliberately concealed the extent of their actions. Plaintiffs point to the release in March 2022 of a report titled "How Much Have the Oil Supermajors Contributed to Climate Change? Estimating the Carbon Footprint of the Oil Refining and Petroleum Product Sales Sectors" as the pivotal point in their awareness of the injury. (Docket No. 280, at 7)("After reviewing this report, Plaintiffs learned which entities have a causal link to Plaintiffs' injuries and their respective market shares in the fossil fuel industry.").

Defendants refute that analysis and argue instead that Plaintiffs should have known of their alleged injuries when the storms passed in 2017. In fact, they state, several municipalities across the nation filed similar complaints in the aftermath of the Hurricanes, *e.g. Cnty. of San Mateo v. Chevron Corp.*, ECF No. 1-2, No. 17-cv-4929 (N.D. Cal. Aug. 24, 2017). Plaintiffs also cite several major media outlets that covered the subject, such as the New York Times. Based on this wealth of evidence, Defendants argue, Plaintiffs should have uncovered the connection between fossil fuels and climate change with minimal diligence.[15]

---

[15] Defendants Conoco, API and Chevron argue that Plaintiffs' claims are time-barred in their separate Motions to Dismiss. (Docket Nos. 237, 254 and 239). Conoco avers that its publicly filed 2012 Form 10-K discusses state, national, and international responses to climate change that should have put Plaintiffs on notice that they could be injured. (Docket No. 237, at 14). API argues that in their case, the statute of limitations is even further expired because Plaintiffs' claims against API do not relate back to the original Complaint. Finally, Chevron alleges that Plaintiffs' counsel undertook a three-year investigation into Defendants' potential liability that began no later than 2018 or 2019. Thus, since at least that time,

39

Add. 39

Plaintiffs riposte that general knowledge of fossil fuels' connection to climate change would not be enough to trigger the statute of limitations. Because this is an action based on fraud and concealment, the key is when Plaintiffs learned of the deception.

The doctrine of equitable tolling only applies "if a plaintiff exercising reasonable diligence could not have discovered information essential to the suit." *Abdallah v. Bain Cap. LLC*, 752 F.3d 114, 120 (1st Cir. 2014)(citing *Bernier v. Upjohn Co.*, 144 F.3d 178, 180 (1st Cir.1998) and *Protective Life Ins. Co. v. Sullivan*, 425 Mass. 615, 631, 682 N.E.2d 624 (1997)).

Examining the criteria for equitable tolling set forth above, I find that Plaintiffs have established that the doctrine applies here. Plaintiffs have alleged that they pursued their rights diligently, conducting investigations prior to filing. They also allege that extraordinary circumstances exist because Defendants conducted a well-organized campaign of deceit. I am not convinced by Defendants pointing to several articles and reports regarding the relationship between climate change and fossil fuels and even the concerted efforts of the major fuel companies to misinform the public. Their contention that these articles should have put Plaintiffs on notice even prior to 2017 of their potential cause of action is unavailing because I only took judicial notice of the fact that those documents were published, not of the truth of their contents.

---

Plaintiffs should have been aware that they had a cause of action. (Docket No. 239, at 11-12). I need not address these arguments because they do not alter the conclusion that Plaintiffs' claims are timely based on the continuous tort doctrine.

40

Add. 40

For these reasons, I find that even if the injury wasn't continuous, equitable tolling would make Plaintiffs' claims timely.

### 4. *Class action tolling*

As to the last point, Plaintiffs cite a Puerto Rico case for the proposition that the filing of a class action automatically tolls the statute of limitations. In *Nevarez Agosto v. United Surety & Indemnity Company*, 209 D.P.R. 346, 2022 WL 1523597 (P.R., 2022), the Court held that when a case is presented as a class action, the statute of limitations is automatically tolled both for the plaintiffs who were part of the original lawsuit and for all potential plaintiffs who are members of the class, including those who were unaware of the proceedings. *Id*. The tolling, however, applies to prospective claims, not the original class action. That case, which triggers the tolling, which must be brought within the statutory limits. In *Nevarez Agosto*, for example, the plaintiff benefitted from the tolling of the statute of limitations to bring an independent action against insurance company United after the Secretary of the Department of Consumer Affairs filed a class action against several insurance companies, United included.

Moreover, *Gonzalez v. Merck*, 166 D.P.R. 659, 683–84, 2006 TSPR 2 (Jan. 5, 2006), clearly delineates the rule by stating: "There is no doubt of the tolling effect that filing a class action has for a later action filed by the individual defendants."

In conclusion, I find that Plaintiffs' claims are not time-barred, as discussed above, under the continuous tort rule. However, their arguments regarding class action tolling under Puerto Rico law are unconvincing.

### D. Failure to State a Claim

#### 1. *RICO*

41

Add. 41

Plaintiffs' fourth, fifth, sixth, and seventh causes of action allege RICO violations in the form of mail and wire fraud under Sections 1962(a)-(d). Defendants move for dismissal on several grounds. First, because Plaintiffs' RICO claims are based on Defendants' membership on API and GCC and participation in public debates about climate change they are precluded by the First Amendment and the *Noerr-Pennington* doctrine. Second, that the Complaint fails adequately to plead the elements of a RICO cause of action. And third, that Plaintiffs' RICO claims improperly seek damages for injuries allegedly sustained by the Municipalities' residents, rather than Plaintiffs themselves, and for the costs of government services.

### a. First Amendment and the Noerr-Pennington doctrine

Defendants categorize all of Plaintiffs' RICO allegations as protected speech or membership in a lawful organization. In essence, Defendants state that Plaintiffs are suing them for their public statements on climate change through the course of decades. Those are protected activities and the First Amendment and the *Noerr-Pennington* doctrine bar Plaintiffs' attempts to hold Defendants liable for political speech.

"[T]he First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (quoting *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002)); *see also* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances."). Relevant to this case, the Supreme Court has held that "political speech does not lose First Amendment protection 'simply because its

42

source is a corporation.'" *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 342, 130 S. Ct. 876, 900, 175 L. Ed. 2d 753 (2010)(citing *First Nat. Bank of Boston v. Belloti,* 435 US. 765, 784 98 S. Ct. 1407 and *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.,* 475 U.S. 1, 8, 106 S. Ct. 903, 89 L.Ed.2d 1 (1986)).

In their response, Defendants distinguish between protected speech and fraudulent statements within a concerted disinformation campaign. Given that the Amended Complaint charges Defendants with deliberately misleading the public through fraud, they reason that neither the First Amendment, nor the *Noerr-Pennington* doctrine apply to bar their claims.

Fraudulent statements are not protected by the First Amendment. *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 84 (1st Cir. 2008), *abrogated by Sorrell v. IMS Health Inc.*, 564 U.S. 552, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011)("Such communications—e.g., insider information about securities, fraudulent statements, or speech that would violate intellectual property laws—are routinely regulated without First Amendment inquiry."); *Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 496, 116 S. Ct. 1495, 1504, 134 L. Ed. 2d 711 (1996)(The Supreme Court has held that the First Amendment "protect[s] the dissemination of truthful and nonmisleading commercial messages about lawful products and services.").

The Noerr-Pennington doctrine, "which derives from the First Amendment's guarantee of 'the right ... to petition the government for redress of grievances,' U.S. Const. amend. I, shields from antitrust liability entities who join together to influence government action—even if they seek to restrain competition or to damage competitors."

Add. 43

*Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 147 (1st Cir. 2000). The doctrine has a "sham" exception, "which withholds immunity when a party's resort to governmental process from antitrust immunity when such resort is objectively baseless and intended only to burden a rival with the governmental decision-making process itself." *Guimerfe, Inc. v. Perez-Perdomo*, No. CIV. 08-1243CCC, 2009 WL 918933, at \*3 (D.P.R. Mar. 31, 2009)(citing *Davric Maine Corporation,* 216 F.3d. at 147).

This is precisely the type of conduct that Plaintiffs denounce in their allegations. Making the assessment of whether Noerr-Pennington immunity applies is a highly factual determination. Our District has taken the position that assessing the applicability of Noerr-Pennington amounts to a "highly factual determination[ ] inappropriate for a dismissal motion." *Abarca Health, LLC v. PharmPix Corp.*, 915 F. Supp. 2d 210, 216 (D.P.R. 2012)(citing *Guimerfe, Inc.,* 2009 WL 918933, at \*3–4 ). "Whether this is, in fact, the case, and whether or not defendant fall within the immunity provided by the Noerr–Pennington doctrine, are highly factual determinations inappropriate for a dismissal motion." *Guiferme*, 2009 WL 918933, at \*4.

I thus find that, at this stage, Defendants' request for dismissal under the First Amendment and the Noerr-Pennington doctrine should be denied.[16]

---

[16] Four defendants, Conoco, Chevron, Chevron, Shell, and API raised First Amendment and/or Noerr-Pennington doctrine arguments in their individual motions to dismiss. (Docket Nos. 237, 239, 244 and 254). Their arguments, however, mirror those in the Joint Motion and were discussed and ruled upon in that section. Only Chevron raised specific arguments regarding the insufficiency of the allegations as to its participation in the alleged scheme at the heart of this suit. However, a review of the Amended Complaint shows otherwise. Plaintiffs alleged particularized facts regarding Chevron's involvement in the RICO conspiracy. (Docket No. 205, ¶¶205, 211(a), 309, 327, 365, 368, 369, 372, 386, 406, 498).

### b. *Proximate Cause*

Next, Defendants move for dismissal for failure to adequately plead a RICO cause of action. According to Defendants, Plaintiffs have failed to plead any of the essential elements: no causation, no enterprise, no racketeering activity, no pattern, no management or control, no investment, no acquisition, and no conspiracy.

RICO makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §1962(c). To state a plausible RICO claim under §1962(c), a plaintiff must allege each of the four elements required by the statute: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 14–15 (1st Cir. 2000); *Giuliano v. Fulton*, 399 F.3d 381, 386 (1st Cir. 2005). "Racketeering activity," as defined in § 1961(1)(B), may include, among others, two "predicate acts" of mail or wire fraud under 18 U.S.C. § 1341 and 18 U.S.C. § 1343, respectively. To constitute a "pattern", at least two acts of racketeering activity must occur within ten years of each other. *Id.* § 1961(5). In addition, a RICO plaintiff must show that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Giuliano v. Fulton*, 399 F.3d at 386–87 (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L.Ed.2d 195 (1989)).

Defendants posit that Plaintiffs' RICO claims fail on the first requirement, because they failed to plead that anybody relied on Defendants' purported misrepresentations.

Plaintiffs don't even plead that they in fact purchased Defendants' products. Instead, they allege that they are Defendants' customers "on information and belief". (Docket No. 235, at 26, referencing Docket No. 205, at ¶¶103–186). But more importantly, Defendants argue, that the causal link is too attenuated because there are too many steps in the causal chain. As Defendants put it, the injury to Plaintiffs would depend on the acts of possibly every human being or entity on Earth that has combusted oil and gas. In that sense, Defendants categorize Plaintiffs' claims as speculative and "facially implausible" because they suggest that the damage of the 2017 storms and its impact was caused by Defendants' actions.

Plaintiffs counter that they plead enough to survive dismissal at this stage, pointing to Claims Four through Seven of the Amended Complaint and to the RICO statement. (Docket No. 205, at 250-269 and 206). Regarding causation, Defendants describe their causal theory as follows: "Defendants...have funded a fraudulent marketing campaign of deception that continues to this day, to convince all consumers, including Plaintiffs, that Defendants' fossil fuel-based products did not—and would not—adversely alter the climate, while knowing the disastrous consequences of their combined carbon pollution on the world and Plaintiffs more so than most." (Docket No. 280, at 34). The harm adduced is that Plaintiffs increased their consumption of fossil fuels, under those false pretenses, which in turn destroyed Puerto Rico's infrastructure and property during the 2017 Hurricane Season. (Docket No. 206, ¶¶ 2(h), 5, 8(a), 30, 31.).

According to the Supreme Court, proximate causation requires a direct relationship between the injury asserted and the injurious conduct alleged. *Holmes v.*

46

*Sec. Inv. Prot. Corp.,* 503 U.S. 258, 274, 112 S. Ct. 1311, 1321, 117 L. Ed. 2d 532 (1992)(*citing Associated General Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 545, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)).

Defendants correctly point out that the First Circuit has identified three functional factors to assess whether there is proximate cause under RICO. *Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*, 990 F.3d 31, 35–36 (1st Cir. 2021) (citing *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 35-36 (1st Cir. 2013) and *Holmes*, 503 U.S. at 269-70)). The first factor is "concerns about proof" because "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors". *Sterling*, 990 F.3d at 35-36 (citing *In re Neurontin*, 712 F.3d at 36.). The second factor is "concerns about administrability and the avoidance of multiple recoveries." *Id.* The third and final factor is "the societal interest in deterring illegal conduct and whether that interest would be served in a particular case." *Id.*

Defendants direct the Court to *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 130 S. Ct. 983, 175 L. Ed. 2d 943 (2010), arguing that dismissal at the pleading stage for an "attenuated causal link" is proper. In *Hemi Group*, the Supreme Court held that the chain of causation was too attenuated because the Defendant's theory of liability rested not only on separate actions, but on separate actions carried out by separate parties. *Id.* at 11. Defendants say that the *Hemi* Court granted dismissal with a "far less attenuated chains of causation" than the one in this case. (Docket No. 235, at 27).

A case from our Circuit, *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 25–26 (1st Cir. 2013), provides a more fitting factual scenario. The case concerned a class

47

Add. 47

action claiming that defendants had engaged in the fraudulent marketing of Neurontin for off-label uses. Plaintiffs asserted claims under RICO, as well as state-law claims for common law fraud, violation of consumer protection statutes, and unjust enrichment. *Id*. at 26.

On the issue of causality, the Court of Appeals echoed the holding of *Bridge v. Phoenix Bond & Indemnity Co.*, 128 S. Ct. 2131, to find that first-party reliance on misrepresentations is not an element of proximate cause in a mail fraud RICO claim. That means that even where the citizens instead of the Municipalities were the direct recipients of the misrepresentations, Plaintiffs have asserted enough for proximate causation under RICO. *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d at 38 (internal citations omitted) ("The *Bridge* Court rejected the attempt to impose a direct reliance requirement on top of the statutory language providing a private right of action under RICO, finding no support for it in the common law. We likewise find none here."). The First Circuit thus rejected the multiple steps defense, finding that the argument "misconstrue[d] the way in which the Court framed the direct relation test." *Id*. at 38.

Plaintiffs pled that they directly suffered the consequences of Plaintiffs' intentional misrepresentations. (Docket No. 205, ¶¶3, 7(h), 614,652, 654). Therefore, like the *In re Neurontin* court, I believe the amended complaint has set forth enough factual allegations of proximate cause under RICO.

### c. Failure to allege an "enterprise"

Civil RICO requires a showing "(1) that there existed an enterprise, which affected interstate commerce; (2) that codefendants were employed by or associated with the enterprise; (3) that codefendants participated in the conduct of the enterprise's affairs;

48

Add. 48

and (4) that codefendants' participation was through a pattern of racketeering activity." *Corporación Insular de Seguros v. Reyes-Muñoz,* 849 F. Supp. 126, 133–34 (D.P.R. 1994). The RICO statute provides that an enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." § 1961(4). The term thus has a broad reach, "encompassing 'any ... group of individuals associated in fact.'" *Boyle v. United States*, 556 U.S. 938, 944, 129 S. Ct. 2237, 2243, 173 L. Ed. 2d 1265 (2009) (citing § 1961(4)).

So-called associations-in-fact may be an enterprise "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle*, 556 U.S. 938, 944 (citing *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 2528, 69 L. Ed. 2d 246 (1981)). RICO does not require that the enterprise be driven by an economic motive. *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 257, 114 S. Ct. 798, 803–04, 127 L. Ed. 2d 99 (1994).

Plaintiffs allege that Defendants acted "through their enterprises-in-fact—the GCC, API, and [their] members." (Docket No. 206, ¶ 2(h)). To be more specific, Plaintiffs allege that only the Oil and Gas Defendants participate in the conduct of the API Enterprise's affairs, and that all Defendants (basically all Defendants except API) participate in the conduct of the GCC Enterprise's affairs. (Docket No. 205, ¶729). The purpose of the enterprises was to mislead regarding climate science and influence public perception of fossil fuel's contribution to climate change. (Docket No. 205, ¶¶ 718-723).

Defendants, point out that the GCC ceased operating in 2002, and Plaintiffs cannot rely on that entity to establish the enterprise because they failed to plead that

49

Add. 49

Defendants operated as a "continuing unit" after 2002. In their Amended Complaint, Plaintiffs admitted that the GCC "was discontinued in 2001." However, it allegedly continues to operate "informally today through other associations like API and the National Association of Manufacturers as an association-in-fact of the Defendants." (Docket No. 205, ¶ 211(a); and 206 ¶¶ 3(b)(v), 10)).

The law does not require that a RICO enterprise be a legal entity. *See United States v. Rodriguez-Torres*, 939 F.3d 16, 24 (1st Cir. 2019). In fact, the group does not need a "hierarchical structure," "chain of command," or "decisionmaking framework." *Boyle*, 556 U.S. at 948. What is required is that the group have "[1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946; *see also Rodriguez-Torres*, 939 F.3d at 24.

Regarding the "purpose" factor, the association must have the "common purpose of engaging in a course of conduct." *Id.* (citing *Boyle*, 556 U.S. at 946). To establish the "relationships" there must be "evidence that the group members came together to advance 'a certain object' or 'engag[e] in a course of conduct.'" *Id.* Finally, as to "longevity", the association must have a shared purpose for a "sufficient duration to permit an association to 'participate' in [the enterprise's affairs] through 'a pattern of racketeering activity,' " *Id.* There is no requirement, however, that the duration factor be continuous. *Id.* ("nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.").

A review of Plaintiffs' allegations shows that they sufficiently pled that the API and the GGC operated as an as an association-in-fact enterprise. Plaintiffs allege that the

50

Add. 50

purpose of the organizations was to engage in a propaganda campaign to misrepresent the effects of fossil fuels on climate change. Plaintiffs also pled that the members of those organizations came together for a common purpose. To that end, they commissioned reports, distributed videos, and issued statements and directives as a united group. (Docket No. 205, at ¶¶362-392). As to the last point, Plaintiffs include allegations that the associations have engaged in that common purpose for decades and continue to do so until today. Defendants allege specific actions undertaken by the associations for at least a decade. In *Rodriguez-Torres*, the Court found that continuing as a cohesive unit for at least eight years was enough to satisfy the "longevity" requirement. *Rodriguez-Torres*, 939 F.3d at 25.

### d.      Racketeering Activity

Plaintiffs in RICO mail and wire fraud actions such as this one, must comply with the Fed. R. Civ. P. 9(b) heightened pleading standard[17] and "state the time, place and content of the alleged mail and wire communications perpetrating that fraud." *N. Bridge Assocs., Inc. v. Boldt*, 274 F.3d 38, 43 (1st Cir. 2001); *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987).

Defendants argue that the Amended Complaint does not comply with this standard and fails to plead adequately a pattern of racketeering activity and the individual Defendants' participation in conducting the affairs of the enterprise. As noted,

---

[17] Fed. R. Civ. P. 9(b) provides that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

51

Add. 51

to sufficiently allege a "pattern," a plaintiff must establish at least two acts of racketeering occurred within ten years of each other. 18 U.S.C § 1961(5). Additionally, a "pattern" also requires "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989).

According to Defendants, Plaintiffs fail to allege mail and wire fraud with particularity as to each Defendant and in the aggregate. Defendants distinguish between schemes that lead their victims to enter into unwanted transactions versus those that include a misrepresentation of a key factor of the bargain. *See Medina-Rodriguez v. $3,072,266.59 in United States Currency*, 471 F. Supp. 3d 465, 478 (D.P.R. 2020) (quoting *United States v. Kelerchian*, 937 F.3d 895, 912 (7th Cir. 2019)). The former does not violate mail and wire fraud statutes, while the latter does. Defendants cite a recent Supreme Court case, *Ciminelli v. United States*, 598 U.S. 306 (2023), 143 S. Ct. 1121, 1124–25, 215 L. Ed. 2d 294 (2023), in support of their argument that the mail and wire fraud statutes are inapplicable where a victim was denied information as opposed to property. Defendants thus move the Court to adopt the view that Plaintiffs can only be defrauded when they are denied actual property. In essence, because Plaintiffs received fuel when they bought fuel, they cannot sustain a claim under the mail and wire statutes.

The wire fraud statute criminalizes "scheme[s] or artifice[s] to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *See* 18 U.S.C. § 1343. The Supreme Court has interpreted the statute to require that the Government prove not only that wire fraud defendants "engaged in deception," but also that money or property was "an object of their fraud." *Kelly v. United*

52

Add. 52

*States*, 590 U.S. 391, 391, 140 S. Ct. 1565, 1566, 206 L. Ed. 2d 882 (2020); *Ciminelli*, 598 U.S. at 312. Further interpreting and defining the contours of the *Kelly* decision, the First Circuit recently held that "property need only be 'an object' of [defendants'] scheme, not the sole or primary goal." *United States v. McGlashan*, 78 F.4th 1, 8 (1st Cir. 2023) (quoting *United States v. Gatto*, 986 F.3d 104, 116 (2d Cir. 2021)).

In *Ciminelli*, which Defendants rely upon, the Supreme Court held that "potentially valuable economic information necessary to make discretionary economic decisions is not a traditional property interest," and thus, does not form "a valid basis for liability under § 1343." *Ciminelli*, 598 U.S. at 309 (international quotations omitted).[18]

The allegations in this case, however, do not turn on whether Defendants crafted a scheme to deprive Plaintiffs of their intangible right to "valuable economic information." The object of the RICO conspiracy, as alleged, was to create and disseminate erroneous, misleading information, with the purpose of obtaining property of value, i.e., money, from the sale of Defendants' products to Plaintiffs. (Docket No. 205, at ¶480). Thus, the facts in this case are distinguishable.

Next, Defendants argue that Plaintiffs fail to plead fraudulent conduct with the requisite particularity required under Fed. R. Civ. P. 9(b). Plaintiffs failed to allege the essential "when, where, and how often the allegedly false statements were made or what, specifically, was stated." *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 358 (1st Cir.

---

[18] The ruling thus rejected the Second Circuit's "right to control" theory of property. *Ciminelli*, 598 U.S. at 314.

53

Add. 53

2013) and *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985). Such omissions warrant dismissal according to the Defendants.

Plaintiffs respond that the First Circuit is reluctant to automatically dismiss RICO cases at the pleading stage if some details are missing. *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987). Instead, they move the Court to allow discovery after considering the following factors laid out in *Becher*: (1) whether the plaintiff presents "a general scheme to defraud," (2) whether the plaintiff's allegations "make it likely that the defendant used interstate mail or telecommunications facilities," and (3) whether "the specific information as to use is likely in the exclusive control of the defendant." *Id*. at 290-91.

Looking at Plaintiffs' pleadings, I find that more information is needed to satisfy Rule 9(b). Although plaintiffs alleged a "general scheme to defraud" that used mail and wire communications for economic gain (Docket No. 205, at ¶¶ 718, 720, 721, 723, 724(a)-(l), 725, 728, 729, 757) and identified certain sender, dates, and content of allegedly fraudulent correspondence, I find that the specificity required of Rule 9(b) falls short.

However, following the ruling of *Becher*, I recommend that Plaintiffs be allowed to conduct discovery on the RICO claims. Plaintiffs have sufficiently pled that most of the information pertaining to the predicate acts is likely under the control of Defendants. Taking as true Plaintiffs' allegations, as I must, it is reasonable to deduce that Defendants should have discoverable information regarding the "who, what, when, where" of the communications. *See Becher*, 829 F.2d at 290 ("We advocate this procedure because of the apparent difficulties in specifically pleading mail and wire fraud as predicate acts.").

54

Add. 54

### e.  A pattern of racketeering activity

Defendants next argue that Plaintiffs have not alleged a "pattern", which requires "at least two predicate acts of 'racketeering activity'" occurring within ten years of each other. 18 U.S.C § 1961(5); *Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 233 (1st Cir. 2003). Additionally, as noted earlier, a "pattern" also requires "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. at 239. Predicate acts of racketeering are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240. To establish the continuity aspect of a RICO claim, the scheme must extend "over a substantial period of time" or "show signs of extending indefinitely into the future." *Efron*, 223 F.3d at 16.

According to Plaintiffs, this is a case of closed continuity which involves "a series of related predicates extending over a substantial period of time."[19] *H.J.*, 492 U.S. at 242. (Docket No. 280, at 43). Defendants refute this view, stating that are no facts suggesting that the alleged racketeering activities will continue. For one, GCC ceased its activities more than two decades ago. And, secondly, Plaintiffs only state—at best—that Defendants' activities continue in the present day but without properly pleading allegations to substantiate their statement.

---

[19] On the other hand, "open continuity" is applicable where (1) the defendants' activities "involve a distinct threat of long-term racketeering activity[;]" and (2) the predicate acts "are part of an ongoing entity's regular way of doing business." *United States v. Chin*, 965 F.3d 41, 48 (1st Cir. 2020) (citation omitted).

55

Add. 55

Here, Plaintiffs proffer 81 predicate acts in the Appendix to the Amended Complaint (Docket No. 205-1). These acts span decades, well above the ten-year threshold. (Id.). Plaintiffs identify approximate dates, contents of the communications, senders, and recipients. (Id.) The predicate acts identified "have a similar purpose" and involve "similar participants." (Id.) As alleged, the events are not isolated, but a link in an elaborate, concerted scheme. That is enough to survive dismissal at this stage.

### f. Conduct of the Enterprise

Defendants also seek dismissal on the basis that Plaintiffs fail to plead sufficient facts showing that each, or any Defendant, conducted the alleged enterprise.

RICO's Section 1962(c) requires that a defendant "conduct or participate, directly or indirectly, in the conduct" of the enterprise. 18 U.S.C. § 1962(c). All that is statutorily required is that the defendant have "some participation in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993). Furthermore, "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184. Although "primary responsibility for the enterprise's affairs" is not necessary, "some part in directing the enterprise's affairs is required." *Id.* at 179; *see also United States v. Hurley*, 63 F.3d 1, 9 (1st Cir. 1995); *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994). For example, the First Circuit has held that an accountant who only carries out ordinary accounting function does not control the enterprise. *See United States v. Houlihan*, 92 F.3d 1271, 1298 (1st Cir. 1996).

Defendants' position is that there are no plausible factual allegations asserting that they exercised control over any enterprise. Whatever pleadings there may be that

56

Add. 56

address the issue are "conclusory," "boilerplate," and only claim mere association, not "control." (Docket No. 235, at 52).

Plaintiffs counter that their pleadings outline specific facts that show Defendants were not mere associates in the GCC and API enterprises. As per their allegations, Defendants effectively controlled the enterprises through several activities that maintained operative power. Specifically, Plaintiffs allege: senior executives of Defendants have served as API Board of Director; the API Board of Directors has been chaired by executives of Defendants every year for the past five years Chevron (2022-present), Conoco (2020-2022), Exxon(2018-2020), and Phillips 66, a subsidiary of Defendant Conoco (2016-2018); Defendants have made financial contributions to API that make up a large portion of its yearly income; Defendants have contributed financially to the enterprises in tens of millions of dollars annually; Defendants have organized, controlled and participated in API committees, task forces, initiatives, marketing efforts, lobbying and communications for the past 50 years. (Docket No. 205, at ¶746(a-d)). Plaintiffs provide additional examples of the involvement of some of the Defendants in leadership positions in the enterprises. (Id., at ¶747).

Taking these facts as true, I find that Plaintiff has adequately pled that Defendants participated in the operation and management of the alleged enterprise. *See, e.g.*, *Duggan v. Martorello*, 596 F. Supp. 3d 158, 193 (D. Mass. 2022).

### g.    *Dismissal of claims under 18 U.S.C. §§1962(a-b)*

Additionally, Defendants seek dismissal of Plaintiffs' claims under sections 1962(a) and (b) for failing to plead any injuries attributable to Defendants' actions.

57

Add. 57

RICO makes it a crime to invest income derived from a pattern of racketeering activity in an enterprise "which is engaged in, or the activities of which affect, interstate or foreign commerce," 18 U.S.C. § 1962(a); or to acquire or maintain an interest in an enterprise through a pattern of racketeering activity, § 1962(b). Under Section 1962(a), the alleged "injury resulting from the investment of racketeering income" must be "distinct from an injury caused by the predicate acts themselves." *Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp.*, 57 F.3d 56, 91 (1st Cir. 1995)(cleaned up). Likewise, Section 1962(b) requires proof of harm "beyond that resulting from the fraud which constituted the predicate act." *Id*. at 92. "It is not enough for a plaintiff to allege an injury caused by defendants' predicate acts of racketeering." *Puerto Rico Med. Emergency Grp., Inc. v. Iglesia Episcopal Puertorriquena, Inc.,* 118 F. Supp. 3d 447, 459 (D.P.R. 2015).

In their opposition, Plaintiffs do not rebut Defendants' arguments regarding Sections §§1962(a-b).

In this case, the damages alleged relate to the scheme to misinform the public and the Municipalities, which are the predicate acts of racketeering described in the Appendix to the Amended Complaint (Docket No. 205-1). Plaintiffs have not pled that Defendants' acquisition or maintenance of control over the enterprises is what caused the harm, nor have they pled that they suffered injuries from the use or investment of any income derived from the racketeering activities. *See Puerto Rico Med. Emergency Grp., Inc.,* 118 F. Supp. 3d at 459. Therefore, Plaintiffs have failed to state a claim for relief under sections 1962(a) and (b). I recommend that Defendants' motion to dismiss Plaintiffs' sections 1962(a) and (b) be granted.

58

Add. 58

### h. Failure to sufficiently allege a conspiracy

Defendants urge the Court to also dismiss for failure to state a claim, the cause of action under section 1962(d), which prohibits conspiracies to violate RICO.

In addition to the other elements under RICO, a claim of conspiracy under the statute requires one additional element: "an agreement with others to commit a substantive RICO violation." *United States v. Marino,* 277 F.3d 11 (1st Cir. 2002). Defendants affirm that Plaintiffs have only made conclusory allegations in support of their claim of an agreement between any of the ten Defendants.

According to Plaintiffs, however, the First Circuit follows the standard set forth in *Salinas v. United States,* 522 U.S. 52, 61, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997)). *Salinas* merely requires a showing that a Defendant intended to further the enterprise "with the knowledge and intent that at least one member of the RICO conspiracy would commit at least two racketeering acts in pursuit of the goals of the enterprise." *United States v. Velazquez-Fontanez,* 6 F.4th 205, n.11 (1st Cir. 2021). (Docket No. 280, at 46).

The First Circuit has in fact adopted the *Salinas* standard. In so doing, it has held that proving a RICO conspiracy does not require a showing that the defendant personally committed or agreed to commit the two or more predicate acts required. *See United States v. Cianci,* 378 F.3d 71, 90 (1st Cir. 2004) (*citing Salinas,* 522 U.S. at 61). In a case with multiple Defendants, the plaintiff "does not need to allege that each conspirator agreed to commit (or actually committed) two or more predicate acts." *Laverty v. Massad,* No. CIV. 08-40126-FDS, 2009 WL 1873646, at *6 (D. Mass. Mar. 10, 2009) (citing *Salinas,* 522 U.S. at 64). In fact, "[n]o overt act is required." *Id.* (citing *Salinas,* 522 U.S. at 64).

Add. 59

In their pleadings, Plaintiffs alleged the existence of an illicit agreement between the Defendants, which they entered into with the knowledge an intent to commit predicate acts in furtherance of their endeavor. (Docket Nos. 205, ¶ 757 and 205-1, ¶18). The Amended Complaint states that Defendants "formulated, funded and supported the GCC enterprise to deceive the public, investors, regulators, Plaintiffs and their citizens, persons of ordinary prudence and comprehension, that their products and business model did not accelerate climate change, and/or that climate change was not real or a threat to the public, including the Municipalities and their citizens." (Docket No. 205, ¶ 757). Furthermore, Plaintiffs allege that Defendants conspired to "market[] false and misleading public statements, through mail and wire, conceal[] and suppress[] internal research data from the public and their investors which proximately caused the damage to the Municipalities in Puerto Rico as alleged herein." (Id.). These allegations are enough to clear the 12(b)(6) threshold, and I thus also recommend denial of the motion to dismiss on this ground.[20]

Codefendants Motiva, API, Conoco, BP, Exxon, BHP, Chevron and Shell also moved independently for dismissal for failure to allege a plausible RICO cause of action as to them. I will briefly discuss each of their arguments.

---

[20]Additionally, Defendants raise lack of standing, arguing that Plaintiffs have not alleged that they suffered a concrete injury directly caused by the alleged conspiracy. Other than citing one case, Defendants' argument is not developed. *See, United States v. Ramdihall*, 859 F.3d 80, 95 (1st Cir. 2017)(citing *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)(arguments raised in a "perfunctory manner" need not be considered by the Court.) Plaintiffs have sufficiently alleged that they suffered an injury. (Docket No. 205, at 760-61).

60

Add. 60

**Motiva's Motion to Dismiss (Docket No. 240)**

Motiva argues that Plaintiffs have lumped it together with the other Defendants and have failed to identify any Motiva-specific conduct that would satisfy the specificity requirements of Rule 9(b). For example, Motiva posits that there's no specific allegations of fraudulent or deceptive practices, nor of predicate acts.

Plaintiffs respond that they have identified specific conduct by Motiva that justifies their claim for relief. They point the Court to the following allegations: Motiva was one of the organizers and funders of the Global Climate Science Communications Team ("GCSCT"). (Docket No. 205, ¶430). Created within the API, the GCSCT "consisted of representatives from the fossil fuel industry, trade associations, and public relations firms. (Id., at 429). The GCSCT prepared a memo where it mapped out a deception strategy to advance the fossil fuel industry. (Id.). Motiva, together with other Defendants, through the API, purposely hid scientific studies that showed the impact that fossil fuels had on the environment. (Docket No. 205-1, ¶1).

I find that together with the rest of the allegations Plaintiffs have pled enough at this stage to survive dismissal, particularly in light of my earlier recommendation that limited discovery be allowed on the RICO claims.

**API's Motion to Dismiss (Docket No. 254)**

API's grounds for dismissing the RICO cause of action rest mainly on the argument that it cannot be liable under RICO because it is the purported RICO enterprise.

It is clear that to establish RICO liability, a plaintiff "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v.*

61

Add. 61

*King,* 533 U.S. 158, 161 (2001). Because of that distinctiveness requirement, Plaintiffs cannot seek remedy against API both as the "enterprise" and the "person" subject to RICO liability.

Plaintiffs do not refute the distinctiveness doctrine. Instead, they respond that the enterprise can be held responsible under Section 1962(a) and cite First Circuit precedent for that proposition. Plaintiffs are correct that the First Circuit has recognized that an enterprise may be held liable under Section 1962(a). *Schofield v. First Commodity Corp. of Bos.*, 793 F.2d 28, 31 (1st Cir. 1986)("The language in section 1962(a) does not require a relationship between the person and the enterprise as does section 1962(c), and so it does not require the involvement of two separate entities.").

However, I recommended that the claims under Section 1962(a) be dismissed for failure to adequately plead a cause of action. Accordingly, I similarly recommend that the claims against the API under RICO be dismissed.

**Conoco's Motion to Dismiss (Docket No. 237)**

Conoco's individual request for dismissal mirrors the Defendants' joint motion on the same grounds. In essence, Conoco argues that Plaintiffs fail to state with particularity the circumstances constituting fraud, as required under Rule 9(b). In response, Plaintiffs point to the specific allegations in their pleadings pertaining to Conoco. (Docket No. 280, at 62). The allegations discuss Conoco's membership in different organizations, task forces, and committees related to promoting the interests of the fossil fuels industry (Docket No. 205, ¶¶2, 05, 206, 211, 327, 365, 372, 430, 522); their individualized statements and reports regarding climate change (Id., ¶¶500, 569, 592); their funding and lobbying efforts (Id., at ¶503); their leadership position in the alleged RICO

Add. 62

enterprises (Id., at ¶¶530, 746(b)); their knowledge of the detrimental effect of fossil fuel products (Id., at ¶604(b)); and the racketeering acts in which they were involved (Id., ¶725).

Conoco further argues that some statements and reports Plaintiffs highlight are not false, and even if they were, fraud has not been properly plead and lack factual details. For example, they state, Plaintiffs have not indicated who at Conoco was aware of the supposed falsity of the statements. Plaintiffs riposte that the issue of the falsity of the statements should not be addressed at the motion to dismiss stage. I agree. The issue may be revisited should the presiding District Judge adopt my recommendation of allowing limited discovery on the RICO claims.

**BP's Motion to Dismiss (Docket No. 236)**

In similar fashion, BP argues that Plaintiffs have not pled racketeering conduct specific to BP and have not established how BP directed or managed the alleged enterprises. All that Plaintiffs proffer, according to Defendants, are conclusory allegations that attribute conduct to BP only through third parties.

The First Amended Complaint contains allegations about BP's membership and active participation in the enterprises and in other entities that promote fossil fuels. (Docket No. 205, ¶¶205, 211, 309, 327, 430, 520-21, ). Plaintiffs also make allegations regarding the fraudulent information and theories that BP assisted in disseminating. (Id., at ¶¶365-371, 386, 395, 412, 514, 516-517, 536, 541-545, 669, 724-725 and 728). Plaintiffs provide dates, names of the allegedly fraudulent reports and communications, names of consultants retained to fuel the propaganda campaign (S. Fred Singer), and names of BP executives who wrote communications about the company's policy regarding emissions

63

Add. 63

(Id., ¶¶545, 669). Based on the allegations contained in the Amended Complaint and the RICO statement, I find that Plaintiffs proffer sufficient facts to support a cause of action for RICO violations against BP.

**Exxon's Motion to Dismiss (Docket No. 242)**

In line with the other Codefendants' motions to dismiss, Exxon argues that Plaintiffs have failed to plead with particularity any instances of fraud. Specifically, Exxon states that the Amended Complaint only identifies six purportedly misleading statements attributable to Exxon and even those, were not plead with particularity. (Docket No. 242, at 5). Moreover, they claim, Plaintiffs failed to allege who supposedly was deceived by any of the identified statements, or who relied on those statements to their detriment. (Id., at 6-7). Lastly, Exxon argues that the remaining allegations fail because they improperly attribute statements to Defendants by grouping them with unrelated third parties. (Id., at 8-11).

After reviewing Plaintiffs' pleadings, I find that they have pled sufficient facts to survive Defendants' motion to dismiss. Plaintiffs assert, rightfully so, that Exxon is the Defendant for which they have pled the most separate acts of racketeering. (Docket Nos. 205, ¶ 725 and 205-1, ¶¶ 1-6, 7(g), 8(i), 17-18, 26-27, 29-41, 46, 51, 53-55, 69, 63-65, 66, 69, 77, 80.). In addition to allegations about membership in trade associations or advocacy groups and their leadership in these organizations, (Id., ¶¶205, 211), Plaintiffs provide details regarding studies and reports produced by either Exxon's employees or commissioned experts, regarding the impact of fossil fuels. (Id., ¶¶ 301, 306, 307, 308,

64

Add. 64

312, 313, 315, 318, 319, 320, 321). Evidence that Plaintiffs claim was disregarded, withheld, and spun into a different narrative to mislead the public.

As to pleading who were the recipients of Exxon's allegedly fraudulent communications and statements, Plaintiffs have repeatedly pled that it was Puerto Rico consumers and the Plaintiff Municipalities. (Id., ¶¶13-16, 261, 618, 685, 691, 713). Moreover, Plaintiffs have specifically pled that they relied on Defendants' false statements and misrepresentations to continue consuming their products. (Id., ¶¶ 3, 7(h), 73, 611, 614, 652, 677, 697, 711, 770, 781, 787, 796, 801, 807, 817, 827, 833).

Therefore, I find that Plaintiffs have met their burden, particularly given my recommendation that additional discovery be allowed.

**BHP's Motion to Dismiss (Docket No. 243)**

In its Motion to Dismiss, BHP argues that: (1) Plaintiffs have not tied BHP to any RICO enterprise; (2) Plaintiffs do not allege that BHP committed a single racketeering act, let alone "a pattern of racketeering activity," as required under 18 U.S.C. § 1962(a), (b), or (c); (3) Plaintiffs' claim under 18 U.S.C. § 1962(d) must fail because Plaintiffs have not adequately alleged that BHP was part of any conspiracy. (Docket No. 243, at 10).

After reviewing the Amended Complaint, I find that Plaintiffs have alleged specific acts of fraud against BHP (Docket No. 205, ¶¶ 572-574, 725). Plaintiffs have also tied BHP to the alleged enterprises and have asserted that BHP had leadership roles and control and was also a funder of the enterprises. (Id., ¶¶211, 365, 372, 395 556, 572-574 and Docket No. 205-1, ¶¶ 64-65, 78-79).

Furthermore, Plaintiffs have adequately alleged that BHP was part of the RICO conspiracy. As I previously discussed, the First Circuit does not require a plaintiff

Add. 65

alleging a RICO conspiracy to show that the defendant personally committed or agreed to commit the two or more predicate acts required. *See Cianci,* 378 F.3d at 90 (*citing Salinas,* 522 U.S. at 61). Here, Plaintiffs alleged the existence of an illicit agreement between the Defendants, which they entered with the knowledge an intent to commit predicate acts in furtherance of said conspiracy. Consistent with my previous determination on this issue, I find that the RICO conspiracy is sufficiently pled as to BHP as well.

**Chevron's Motion to Dismiss (Docket No. 239)**

Chevron moves the Court to dismiss the RICO claims, alleging that Plaintiffs have not pled "a single fact" related to Chevron's participation in the RICO enterprise. (Docket No. 239, at pg. 10). It further claims that Plaintiffs have failed to allege that Chevron supported the statements of the trade associations and lobbying groups highlighted in the Amended Complaint. I disagree.

Plaintiffs' pleadings include allegations identifying Chevron, not only as a member, but as a key player in these entities. (Docket No. 205-1, ¶¶1, 14-15, 17, 51, 56, 61, 64-65, 80). In addition, Plaintiffs have alleged that Chevron was involved in crafting the narrative that the enterprises used to further their goals. (Docket No. 205, ¶¶ 498, 527(c), 536, 546-548, 565-567). Chevron's motion to dismiss the RICO claims should be denied.

**Shell's Motion to Dismiss (Docket No. 244)**

Shell moves for dismissal on the basis of failure to allege any predicate racketeering acts or that Shell agreed to conspire with anyone. (Docket No. 244, at pg. 19). Plaintiffs respond that it has alleged 43 specific predicate acts under RICO, 15 of

66

Add. 66

which identify Shell (not Chevron) as also having a leadership role in the fraudulent acts. (Docket No. 205-1, ¶1, 2, 14-15, 17, 19, 22, 51, 57, 61, 64-65, 72-73, 80).

Again, I find that dismissal for failure to allege is not appropriate at this juncture. Plaintiffs have sufficiently pled the elements of a RICO cause of action against Shell and, as I recommended, should be allowed limited discovery. Therefore, I recommend that Shell's motion to dismiss the RICO claims be denied.

### i. *Applicability of parens patriae*

Defendants' last RICO-related argument is that Plaintiffs may not recover on behalf of their residents under the doctrine of parens patriae so any claims that might be construed under that theory should be dismissed.

States may exert their "quasi-sovereign" interest to represent the interests of individual citizens. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 600–01, 102 S. Ct. 3260, 3265, 73 L. Ed. 2d 995 (1982)(internal citations omitted). To establish a parens patriae action, "the State must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party. The State must express a quasi-sovereign interest." *Id*. at 607.

According to Defendants, the Municipalities are political subdivisions that lack their own sovereignty, and thus, they do not meet "quasi-sovereign interest" requirement. (Docket No. 235, at 37).

Without the benefit of Plaintiffs' argument in rebuttal, I must agree with Defendants' view. The parens patriae doctrine has developed as to States of the United States and has been extended to the Commonwealth of Puerto Rico. *See Alfred L. Snapp & Son, Inc.,* 458 U.S. at 609 (finding that the Commonwealth of Puerto Rico had parens

67

Add. 67

patriae standing "to pursue the interests of its residents in the Commonwealth's full and equal participation in the federal employment service scheme established pursuant to the Wagner-Peyser Act and the Immigration and Nationality Act of 1952."). However, it has not been extended to a foreign nation "unless there is a clear indication of intent to grant such standing expressed by the Supreme Court or by the two coordinate branches of government." *Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 336 (1st Cir. 2000).

Likewise, there is caselaw from other circuits holding that cities, counties and other political subdivisions may "sue to vindicate such of their own proprietary interests as might be congruent with the interests of their inhabitants," but have no parens patriae standing. *United States v. City of Pittsburg, Cal.*, 661 F.2d 783, 787 (9th Cir. 1981)(citing *In Re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973); *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1188 n. 15 (D.N.M. 2020)(gathering cases); *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir. 1979)(citing *In Re Multidistrict,* 481 F.2d at 131).

Here, the Municipalities are suing to vindicate their own proprietary rights in congruence with the interest of their residents. *See United States v. W.R. Grace & Co.-Conn.*, 185 F.R.D. 184, 190 (D.N.J. 1999) ("The doctrine of *parens patriae* does not extend to municipalities, except to the extent that a municipality's own rights are congruent with those of its residents.). Therefore, I find that Plaintiffs have standing to bring this action only as to their own proprietary rights.

### 2. Antitrust

68

Add. 68

Defendants also move the Court to dismiss the Antitrust cause of action for failure to allege the existence of any agreement and/or injury. In addition, Defendants argue that Plaintiffs seek to improperly use antitrust laws to recover for alleged environmental harms or for harms sustained by their residents. Defendants respond that making such a determination is premature because Courts should reserve judgment on motions to dismiss antitrust claims until discovery is conducted.

### a. Failure to allege an anticompetitive agreement

To plausibly plead an antitrust conspiracy pursuant to the Sherman Act, a plaintiff must establish: "(1) the existence of a contract, combination or conspiracy among two or more separate entities that (2) unreasonably restrains trade and (3) affects interstate or foreign commerce." *Norte Car Corp. v. FirstBank Corp.*, 25 F. Supp. 2d 9, 16 (D.P.R. 1998) (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 52 (1911)).

Defendants maintain that Plaintiffs have not alleged the existence of an agreement, much less an anticompetitive one. (Docket No. 235, at pg. 38). Instead, Plaintiffs merely refer to a supposed "agreement" between Defendants to "maintain their energy monopoly, fix prices, and increase obstacles for competitive entry into the [energy market]." (Id., referencing Docket No. 205, ¶ 767). Defendants view that statement as "insufficient" to assert an antitrust conspiracy. (Id.).

For Sherman Act purposes, "[a]n agreement may be found when 'the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 43 (1st Cir. 2013) (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S. Ct. 2731, 81 L. Ed.2d 628 (1984))(internal quotation marks and citation

69

omitted)). At the pleading stage, the plaintiff "may present either direct or circumstantial evidence of defendants' 'conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Id.* (citing *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L.Ed.2d 775 (1984)(citation and internal quotation marks omitted)); *see also*, *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S. Ct. 1125, 1139, 90 L. Ed. 1575 (1946)("Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition."). Therefore, the complaint must allege, at the very least, "the general contours of when an agreement was made, supporting those allegations with a context that tends to make said agreement plausible." *Id.* at 46.

Plaintiffs allege that Defendants engaged in a coordinated effort to restrain trade. (Docket No. 205, at 765-66). Specifically, Defendants "increased production to maintain their energy monopoly," "fix[ed] prices," and increased obstacles to prevent alternative energy companies from entering the market. (Id., ¶767). According to Plaintiffs, the agreement affected competition because it sought to exclude alternative energy companies through anticompetitive means. (Id., ¶¶ 616, 767). The agreement was purportedly formalized through: (i) the dissemination of evidence that was passed off as being scientific but was actually fabricated to further Defendants' goals (Docket No. 280, at pg. 56; Docket No. 205, ¶¶ 354-59, 361, 377, 378, 380, 384, 463-70); the funding of contrarian climate scientists (Id., ¶¶ 405-13, 441-62); the participation and leadership in formal and informal trade associations (Id. ¶¶ 363-67, 368, 386-87, 391); and the

70

Add. 70

launching of misleading marketing and propaganda campaigns (Id. ¶¶ 370, 376, 388-89, 501-02, 525-57).

Through these activities, Defendants created allegedly doubt regarding the real effects of climate change and the role of fossil fuels in accelerating it. (Id., ¶¶ 373, 473-86, 593, 595, 610-11). The result being that Defendants effectively excluded renewable energy sources from being available in the energy market. (Id. ¶¶ 3, 7(d), 80, 82, 88, 383, 616, 651-52).

Because they were competitors, Defendants state, they had an incentive to lower their prices and increase their production. These actions, perfectly reasonable in response to competition, cannot be ascribed to an anticompetitive agreement between Defendants. Defendants' argument is not supported by caselaw. Courts have found competitors liable for antitrust conspiracy. *See, e.g., Am. Tobacco Co.*, 328 U.S. at 809, (finding the American Tobacco Company, Liggett & Myers Tobacco Company, R. J. Reynolds Tobacco Company and American Suppliers, Inc., guilty for conspiracy in restraint of trade, among other charges). In fact, "agreement among 'actual or potential rivals' that 'eliminate[ ] some avenue of rivalry among them'—'have traditionally received antitrust's highest level of scrutiny.'" *United States v. Am. Airlines Grp. Inc.,* 675 F. Supp. 3d 65, 108 (D. Mass. 2023), *aff'd,* 121 F.4th 209 (1st Cir. 2024)(citing 11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* ¶¶ 1900, 1901b (4th ed. 2018)).

With regards to the anticompetitive aspect, Plaintiffs have pled that Defendants agreed to fix prices and restrict the entry of renewable energy players into the energy

71

Add. 71

field. (Docket No. 205, ¶¶7(d) and 767).[21] Defendants contend that an agreement needs to increase prices or decrease output to be anticompetitive.[22] The caselaw, however, makes clear that although those two metrics are "paradigmatic examples of restraints of trade,"[23] injury is also measured in terms of "decreased efficiency in the marketplace which negatively impacts consumers." *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1096–97 (1st Cir. 1994) (citing *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 21–22 (1st Cir.1990), *cert. denied,* 499 U.S. 931, 111 S. Ct. 1337, 113 L.Ed.2d 268 (1991) and *Interface Group, Inc. v. Massachusetts Port Auth.*, 816 F.2d 9, 10 (1st Cir.1987)). In short, a practice is not anticompetitive because it harms competitors, but because it harms the "competitive process." *Town of Concord*, 915 F.2d at 21–22)(internal citations omitted)("It harms that process when it obstructs the achievement of competition's basic goals—lower prices, better products, and more efficient production methods."). *See also, Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 794 (1st Cir. 1988).

---

[21] As per the Amended Complaint, Defendants "maintained their energy monopoly in Puerto Rico by conspiring, and succeeding, in keeping prices low, to prevent the development of noncarbon-based energy sources and maintain the dependency of the Municipalities and their citizens upon their products." (Docket No. 205, ¶84).

[22] The cases that Defendants cite, *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 114 (1984) and *In re German Auto. Mfrs. Antitrust Litig.*, 392 F. Supp. 3d 1059, 1072–73 (N.D. Cal. 2019), do not do much to support their arguments. In the former, the Court found that plaintiff had "restricted rather than enhanced the place of intercollegiate athletics" through its anticompetitive practices. *Board of Regents*, 468 U.S. at 120. Whereas in the latter, the Court reasoned that Defendants' consensus to follow certain vehicle specifications and agreement not to use certain features was not a "compelling example of an agreement 'to make a product of inferior quality.'" *In re German Auto. Manufacturers Antitrust Litig.*, 392 F. Supp. 3d at 1069. Particularly given the lack of allegations that consumers even wanted those features and common sense dictating that the opposite would be true for safety reasons. *Id.* This case, in contrast, claims that Defendants' concerted actions presented a barrier to entry for cleaner and safer renewable energy technologies.

[23] *Board of Regents*, 468 U.S. at 104-7 ("Restrictions on price and output are the paradigmatic examples of restraints of trade.").

Add. 72

Defendants also point out that membership in a trade organization, by itself, cannot serve to establish an unlawful agreement. *See Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988). Here, however, Plaintiffs are not alleging mere membership. Their claim is that Defendants created, funded, and led these organizations to act as propaganda machines that put out deceptive materials. Such activities "facilitate collusion," *Evergreen*, 720 F.3d at 49-50, and are not shielded from antitrust scrutiny merely because they emanate from a trade organization. *See, e.g., United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 665–66, 85 S. Ct. 1585, 1591, 14 L. Ed. 2d 626 (1965) (finding that union that is otherwise guilty of a conspiracy in violation of the antitrust laws cannot escape liability merely because some of the means of accomplishing the goals of that conspiracy were embodied in a collective bargaining agreement); *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459, 106 S. Ct. 2009, 2018, 90 L. Ed. 2d 445 (1986).

Lastly, Defendants argue that advertising and promotional activities are permitted and even considered "procompetitive." (Docket No. 235, at pg. 40). Actually, Defendants enunciate, even false advertising is not considered antitrust conduct. (Id.). Plaintiffs respond that a deceptive marketing campaign can constitute a violation of Section 1 of the Sherman Act.

Defendants cite a series of cases worth discussing. In *Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 565 45 S. Ct. 578, 578, 69 L. Ed. 1093 (1925), the Supreme Court stated that defendant Maple Flooring Manufacturers' Association, which was an unincorporated 'trade association, of which other defendants were members, engaged in many activities that were "admittedly beneficial to the industry and to consumers." *Id*.

73

Add. 73

These included "co-operative advertising" as well as the "standardization and improvement of its product." *Id*. The Court, however, makes a distinction that sets the case apart from the facts in the instant action. The Court expressed that it was neither alleged nor proved in the extensive record developed that there was an agreement among the organization's members to affect production or fix prices. *Id*. at 567. The Amended Complaint in this case, however, specifically alleges that Defendants engaged in a concerted effort to fix prices and prevent the entry of renewable energy competitors.

Another cited decision is *Retractable Techs., Inc. v. Becton Dickinson & Co.,* 842 F.3d 883, 895 (5th Cir. 2016), where it was held that "false advertising alone hardly ever operates in practice to threaten competition." Should this case turn only on false advertising, that reasoning would perhaps warrant dismissal of the antitrust cause of action. But Plaintiffs' allegations of anticompetitive behavior do not rely solely on false advertising. Instead, Plaintiffs claim that Defendants colluded to fix prices and create barriers of entry in the market.

Likewise, in *Steward Health Care Sys. LLC v. Southcoast Health Sys., Inc.*, No. CV 15-14188-MLW, 2016 WL 9022444, at *3 (D. Mass. Sept. 2, 2016), the Magistrate Judge recommended dismissal of the federal antitrust claim. The Court reasoned that a series of newspaper articles that Plaintiff claimed were defamatory "could logically be considered a publicity campaign, which is immune from antitrust liability, even where unethical and deceptive methods are employed." *Id.*, at *7 (citing *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 849 (7th Cir. 2011)). Again, unlike the *Steward* complaint, the antitrust violations alleged here are not only supported by claims of false advertising and deceptive marketing.

Add. 74

The procedural history of these cases is also telling. One of Plaintiffs' salient points throughout their opposition is that Defendants cite cases that were decided at the summary judgment stage, or after a trial was conducted. Having access to such a developed record puts the court in a proper position to decide the issues at hand. But here, Plaintiffs argue, those determinations are premature, and judgment should be reserved until after discovery. For support, Plaintiffs cite *Ticket Ctr., Inc., Banco Popular de Puerto Rico*, 2006 WL 2273603, at *1 (D.P.R. Aug. 8, 2006)(holding that "antitrust actions should rarely be dismissed prior to giving the plaintiff ample opportunity for discovery.")(citing *Morales–Villalobos v. Garcia–Llorens*, 316 F.3d 51, 56 (1st Cir.2003)(reversing lower court dismissal because questions of fact, on which antitrust actions routinely hinge, should not be decided on a motion to dismiss).

I partly agree with Plaintiffs. Although the benefit of a full record would assist in deciding these issues, it is no less true than mere threadbare recitals and conclusory statements do not suffice to establish a cause of action. *Ashcroft v. Iqbal*, 556 U.S.662. 678 (2009). Here, however, Plaintiffs have pled enough to survive dismissal regarding the existence of an anticompetitive agreement.[24]

---

[24] Defendants Conoco, Motiva, Exxon, BHP and Shell also move for dismissal of the antitrust claims in their individual motions to dismiss. (Docket Nos. 237, 240, 242, 243 and 244, respectively). All of the independent motions contend that the pleadings do not allege specific instances of anticompetitive conduct. Because I have already addressed those arguments through Defendants' Joint Motion at Docket No. 235, I will not restate them here. BHP additionally claims that Plaintiffs failed to plead the existence of an anticompetitive agreement. (Docket No. 243). I have also discussed and ruled upon said argument. Finally, Exxon argues that Plaintiffs failed to meet a heightened pleading standard for antitrust claims set in Rule 9(b). However, the First Circuit has held that the heightened pleading standard is not applicable in § 1 claims. *Evergreen*, 720 F.3d at 50. Therefore, I recommend that the individual motions to dismiss the antitrust cause of action be denied.

### b.      Failure to allege an antitrust injury

Defendants also claim that Plaintiffs' antitrust claims fail for the following reasons: (1) failure to plead an injury "of the type that the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful;"[25] (2) improperly using antitrust laws to address environmental harms; and (3) claimed injuries are too indirect and attenuated. (Docket No. 235, at pg. 42).

Regarding the injury requirement, it must be "sufficiently direct, nonspeculative, and measurable to the extent that causality is not in doubt." *Sterling Merch.*, 724 F. Supp. 2d at 258 (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 533, 103 S. Ct. 897, 906, 74 L.Ed.2d 723 (1983).

Plaintiffs respond that they have put forward sufficient allegations that Defendants' antitrust violations were a "material cause"[26] of Plaintiffs' injury and that "their injury is the type of injury the antitrust violation would cause to competition."[27] (Docket No. 280, at 65). They recount their allegations of conspiratorial behavior that resulted in lower quality products, restricted consumer choice, and hindered innovation by excluding non-carbon-based energy sources. (Docket No. 205, ¶¶706, 708, 765). Furthermore, Plaintiffs further claim that Defendants held "substantial market power in

---

[25] *Sterling Merchandising, Inc. v. Nestle, S.A.*, 724 F. Supp. 2d 245, 258 (D.P.R. 2010) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

[26] *Sullivan*, 34 F.3d at 1097.

[27] *Sterling Merch.*, 656 F.3d at 121.

76

Add. 76

the energy market" and instituted a "common scheme designed to restrain trade" in that market. (Id. ¶765). These actions prevented Plaintiffs from reducing their purchase of Defendants' products and buying instead "alternative, non-carbon-based energy sources." (Id. ¶ 767).

Though Plaintiffs cite a series of cases purportedly holding that actions leading to decreased innovation are an actionable antitrust injury,[28] (Docket No. 280, at pgs. 65-66), Defendants counter with the opposite. Citing to *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 414 (3d Cir. 1997), Defendants assert that the deprivation of access to other energy sources is not a cognizable "antitrust injury." In *Schuylkill Energy*, the Court framed the proper antitrust inquiry as follows: "whether [Defendant] unlawfully excluded independent power producers like [Plaintiff] from the relevant market, not whether consumers receive electricity generated by nuclear, coal, culm, solar, or any other energy source." *Id*. As previously discussed, the key factor is "injury to the market or to competition in general, not merely injury to individuals or individual firms that is significant." *Imperial Irrigation Dist. v. California Indep. Sys. Operator Corp.*, 146 F. Supp. 3d 1217, 1238 (S.D. Cal. 2015).

Here, Plaintiffs allege that Defendants excluded other renewable players from entering the market. Hence, they pled their claim within the framework laid out in *Schuylkill Energy* and the case law related to antitrust liability previously cited.

---

[28] *In re Dealer Management Sys. Antitrust Litig.*, 362 F.Supp.3d 510, 535 (N.D. Ill. 2019); *Cascades Comput. Innovation LLC v. RPX Corp.*, 2013 WL 316023, at *10 (N.D. Cal. Jan. 24, 2013); *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1185 (N.D. Cal. 2012); *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1036 (C.D. Cal. 2007) and *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978).

77

Add. 77

Furthermore, Plaintiffs reiterate the request to conduct discovery to fully develop the record.

Because I find that Plaintiffs have sufficiently pled an antitrust injury, and in light of the court's remarks in *Ticket Ctr., Inc. v. Banco Popular de Puerto Rico*, 2006 WL 2273603, at *1, I recommend that dismissal of the antitrust cause of action be denied at this time.

### c.      *Lack of parens patriae standing*

Defendants restate the same argument they raised for the RICO claims, namely, that Plaintiffs lack standing to bring a parens patriae cause of action. Plaintiffs counter that Municipalities are considered "persons" within Section 4 of the Clayton Act. But in any case, they state they are not pursuing a parens patriae cause of action but suing on their own capacity as Municipalities. Therefore, this ground for dismissal should be denied.

### 3.      *Puerto Rico Law Claims*

Plaintiffs bring nine claims under Puerto Rico law: Claim 1 (Common Law Consumer Fraud); Claim 2 (Conspiracy to Commit Common Law Consumer Fraud); Claim 3 (Violation of Puerto Rico Rule 7); Claim 9 (Public Nuisance); Claim 10 (Strict Liability–Failure to Warn); Claim 11 (Strict Liability–Design Defect); Claim 12 (Negligent Design Defect); Claim 13 (Private Nuisance); and Claim 14 (Unjust Enrichment). (Docket No. 205).

Defendants move to dismiss all the claims for three reasons: (1) claims for injuries from transboundary pollution are preempted; (2) the allegations fail to state claims under Puerto Rico law; and (3) Plaintiffs cannot seek relief on behalf of their residents.

78

Add. 78

### a.    *Claims are Preempted*

Defendants' constitutional argument goes as follows: insofar as Plaintiffs' Puerto Rico law claims assert injuries caused by the worldwide combustion of fossil fuels—a quintessential interstate and international activity—the claims are preempted. *See* U.S. Const. Art. VI, cl. 2. Defendants direct the Court's attention to *City of New York v. Chevron Corp.*, 993 F.3d 81, 91 (2d Cir. 2021). In that case, the court refused the City's categorization of the suit as one concerning "the production, promotion, and sale of fossil fuels," rather than the regulation of emissions. *Id.* Instead, the court deemed the suit one of "global greenhouse gas emissions." *Id.* On that basis, it found that "a nuisance suit seeking to recover damages for the harms caused by global greenhouse gas emissions may [not] proceed under New York law." *Id.*

Plaintiffs respond that the federal common law that Defendants rely upon has been displaced and, even if it wasn't, it's inapplicable to their claims. Most importantly, they argue that their claims against Defendants do not interfere with the federal government's foreign policy on climate change because they are tort claims based on Puerto Rico law.

I agree with Plaintiffs' position. The Puerto Rico law-based allegations in this case cannot be read as claims to regulate greenhouse gas emissions directly or to recover for damages for interstate emissions. At the heart of Plaintiffs' claims for relief is a purported decades-long misinformation and propaganda campaign. (Docket No. 205, ¶¶ 65, 595, 599). Thus, the culprit is Defendants' words, not their emissions.

79

Add. 79

In *City & Cnty. of Honolulu v. Sunoco LP*, 153 Haw. 326, 354, 537 P.3d 1173, 1201 (2023)—which Defendants cite—the Court referenced similar cases where the argument that tort-based cases were really about greenhouse emissions was refused.

> Numerous courts have rejected similar attempts by oil and gas companies to reframe complaints alleging those companies knew about the dangers of their products and failed to warn the public or misled the public about those dangers. The Ninth Circuit did so in this case. And in other cases alleging similar deceptive promotion and failure to warn torts, the Fourth Circuit, Tenth Circuit, and the Districts of Connecticut, Massachusetts, and Minnesota have also rejected attempts to characterize those claims as being about emissions and pollution.

*Id.* (internal citations omitted).[29]

Having carefully reviewed the allegations in this case, I find that Defendants' characterization of Plaintiffs' Puerto Rico law claims as claims about the effect of emissions on the environment is incorrect.

Next, Plaintiffs assert that the Clean Air Act ("CAA") has displaced the federal common law that Defendants allude to and, therefore, the latter cannot have a preemptive effect over their claims. *See Rhode Island v. Shell Oil Prods. Co.*, 35 F.4th 44, 55 (1st Cir. 2022) (citing *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 199, 205-207 (4th Cir. 2022))("The Clean Water Act and the Clean Air Act — neither of

---

[29] Recently, the United States Supreme Court denied a petition for writ of certiorari seeking review of the Supreme Court of Hawaii's decision. *See Sunoco LP v. City and Cnty. of Honolulu*, No. 23-947, ___ S.Ct. ___, 220 L.Ed.2d 413, 2025 WL 76706, 2025 U.S. LEXIS 146 (Jan. 13, 2025) and *Shell PLC v. City and Cnty. of Honolulu*, No. 23-952, ___ S.Ct. ___, 220 L.Ed.2d 413, 2025 WL 76704, 2025 U.S. LEXIS 256 (Jan. 13, 2025).

which Rhode Island invokes — 'have statutorily displaced any federal common law that previously existed.' So we cannot rule that any federal common law controls Rhode Island's claims."). Defendants recognize that the CAA now governs domestic interstate emissions but argue that the Court may still apply the "preemption defense" in accordance with federal case law because state law is inadequate to regulate emissions beyond its jurisdiction. Though both parties cite case law to support their position, I find that Plaintiffs' more closely follows applicable precedent.

Defendants, for one, rely heavily on the Second Circuit's *City of New York* decision whereas Plaintiffs look to *Rhode Island*, a case from our Circuit. Defendants, in fact, argue that *Rhode Island's* holding is not contrary to their position. I disagree with Defendants' interpretation. The *Rhode Island* opinion makes clear that the CAA did not preempt the state-law claims. *Rhode Island*, 35 F.4th at 57–58 (gathering cases and concluding that the CAA contains two saving clauses that preserve state and local government's right to impose standard and limitations on air pollution that are stricter than national requirements.). I am not persuaded that I should depart from our Circuit's holding.

Next, Defendants argue that Plaintiffs' claims are preempted because they interfere with foreign affairs. In Defendants' view, the causes of action against them have global implications. For starters, Plaintiffs seek to impose monetary damages for sale of fossil fuels that happen outside Puerto Rico and the United States. And second, global emissions from Defendants' products are the result of activities undertaken in foreign countries. Defendants thus move the Court to dismiss Plaintiffs' claims "to the extent

81

Add. 81

they seek damages based on the exploration, production, marketing, sale, or combustion of fossil fuels and resulting emissions outside the United States." (Docket No. 235, at 50).

Defendants rely on *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003), which held that "state legislation . . . produc[ing] something more than incidental effect in conflict with express foreign policy of the National Government" is preempted. *Id*. at 420 (citing *Zschernig v. Miller*, 389 U.S. 429 (1968)).

Plaintiffs cast doubt on whether *Garamendi* even applies with full force today. Even if it did, they state Defendants have not shown that their claims have "something more than an incidental effect" on foreign affairs. Other courts have rejected similar arguments. *See Baltimore*, 31 F.4th at 214 ("Baltimore's Complaint does not contain any allegations that develop foreign policies with other countries, and nor does it undermine the federal government in the international arena. At best, it involves an intersection between Maryland law and private, international companies."); *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31, 44 (D. Mass. 2020) ("Contrary to ExxonMobil's caricature of the complaint, the Commonwealth's allegations do not require any forays into foreign relations or national energy policy.").

Like those cases, the allegations here do not implicate greenhouse emissions or foreign policy. These are tort-based claims based on advertising, unfair business practices, and consumer protection, all issues within the purview of state regulation. Not a single cause of action pertains to the "exploration, production, marketing, sale, or combustion of fossil fuels and their emissions" as Defendants declare. The allegations pertaining to marketing are related to misleading and deceitful materials in furtherance of Defendants' alleged misinformation campaign. The Court will thus not deem Plaintiffs'

82

Add. 82

state law claims intrusive of foreign affairs. Consequently, the Court should reject Defendants' arguments regarding preemption.

### b. Failure to State a Claim

Defendants move to dismiss Plaintiffs' Puerto Rico claims for failure to sufficiently plead the required elements, especially with the particularity required by Rule 9(b). I will examine each ground for dismissal.

### (i) Plaintiffs' Fraud-based Claims

Plaintiffs' first, second, and third causes of action allege fraudulent behavior. Defendants argue that Puerto Rico law does not recognize the causes of actions under which Plaintiffs seek relief.

The first and second causes of action assert "common law consumer fraud," "deceptive practices" and conspiracy to do the same. (Docket No. 205, ¶¶634-700). Defendants point out that Puerto Rico does not recognize "common law consumer fraud" and has no specific consumer protection statute that provides a private right of action for consumer fraud.[30] Likewise, there is no cause of action for civil conspiracy.[31]

Plaintiffs do not refute that those causes of actions are not codified. Instead, they argue that the legal source of their claims is found in the Federal Trade Commission's "Guides for the Use of Environmental Marketing Claims." *See* 16 C.F.R. § 260.1 et seq.;

---

[30] *Simonet v. SmithKline Beecham Corp.*, 506 F. Supp. 2d 77, 91 (D.P.R. 2007) (Dismissing cause of action for violation of consumer protections statutes because Puerto Rico has no specific consumer protection statute that provides a private right of action for consumer fraud.)

[31] *Next Step Med. Co., Inc. v. Biomet, Inc.*, 2015 WL 993095, at *13 (P.R. Cir. Jan. 30, 2015) (holding that Puerto Rico law does not recognize civil conspiracy pursuant to Article 1802 of the 1930 Civil Code).

83

Add. 83

*see also* Docket No. 205, ¶¶634- 688. The Guides discourage "unqualified general environmental benefit claims," 16 C.F.R. § 260.4(b), and instruct corporations to use specific language. 16 C.F.R. § 260.4(c). But as Defendants correctly state, FTC regulations "do not confer any rights on any person and do not operate to bind the FTC or the public." 16 C.F.R. § 260.1. Accordingly, "the FTC Act contains no private right of action." *Liu v. Amerco*, 677 F.3d 489, 492 (1st Cir. 2012). Therefore, I recommend that the First Cause of Action be dismissed.

Regarding the third cause of action, Plaintiffs assert a claim under the Puerto Rico Rules Against Misleading Practices and Advertisements. P.R. Dep't of Consumer Aff., Regul. 9158 at Rule 14 (Feb. 6, 2020) ("Rules"). Defendants raise an issue with the application of the Rules to municipalities because they state that it is limited to "natural persons."

As defined in the Rules, a "Consumer" is "any natural person who acquires or uses products or services as their final destination. It includes any other person, association, or entity appointed by Law who is authorized to present a claim to the Department." Rule 5(J), Puerto Rico Regulations Against Misleading Practices and Advertisement, P.R. Dep't of Consumer Affairs, Regul. 8599 (May 29, 2015). Plaintiffs interpret the Rules, in conjunction with the Puerto Rico Municipal Code, as granting municipalities the power to pursue a cause of action under the Misleading Practices Rules. *See* PRS ST T. 21 §§ 7013 and 7028. Defendants, however, aptly highlight that there is no private right of action under the Rules because the Department of Consumer Affairs (DACO for its Spanish acronym) has exclusive enforcement jurisdiction. P.R. Laws Ann. tit. 31, § 341e.

84

Add. 84

Although Plaintiffs would have the Court read beyond the Rules and interpret the Municipal Code as granting municipalities carte blanche, I decline to do so. Defendants are correct in that dismissal of the Third Cause of Action is warranted.[32]

### *(ii)   Design Defect*

Although the 1930 Civil Code did not explicitly incorporate the doctrine of strict liability, Courts have interpreted it as including causes of action for negligent and strict liability design defect. *Isla Nena Air Servs., Inc. v. Cessna Aircraft Co.*, 449 F.3d 85, 88 (1st Cir. 2006)(citing P.R. Laws. Ann., tit. 31 § 5141)[33]. A plaintiff claiming a design defect must show that: "(1) defendant owed a duty to prevent the harm by conforming to a reasonable standard of conduct, (2) defendant breached that duty through a negligent act or omission, and (3) the negligent act or omission caused the plaintiff's harm." *Carballo-Rodriguez v. Clark Equip. Co.*, 147 F. Supp. 2d 66, 72 (D.P.R. 2001). As for strict liability, "a plaintiff must prove that (1) the product had a defect that made the product unsafe, and (2) the defect proximately caused the plaintiff's injury." *Id*. at 71.

Plaintiffs carry the burden of establishing the applicable standard of care, and showing that Defendants acted below that minimum standard, and that Defendants'

---

[32] Although Defendants proffer additional arguments regarding failure to plead with particularity under Rule 9(b) and failure to plead causation, I see no need to address them as I recommend dismissal of the causes of action for not being cognizable claims. Likewise, I need not analyze in depth Codefendants BP, Conoco, BHP and Exxon's arguments regarding failure to plead with particularity the state law claims and BP's failure to plead arguments under the same rationale.

[33] Because the acts or omissions alleged in this case occurred before the effective date of the 2020 Puerto Rico Civil Code, liability would be governed by the provisions of the 1930 Puerto Rico Civil Code.

Add. 85

negligence was the proximate cause of Plaintiffs' damages. *Id.* (citing *Tokio Marine & Fire Ins. Co., Ltd. v. Grove Manuf. Co.*, 958 F.2d 1169, 1171-72 (1st Cir. 1992)).

Defendants state that Plaintiffs have alleged neither a defect, nor causation. To establish a defect, a plaintiff must satisfy either the consumer expectation test or the cost-benefit analysis test. *See Vazquez-Filippetti v. Banco Popular de Puerto Rico*, 504 F.3d 43, 52 (1st Cir. 2007). Under the consumer expectations test, a product is defective if it "failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Rivera et al. v. Superior Pkg., Inc. et al.*, 132 D.P.R. 115 (1992) (citing *Barker v. Lull Engineering Co., Inc.*, 573 P.2d 443, 455-56 (1978)); see also *Carballo-Rodriguez*, 147 F. Supp. 2d at 66.

The Cost-Benefit Analysis test, on the other hand, requires a plaintiff to establish the defendant's product's design proximately caused its injuries. The burden of proof then shifts to the defendant/manufacturer to show that the "benefits of the design at issue outweighs the risk of danger inherent in such a design." *See Rivera*, 132 D.P.R. 115.

Guided by this framework, I find that Plaintiffs have failed to plead a design defect cause of action. Plaintiffs allege that Defendants' fossil fuel products are defective "because the risks they pose to consumers...outweigh their benefits." (Docket No. 205, at ¶802). Plaintiffs' allegations are textbook conclusory and fail to comply with the requirements of establishing a plausible cause of action. Moreover, to the extent they rely on the consumer expectation test, Plaintiffs have not alleged what is the ordinary consumer's expectation in using the product as intended. *See Collazo-Santiago v. Toyota Motor Corp.*, 937 F. Supp. 134 (D.P.R. 1996), *aff'd*, 149 F.3d 23 (1st Cir. 1998). The same pleading deficiencies are present under the cost-benefit-analysis test. Plaintiffs

86

have not established that Defendants' fossil fuel products proximately cause a design defect injury. *See Ayala v. Kia Motor Corp.*, 633 F. Supp. 3d 555, 569 (D.P.R. 2022)(citing *Mendoza v. Cervecería Corona*, 97 P.R. Dec. 499, 512 (1969)("In sum, '[i]f the damage is not attributable to a defect of the product, there is no ground for applying the strict liability rule.'").

Therefore, I likewise find that Plaintiffs have failed to adequately plead a design defect cause of action.

### (iii)    Duty to Warn

To prove a failure to warn cause of action under Puerto Rico law, Plaintiffs must show that: "(1) the manufacturer knew or should have known of the risk inherent in the product; (2) there were no warnings or instructions, or those provided were inadequate; (3) the absence of warnings made the product inherently dangerous; and (4) the absence of adequate warnings or instructions was the proximate cause of plaintiff's injury." *Cruz Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271, 276 (1st Cir. 2003) (citing *Aponte Rivera v. Sears Roebuck,* 144 D.P.R. 830 (1998)).

Plaintiffs allege that Defendants were fully aware of the risk inherent to their fossil fuel products yet failed to warn the public or their consumers. (Docket No. 250 ¶¶ 785-790). Defendants counter that there is no legal basis under Puerto Rico law recognizing a duty to disclose information about climate change. At most, they claim, Puerto Rico courts recognize a duty to warn that "extends to all the uses that can be reasonably foreseen by the defendant...to assure the safest use of the product." *Silva v. Am. Airlines*, Inc., 960 F. Supp. 528, 533 (D.P.R. 1997). Plaintiffs, however, do not allege that Defendants failed to warn users of reasonably foreseeable dangers those users may

Add. 87

encounter using the product. Rather, Plaintiffs argue that Defendants failed to warn users of the effects that fossil fuels had on climate change. I do not read the duty to warn in such an expansive manner. For that reason, I recommend that the failure to warn cause of action be dismissed.[34]

### *(iv)   Nuisance Claims*

Private and public nuisances are actionable under Puerto Rico law. P.R. Laws Ann. tit. 32, § 2761. In the Amended Complaint, Plaintiffs assert both. (Ninth Cause of Action-Public Nuisance and Thirteenth Cause of Action: Private Nuisance).

A nuisance is defined as:

> Anything which is injurious to health, indecent, or offensive to the senses, or an obstruction to free use of property so as to interfere with the comfortable enjoyment of life or property, or that is a nuisance to the wellbeing of a neighborhood, or to a large number of persons or that illegally obstructs free flow traffic in the usual manner by a lake, river, bay, stream channel or navigable basin or by a park, square, street, public road and other similar sic constitute a nuisance and the subject of an action.

P.R. Laws Ann. tit. 32, § 2761.

Plaintiffs defend against dismissal of this cause of action by stating that Defendants are fossil fuel producers and generators of greenhouse emissions and thus have engaged in conduct—causing extreme whether events and impacting climate change—that created unreasonable and substantial interference with Plaintiffs' enjoyment of their property.

---

[34] Codefendant BP mirrored the allegations regarding failure to warn contained in the Joint Motion to Dismiss at Docket No. 235 in its individual motion at Docket No. 236.

Defendants refute Plaintiffs' position by arguing that the purpose of § 2761 actions are to obtain (1) injunctive relief in the form of abatement and (2) indemnification in the form of damages. *See Casiano Sales v. Lozada Torres*, 91 D.P.R. 488 (1964), 91 P.R.R. 473, 483 (1964); *Marrero-Hernandez v. Esso Standard Oil Co. (Puerto Rico)*, 429 F. Supp. 2d 469, 471 (D.P.R. 2006). But Plaintiffs do not seek to abate by way of injunctive relief, due to Defendants' fossil fuel activities. The cases cited seem to suggest that the recovery of damages is dependent on abatement. In other words, that one goes with the other.

Defendants also argue that Plaintiffs failed to properly plead causation for their nuisance claims. (Docket Nos. 235, 254). I agree. On this score, Plaintiffs' allegations are conclusory, at best. There are no allegations that Defendants are, for example, burning fossil fuels themselves in Puerto Rico, or operating facilities in the Municipalities. In fact, it is undisputed that none have plants or refineries on the island. Plaintiffs have failed to show a causal nexus between Defendants' acts or omissions and the damages claimed for any prior or ongoing conduct that can be said to be injurious to health and that interfered with the enjoyment of property by the Municipalities. I thus recommend that the nuisance causes of action be dismissed.

### *(v)    Unjust Enrichment*

Defendants seek dismissal of the unjust enrichment cause of action because they claim that Puerto Rico law only permits the remedy where there are no other forms of relief available. For support, they cite to *Rivera Muñiz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57, 65 (D.P.R. 2010) (Unjust enrichment "is unavailable if the plaintiff may seek other forms of relief.") and *P.R. Tel. Co. v. SprintCom, Inc.*, 662 F.3d 74, 97 (1st Cir. 2011).

Add. 89

Plaintiffs offer no substantive argument in response. Their opposition only focuses on allowing them discovery prior to dismissing the unjust enrichment claim. But to access discovery, a plaintiff's complaint must pass the plausibility test. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Plaintiffs have not passed that hurdle with their unjust enrichment claim for there are other forms of relief available in this case. *See Ocaso, S.A., Compania De Seguros Y Reaseguros v. Puerto Rico Mar. Shipping Auth.*, 915 F. Supp. 1244, 1263 (D.P.R. 1996)(citing *Medina & Medina v. Country Pride Foods Ltd.*, 631 F. Supp. 293, 302 (D.P.R.1986) *aff'd by* 901 F.2d 181 (1st Cir.1990))("C]laims for unjust enrichment are 'subsidiary in nature and will only be available in situations where there is no available action to seek relief.'").

Accordingly, I recommend that the unjust enrichment claim be dismissed.

### *(vi)   Lack of Parens Patriae Standing*

As they asserted for the other causes of action, Defendants once again argue that Plaintiffs lack parens patriae standing because they are political subdivisions. However, as I have previously reasoned, the Municipalities are suing to vindicate their own rights which happen to be congruent with the interests of their residents. *See United States v. W.R. Grace & Co.Conn.*, 185 F.R.D. at 190. Because I find that Plaintiffs have standing to bring this action as to their own proprietary rights, this is not a basis to obtain dismissal of any of the causes of action that survived.

### IV.   CONCLUSION

In view of the foregoing, I recommend that the Presiding Judge deny the Joint Motion to Dismiss at Docket No. 234 for lack of jurisdiction.

I also recommend that the Joint Motion to Dismiss at Docket No. 235 be granted in part and denied in part. The following Counts should be dismissed for failure to state a claim: Common law consumer fraud (Count I); Conspiracy to commit common law consumer fraud and deceptive business practices (Count II); Rule 7 of Puerto Rico Rules against misleading practices and advertisements (Count III); public nuisance (Count IX); strict liability failure to warn (Count X); strict liability design defect (Count XI); negligent design defect (Count XII); private nuisance (Count XIII), and unjust enrichment (Count XIV).

It is further recommended that dismissal be denied as to the RICO claims under §§1962(c) and (d) but granted as to §§1962 (a) and (b). Dismissal should likewise be denied as to the antitrust cause of action (Counts IV-VII and VIII, respectively).

As to Defendants' individual motions to dismiss, I recommend as follows:

(i)    Grant in part and deny in part Occidental's motion to dismiss at Docket No. 232. Grant as to the failure to serve summons but deny on the other jurisdictional grounds. Grant in part and deny in part regarding the failure to allege all counts of the Amended Complaint as set forth for the Joint Motion at Docket No. 235.

(ii)    Grant in part and deny in part BP's motion to dismiss at Docket No. 236 to reflect the recommendations as to the Joint Motion at Docket No. 235.

(iii)    Deny Conoco's motion to dismiss at Docket No. 237.

(iv)    Deny Chevron's motion to dismiss at Docket No. 239.

(v)    Grant in part and deny in part Motiva's motion at Docket No. 240 as recommended regarding the Joint Motion to dismiss at Docket No. 235.

91

Add. 91

(vi)    Grant in part and deny in part Exxon's motion at Docket No. 242 as recommended regarding the Joint Motion to dismiss at Docket No. 235.

(vii)   Grant in part and deny in part BHP's motion at Docket No. 243 as recommended regarding the Joint Motion to dismiss at Docket No. 235.

(viii)  Grant in part and deny in part Shells' motion at Docket No. 244 as set forth in the Joint Motion to dismiss at Docket No. 235.

(ix)    Deny BHP's motion to dismiss on the basis of lack of jurisdiction at Docket No. 245.

(x)     Deny Rio Tinto's motion to dismiss for lack of jurisdiction at Docket No. 246.

(xi)    Grant in part and deny in part Rio Tinto's motion to dismiss for failure to plead at Docket No. 247, as recommended with respect to the Joint Motion to Dismiss at Docket No. 235.

(xii)   Grant in part and deny in part API's motion to dismiss at Docket No. 254, as recommended for the Joint Motion to Dismiss at Docket No. 235.

Finally, I also recommend that the motion for judicial notice at Docket No. 238 be granted, but only as to taking notice of the fact that the articles and reports were published, and that the motion for judicial notice at Docket No. 241 be denied.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within 14 days**. Failure to file timely and specific objections is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

92

Add. 92

**IT IS SO RECOMMENDED**

In San Juan, Puerto Rico this 20th day of February, 2025.

> S/Héctor L. Ramos-Vega
> HÉCTOR L. RAMOS-VEGA
> UNITED STATES MAGISTRATE JUDGE

93

Add. 93

IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| MUNICIPALITY OF BAYAMÓN, ET AL., Plaintiffs, v. EXXON MOBIL CORP., ET AL., Defendants. | CIV. NO.: 22-1550 (SCC) |

**OMNIBUS OPINION AND ORDER**

Magistrate Judge Hector Ramos-Vega filed a Report and Recommendation ("R&R") as to the pending motions to dismiss at Docket Nos. 232, 234, 235, 236, 237, 239, 240, 242, 243, 244, 245, 246, 247, and 254 and for judicial notice at Docket Nos. 238 and 241. *Municipality of Bayamón v. Exxon Mobil Corp.*, 2025 WL 600430 (D.P.R. Feb. 20, 2025); Docket No. 315. For the reasons set forth below, the Court hereby **ADOPTS in part** the R&R.

### I. BACKGROUND

Plaintiffs, the municipalities of Bayamón, Caguas, Loíza, Lares, Barranquitas, Comerío, Cayey, Las Marías,

Add. 94

Trujillo Alto, Vega Baja, Añasco, Cidra, Aguadilla, Aibonito, Morovis, Moca, Barceloneta, Camuy, Cataño, Salinas, Adjuntas, Arroyo, Culebra, Dorado, Guaynabo, Hormigueros, Juncos, Lajas, Manatí, Naguabo, Naranjito, Utuado, Villalba, Coamo, Orocovis, Vieques, and Yabucoa (collectively, "Plaintiffs"), filed suit in November 2022 in their own right and on behalf of a proposed class consisting of the 78 Municipalities of Puerto Rico. Docket No. 1. The suit is against Exxon Mobil Corporation ("Exxon"), Shell PLC ("Shell"), Chevron Corporation ("Chevron"), BP PLC ("BP"), Motiva Enterprises LLC ("Motiva"), Occidental Petroleum ("Occidental"), BHP Group ("BHP"), Rio Tinto PLC ("Rio Tinto"), ConocoPhillips ("ConocoPhillips"), and American Petroleum Institute ("API"), as well as various unnamed individuals and entities. In their amended complaint, Docket No. 205, Plaintiffs allege that Exxon, Shell, Chevron, BP, Motiva, Occidental, BHP, Rio Tinto, and ConocoPhillips colluded with each other and API (collectively, "Defendants") to misrepresent risks posed by the carbon-based and fossil-fuel products they marketed and sold. According to Plaintiffs,

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 3

those actions ultimately led to hurricanes in 2017 that resulted in extensive damages throughout Puerto Rico.

## II. THE R&R

### A. The Joint Motions to Dismiss

Two of the motions to dismiss are joint. One argues lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). Docket No. 234. Magistrate Judge Ramos-Vega recommends that this motion be denied. 2025 WL 600430, at * 43. He further recommends "limited discovery on the issue of jurisdiction . . . because a more developed record would assist the Court in making its jurisdictional finding." 2025 WL 600430, at * 8.

The other joint motion to dismiss argues failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Docket No. 235. Magistrate Judge Ramos-Vega recommends that this motion be granted in part and denied in part. 2025 WL 600430, at * 43. He recommends that the motion be granted as to the claims under Puerto Rico law: common law consumer fraud; conspiracy to commit common law consumer fraud and deceptive business practices; Rule 7 of the Puerto Rico rules

Municipality of Bayamón, et al.                                    Page 4
v. Exxon Mobil Corp., et al.

against misleading practices and advertisements; public
nuisance; strict liability failure to warn; strict liability for
design defect; negligent design defect; private nuisance; and
unjust enrichment. As to the federal claims, Magistrate Judge
Ramos-Vega recommends that the motion be granted as to
two Racketeer Influenced and Corrupt Organizations Act
("RICO") claims, under 18 U.S.C. §§ 1962(a) and 1962(b), and
denied as to the other two RICO claims, under 18 U.S.C. §§
1962(c) and 1962(d), and the claim under the antitrust laws,
15 U.S.C. § 1 et. seq.

### B. The Individual Motions to Dismiss

All ten Defendants filed individual motions to dismiss:
Occidental under Federal Rules of Civil Procedure 12(b)(2),
12(b)(5) and 12(b)(6), Docket No. 232; BP under Rule 12(b)(6),
Docket No. 236; ConocoPhillips under Rule 12(b)(6), Docket
No. 237; Chevron under Rule 12(b)(6), Docket No. 239; Motiva
under Rules 12(b)(2), 12(b)(3), and 12(b)(6), Docket No. 240;
Exxon under Rule 12(b)(6), Docket No. 242; BHP under Rule
12(b)(6), Docket No. 243, and under Rule 12(b)(2), Docket No.
245; Shell under Rule 12(b)(6), Docket No. 244; Rio Tinto

Municipality of Bayamón, et al.                                      Page 5
v. Exxon Mobil Corp., et al.

under Rule 12(b)(2), Docket No. 246, and under Rule 12(b)(6),

Docket No. 247; and API under Rule 12(b)(6), Docket No. 254.

Magistrate Judge Ramos-Vega recommendations as to

these motions are as follows:

> (i) Grant in part and deny in part Occidental's motion to dismiss at Docket No. 232. Grant as to the failure to serve summons but deny on the other jurisdictional grounds. Grant in part and deny in part regarding the failure to allege all counts of the Amended Complaint as set forth for the Joint Motion at Docket No. 235.
>
> (ii) Grant in part and deny in part BP's motion to dismiss at Docket No. 236 to reflect the recommendations as to the Joint Motion at Docket No. 235.
>
> (iii) Deny Conoco's motion to dismiss at Docket No. 237.
>
> (iv) Deny Chevron's motion to dismiss at Docket No. 239.
>
> (v) Grant in part and deny in part Motiva's motion at Docket No. 240 as recommended regarding the Joint Motion to dismiss at Docket No. 235.
>
> (vi) Grant in part and deny in part Exxon's motion at Docket No. 242 as recommended regarding the Joint Motion to dismiss at Docket No. 235.
>
> (vii) Grant in part and deny in part BHP's motion at Docket No. 243 as recommended regarding the Joint Motion to dismiss at Docket No. 235.
>
> (viii) Grant in part and deny in part Shells' [sic] motion

Add. 98

at Docket No. 244 as set forth in the Joint Motion to dismiss at Docket No. 235.

(ix) Deny BHP's motion to dismiss on the basis of lack of jurisdiction at Docket No. 245.

(x) Deny Rio Tinto's motion to dismiss for lack of jurisdiction at Docket No. 246.

(xi) Grant in part and deny in part Rio Tinto's motion to dismiss for failure to plead at Docket No. 247, as recommended with respect to the Joint Motion to Dismiss at Docket No. 235.

(xii) Grant in part and deny in part API's motion to dismiss at Docket No. 254, as recommended for the Joint Motion to Dismiss at Docket No. 235.

2025 WL 600430, at * 43–44.

### C. The Motions for Judicial Notice

There are two motions for judicial notice under Rule 201 of the Federal Rules of Evidence. One was filed jointly by Defendants, Docket No. 238, and Magistrate Judge Ramos-Vega recommends that it be granted, "but only as to taking notice of the fact that the articles and reports [of which notice is sought] were published." 2025 WL 600430, at * 44. Magistrate Judge Ramos-Vega recommends that the other motion, filed by Chevron, Docket No. 241, be denied, *id*.

---

Municipality of Bayamón, et al.                                      Page 7
v. Exxon Mobil Corp., et al.

### III. STANDARD OF REVIEW

The Court must "make a de novo determination of those portions of the [R&R] to which objection [has been] made." 28 U.S.C. § 636(b)(1)(C). The Court "may accept, reject, or modify, in whole or in part, the [R&R]." *Id.*

The R&R notified the parties that failure to timely object means waiver. 2025 WL 600430, at * 44. They were given ample time to object, beyond the 14 days provided for in 28 U.S.C. § 636(b)(1)(C), Federal Rule of Civil Procedure 72(b)(2), and District of Puerto Rico Local Rule 72(d). *See* Docket No. 317. The parties having been given both notice and ample time, any failure to assert a specific objection irretrievably waived any right to review by this Court. *Santiago v. Canon U.S.A., Inc.*, 138 F.3d 1, 4 (1st Cir. 1998). New arguments cannot be introduced for the first time on the review of the R&R. *Robb Evans & Assocs., LLC v. United States*, 850 F.3d 24, 35 (1st Cir. 2017).

### IV. ANALYSIS

The Court must determine personal jurisdiction before the merits. *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 95

Add. 100

(2017). Proper service of process is a requirement for personal jurisdiction. *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).

### A. Insufficient Service

Occidental's individual motion to dismiss is based in part on insufficient service of process under Rule 12(b)(5). Docket No. 232. Magistrate Judge Ramos-Vega recommends that the motion be granted as to Rule 12(b)(5). 2025 WL 600430, at * 12–13. Plaintiffs did not object. For the first time in response to Occidental's individual objections, Docket No. 320, Plaintiffs argue that they "have shown a good-faith effort to serve Occidental and should be permitted to cure service if necessary," Docket No. 342, pg. 6.

To be sure, motions to dismiss for insufficient service of process are often construed as motions to quash service as courts are "reluctan[t] . . . to dismiss an action when there is a possibility that effective service will be completed." 5B Wright & Miller, Federal Practice & Procedure § 1354 (4th ed. May 2025 update) ("Wright & Miller"). But here the entire case will be dismissed, and the Court sees no reason why the

Municipality of Bayamón, et al.                                    Page 9
v. Exxon Mobil Corp., et al.

claims against Occidental do not also fail. The failure to object

is determinative, *Santiago*, 138 F.3d at 4, but in any event,

because the case will be dismissed, the Court will not engage

in the futile exercise of allowing Plaintiffs another

opportunity to effect service, *see* 5B Wright & Miller, § 1354.

Occidental's motion to dismiss at Docket No. 232 is

**GRANTED in part and MOOT in part**. It is granted as to

Rule 12(b)(5) and moot as to Rules 12(b)(2) and 12(b)(6).

Accordingly, the claims against Occidental will be dismissed

without prejudice. *See* Fed. R. Civ. P. 4(m).

### B. Personal Jurisdiction

Defendants object to the recommendation to deny their

Rule 12(b)(2) motion at Docket No. 234. They argue that

Plaintiffs "fail[] to establish personal jurisdiction over any

Defendant." Docket No. 326, pg. 11. There are also individual

objections to the recommended denial of the individual Rule

12(b)(2) motions. Docket No. 328 (Motiva); Docket No. 330

(Rio Tinto); Docket No. 332 (BHP). Plaintiffs object to the

recommendation for jurisdictional discovery. Docket No. 323.

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 10

Plaintiffs bear the burden of showing that personal jurisdiction exists. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50 (1st Cir. 2002). The Court "may choose from among several methods for determining whether [Plaintiffs] ha[ve] met this burden." *Id.* at 50–51. "Where, as here, a motion to dismiss for want of in personam jurisdiction is made at the inception of the case and the issue of jurisdiction is not intertwined with the merits, the prima facie approach controls." *Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 121 (1st Cir. 2022). Under that approach, the Court "draw[s] the relevant facts 'from the pleadings and whatever supplemental filings (such as affidavits) are contained in the record, giving credence to [Plaintiffs'] version of genuinely contested facts.'" *Kuan Chen v. United States Sports Academy, Inc.*, 956 F.3d 45, 52 (1st Cir. 2020) (quoting *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016)). The Court also "take[s] into account undisputed facts put forth by [Defendants]." *Id.* (quoting throughout *Baskin-Robbins*, 825 F.3d at 34).

---

Federal courts have "power to decide 'diversity' cases, between 'citizens of different States' whose dispute involves more than a stated sum (the so-called amount-in-controversy)." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025) (quoting 28 U.S.C. § 1332(a)). Federal courts also have power to "resolve cases 'arising under' federal law," and such jurisdiction is "more often known as federal-question jurisdiction." *Id.* (quoting 28 U.S.C. § 1331). The amended complaint invokes 28 U.S.C. § 1332(a) and diversity jurisdiction. Docket No. 205, ¶ 12. At the same time, though there is no citation to 28 U.S.C. § 1331, amongst the causes of action are claims under RICO and federal antitrust law.

Where "<u>subject-matter</u> jurisdiction rests wholly or in part on the existence of a federal question, the constitutional limits of the court's <u>personal</u> jurisdiction are drawn in the first instance" by the Fifth Amendment. *Lorelei Corp. v. Cty. of Guadalupe*, 940 F.2d 717, 719 (1st Cir. 1991) (emphasis in original). Plaintiffs thus have to "show that [Defendants] ha[ve] adequate contacts with the United States as a whole, rather than with a particular state," as is the case under the

Fourteenth Amendment. *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001) (*Swiss Am. Bank II*). Even where there is "no direct constitutional check" on the exercise of personal jurisdiction, there is still "a statutory limitation." *Lorelei Corp.*, 940 F.2d at 719. Specifically, there must be service of process "grounded within a federal statute or Civil Rule." *United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992). Under Rule 4(k)(1), "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant" under three circumstances: the defendant "is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located," the defendant is joined under Rules 14 or 19 and appropriately served, or "when authorized by a federal statute." Fed. R. Civ. P. 4(k)(1)(A)-(C).

The Supreme Court in *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cty.* expressly "le[ft] open the question whether the Fifth Amendment imposes the same restrictions [as the Fourteenth] on the exercise of personal jurisdiction by a federal court." 582 U.S. 255, 269 (2017). The

First Circuit, as recently as last year, held that, in determining whether there are adequate contacts with the United States as a whole under the Fifth Amendment, a "'federal court's role is the same' as when it 'adjudicates state-created rights based on diversity of citizenship jurisdiction'" under the Fourteenth Amendment. *SEC v. Gastauer*, 93 F.4th 1, 8 (1st Cir. 2024) (quoting *Baskin-Robbins*, 825 F.3d at 34 n. 2). *See also Lewis v. Mutond*, 62 F.4th 587, 592 (D.C. Cir. 2023); *Fuld v. Palestine Liberation Organization*, 82 F.4th 74, 86 (2d. Cir. 2023); *Herederos de Roberto Gomez Cabrera, LLC v. Teck Resources Ltd.*, 43 F.4th 1303, 1308 (11th Cir. 2022); *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 235 (5th Cir. 2022) (en banc). *But see id.* at 249 (Elrod, J., dissenting); *id.* at 282 (Higginson, J., dissenting); *id.* at 284 (Oldham, J., dissenting); *Mutond*, 62 F.4th at 596 (Rao, J., concurring); *Fuld v. Palestine Liberation Organization*, 101 F.4th 190, 203 (2d. Cir. 2024) (Menashi, J., dissenting from the denial of rehearing en banc). Under that framework, to determine whether the exercise of personal jurisdiction comports with the Fifth Amendment, a court has to apply the

familiar "minimum contacts" standard from *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

Recently, the Supreme Court, on certiorari from the Second Circuit, addressed the question it had reserved and held that "the Fifth Amendment does not impose the same jurisdictional limitations as the Fourteenth." *Fuld v. Palestine Liberation Org.*, 145 S.Ct. 2090, 2106 (2025). The Supreme Court "decline[d] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment" and held that the Fifth Amendment "necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* at 2105. The Supreme Court did not, however, determine the Fifth Amendment's "outer limits on the territorial jurisdiction of federal courts." *Id.* at 2106.

The day the Supreme Court decided *Fuld*, this Court ordered the parties to file supplemental briefs regarding the decision and the impact it could have on this case. Docket No. 390. They dutifully complied. Docket Nos. 399, 400, 401, 402.

Municipality of Bayamón, et al.  
v. Exxon Mobil Corp., et al.  

Page 15

Except for Rio Tinto, Docket No. 246, pg. 8; Docket No. 330, pg. 6; Docket No. 400, pgs. 15–18, no one amongst Defendants has anywhere, *Fuld* briefs included, questioned the constitutionality of exercising personal jurisdiction under the Fifth Amendment. The Court thus need not consider the matter as to them. *See Motus*, 23 F.4th at 122. As to Rio Tinto, it cannot, as will be explained below, be properly served, and there is thus no personal jurisdiction over it. The Court need not undertake any Fifth Amendment analysis. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981) ("[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.").

## 1. RICO

The Court starts with RICO, which includes a provision on, as stated in its title, "Venue and process." 18 U.S.C. § 1965. That provision authorizes service under certain circumstances. Plaintiffs invoke it in the amended complaint. Docket No. 205, ¶ 18.

Magistrate Judge Ramos-Vega considered the matter. 2025 WL 600430, at * 11–12. He recommends that, "[b]ecause

[RICO] requires a finding of jurisdiction over at least one defendant," the analysis under RICO "be conducted once jurisdictional discovery is completed." *Id.* at * 12.

Plaintiffs and Defendants filed objections. Plaintiffs object to jurisdictional discovery generally and to "defer[ring] the [RICO] jurisdictional analysis . . . until jurisdictional discovery is completed." Docket No. 323, pg. 6. Defendants in the joint objections state that RICO jurisdiction is "inapplicable" and that "jurisdictional discovery is unwarranted" because "Plaintiffs have not adequately alleged personal jurisdiction over any defendant." Docket No. 326, pg. 46. They further that that the R&R does not "address[] Defendants' point that [RICO] cannot permit <u>international</u> service of process, making it inapplicable to Shell, BP, BHP, and Rio Tinto." *Id.* at pgs. 46–47 n. 29 (emphasis in original).

Section 1965(a) provides that "[a]ny civil action or proceeding under [RICO] against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent,

or transacts his affairs." 18 U.S.C. § 1965(a). Section 1965(b)

provides that "[i]n any action" under 18 U.S.C. § 1964—which

provides for a private cause of action for violations of § 1962,

the provision Plaintiffs allege Defendants violated—"in any

district court of the United States in which it is shown that the

ends of justice require that other parties residing in any other

district be brought before the court, the court may cause such

parties to be summoned, and process for that purpose may be

served in any judicial district of the United States by the

marshal thereof." Finally, § 1965(d) provides that "[a]ll other

process in any action or proceeding under this chapter may

be served on any person in any judicial district in which such

person resides, is found, has an agent, or transacts his affairs."

Section 1965 "is not a model of clarity." *World Depot*

*Corp. v. Onofri*, 2017 WL 6003052, at * 5 (D. Mass. Dec. 4, 2017).

The first two circuit courts to consider the issue identified §

1965(b) as creating personal jurisdiction. *Butcher's Union Local*

*No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 538–39 (9th Cir. 1986);

*Lisak v. Mercantile Bancorp Inc.*, 834 F.2d 668, 671–72 (7th Cir.

1987). A decade after those two decisions, the Eleventh and

Fourth Circuits focused on § 1965(d). *Republic of Panama v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997); *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997). A year later, in *PT United Can Co. v. Crown Cork & Seal Co., Inc.*, the Second Circuit held that "a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant" and that "§ 1965(b) provides for nationwide service and jurisdiction over 'other parties' not residing in the district, who may be additional defendants of any kind, including co-defendants, third party defendants, or additional counter-claim defendants," as long as there is "a showing that the 'ends of justice' so require." 138 F.3d 65, 71 (2d Cir. 1998).

The Second Circuit was "[t]he first federal appellate court to actually analyze § 1965's full text and offer reasoning for its choice of subsections." *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1230 (10th Cir. 2006). Since then, every circuit court to consider the issue, namely the Third, Sixth, Tenth, and D.C. Circuits, have agreed with the Second Circuit's analysis. *PT*

Add. 111

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 19

*United Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 120 (3d Cir. 2020); *Peters Broad. Eng'r, Inc. v. 24 Capital, LLC*, 40 F.4th 432, 440–41 (6th Cir. 2022); *Cory*, 468 F.3d at 1229–33; *FC Inv. Grp. v. IFX Markets, Ltd.*, 529 F.3d 1087, 1098–1100 (D.C. Cir. 2008).

Courts in the First Circuit—including one court in this District at the recommendation of the undersigned, then a Magistrate Judge—have overwhelmingly adopted the majority approach. *See, e.g., Dispensa v. Nat'l Conf. of Cath. Bishops*, 2020 WL 2573013, at * 10 (D.N.H. May 21, 2020); *Kalika, LLC v. Boston & Maine Corp.*, 2019 WL 1276099, at * 7 (D. Mass. Mar. 20, 2019); *Marrero-Rolón v. Autoridad de Energía Eléctrica de P.R.*, 2015 WL 5719801, at * 3 (D.P.R. Sept. 29, 2015), report and recommendation adopted, 2016 WL 9459821 (D.P.R. Mar. 31, 2016); *Ginsburg v. Dinicola*, 2007 WL 1673533, at * 4–5 (D. Mass. June 7, 2007).

To the Court's understanding, there have been two deviations, in decisions rendered a few months apart by the same judge. *See Bridge v. Invest Am., Inc.*, 748 F. Supp. 948 (D.R.I. 1990); *Omni Video Games, Inc. v. Wing Co., Ltd.*, 754 F.

Supp. 261 (D.R.I. 1991). *Bridge* relied on various decisions by district courts in circuits that eventually adopted the majority approach. *See* 748 F. Supp. at 951. Further, like the Eleventh Circuit in *Republic of Panama*, 119 F.3d at 942, which cited to the Seventh Circuit's decision in *Lisak* for support even though *Lisak* identified § 1965(b) as governing personal jurisdiction, *Bridge*, 748 F. Supp. at 951, cited to both *Lisak* and the Ninth Circuit's decision in *Butcher's Union*—which also identified § 1965(b) as governing personal jurisdiction. In another parallel, *Omni Video Games* summarily reached its conclusion, 754 F. Supp. at 263, after citing to "th[at] [c]ourt['s] recent[] h[o]ld[ing]" in *Bridge*, like the Fourth Circuit cited to the Eleventh Circuit's decision in *Republic of Panama* after a brief discussion of § 1965, though not subsection b, *see ESAB Grp.*, 126 F.3d at 626.

Considering "the language and structure of the RICO provision itself as well as the relative absence of reasoning in support of the minority position," *Laurel Gardens*, 948 F.3d at 117, the Court aligns with the majority position. *Cf. Biden v. Texas*, 597 U.S. 785, 798–99 (2022) (looking at the text first and

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 21

"confirm[ing] [its] conclusion" by looking at statutory structure). "[B]cause '§ 1965(a) grants personal jurisdiction over an initial defendant . . . to the district court for the district in which that person resides, has an agent, or transacts his or her affairs,' nationwide jurisdiction hinges on whether at least one defendant has minimum contacts with the forum state," *Peters Broad.*, 40 F.4th at 439 (quoting *Laurel Gardens*, 948 F.3d at 117–18), under the "traditional contacts test," *Laurel Gardens*, 948 F.3d at 120.

Under that test, there are two types of personal jurisdiction: "general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021). "[G]eneral jurisdiction [can be exercised] only when a defendant is 'essentially at home' in the State" and "extends to 'any and all claims' brought against a defendant." *Id.* (quoting *Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915, 919 (2011)). Specific jurisdiction "covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Id.* at 359.

Add. 114

Here, there is no suggestion by Plaintiffs of general jurisdiction, so the Court only assesses specific jurisdiction. "Questions of specific jurisdiction are always tied to the particular claims asserted." *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 289 (1st Cir. 1999). Plaintiffs, then, must demonstrate the three requirements of relatedness, purposeful availment, and reasonableness, *see id.* at 288, as to the particular defendant and RICO.

It is rather clear that there is personal jurisdiction in Puerto Rico as to RICO over the first named defendant, Exxon. Further, because the Puerto Rico long-arm statute applies, the same tripartite framework of relatedness, purposeful availment, and reasonableness, *Negrón-Torres v. Verizon Commc'ns, Inc.*, 478 F.3d 19, 24 (1st Cir. 2007), the Court, in the interest of avoiding repetitiousness, will address here service under that statute over Exxon for the antitrust and Puerto Rico law claims.

Exxon's individual objections to the R&R focus, like its motion to dismiss, on the merits. Docket No. 321. Defendants are clear in the joint objections that, at least as to those

Add. 115

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 23

amongst them that did not file individual Rule 12(b)(2) motions, and Exxon did not, they "take all material jurisdictional allegations as true for purposes of the joint motions and objections." Docket No. 326, pg. 13. So does the Court. Further, in the joint Rule 12(b)(2) motion, Defendants rightly state that "[s]pecific jurisdiction exists only if" there is relatedness, purposeful availment, and reasonableness, Docket No. 234, pg. 14, but argue that Plaintiffs have not made a prima facie case of personal jurisdiction because they have not showed relatedness or reasonableness, *id.* at pg. 15. It is conceded then that there is purposeful availment, and the Court examines only relatedness and reasonableness. *See Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 7 (1st Cir. 2018).

Starting with relatedness, it requires that the claims "arise out of <u>or relate to</u> the defendant's contacts with the forum." *Ford Motor Co.*, 592 U.S. at 362 (quoting throughout *Bristol-Myers*, 582 U.S. at 262) (emphasis in original). "The first half of that standard asks about causation," and "the back half, after the 'or,' contemplates that some relationships will

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 24

support jurisdiction without a causal showing." *Id.* "That does not mean anything goes," but rather that there may be relatedness without causation "because of another activity or occurrence involving the defendant that takes place in the State." *Id.* (cleaned up). For example, "if Audi and Volkswagen's business deliberately extended into Oklahoma (among other States), then Oklahoma's courts could hold the companies accountable for a car's catching fire there—even though the vehicle had been designed and made overseas and sold in New York." *Id.* at 363.

The amended complaint alleges that Exxon "advertises, markets, and sells its products in Puerto Rico," and that Exxon's "downstream operation" consists of "marketing, refining, and retail operations" and "includes sales of its petroleum-based consumer products in Puerto Rico." Docket No. 205, ¶¶ 97, 103. The amended complaint further names specific kinds of products that, as alleged, Exxon sells in Puerto Rico. *See id.* at ¶¶ 101–02.

The amended complaint shows relatedness as to Exxon as to all claims. Even if Exxon's products are manufactured

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 25

elsewhere, the amended complaint alleges extensive marketing and sales in Puerto Rico as part of a scheme between Defendants that violates RICO and the antitrust laws by colluding to defraud and maintain an illegal monopoly and resulting in injury in tort and consumer protection violations under Puerto Rico law. *See Ford Motor Co.*, 592 U.S. at 362; *id.* at 368 ("An automaker regularly marketing a vehicle in a State . . . has 'clear notice' that it will be subject to jurisdiction in the State's courts when the product malfunctions there (regardless of where it was first sold).") (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)); *Goya Foods Inc. v. Oy*, 959 F. Supp. 2d 206, 213–14 (D.P.R. 2013) (finding relatedness where defendant consistently marketed in the forum and shipped to vendors for sale in the forum and dispute arose from those activities in the forum).

The cases on which Defendants rely do not help their case. Defendants cite extensively to *Ford Motor Co.*, which shows relatedness, as just determined. It also forecloses Defendants the causal standard Plaintiffs embrace. *See* Docket

No. 234, pg. 15–22. For support, Defendants cite to *City of Oakland v. BP p.l.c.*, where a court in the Northern District of California rested its finding of no personal jurisdiction on the lack of a "causal chain." 2018 WL 3609055, at * 4 (N.D. Cal. July 27, 2018). *Ford Motor Co.* expressly rejected such a standard. 592 U.S. at 362.

Defendants also cite to *Vapotherm, Inc. v. Santiago*, 38 F.4th 252 (1st Cir. 2022). There, the First Circuit found no relatedness under *Ford Motor Co.* because "[t]he actions which form[ed] the basis of the tort claim, [the defendant's] alleged solicitation of" three "clinical managers [who] provided training and support to hospitals that use [the plaintiff's] product," did "not arise out of or relate to [the defendant's] contacts with" the forum state, New Hampshire. *Id.* at 256 n. 2, 261. Rather, "the three [clinical managers] [we]re connected to [the defendant] through their contacts in Florida and Georgia where they all worked throughout the duration of their employment with [the plaintiff]." *Id.* at 261.

The facts here are different. As alleged in the amended complaint, there was an illegal monopoly and RICO scheme

to defraud and sell products to consumers in Puerto Rico by misrepresenting their impact on climate change.

Defendants also rely on the Rhode Island Supreme Court's decision in *Martins v. Bridgestone Am. Tire Ops., LLC*, 266 A.3d 753 (R.I. 2022). They argue that in *Martins* "personal jurisdiction did not exist because the plaintiff's claims did not arise from the use and malfunction of the product in Rhode Island, even though the plaintiff alleged that the defendant-manufacturers had 'extensive contacts with Rhode Island and their intent [was] to conduct business in Rhode Island.'" Docket No. 234, pg. 17 (quoting *Martins*, 266 A.3d at 759).

But Defendants do not tell the whole story. *Martins* involved a Rhode Island resident who drove a truck from Massachusetts to Connecticut and struck a tree in Connecticut after a tire made and installed in Tennessee failed. 266 A.3d at 756. The only connection between Rhode Island, where the suit was brought, and the suit was that the driver was a Rhode Island resident who died in Rhode Island. *Id.* at 761. The Rhode Island Supreme Court accordingly did not find relatedness. *Id.* Again, the facts are entirely different here.

Finally, Defendants rely on the Second Circuit's decision in *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021). That case is irrelevant here because it involved federal preemption, not personal jurisdiction. *Id.* at 85. Indeed, the district court decision the Second Circuit affirmed made it explicit that judgment on the personal jurisdiction challenge was deferred. *City of New York v. BP P.L.C.*, 325 F.Supp.3d 466, 470 n. 1 (S.D.N.Y. 2018).

There is, in short, relatedness. As explained, that there is purposeful availment is conceded. The Court jumps to the third and last requirement, reasonableness, which is determined by considering five factors:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies. *Pleasant St.*, 960 F.2d at 1088.

Starting with Exxon's burden of appearing, "modern travel creates no especially ponderous burden for business

| Municipality of Bayamón, et al. | Page 29 |
| v. Exxon Mobil Corp., et al. | |

travelers," and, accordingly, "[f]or this type of burden to affect the analysis, the defendant must show that it is special or unusual." *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 70 (1st Cir. 2014) (cleaned up). There is no such showing, and this factor goes to jurisdiction.

As to the second factor, Puerto Rico's interest in adjudicating this dispute, Defendants argue that "assertion of jurisdiction here would offend the principles underlying the interstate judicial system because Plaintiffs seek to use Puerto Rico tort law to penalize and regulate Defendants' nationwide (indeed, worldwide) activities, including fossil fuel production, promotion, marketing, and sales—activities heavily regulated, and in many instances encouraged, by the federal government, all 50 States, and every other country in the world in which these companies operate." Docket No. 234, pg. 24. But the Court's task "is not to compare the interest of [different] sovereigns." *Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708, 718 (1st Cir. 1996). Rather, the Court must "determine whether [Puerto Rico] has an interest . . . in exercising jurisdiction." *Id.* (emphasis in original). It clearly

does, and this factor also goes to jurisdiction.

The third factor, Plaintiffs' interest in obtaining convenient and effective relief, does as well. Plaintiffs' "choice of forum must be accorded a degree of deference." *Sawtelle v. Farrell*, 70 F.3d 1381, 1395 (1st Cir. 1995).

The fourth factor, the judicial system's interest in obtaining the most effective resolution of the case, is "self-evidently a wash." *Baskin-Robbins*, 825 F.3d at 41. "Even though [Puerto Rico] courts can effectively administer justice in this dispute, they have no corner on the market." *Id.*

The fifth and final factor, the common interests of all sovereigns in promoting substantive social policies, is the one Defendants contest the most. They argue that "the substantive social policies Plaintiffs seek to advance—chilling Defendants' speech on matters of public concern that Plaintiffs deem misleading, curbing energy production and the use of fossil fuels, or allocating the downstream costs of global climate change to the energy companies to bear directly—are not shared uniformly across all the various States and nations." Docket No. 234, pg. 25. "Plaintiffs'

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 31

claims," Defendants also argue, "implicate the interests of numerous other States and Nations, and thus this Court cannot reasonably exercise jurisdiction over Defendants." *Id.* For this they cite to an August 2021 statement by the National Security Advisor at the time articulating a policy to encourage an increase in crude oil production because it, Defendants posit, "w[as] (and still [is]) essential to the 'ongoing global recovery' from the pandemic." *Id.*

The Court must "consider[] the interests of the 'several States,' in addition to [Puerto Rico], in the efficient judicial resolution of the dispute and the advancement of substantive policies." *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cty.*, 480 U.S. 102, 115 (1987). It must also "consider the procedural and substantive policies of other nations whose interests [may be] affected by the assertion of jurisdiction" over the non-U.S.-based Defendants. *Id.* "[T]hose interests, as well as the Federal interest in Government's foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an

alien defendant outweighed by minimal interests on the part of [Plaintiffs] or [Puerto Rico]." *Id.*

The Court takes into account this argument here even though Exxon is a domestic corporation. The Court also assumes the soundness of Defendants' framing of this case and an interest by some other jurisdiction to "protect[] [Defendants'] businesses," even though that jurisdiction would have to serve as a forum for adjudication of this dispute, *Nowak*, 94 F.3d at 719, and Defendants are wholly unclear what that jurisdiction may be. *Nowak*, 94 F.3d at 719.

Even on that assumption, this factor does not go against jurisdiction. As to speech, the First Circuit has been clear that "no weight" ought to be placed "on First Amendment values" because "the [Supreme] Court has shied away from allowing First Amendments concerns to enter into the jurisdictional analysis." *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 211–12 (1st Cir. 1994). And regardless of any interest by some other jurisdiction, Puerto Rico still "has an interest in protecting its citizens from out-of-state providers of goods and services" and providing "a

convenient forum" for the resolution of disputes. *Nowak*, 94 F.3d at 719. Accordingly, and even with all assumptions in Defendants' favor, the balance "tips only slightly in [Plaintiffs'] favor." *Id.*

The Court concludes that jurisdiction over Exxon here does not "make[] litigation so gravely difficult and inconvenient as to render the exercise of personal jurisdiction unreasonable and unfair." *Fuld*, 145 S.Ct. at 2110 (cleaned up). Relatedness, purposeful availment, and reasonableness all being present as to all claims, the Court can exercise personal jurisdiction over Exxon as to all claims.

Because the Court can exercise personal jurisdiction over that defendant, under RICO, "summonses can be served nationwide on [the] other defendants if required by the ends of justice." *Cory*, 468 F.3d at 1231 (emphasis added).

RICO does not define "ends of justice." One reading, embraced by the Ninth Circuit, is that a plaintiff must show that there is no other district where a court would have personal jurisdiction over all defendants. *Butcher's Union*, 788 F.2d at 539. Another, adopted by the Tenth Circuit, is that the

"ends of justice" is "a flexible concept uniquely tailored to the facts of each case." *Cory*, 468 F.3d at 1232. Courts in the First Circuit have adopted the latter approach. *See Dispensa*, 2020 WL 2573013, at * 10; *Kalika*, 2019 WL 1276099, at * 8.

Per the amended complaint, the "interests of justice require that [Plaintiffs] be permitted to bring the Defendants before the Court in a single trial." Docket No. 205, ¶ 18. There is similar language in *Butcher's Union*. *See* 788 F.2d at 539. The joint Rule 12(b)(2) motion does not address the matter. Motiva, in its individual motion, quotes *Butcher's Union* and argues that Plaintiffs have not shown that there is no other district that has jurisdiction over Defendants. Docket No. 240, pg. 11. It further argues that Plaintiffs fail under *Butcher's Union* because they have not alleged a single nationwide RICO conspiracy, *id.* at pg. 12, an argument Rio Tinto also raises, *see* Docket No. 246, pgs. 16–19. Motiva also argues, this time by citation to *Cory*, that "sustaining damages and litigation costs in Puerto Rico is not by itself sufficient to meet the 'ends of justice' requirement." Docket No. 240, pg. 12.

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 35

Because "the parties in this case do not recognize th[e] conflict," between the Ninth Circuit and the Tenth Circuit, and because "Plaintiffs establish both that no other district would have traditional jurisdiction over [Defendants] and that the exercise of jurisdiction satisfies a flexible understanding of the 'ends of justice,'" the Court "need not— and do[es] not—decide whether the Ninth or the Tenth Circuit is correct." *Laurel Gardens*, 948 F.3d at 121. It "likewise need not—and do[es] not—decide whether [Plaintiffs] must specifically allege . . . '[a] single nationwide RICO conspiracy' encompassing [Defendants]." *Id.* at 121 n. 11 (quoting *Butcher's Union*, 788 F.2d at 539).

Under the flexible approach, "courts consider a variety of factors" including "the location of the parties, witnesses, records, and acts or omissions giving rising to the claims," "whether judicial economy favors trying the action in one court," and the existence of an alternative forum. *Crenshaw v. Antokol*, 287 F. Supp. 2d 37, 42 (D.D.C. 2003). As to the last factor, "virtually all courts to have considered the question have noted [that] the existence of an alternative forum will be

Add. 128

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 36

a significant and often dispositive factor." *Dispensa*, 2020 WL 2573013, at * 10. The Ninth Circuit's approach, as explained above, requires no alternative forum.

The Court does not see an alternative forum. Defendants hail from different parts of the country and the world. It is not as if, say, "New Hampshire provides a forum with personal jurisdiction over all [Defendants]," thus "militat[ing] against concluding that the ends of justice require that [the other Defendants] 'be brought before [this Court].'" *Kalika*, 2019 WL 1276099, at * 8 (quoting 18 U.S.C. § 1965(b)). On the contrary, "it is unlikely that all [Defendants] are subject to venue in one district." *Southmark Prime Plus, L.P. v. Falzone*, 768 F.Supp. 487, 491 (D. Del. 1991). And the acts "giving rise to this case occurred in Puerto Rico." *Marrero-Rolón*, 2015 WL 5719801, at * 3.

The Court holds that the "ends of justice" requirement is met. Accordingly, "summonses can be served <u>nationwide</u>." *Cory*, 468 F.3d at 1231 (emphasis added).

Naturally, Defendants contest whether summonses can also be served <u>internationally</u>. And because Shell, BP,

Add. 129

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 37

BHP, and Rio Tinto were served abroad, RICO jurisdiction does not, per Defendants, apply. Docket No. 234, pgs. 26–27.

Under Rule 4, "[a] foreign entity may be served with process pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters." *AngioDynamics, Inc. v. Clarion Med. Tech.*, 2019 WL 10787926, at * 11 (D. Mass. Sept. 25, 2019). In February 2023, Plaintiffs asked for an extension of time for service of process, stating that they had "commenced efforts" to serve BP, Shell, BHP, Rio Tinto, "all of which are located internationally, pursuant to the applicable provisions of the Hague Convention." Docket No. 9, ¶ 6. "As a practical matter," Plaintiffs stated, "international process service pursuant to the Hague Convention can take between three to six months due to the lengthy legal process required to ensure service has been completed correctly." *Id.* Eventually, the parties filed a motion outlining a proposed briefing schedule and dealing with other procedural matters and there stated that Shell, BP, BHP, and Rio Tinto "will agree to waive service of process or to accept service of process by direct mail at the

addresses to be provided to Plaintiffs." Docket No. 25, pg. 2. They reserved, though, "any right, defense, affirmative defense, claim, or objection, including lack of subject matter jurisdiction, lack of personal jurisdiction, or insufficient service of process." *Id.* at pg. 2 n. 1. There is no suggestion from Plaintiffs that BP, Shell, BHP, or Rio Tinto were served in the United States. Rio Tinto in particular states that it "agreed to accept service of summons by mail in London as part of [the] agreement." Docket No. 246, pg. 15 n. 5.

The Court "begin[s], of course, with RICO's text." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 237 (1989). Under § 1965(b), the Court "may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof." 18 U.S.C. § 1965(b). Under § 1965(d), "[a]ll other process . . . may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(d). Whatever side of the debate on which subsection provides the basis for nationwide jurisdiction under RICO is correct, the common

Add. 131

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 39

denominator here is that for service to be satisfactory, it must be, at minimum, in a judicial district of the United States. That is in contrast with statutes such as the Clayton Act, which will be discussed below, that provide for service "'wherever the defendant may be found,' or similar language, which is not limited to the judicial districts of the United States." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 941 (7th Cir. 2000).

To the Court's understanding, courts are universally in agreement that RICO allows for only nationwide service. Indeed, circuits that have taken different sides in the debate on which subsection of § 1965 provides for personal jurisdiction agree that service must take place in the United States. *See Stauffacher v. Bennett*, 969 F.2d 455, 460–61 (7th Cir. 1992); *Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1293 (11th Cir. 2021). Also in agreement are district courts within circuits to have taken a position on which RICO subsection determines nationwide service but not considered the issue of international service. *See, e.g., Bayshore Capital Advisors, LLC v. Creative Wealth Media Finance Corp.*, 667

F.Supp.3d 83, 119 (S.D.N.Y. 2023); *Nuevos Destinos, LLC v. Peck*, 2019 WL 78780, at * 12 (D.D.C. Jan. 2, 2019). So are courts in circuits that have not considered that issue. *See, e.g., Marani v. Cramer*, 2024 WL 1511329, at * 6 (N.D. Cal. Feb. 2, 2024); *Skidmore Energy, Inc. v. KPMG*, 2004 WL 2804888, at * 7 (N.D. Tex. Dec. 3, 2004). Courts in the First Circuit agree. *See, e.g., Ayasli v. Korkmaz*, 2020 WL 4287923, at * 26 (D.N.H. July 27, 2020). That includes the one outlier identified above that sided with the minority approach in the debate on which RICO subsection determines nationwide service. *See Omni Video Games*, 754 F. Supp. at 263.

On this at least, § 1965 is clear. For there to be jurisdiction under § 1965 over BP, Shell, BHP, and Rio Tinto, there need to have been service in the United States. There was not. The only hook then on which Plaintiffs can rely for RICO jurisdiction over BP, Shell, BHP, and Rio Tinto is the Puerto Rico long-arm statute. *Stauffacher*, 969 F.2d at 461. And Plaintiffs appear to concede this. *See* Docket No. 281, pg. 16.

Plaintiffs allege that BP "markets and sells its products in Puerto Rico," including "oils, greases and similar

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 41

products." Docket No. 205, ¶¶ 137, 140. As to Shell, Plaintiffs allege that "Shell branded gasoline was sold in Puerto Rico through the Sol Group . . . and Sol Puerto Rico Limited," which, per Plaintiffs, is "the exclusive distributor of Shell Fuels in Puerto Rico." *Id.* at ¶ 111. "Shell's website," Plaintiffs further allege, "reflect[ed] 121 Shell gas stations in Puerto Rico as of November 14, 2022." *Id.* Plaintiffs also allege that "Shell advertises, markets, and sells its products, including consumer products, in Puerto Rico." *Id.* at ¶ 113.

BP and Shell join the joint Rule 12(b)(2) motion. They did not file individual Rule 12(b)(2) motions. The analysis as to them is no different than that as to Exxon. There is personal jurisdiction over them as to all claims under the Puerto Rico long-arm statute.

BHP and Rio Tinto are a different story. Besides joining the joint Rule 12(b)(2) motion, they both filed individual Rule 12(b)(2) motions. Docket Nos. 245 (BHP), 246 (Rio Tinto). Plaintiffs do not carry the burden as to either.

Starting with Rio Tinto, the Court sees no purposeful availment and thus jumps to that. *See Adams v. Adams*, 601

Add. 134

F.3d 1, 6 (1st Cir. 2010). "The purposeful availment requirement ensures that the exercise of jurisdiction is essentially voluntary and foreseeable, not premised on a defendant's random, fortuitous, or attenuated contacts." *Plixer*, 905 F.3d at 7 (cleaned up). Voluntariness requires that the contacts "proximately result from actions by the defendant himself." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (emphasis in original). Foreseeability requires contacts such that the defendant could "reasonably anticipate being haled into court [in the forum]." *World-Wide Volkswagen*, 444 U.S. at 297.

The only contact with Puerto Rico alleged in the amended complaint is membership in trade associations, something that was "performed in the US with US groups[] and targeted US legislation and the US public, including the Municipalities and their citizens in Puerto Rico." Docket No. 205, ¶ 184. Plaintiffs in their opposition point to that allegation. *See* Docket No. 281, pgs. 17–18. They further offer conclusory allegations. *See id.* at pg. 25 ("Plaintiffs' Amended Complaint asserts sufficient facts to demonstrate Rio Tinto's

purposeful availment with Puerto Rico. Plaintiffs asserts [sic] that Rio Tinto has contacts with Puerto Rico and the United States."). And the one slightly more specific argument attempts to equate United States contacts with Puerto Rico contacts. *See id.* ("Though Rio Tinto alleges that it has not had coal reserves in the United States since 2013, the information Plaintiffs provide says otherwise. Despite Rio Tinto's contention, Plaintiffs still allege a foundation to demonstrate contacts between Rio Tinto and the forum through their business and involvement within the United States.") (cleaned up).

With its Rule 12(b)(2) motion, Docket No. 246, Rio Tinto provided a declaration under penalty of perjury by its Head Secretariat, Docket No. 246-1. The affidavit states that Rio Tinto is based in England. *Id.* at ¶ 4. It further states that Rio Tinto "does not own any assets located in Puerto Rico," that it "does not sell or market products in Puerto Rico," that it "is not registered to do business in Puerto Rico," that it "is not subject to income tax in Puerto Rico," that it "does not have bank accounts" or a "registered agent for service of

process in Puerto Rico," that it "does not have employees based in Puerto Rico," that it "does not have offices, telephone listings, or mailing addresses in Puerto Rico," that it "does not maintain corporate books or records in Puerto Rico," that it "does not own or operate personal or real property in Puerto Rico," and that it has not "directed any marketing or sales of its products in Puerto Rico." *Id.* at ¶ 6.

The affidavit also disputes Plaintiffs' allegation in the amended complaint, apparently derived from a May 2007 third party document, that Rio Tinto is "a major holder of US Coal Reserves, holding an estimated 1.4 billion short tons of US coal reserves." Docket No. 205, ¶ 183 (citing National Mining Association, 2006 Coal Producer Survey (May 2007)). The affidavit states that none of Rio Tinto, its affiliates, or its subsidiaries "currently hold any U.S.-based coal assets" and that "no Rio Tinto subsidiary has engaged in coal production, held U.S. coal reserves, marketed, or sold coal in the U.S. since at least 2013." Docket No. 246-1, ¶ 9.

Finally, in response to Plaintiffs' allegation that Rio Tinto "avails itself to [sic] the United States through their

large mining operations in Utah, California, and Arizona," Docket No. 205, ¶ 183, the affidavit states that "no Rio subsidiary currently mines, markets, or sells any fossil fuel and has not since at least 2018." Docket No. 246-1, ¶ 11.

"[J]urisdictional facts may be adduced by means of an affidavit made by a person who—like [Rio Tinto's Head Secretariat]—has adequate knowledge of the situation." *Kuan Chen*, 956 F.3d at 56. Plaintiffs "did not dispute the contents of [the] affidavit either with a dueling affidavit or with any other evidentiary proffer." *Id.* at 55. Their "memorandum in opposition to [the Rule 12(b)(2)] motion[s] to dismiss did not even mention the affidavit." *Id.* at 56. Plaintiffs summarily dismiss the affidavit in response to Rio Tinto's objections to the R&R. *See* Docket No. 343, pg. 8 ("Rio Tinto's jurisdictional declaration—crafted in self-serving fashion—does not override the allegations in the Complaint [sic]."). But the affidavit is "not deemed disputed merely because [Plaintiffs'] counsel, in an unsworn brief . . . challenges [it]." *Kuan Chen*, 956 F.3d at 56. The Court then has "every right to treat the factual assertions embedded in the affidavit as undisputed

and to rely on those facts [in] resolving the motion." *Id.* And the affidavit shows no purposeful availment. *See Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 681–83 (1st Cir. 1992) (finding no purposeful availment of Maine where there was no evidence that manufacturer intended to serve market in Maine, designed product for Maine, advertised in Maine, established channels for providing regular advice to customers in Maine, or marketed products to distributor who had agreed to serve as sales agent for Maine).

As to Plaintiffs' oft-repeated claim that Rio Tinto's alleged membership in trade associations establishes personal jurisdiction, the most Plaintiffs do is cite to a page on riotinto.com and encourage the downloading of a document that cannot be found on that page. *See* Docket No. 205, ¶ 183 & n. 166; Docket No. 281, pg. 18 (citing to amended complaint); Docket No. 343, pg. 7 (citing to the R&R). Worse, there is no argument that, even if taken at face value, the contacts are sufficient to show purposeful availment—or any of the other two requirements for specific jurisdiction.

One court has found personal jurisdiction over a trade association itself on the basis of "longstanding relationships with several [forum state] entities who comprise a significant percentage of [the trade association's] membership and pay a proportional share of dues." *Wright by Wright v. Sherwin-Williams Co.*, 708 F.Supp. 705, 707 (W.D. Pa. 1989). Another has found no personal jurisdiction over a corporate defendant after the plaintiff "failed to present any other evidence which may give rise to a finding of personal jurisdiction over [the corporate defendant] other than possible lobbying activities which alone cannot give rise to jurisdiction." *Herman v. YellowPages.com, LLC*, 780 F.Supp.2d 1028, 1034 (S.D. Cal. 2011). Plaintiffs "offer[] no citations nor any reasoned argument," and the Court's "own brief look into the law reveals that there is a diversity of views among various courts." *Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H & Co. Kg.*, 295 F.3d 59, 67 (1st Cir. 2002). Plaintiffs' association-related "proposition is arguable but not obvious," and "no other colorable basis for jurisdiction has been preserved as to" Rio Tinto. *Id.*

The same is true as to BHP. The Court again sees no purposeful availment and jumps to that. *Adams*, 601 F.3d at 6.

Plaintiffs' sole related allegation is that BHP "is a 1/3 owner in . . . Cerrejón," a "large open-pit coal mine in Colombia." Docket No. 205, ¶ 172. "Typically," Plaintiffs say, "about 1.6 million short tons of coal are imported annually from Cerrejon to supply Puerto Rico's coal-fired electricity generating plant at Guayama." *Id.* at ¶ 174.

As with Rio Tinto, the Court factors in, *Kuan Chen*, 956 F.3d at 56, the uncontested affidavit tendered by BHP, Docket No. 245-1. The affidavit is by a longtime BHP employee familiar with companies and joint ventures in which BHP "holds interests" but which "are independently managed and operated." *Id.* at ¶ 2. He states that BHP had no share in the Cerrejón mine and that there were "indirect subsidiaries" of BHP that were minority shareholders in three entities related to the mine. *Id.* at ¶ 9.

On the basis of the affidavit, BHP states in the motion that no facts are pled "to overcome th[e] presumption" of corporate separateness and that "[e]ven if BHP itself had been

the minority shareholder of the Cerrejón Entities (which it was not), the purported forum contacts of the Cerrejón Entities still could not be imputed to BHP" considering that they are "separate and distinct from BHP, which was at most an indirect 1/3 shareholder." Docket No. 245, pg. 11. BHP reiterates the argument in its individual objections to the R&R. Docket No. 332, pgs. 4–9.

Plaintiffs' entire response is that "[d]espite 'corporate separateness' between the two companies, BHP still targeted Puerto Rico customers, its electricity market, and pursued their business ventures in this jurisdiction." Docket No. 281, pg. 23. Plaintiffs do not address the matter at all in the response to BHP's objections—the only mention of jurisdiction is as to discovery. Docket No. 336, pgs. 6–7.

"The mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is the sole owner of the subsidiary." *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir. 1980). To be sure, the presumption of corporate separateness may be overcome if the parent exercises a

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 50

"greater" degree of control "than that normally associated with common ownership and directorship." *Donatelli v. NHL*, 893 F.2d 459, 466 (1st Cir. 1990) (quoting throughout *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983)). But Plaintiffs fail to provide any argument, let alone evidence, of control by BHP over the subsidiaries. They, in short, show no jurisdiction over BHP.

A final matter as to RICO jurisdiction. Defendants argue that § 1965 authorizes jurisdiction "only if a plaintiff first pleads viable RICO claims as to th[e] defendant" over whom there is traditional jurisdiction. Docket No. 234, pg. 26 (emphasis in original). *See also* Docket No. 326, pg. 46. Defendants for support cite to *Casio Computer Co. Ltd. v. Savo*, 2000 WL 1877516, at * 26 (S.D.N.Y. Oct. 13, 2000), stating that that court "declin[ed] to apply § 1965(b) where a RICO claim suffered from 'fatal' pleading deficiencies," Docket No. 234, pg. 27.

In *Casio Computer*, the report and recommendation that the court adopted "recommend[ed] dismissal of the action" for "lack[] [of] personal jurisdiction over defendants"

because, although "§ 1965(b) permits a district court to exercise nationwide jurisdiction over a defendant . . . when 'the ends of justice require,'" the "plaintiff's RICO claim [wa]s fatal," and "the 'ends of justice' [thus] d[id] not mandate the exercise of national jurisdiction." *Casio Computer*, 2000 WL 1877516, at * 26 (quoting *PT United*, 138 F.3d at 71).

Other courts have articulated a similar concept—that nationwide service of process requires a "colorable" claim. *See Nunes v. Fusion GPS*, 531 F.Supp.3d 993, 1003 (E.D. Va. 2021) ("Some claims may be so 'implausible, insubstantial, or frivolous' that they fail to state a 'colorable' RICO claim. A plaintiff bringing such an action cannot rely on RICO's nationwide-service-of-process provision.") (quoting *D'Addario v. Geller*, 264 F. Supp. 2d 367, 388 (E.D. Va. 2003)). Those courts state that "[w]hen a jurisdictional motion to dismiss depends . . . on the assertion of a right created by a federal statute, the court should dismiss for lack of jurisdiction only if the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit as not to involve a federal

Add. 144

controversy." *Republic of Panama*, 119 F.3d at 941 (cleaned up). That "requirement . . . is a <u>subject matter</u> jurisdiction requirement." *Noble Sec., Inc. v. MIZ Engineering, Ltd.*, 611 F.Supp.2d 513, 551 (E.D. Va. 2009) (emphasis added).

Those courts place a "high burden" on the defendant to show that the claim is not colorable. *D'Addario*, 264 F. Supp. 2d at 388. And the "pleading standard" is "lower . . . than [that] required under Rule 12(b)(6)." *Rilley v. MoneyMutual, LLC*, 2017 WL 3822727, at * 3 (D. Minn. August 30, 2017). A plaintiff's allegations can be "infirm" and still state a colorable claim. *See Burnett v. Al Baraka Inv. and Development Corp.*, 274 F.Supp.2d 86, 98 (D.D.C. 2003). On these standards, Defendants make no winning argument.

Defendants embrace a higher standard. *See* Docket No. 234, pg. 26 (stating that RICO nationwide service requires that "a plaintiff first pleads <u>viable</u> RICO claims") (emphasis added); *id.* at pg. 27 (stating that the RICO claim here "is <u>inadequately pleaded</u>, [so] RICO's nationwide jurisdiction provision is inapplicable") (emphasis added); Docket No. 326, pg. 46 (same). But that puts the cart before the horse.

Add. 145

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 53

"Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which [the plaintiff] could actually recover." *Bell v. Hood*, 327 U.S. 678, 682 (1946). Plaintiffs' claims do not "clearly appear[] to be immaterial and made solely for the purpose of obtaining jurisdiction," nor are they "wholly insubstantial and frivolous." *Id.* at 682–83 Therefore, whether the amended complaint "states a cause of action on which relief could be granted [under RICO] is a question of law [which] must be decided after and not before [this Court] has assumed jurisdiction over the controversy." *Id.* at 682.

### 2. Puerto Rico Long-Arm Statute

The Court has found jurisdiction as to all claims over Exxon, Shell, and BP. It has found jurisdiction under RICO over ConocoPhillips, Chevron, Motiva, and API. It has finally found no jurisdiction as to BHP and Rio Tinto under RICO or the Puerto Rico long-arm statute. The Court addresses here jurisdiction under the Puerto Rico long-arm statute over ConocoPhillips, Chevron, Motiva, and API as to antitrust and the Puerto Rico law claims.

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 54

The analysis is the same for ConocoPhillips and Chevron as it was for Exxon. The allegations as to their respective contacts with Puerto Rico are similar as to the respective contacts of Exxon. *See* Docket No. 205, ¶¶ 120–32 (Chevron), 147–55 (ConocoPhillips). As with Exxon, the arguments raised in the joint Rule 12(b)(2) motion are the only personal jurisdiction arguments raised by Chevron and ConocoPhillips. They were addressed and rejected above.

That leaves Motiva and API. Starting with Motiva, it filed an individual motion, which diverges from the approach in the joint Rule 12(b)(2) motion by disputing, besides relatedness and reasonableness, purposeful availment. Docket No. 240. The allegations in the amended complaint are similar as to Motiva as they are regarding Exxon. *See* Docket No. 205, ¶¶ 156–64. Motiva does not make any new arguments in its individual motion as to relatedness and reasonableness, and the analysis is the same as for Exxon above. But purposeful availment must be addressed here.

The amended complaint alleges that Motiva "markets and sells its products in Puerto Rico through its joint ventures

with [the other Defendants]." Docket No. 205, ¶ 163. Motiva argues that Plaintiffs "fail to allege that [it] has a substantial connection with Puerto Rico through any voluntary or deliberate actions in Puerto Rico." Docket No. 240, pg. 9. The amended complaint, Motiva says, "lacks any factually specific, non-conclusory allegations that Motiva has voluntarily or foreseeably subjected itself to jurisdiction in Puerto Rico." *Id.*

Plaintiffs in their opposition do not provide much elaboration. *See* Docket No. 281, pg. 18. They cite to, amongst other parts of the amended complaint, the one paragraph, ¶ 163, that alleges any contact by Motiva with Puerto Rico.

Motiva replies that ¶ 163 "makes [a] conclusory allegation" and that "[b]ecause the court 'does not "credit conclusory allegations or draw farfetched inferences,"' [Plaintiffs] fail to meet the relatedness and purposeful availment requirements of establishing specific personal jurisdiction." Docket No. 302, pg. 3 (quoting *Vargas-Santos v. Sam's West, Inc.*, 2021 WL 4768387, at * 2 (D.P.R. Oct. 12, 2021)).

In the objections to the R&R, Motiva makes a similar

Add. 148

argument. It says that Plaintiffs "do not even allege or provide evidence that Motiva is registered to do business in Puerto Rico," that "[a] search on the Puerto Rico department of State's website does not reveal any business registration by Motiva," and that "[t]here are no allegations or evidence to support the conclusory allegations that Motiva marketed, promoted, or sold products in Puerto Rico." Docket No. 328, pg. 3 & n. 5 (citation omitted). Motiva repeats the argument as to conclusory allegations in its reply to Plaintiffs' response, Docket No. 341, to its objections, Docket No. 369, pgs. 1–2.

Motiva applies the wrong standard. The Court "draw[s] the facts from the pleadings and the parties' supplementary filings, including affidavits, taking facts affirmatively alleged by [Plaintiffs] as true and construing disputed facts in the light most hospitable to [them]." *Ticketmaster-New York*, 26 F.3d at 203. To be sure, the Court "do[es] not credit conclusory allegations or draw farfetched inferences." *Id.* But there is a difference between "facts" and "conclusions" that Motiva misses. "[F]acts are susceptible to objective verification," whereas conclusions "are empirically

unverifiable in the usual case" and "represent the pleader's reactions to, sometimes called 'inferences from,' the underlying facts." *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 16 (1st Cir. 1989).

And as explained in the case to which Motiva cites, in the sentence right before the one Motiva quotes, "[t]he defendant may put forward undisputed facts to rebut the plaintiff's prima facie showing, but any factual disputes are construed in the plaintiff's favor when deciding the jurisdictional question." *Vargas-Santos*, 2021 WL 4768387, at * 2. Here, Plaintiffs make factual allegations as to Motiva's activities in Puerto Rico, in particular that it markets and sells products through joint ventures. Motiva does not dispute that anywhere. Indeed, across four filings, it is careful not to make a suggestion to the contrary, chastising instead Plaintiffs for not providing evidence. Even as to whether it is registered to do business in Puerto Rico, Motiva does not make an affirmative statement, instead tap dancing around whether Plaintiffs have alleged that it is registered and stating that the website of the Puerto Rico State Department does not show

such a registration. *See* Docket No. 328, pg. 3 & n. 5. Motiva itself brings up registration, but what relevance registration has Motiva does not explain. Indeed, registration is "of little significance" in the purposeful availment inquiry, *RPB SA v. Hyla, Inc.*, 2020 WL 12187801, at * 11 (C.D. Cal. June 9, 2020), so the Court sees this as nothing more than a strawman.

From the undisputed allegation of marketing and sale of products by Motiva in Puerto Rico, the Court sees purposeful availment. *See Benitez-Allende v. Alcan Aluminio do Brasil, S.A.*, 857 F.2d 26, 29–30 (1st Cir. 1988) (Breyer, J.) (finding purposeful availment where Brazilian pressure cooker manufacturer placed its products into the stream of commerce and contacted a sales agent to discuss a marketing strategy for Puerto Rico).

The Court finally turns to API. To begin, API in its objections raises personal jurisdiction arguments, including as to purposeful availment. *See* Docket No. 319, pgs. 4–5. API filed an individual Rule 12(b)(6) motion, Docket No. 254, but not an individual Rule 12(b)(2) motion. The joint Rule 12(b)(2) motion did not, as explained above, deal with purposeful

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 59

availment. Objections to a report and recommendation are not an opportunity for a do-over. *See Robb Evans*, 850 F.3d at 35. The Court will limit its review to the joint Rule 12(b)(2) motion, the joint objections, and related briefs.

The Court starts with relatedness. And it ends there, because, as discussed below, it finds that relatedness is not present.

Plaintiffs' federal antitrust claim is premised on the following: "Defendants, separate economic actors, and competitors who have substantial market power in the energy market, and each of them, consciously committed to a common scheme designed to restrain trade." Docket No. 205, ¶ 765. API is not a "competitor . . . in the energy market," let alone have "substantial market power" in that market. As to the Puerto Rico law claims, Plaintiffs similarly focus on the activities of Exxon, Chevron, Motiva, BP, Shell, and ConocoPhillips. *See* Docket No. 205, ¶ 636 (common law consumer fraud); *id.* at ¶ 691 (conspiracy to commit common law consumer fraud and deceptive businesses practices); *id.* at ¶ 704 (Puerto Rico Rules); *id.* at ¶ 778 (public nuisance); *id.*

at ¶ 784 (strict liability for failure to warn); *id.* at ¶ 799 (strict liability for design defect); *id.* at ¶ 810 (negligent design defect); *id.* at ¶ 825 (private nuisance); *id.* at ¶ 830 (unjust enrichment).

To the extent Plaintiffs attempt to impute the contacts of API's members to it, the presence of members in Puerto Rico does not automatically confer jurisdiction on API itself. The Court rather "assess[es] the extent of control, if any, exercised by [API] over [those] members" and "the extent to which the member[s] act[ed] for, a[re] . . . agent[s] of, or [are] synonymous with, [API]." *Donatelli*, 893 F.2d at 469. "The barometer for control . . . is whether or not [API] exercised substantial influence over the member's decision to carry on the in-forum activities which constitute the relevant 'minimum contacts.'" *Id.* If Plaintiffs "cannot show that [API] substantially influenced the decisionmaking leading to the member's in-forum activities, then there can be no attribution." *Id.*

Plaintiffs allege some control of API by members with contacts to Puerto Rico, *see* Docket No. 205, ¶¶ 205–08, but

they do not allege that API in any way influenced a member's contacts with Puerto Rico. Accordingly, the contacts of its members cannot sustain jurisdiction over API itself. *See Donatelli*, 893 F.2d at 470–71 (finding no jurisdiction over association, although member advertised and sold tickets in Rhode Island and broadcast its games there, because member "entered the Rhode Island market by [its] own choice and for [its] own benefit, not as the association's handmaiden"). *Cf. Relevent Sports, LLC v. United States Soccer Federation, Inc.*, 61 F.4th 299, 305–06 (2d Cir. 2023) (finding minimum contacts with New York by international association that vested with the exclusive authority to sanction all men's professional soccer leagues and games played in the United States a national association that incorporated as a New York not-for-profit, acted as international association's agent, and transacted substantial business on behalf of international association in New York).

### 3. Antitrust

Plaintiffs argue in the opposition to the Rule 12(b)(2) motions that "[l]ike RICO Section 1965, antitrust claims confer

personal jurisdiction through global service of process so long as a plaintiff can demonstrate minimum contacts with the United States." Docket No. 281, pg. 25 (citing *Amtrol, Inc. v. Vent-Rite Valve Corp.*, 646 F. Supp. 1168, 1172 (D. Mass. 1986)). This is in response to Rio Tinto's argument that Section 12 of the Clayton Act, 15 U.S.C. § 22, does not confer jurisdiction over it, *see* Docket No. 246, pgs. 19–21. One other defendant addresses Section 12: Motiva. *See* Docket No. 240, pgs. 12–13. The joint Rule 12(b)(2) motion does not mention Section 12.

Plaintiffs' argument is undeveloped, and it does not, unlike the § 1965 argument, appear in the amended complaint. In any event, the argument fails on the merits. For the three defendants, BHP, Rio Tinto, and API, over which there is no jurisdiction under the Puerto Rico long-arm statute for the antitrust claim, Section 12 does not confer it.

Section 12 provides that:

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 63

in the district of which it is an inhabitant, or wherever it may be found.
15 U.S.C. § 22.

The first clause sets venue where the "corporation" is an "inhabitant," "may be found," or "transacts business." The second clause provides for process where the corporation is "an inhabitant" or "wherever it may be found."

Section 12 is by terms limited to "corporation[s]," but not domestic corporations. *See United States v. Scophony Corp. of Am.*, 333 U.S. 795, 810 (1948) (applying Section 12 to foreign corporation); Black's Law Dictionary 273 (2d ed. 1910) (defining "[c]orporation" as "[a]n artificial person or legal entity created by or under the authority of the laws of a state or nation." Here, BHP states that it is "an Australian corporation." Docket No. 245, pg. 2. And Rio Tinto states that "Plaintiffs correctly identify [it] as an entity 'incorporated in England and Wales.'" Docket No. 246, pg. 8 (quoting Docket No. 205, ¶ 180). Section 12 thus may apply.

But it does not apply to API. API is an association. Courts have consistently and over decades rightly refused to

apply Section 12 to associations. *See Cal. Clippers, Inc. v. U.S. Soccer Football Ass'n*, 314 F. Supp. 1057, 1061 (N.D. Cal. 1970) ("unincorporated association"); *Thill Securities Corporation v. New York Stock Exchange*, 283 F.Supp. 239, 242 (E.D. Wis. 1968) (same); *Pacific Seafarers, Inc. v. Pacific Far East Line*, 48 F.R.D. 347, 349 (D.D.C. 1969) ("voluntary association"); *McManus v. Tato*, 184 F.Supp. 958, 959 (S.D.N.Y. 1959) (same). In all, then, since the Puerto Rico long-arm statute is not a hook as to API, as explained above, the only claims for which there is jurisdiction as to API is the four RICO claims.

Section 12 provides for worldwide service. Plaintiffs make this point by citing to *Amtrol*. There is higher, indeed binding, authority. The First Circuit has twice described Section 12 as "providing for worldwide service of process." *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 36 (1st Cir. 1999) (*Swiss Am. Bank I*); *Pleasant St.*, 960 F.2d at 1086 n. 6.

Whether for that worldwide service to establish personal jurisdiction requires venue that is proper under the first clause of Section 12, is the subject of a circuit split. On this, the First Circuit has not spoken.

Add. 157

Most circuit courts to have considered the issue have held that Section 12 confers personal jurisdiction over a corporation under its second clause only when there is proper venue under the first clause. *See KM Enterprises, Inc. v. Global Traffic Technologies, Inc.*, 725 F.3d 718, 730 (7th Cir. 2013) (Wood, J.); *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005); *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000). The Ninth Circuit, by contrast, sees the two clauses as independent of one another and allows plaintiffs to pair the second clause with 28 U.S.C. § 1391, the general venue provision. *See Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1417 (9th Cir. 1989). The Third Circuit agrees, *In re Auto. Refinishing Paint Antitrust Litigation*, 358 F.3d 288, 296–97 (3d Cir. 2004), though it has emphasized the distinction between "alien" and "out-of-state" corporation, *id.* at 296 n. 10.

Motiva embraces the majority approach. Docket No. 240, pgs. 12–13. Rio Tinto recognizes the split but does not take a position. Docket No. 246, pgs. 19–20 n. 9.

Add. 158

As to Plaintiffs, they cite to *Amtrol*. That court did not read Section 22 as a whole. *See* 646 F. Supp. at 1171. To the Court's understanding, only one other court in the First Circuit has addressed the matter. That court found "persuasive" the then-recent "comprehensive" decision by the Third Circuit in *In re Auto. Refinishing Paint Antitrust Litigation* and "s[aw] no reason as a trial court . . . to repeat what [the Third Circuit] has done." *In re New Motor Vehicles Canadian Export*, 307 F.Supp.2d 145, 149 (D. Me. 2004).

This Court agrees with the majority approach embraced by the Second, Seventh, and D.C. Circuits. In statutory interpretation, courts "look first to . . . ordinary meaning." *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407 (2011). Courts then look to "the provision's 'entire text,' read as an 'integrated whole.'" *Id.* at 408 (quoting *Graham Cty. Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290, 293 n. 12 (2010)).

Section 12 "consists of two parts," one "before the semicolon," which "addresses venue [and] permit[s] antitrust actions against corporations to be maintained 'not only in the

Add. 159

judicial district whereof [the corporate defendant] is an inhabitant, but also in any district wherein it may be found or transacts business,'" and another "after the semicolon," which "provides for worldwide service of process and, therefore, the exercise of personal jurisdiction 'in such cases.'" *Daniel*, 428 F.3d at 422. "It is 'in such cases,' i.e., such venued cases, that Section 12 makes worldwide service of process available." *Id.* at 424. *See also GTE New Media*, 199 F.3d at 1350 ("The language of the statute is plain, and its meaning seems clear: The clause before the semi-colon relates to a supplemental basis for venue in actions under the Clayton Act; the clause after the semi-colon relates to nationwide service of process in antitrust cases; and invocation of the nationwide service clause rests on satisfying the venue provision.").

The Ninth Circuit's approach is unpersuasive. Amongst the "most basic of interpretative canons" is that against antisuperfluousness, under which a "statute should be constructed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or

insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (cleaned up). "Even the Ninth Circuit seems to recognize that its sweeping interpretation of Section 12 tends to make the venue provision 'wholly redundant.'" *GTE New Media*, 199 F.3d at 1351 (quoting *Go-Video*, 885 F.2d at 1413). *See also KM Enterprises*, 725 F.3d at 729 ("If the clauses are not linked, then the venue language is superfluous. Interpretations that render words of a statute superfluous are disfavored as a general matter and this principle has even greater force in a context such as this, where, in order to decouple Section 12's venue and service-of-process provisions, we would have to assume that Congress intentionally joined the two provisions with a semicolon, but nevertheless intended for the second provision to render the first disposable.") (cleaned up); Areeda & Hovenkamp, Antitrust Law ¶ 271 (updated May 2025) ("[G]enerally accepted canons of statutory construction would appear to favor the narrower construction.").

In short, for the service effected on BHP and Rio Tinto to confer jurisdiction over it, there must be proper venue under the first clause of Section 12. BHP and Rio Tinto must

either be "inhabitant[s]" of this District or "may be found" or "transact[] business" in this District.

"Inhabitant" in Section 12 is "synonymous with 'resident,'" and a corporation is "resident" where it is "incorporated." *Aro Mfg. Co. v. Automobile Body Research Corp.*, 352 F.2d 400, 404 (1st Cir. 1965). BHP and Rio Tinto clearly are not "inhabitant[s]" of this District.

As to "found," it is "the equivalent of saying that [the corporation] must be present there by its officers and agents carrying on the business of the corporation." *Id.* "In this way only can a corporation be said to be 'found' within the district." *Id.* BHP and Rio Tinto do not meet that definition.

Finally, as to "transact[ing] business," the Supreme Court has found it to be a broader concept than being "found." It means "the practical, everyday business or commercial concept of doing business or carrying on business 'of any substantial character.'" *Scophony Corp. of Am.*, 333 U.S. at 807. *See also Eastman Kodak Co. v. S. Photo Materials Co.*, 273 U.S. 359, 374 (1927) (holding that a defendant transacted business for Section 12 purposes in a district where it

promoted its goods through product demonstrations, solicited orders through salesmen in the district, and shipped its products to the district); *Jeffrey-Nichols Motor Co. v. Hupp Motor Car Corp.*, 46 F.2d 623, 625 (1st Cir. 1931) ("[W]hile a single transaction of business may not be sufficient to establish venue in a district, it does not require the maintenance of an office or place of business or the presence of agents soliciting or taking orders.").

Here, the only possible hook as to both BHP and Rio Tinto is, as explained above, through subsidiaries. But that is inapplicable here for the same reasons it fails above. Corporate separateness applies with equal force in the Section 12 context. *See Aro Mfg. Co.*, 352 F.2d at 404.

In all, this District is not proper venue for BHP and Rio Tinto under the first clause of Section 12, and worldwide service under the second clause of Section 12 thus does not apply to BHP and Rio Tinto. The Court having already determined that RICO and the Puerto Rico long-arm statute do not apply to BHP and Rio Tinto, that Section 12 does not

apply either means that there is no personal jurisdiction over BHP and Rio Tinto as to any claim.

A final matter. Motiva invokes, besides Rules 12(b)(2) and 12(b)(6), Rule 12(b)(3), which provides for dismissal for improper venue. The only mention of venue is in arguing that Plaintiffs "cannot satisfy the venue requirements under 15 U.S.C. § 22" and "the Court [thus] lacks jurisdiction over Motiva." Docket No. 240, pg. 13.

It is undisputed that Motiva is a limited liability company ("LLC"). Section 12 applies only to corporations, and courts accordingly have refused to apply Section 12 to LLCs. *See, e.g., GovernmentGPT Inc. v. Axon Enterprise Inc.*, 769 F.Supp.3d 959, 978–79 (D. Ariz. 2025). Section 12 never could apply to Motiva, and since the only discussion of venue in its motion being as to Section 12, any argument that the claims against it should be dismissed for improper venue is waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).

### 4. Jurisdictional Discovery

In response to Rio Tinto's and BHP's objections to the recommendation in the R&R to deny their individual Rule

12(b)(2) motions, Plaintiffs cite to *New England Data Servs., Inc. v. Becher*, 829 F.2d 286 (1st Cir. 1987) and ask for jurisdictional discovery. Docket No. 336, pgs. 6–7; Docket No. 343, pgs. 7–8.

*Becher* is irrelevant. There, the First Circuit held "that Rule 9(b) requires specificity in the pleading of RICO mail and wire fraud." 829 F.2d at 290. It then held that, if specificity is lacking, the "court should make a <u>second</u> determination as to whether the claim as presented warrants the allowance of discovery and if so, thereafter provide an opportunity to amend the defective complaint." *Id.* (emphasis in original). *Becher*, in other words, has nothing to do with jurisdictional discovery. And, in any event, the First Circuit "has never applied *Becher* in a case . . . where the complaint fell short not only of Rule 9(b)'s heightened particularity requirements but also of the ordinary plausibility standard." *Douglas v. Hirshon*, 63 F.4th 49, 59 (1st Cir. 2023). Here, as will be explained below, "it is not simply the details [Plaintiffs] lack, but the substance of a RICO claim." *Id.* (quoting throughout *N. Bridge Assocs., Inc. v. Boldt*, 274 F.3d 38, 44 (1st Cir. 2001)). Accordingly, "*Becher* discovery is unwarranted." *Id.*

More importantly, Plaintiffs themselves want nothing to do with jurisdictional discovery—per their own objections to the R&R. There, they object to Magistrate Judge Ramos-Vega's "recommendation of limited jurisdictional discovery." Docket No. 323, pg. 6. Indeed, they dedicate a paragraph to explaining that "[e]ven 'limited' jurisdictional discovery will generate an extensive motions practice about what is appropriate to include in a presently undefined 'limited' jurisdictional discovery." *Id.* at pg. 8. And there is no mention anywhere in the Rule 12(b)(2) briefing of jurisdictional discovery. *See* Docket No. 281.

Plaintiffs "had ample opportunity to move for jurisdictional discovery" but "cho[se] not to avail [themselves] of an opportunity for discovery" and thus "can scarcely be heard to complain [now that] the lack of such discovery . . . redounds to [their] detriment." *Kuan Chen*, 956 F.3d at 56. To be sure, "district courts have a certain amount of leeway to treat informal requests for jurisdictional discovery made in opposition papers as if made by motion when there is no prejudice to the other party." *Motus*, 23 F.4th

at 128. But the Court sees no leeway to grant jurisdictional discovery to a party asking for such discovery in its response to the other side's objections to a report and recommendation when that party not only never brought up jurisdictional discovery in the original Rule 12(b)(2) briefing, *Robb Evans*, 850 F.3d at 35, it expressly objected to the magistrate judge's jurisdictional discovery recommendation.

A plaintiff must bring forth facts "which show why jurisdiction would be found if discovery were permitted." *Swiss Am. Bank II*, 274 F.3d at 626. Indeed, a plaintiff must identify "what relevant information it hope[s] to glean through such discovery." *Motus*, 23 F.4th at 128. Even in the two filings where Plaintiffs bring up jurisdictional discovery, there is no mention of what Plaintiffs would seek in the discovery.

### 5. Conclusion as to Personal Jurisdiction

BHP's Rule 12(b)(2) motion at Docket No. 245 and Rio Tinto's Rule 12(b)(2) motion at Docket No. 246 are both **GRANTED**. BHP's Rule 12(b)(6) motion at Docket No. 243 and Rio Tinto's Rule 12(b)(6) motion at Docket No. 247 are

both **MOOT**. *See Lightfoot*, 580 U.S. at 95. The joint Rule 12(b)(2) motion at Docket No. 234 is **GRANTED in part, DENIED in part and MOOT in part**. It is granted as to Rio Tinto and BHP as to all claims and API as to the federal antitrust and Puerto Rico law claims. It is denied as to Exxon, Shell, BP, Chevron, ConocoPhillips, and Motiva. It is also denied as to API and RICO. It is moot as to Occidental.

The personal jurisdiction dismissals will be without prejudice because "'[n]o jurisdiction' and 'with prejudice' are mutually exclusive." *Frederiksen v. City of Lockport*, 384 F.3d 437, 438 (7th Cir. 2004) (Easterbrook, J.). But "new process [belongs] in a <u>different court</u>." *Rodi v. Southern New England Sch. of Law*, 389 F.3d 5, 18 (1st Cir. 2004) (emphasis added). These "jurisdictional disposition[s]" are, in other words, "conclusive on the jurisdictional question[s]." *Frederiksen*, 384 F.3d at 438.

### C. Judicial Notice

There are two motions for judicial notice. The motion at Docket No. 238 was filed by Defendants jointly. It asks the Court to take judicial notice of certain articles and reports. The

motion at Docket No. 241 was filed by Chevron and involves a legal services contract.

Magistrate Judge Ramos-Vega recommends that the motion at Docket No. 238 be granted, "but only as to taking notice of the fact that the articles and reports were published" and not "regarding the truth of their contents." 2025 WL 600430, at * 16.

Plaintiffs' objections do not address these two motions. And it is unclear whether Defendants actually object to this recommendation. In a footnote, Defendants argue that Magistrate Judge Ramos-Vega "erred in concluding that the articles were irrelevant for statute of limitations purposes because he could not take notice of the truth of the assertions within the articles" and state that they "understand that to be an error in the application of judicial notice." Docket No. 326, pg. 40, n. 22 (emphasis in original). "[T]o the extent," they say, that Magistrate Judge Ramos-Vega "declined to take notice that the assertions contained within the documents were publicly available (not for the truth of the matter asserted), [they] object to the Magistrate Judge's recommendation." *Id.*

In another footnote, Defendants state that "[t]o the extent the Court construes the [R&R] as denying [their motion], [they] object to it for the reasons set forth in the Motion, Reply, and [the objections]." *Id.* at pg. 41 n. 24 (citing Docket Nos. 238, 289). All other portions of the objections where notice comes up, it is tied to the merits of the statute of limitations argument. *See id.* at pgs. 40–41.

Assuming Defendants have asserted, as is required to preserve the argument, not just an objection but a "specific objection," *Santiago*, 138 F.3d at 4, it fails. Defendants have made it clear that they are asking the Court to "take notice of the relevant facts contained in th[e] documents, namely the date of publication and the assertions contained therein (the simple fact those assertions were made, not the truth of those assertions)." Docket No. 298, pg. 2. That is Magistrate Judge Ramos-Vega's recommendation exactly. And it could not be otherwise: "courts have routinely held that newspaper articles constitute inadmissible hearsay because they usually provide no evidence of the reporter's perception, memory or sincerity." *Democracy Forward Foundation v. Pompeo*, 474

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 78

F.Supp.3d 138, 150 (D.D.C. 2020) (cleaned up). Everything else ties to the merits of the statute of limitations argument, and Defendants themselves have differentiated between "a merits argument about whether [their] statute of limitations arguments should prevail" and "whether judicial notice of the[] documents' publication date and their contents is appropriate." Docket No. 298, pg. 7.

The motion at Docket No. 238 is **GRANTED** as to judicial notice that the exhibits to the motion were publicly available reports and news articles and not for the truth of the matter asserted.

As to the motion at Docket No. 241, Magistrate Judge Ramos-Vega recommends that it be denied. 2025 WL 600430, at * 16. Chevron reiterates in its objections that the document "was 'offered only for the purposes of showing that amendment [of the Amended Complaint] would be futile, not for the merits of the Motion to dismiss.'" Docket No. 325, pg. 4 (quoting Docket No. 241, pg. 2). As will be explained below, no leave to amend further will be granted. The motion at Docket No. 241 is **MOOT**.

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 79

### D. The Merits

There were no objections to the recommendation to dismiss claims 1 through 3, all under Puerto Rico law and concerning respectively common law consumer fraud, conspiracy to commit common law consumer fraud and deceptive business practices, and the Puerto Rico Rules against misleading practices and advertisements. The recommendation thus will be adopted. *Santiago*, 138 F.3d at 4. In any event, the Court discerns no reason why the conclusion below that the other Puerto Rico law claims are—as are the federal claims—time-barred, does not apply with equal force to claims 1 through 3.

Under Rule 12(b)(6), parties may move, as Defendants have done jointly and individually, for dismissal for "failure to state a claim upon which relief can be granted." Lest it be dismissed, the amended complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court "draw[s] the facts from the [amended]

complaint, documents attached to or fairly incorporated into the complaint, facts susceptible to judicial notice, and concessions in [Plaintiffs'] response to the motion[s] to dismiss." *Cheng v. Neumann*, 51 F.4th 438, 441 (1st Cir. 2022) (cleaned up). The Court "credit[s] neither conclusory legal allegations nor factual allegations that are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *Legal Sea Foods, LLC v. Strathmore Ins. Co.*, 36 F.4th 29, 33–34 (1st Cir. 2022) (cleaned up).

Magistrate Judge Ramos-Vega recommends that the claims in this case be found to be timely. 2025 WL 600430, at * 19. He makes three specific recommendations: that the claims are "not time-barred . . . under the continuous tort rule," that "even if the injury wasn't continuous, equitable tolling would make Plaintiffs' claims timely," and that Plaintiffs' "arguments regarding class action tolling under Puerto Rico law are unconvincing." *Id.*

There is no objection by Plaintiffs as to class action tolling, so the recommendation is adopted. *Santiago*, 138 F.3d at 4. Defendants in the joint objections object to the

recommendation by Magistrate Judge Ramos-Vega not to dismiss on statute of limitations grounds. *See* Docket No. 326, pgs. 33–42. ConocoPhillips also objects in its individual objections. Docket No. 329, pgs. 9–10.

Plaintiffs' claims are barred by the applicable statutes of limitations, and no equitable doctrine salvages them. Given the findings below, the Court need not consider ConocoPhillips's objections.

Statutes of limitations "are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost." *Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 314 (1945). But they are also "by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay." *Id.* Statutes of limitations "find their justification in necessity and convenience rather than in logic" and "represent expedients, rather than principles." *Id.* They "have come into the law not through the judicial process but through legislation," *id.*, a

choice by the legislative branch that the courts are, as a matter of the separation of powers, duty-bound to accept.

"Granting a motion to dismiss based on a limitations defense is entirely appropriate when the pleader's allegations leave no doubt that an asserted claim is time-barred." *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998). That means that "the dates included in the complaint show that the limitations period has been exceeded and the complaint fails to 'sketch a factual predicate' that would warrant the application of either a different statute of limitations period or equitable estoppel." *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 320 (1st Cir. 2008) (quoting *LaChapelle*, 142 F.3d at 509–10).

For the Puerto Rico law claims, the Court "must apply the substantive law of Puerto Rico." *Rodríguez v. Señor Frog's de la Isla, Inc.*, 642 F.3d 28, 36 (1st Cir. 2011). The Court accordingly applies as to those claims "Puerto Rico's statute of limitations, as well as the concomitant tolling provisions." *Montalvo v. González-Amparo*, 587 F.3d 43, 46 (1st Cir. 2009).

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 83

Per Plaintiffs, "the acts or omissions alleged in this action occurred before" the 2020 Puerto Rico Civil Code went into effect, Docket No. 280, pg. 19, in other words, November 28 of that year, *Rivera-Rosario v. LSREF2 Island Holdings, Ltd., Inc.*, 79 F.4th 1, 5 n. 1 (1st Cir. 2023). Plaintiffs thus apply the 1930 Puerto Rico Civil Code. Docket No. 280, pgs. 19–20. Defendants are in agreement on this. Docket No. 297, pg. 14 n. 2. Under the 1930 Civil Code, the statute of limitations is one year from knowledge of the injury, "that is, notice of the injury, plus notice of the person who caused it." *Arturet-Vélez v. R.J. Reynolds Tobacco Co.*, 429 F.3d 10, 14 (1st Cir. 2005) (cleaned up). As to the federal claims, Section 4 of the Clayton Act provides for a private right of action under the antitrust laws, 15 U.S.C. § 15, and such claims must be filed "within four years after the cause of action accrued," *id.* § 15b. The Supreme Court has imported the four-year term from the Clayton Act into civil RICO claims. *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 156 (1987).

Plaintiffs argue that it was only in March 2022 that they identified Defendants by reviewing a Columbia University

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 84

report "entitled 'How Much Have the Oil Supermajors Contributed to Climate Change? Estimating the Carbon Footprint of the Oil Refining and Petroleum Product Sales Sectors.'" Docket No. 280, pg. 20. It was after reviewing that report, the argument goes, that Plaintiffs "learned which entities have a causal link to Plaintiffs' injuries and their respective market shares in the fossil fuel industry." *Id.*

First, the amended complaint contains a section on why "No Statute of Limitations Bars Plaintiff's [sic] Claims." Docket No. 205, pgs. 13–15. This was filed after Defendants raised timeliness arguments in seeking to dismiss the original complaint. Docket No. 185, pgs. 26–32. Yet Plaintiffs' argument made its first appearance in the opposition to the Rule 12(b)(6) motions.

Second, the original complaint was filed on November 22, 2022, and the amended complaint on November 3, 2023. "Under the doctrine of relation back, an amended complaint can be treated, for purposes of the statute of limitations, as having been filed on the date of the original complaint." *Pessotti v. Eagle Mfg. Co.*, 946 F.2d 974, 975 (1st Cir. 1991).

Plaintiffs make no argument that the amended complaint, relates back to the original. Under Plaintiffs' own theory then the Puerto Rico law claims are clearly time-barred.

Third, as Defendants point out in their joint objections, Docket No. 326, pg. 38, n. 18, the Columbia report addresses two entities not party to this suit, Eni and TotalEnergies, and does not address four of the nine Defendants here, Rio Tinto, BHP, Motiva, and Occidental. Defendants filed a response to Defendants' joint objections, Docket No. 345, but offered no response to this point. If the 2022 report is what determined in Plaintiffs' eyes who to sue, this suit would have had half the named defendants it actually has. Or perhaps three quarters—swap Rio Tinto, BHP, Motiva, and Occidental for Eni and TotalEnergies, which it appears has, perhaps through a subsidiary, been doing business in Puerto Rico for more than a decade. *See TotalEnergies Marketing Puerto Rico Corp. v. Rivera-Robles*, 2024 WL 5423045, at * 1–3 (D.P.R. Jan. 25, 2024). And it—or its subsidiaries—has been sued alongside many of the Defendants here in similar cases. *See, e.g., Delaware v. BP America Inc.*, 578 F.Supp.3d 618 (D. Del. 2022) (2020 case).

Regardless of these three matters, there is overwhelming evidence of public knowledge of articles, reports, and cases making the connection between Defendants and Plaintiffs' claims, including as to Puerto Rico. The Court has taken judicial notice of numerous articles in the popular press and reports. One in a national outlet in September 2017 tied to climate change the hurricanes that had just occurred and are central to Plaintiffs' claims. Docket No. 238-4. Plaintiffs themselves cited to this article in the original complaint. Docket No. 1, ¶ 240 n. 217. Another is a 2008 article in different national outlet on the lawsuit that had just been filed by Kivalina, a coastal village in Alaska, against "5 oil companies, 14 electric utilities and the country's largest coal company," including Exxon, ConocoPhillips, and BP America. Docket No. 238-2, pg. 2. Amongst the claims noted in the article are public nuisance and conspiracy, *id.*, claims Plaintiffs bring here.

There is also a 2013 report on the impact of climate change in Puerto Rico published by the Puerto Rico Climate Change Council. Docket No. 238-7. This was also cited in the

original complaint. Docket No. 1, ¶ 263 n. 245. In the foreword, the report notes the "Puerto Rico . . . general public['s] . . . primar[y] concern[] about the potential impacts of climate change . . . and the potential increase in the frequency and magnitude of storms and hurricanes, storm surges, floods, and coastal erosion." Docket No. 238-7, pg. 13. And in the first paragraph of the introduction, it speaks of "[s]torm surges, winter swells, tsunamis, [and] coral bleaching" as examples of "rapid-onset events," which, with their "slow-onset" counterparts, pose "substantial risks" to Puerto Rico. *Id.* at pg. 16.

There have been also many a plaintiff bringing similar cases, and the Court can take judicial notice, *Freeman v. Town of Hudson*, 714 F.3d 29, 36–37 (1st Cir. 2013). The Kivalina case reached the Ninth Circuit in 2012, and amongst the defendants there were—other than, as noted in the article, Exxon, ConocoPhillips, and BP America—Chevron and Shell. *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012). "Kivalina's survival," the Ninth Circuit explained, "has been threatened by erosion resulting from wave action

and sea storms for several decades," and "Kivalina attribute[d] the impending destruction of its land to the effects of global warming, which it allege[d] results in part from emissions of large quantities of greenhouse gases by the" defendants in that case. *Id.* at 853–54.

Major hurricanes have also been at the center of suits. *See Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460, 464–65 (5th Cir. 2013) ("A group of Mississippi Gulf Coast residents and property owners . . . first filed suit . . . in 2005, alleging that emissions by energy company Defendants caused global warming which, increased the destructive capacity of Hurricane Katrina, which, in turn, damaged the class members' property. Plaintiffs asserted claims of public and private nuisance, trespass, negligence, unjust enrichment, fraudulent misrepresentation, and civil conspiracy against the companies.") (cleaned up).

And as far back as 2007, the Supreme Court noted expert testimony that, first, there is amongst "qualified scientific experts involved in climate change research . . . a strong consensus that global warming threatens (among other

things) a precipitate rise in sea levels by the end of the century" and "severe and irreversible changes to natural ecosystems" and, second, "rising ocean temperatures may contribute to the ferocity of hurricanes." *Massachusetts v. EPA*, 549 U.S. 497, 521–22 (2007).

Under RICO, the clock starts "when a plaintiff knew or should have known of his injury." *Álvarez-Maurás v. Banco Popular of Puerto Rico*, 919 F.3d 617, 625–26 (1st Cir. 2019) (quoting throughout *Rodríguez v. Banco Cent.*, 917 F.2d 664, 666 (1st Cir. 1990) (Breyer, C.J.)). The clock begins "even if the plaintiff is unaware of the precise acts of racketeering that caused the injury." *Id.* at 626 (quoting throughout *Lares Group, II v. Tobin*, 47 F.Supp.2d 223, 230 (D.R.I. 1999) aff'd, 221 F.3d 41 (1st Cir. 2000)). By September 2021, the 2017 hurricanes' four-year mark, Plaintiffs knew or should have known they had suffered considerable injury and who to sue. *See City of Boston v. Express Scripts, Inc.*, 765 F.Supp.3d 31, 42 (D. Mass. 2025) ("By 2018, all the telltale warning signs were present that the City suffered injury as a result of the [pharmacy benefit managers'] role in the opioid epidemic. Thus, despite

Defendants' misrepresentations, the City's actions to combat the opioid epidemic, combined with the widespread scrutiny and litigation concerning the role of [pharmacy benefit managers], leave no doubt that the City knew or should have known of its injuries.") (cleaned up). *Cf. Marrero-Rolón*, 2015 WL 5719801, at * 6–8 (finding no inquiry notice where there were two news reports and one lawsuit, a comptroller report, and government internal audits that were not "the subject of press coverage," let alone "substantial press coverage").

Moving to the Clayton Act, "[g]enerally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). And "relevant authority uniformly supports the requirement" that an antitrust plaintiff must "'show[] that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense.'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195 (1997) (quoting 2 Areeda & Hovenkamp, ¶ 338b (rev. ed. 1995)). *See also Rodríguez*, 917 F.2d at 666 (finding RICO's rule of "known or should have known" to be "at least roughly

similar to the Clayton Act's rule" under *Zenith*). As with RICO, Plaintiffs felt the adverse impact in September 2017 and the clock began to run then. *See Blenheim Capital Holdings Ltd. v. Lockheed Martin Corp.*, 53 F.4th 286, 298 (4th Cir. 2022) (finding that statute of limitations begun to run on October 6, 2016, because the "complaint's allegations place October 6, 2016, as the date when [the plaintiff] was cut out of the offset transaction" and "describe how, as of that date, [the plaintiff] was injured in its business and property and [the defendants] were enriched by the product of [the plaintiff's] years of work and effort, seizing the fruits and denying [the plaintiff] the benefits of the deal"); *DJ Mfg. Corp. v. Tex-Shield, Inc.*, 275 F. Supp. 2d 109, 120–22 (D.P.R. 2002), aff'd, 347 F.3d 337 (1st Cir. 2003) (finding that statute of limitations began to run when the defendant supplier of chemical protective clothing material made higher quote to the plaintiff unsuccessful bidder for chemical protective clothing contract than to successful bidder, rather than when Department of Defense agency awarded contract, as the former was the act that injured the plaintiff's business).

Under Puerto Rico law, "it is enough that the would-be plaintiff had notice that would have led a reasonable person to investigate and so uncover the needed information." *Arturet-Vélez*, 429 F.3d at 14. "Once a plaintiff is made aware of facts sufficient to put her on notice that she has a potential tort claim, she must pursue that claim with reasonable diligence, or risk being held to have relinquished her right to pursue it later, after the limitation period has run." *Rodríguez-Suris v. Montesinos*, 123 F.3d 10, 16 (1st Cir. 1997). And "once a plaintiff is put on notice that someone or some entity is the cause of the injury, the plaintiff may not succeed in a late-filed claim by asserting ignorance about the precise identity of the tortfeasor." *Id.* "[C]orporate identities and intracorporate relationships are a matter of public record," and "knowledge of the precise corporate identity of the entity responsible for a plaintiff's injury is [thus] not required before the period prescribed by the statute of limitation begins to run." *Id.*

The injury and which entities to sue and on what basis were all readily apparent from the coverage in the popular

press, the court cases, and the reports, and Plaintiffs were not diligent. *See Estate of Alicano Ayala v. Philip Morris, Inc.*, 263 F.Supp.2d 311, 317–19 (D.P.R. 2003) (finding lack of diligence in suit alleging conspiracy by major tobacco companies to defraud the public and conceal information regarding health hazards of tobacco product consumption given "widespread knowledge of the health hazards of smoking," including because of court cases, scientific reports, and news coverage).

### a. Continuing Violation, Separate Accrual Rule, Continuing Tort

Per the amended complaint, "[n]o statute of limitation can be pleaded against the Plaintiffs as the allegations and losses are continuous, wrongful, and ongoing, and the Defendants' wrongful conduct has just recently come to the knowledge of [Plaintiffs]." Docket No. 205, ¶ 20. The latter theory was just rejected. As to the former, Plaintiffs' argument in the original briefing on the Rule 12(b)(6) motions is limited to a single sentence that repeats the allegation from the amended complaint, with no developed argumentation or citation to authority. *See* Docket No. 280, pg. 19. Plaintiffs had

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 94

a responsibility to make their case before Magistrate Judge Ramos-Vega. *Robb Evans*, 850 F.3d at 35. Magistrate Judge Ramos-Vega generously considered the argument regardless. *See* 2025 WL 600430, at * 16–17. *See also McMillan v. Rodríguez-Negrón*, 511 F.Supp.3d 75, 82 (D.P.R. 2020) (Gelpí, J.) (entertaining—before granting dismissal—a continuous tort theory that was "strongly hint[ed]" by the pleadings, "[e]xamined collectively"). The Court will consider—and reject—the theory under Puerto Rico law and similar doctrines under RICO and the Clayton Act.

Starting with the federal claims, the Supreme Court first spoke of "continuing violation" under the Clayton Act in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 n. 15 (1968). Such conduct "inflict[s] continuing and accumulating harm on [the plaintiff]." *Id.* Three years later, in *Zenith*, the Supreme Court held that, under the Clayton Act, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused

by that act and that, as to those damages, the statute of limitations runs from the commission of the act." 401 U.S. at 338.

In *Klehr*, the Supreme Court noted that the Clayton Act "provides that, in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' e.g., each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'" 521 U.S. at 189 (quoting 2 Areeda & Hovenkamp, ¶ 338b (rev. ed. 1995)). "But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Id. Klehr*, though a RICO case, provided a "definition of a continuing violation [that] follows longstanding Supreme Court precedent," *Hanover Shoe* and *Zenith*. *In re Pre-Filled Propane Tank Antitrust Litigation*, 860 F.3d 1059, 1064–65 (8th Cir. 2017) (en banc).

"The fact that some damages [a]re to accrue in the future does not extend the accrual date." *Blenheim Capital Holdings*, 53 F.4th at 299 (emphasis in original). Rather, "to recover future damages, the plaintiff still must 'sue within the requisite number of years from the accrual of the action,' when it <u>first</u> felt 'the adverse impact of [the] antitrust conspiracy.'" *Id.* (quoting *Zenith*, 401 U.S. at 339) (emphasis in original).

Under RICO, the First Circuit has held that "each time a plaintiff suffers an injury caused by a violation of 18 U.S.C. § 1962, a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury." *Rodríguez*, 917 F.2d at 665–66 (quoting throughout *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir. 1988)). This is the "separate accrual" rule. *Rhoades*, 859 F.2d at 1103. The Supreme Court in *Klehr* held that under RICO, "as in the antitrust cases, the plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." 521 U.S. at 190.

Here, starting with RICO, Plaintiffs make clear that the racketeering activity preceded the 2017 storms. *See* Docket No. 205, ¶ 743 (§ 1962(a)) ("Defendants knew that their predicate acts, material misrepresentations, fraudulent concealments, omissions, and deceit of the Plaintiffs and their citizens as detailed in this Count, would, and did, cause the Plaintiff Government and the Municipalities represented by the Plaintiffs to accept a substantial risk that they otherwise would not have taken, by purchasing the Defendants' carbon-based products, and prevent the Plaintiffs and their citizens from having the knowledge that they needed to adequately prepare for the 'hotter and wetter' storms that pummeled the Island in 2017."); *id.* at ¶ 754 (§ 1962(b)) (same); *id.* at ¶ 762 (§ 1962(d)) (same).  And where Plaintiffs allege specific kinds of damage, it is, as with Puerto Rico law claims, related to the 2017 storms. *See* Docket No. 205, ¶ 741 (§ 1962(a)); *id.* at ¶ 752 (§ 1962(b)); *id.* at ¶ 760 (§ 1962(d)).

Plaintiffs do not allege some "separable, new predicate act within a 4–year limitations period" that "caused them harm over and above the harm that the earlier acts caused."

Add. 190

*Klehr*, 521 U.S. at 190. The separate accrual rule thus does not apply. *See City of Boston*, 765 F.Supp.3d at 41 ("Without plausible allegations of ongoing predicate acts causing additional injury, the City cannot rely on the separate-accrual rule."); *Alaska v. Express Scripts, Inc.*, 774 F.Supp.3d 1150, 1163 (D. Alaska 2025) ("Because the State fails to identify which, if any, of Express Scripts' acts constitutes a new overt act inflicting a new injury within the limitations period, the Court finds that the separate accrual rule does not apply. The [second amended complaint] contains specific, dated allegations of certain acts by Express Scripts, but those allegations all pre-date August 2019 and therefore fall outside of the four-year limitations period.").

The antitrust claim is similarly all about activity leading up to the 2017 storms. *See* Docket No. 205, ¶ 767 ("Defendants' agreement had a substantially adverse effect on competition in Puerto Rico because, had the Plaintiffs and their citizens known that their purchase and use of the Defendants' products would lead to increasingly intense hurricanes as a result of the acceleration of climate change,

Plaintiffs would have substantially reduced their purchases of the Defendants' products and instead implemented alternative, non-carbon-based energy sources, such as wind and solar energy, many years ago. This would have prevented the storms of September 2017."). Plaintiffs do not allege some new "overt act that is part of the violation and that injures [them]." *Klehr*, 521 U.S. at 189 (quoting throughout 2 Areeda & Hovenkamp, ¶ 338b (rev. ed. 1995)). Plaintiffs did not sue within four years of "<u>first</u> fe[eling] 'the adverse impact of [the] antitrust conspiracy.'" *Blenheim Capital Holdings*, 53 F.4th at 299 (quoting *Zenith*, 401 U.S. at 339) (emphasis in original). Plaintiffs thus did not allege continuing violation. *See id.* (finding 2021 claim time-barred because the plaintiff "felt adverse impacts immediately upon [the defendant's] October 2016 termination of the brokerage agreement"). *See also Berkson v. Del Monte Corp.*, 743 F.2d 53, 55 (1st Cir. 1984) (affirming summary judgment against plaintiff whose claims were based upon the defendants' allegedly wrongful agreement regarding the sale of banana-growing properties in Guatemala because "no subsequent overt act in furtherance

of the alleged conspiracy [was] described or even hinted at" in the plaintiff's complaint and "any subsequent harm" thus had to "be seen as the unabated inertial consequence of the earlier events") (cleaned up).

There is one count that the Court has not discussed, under § 1962(c). The wording there is somewhat different than the other RICO claims. *See* Docket No. 205, ¶ 735 ("Defendants knew that their predicate acts, material misrepresentations, fraudulent concealments, omissions, and deceit of the Plaintiffs as detailed in this Count, would, and did, cause the Plaintiffs and their citizens to face an unknown substantial risk that they otherwise would not have taken, by purchasing the Defendants' carbon-based products, and prevented the Plaintiffs and their citizens from having the knowledge they needed to adequately prepare for the 'hotter and wetter' storms that pummeled Puerto Rico in 2017, causing damages and losses at the time and ongoing."). The kinds of damage alleged are the same as with the other RICO claims and the Puerto Rico law claims, however. *See id.* at ¶ 733.

First, even with the use of the word "ongoing," Plaintiffs rather clearly limit the racketeering allegations to pre-storms conduct. Second, "[s]imply labeling allegations as 'ongoing' does not convert conclusory statements into 'factual allegations.'" *City of Boston*, 765 F.Supp.3d at 40 (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)).

That applies equally to the allegations of continuing or ongoing conduct in the "Nature of the Case" and "Allegations of Fact" sections of the amended complaint. *See* Docket No. 205, ¶ 6 ("[Plaintiffs] . . . seek[] damages for ongoing deceit of [sic] the Defendants."); *id.* at ¶ 429 ("In 1998, . . . to stave off approval of the [Kyoto] treaty by the U.S. Senate and other climate action in the United States, [API] mapped out a multifaceted deception strategy for the fossil fuel industry that continues to this day."); *id.* at ¶ 557 ("[G]reenwashing tactics have been and continue to be used to conceal the Defendants' continuous sponsorship of climate denial and their record-breaking profits from fossil fuels."); *id.* at ¶ 611 ("Defendants have deceived and continue to deceive [Plaintiffs] and their citizens."); *id.* at ¶ 618 (alleging "ongoing

Add. 194

pattern of dishonesty and deception designed to keep a market for their products and increase industry profits"). The Court cannot credit the "meager, vague, or conclusory." *Legal Sea Foods*, 36 F.4th at 33–34 (quoting throughout *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc)).

As to Puerto Rico law, continuous tort requires "continued, or uninterrupted, disturbance of unlawful acts or omissions which cause foreseeable lasting damages." *McMillan*, 511 F.Supp.3d at 83. An example in the public nuisance context is where a "city factory's smoke and gases affects other nearby workers in the area." *Id.* The doctrine applies because of the "ongoing injuries produced by the smoke and gases to nearby workers." *Id.* Another example is "continuing omission by a municipality to fix a sewer," which "caused recurrent flooding." *Ahmad Hamdallah v. CPC Carolina PR, LLC*, 556 F.Supp.3d 34, 55 (D.P.R. 2021).

A continuous tort is "not a continuing harmful effect." *M.R. (Vega Alta), Inc. v. Caribe General Elec. Products, Inc.*, 31 F.Supp.2d 226, 240 (D.P.R. 1998). A continuous tort, in other words, "should not be confused with the injury it produces."

*McMillan*, 511 F.Supp.3d at 83. It is a "misconception" of the doctrine to apply it to "the injury suffered," as opposed to "acts or omissions that produce the harm." *Id.* To go "back to the public nuisance example, possible damages, such as emotional distress, caused to the city factory workers can be considered to be the injury itself." *Id.*

Here, Plaintiffs, across the Puerto Rico law claims, treat the injury as the 2017 storms. *See* Docket No. 205, ¶ 781 (public nuisance) ("Defendants knew that their acts, omissions, and deceit of the Plaintiffs and their citizens as detailed in this Count, would, and did, prevent [Plaintiffs] and those represented by the Plaintiffs from having the knowledge that they needed to adequately prepare for the 'hotter and wetter' storms that pummeled the Island in 2017."); *id.* at ¶ 796 (strict liability for failure to warn) (same); *id.* at ¶ 807 (strict liability for design defect) (same); *id.* at ¶ 817 (negligent design defect) (same); *id.* at ¶ 827 (private nuisance) (same); *id.* at ¶ 833 (unjust enrichment). Indeed, Plaintiffs explicitly state that "the acts or omissions alleged in this action occurred before the effective date of the 2020 Puerto Rico Civil Code," Docket

No. 280, pgs. 19, i.e. November 28, 2020, *Rivera-Rosario*, 79 F.4th at 5 n. 1. And where Plaintiffs list specific kinds of damage, everything is related to that 2017 injury. *See* Docket No. 205, ¶ 794 (strict liability for failure to warn); *id.* at ¶ 805 (strict liability for design defect); *id.* at ¶ 815 (negligent design defect).

These are "continual ill effects from an original violation," *Bonilla v. Trebol Motor Corp.*, 913 F. Supp. 655, 659 (D.P.R. 1995), not "continued . . . unlawful acts or omissions which cause foreseeable lasting damages," *McMillan*, 511 F.Supp.3d at 83. The doctrine does not apply. *See M.R. (Vega Alta), Inc.*, 31 F.Supp.2d at 240 (holding that property owners who sued private polluters and the Environmental Protection Agency for contamination of water supply arising from a contaminated industrial site did not show continuous tort because "the pollutants [that continued to] enter[] the land [we]re doing so without any further impetus on the part of the Defendants," who were not "continuously acting, i.e., continuing to dump pollutants on [the plaintiffs'] land").

### b. Fraudulent Concealment

Plaintiffs' last hope is to "sketch a factual predicate that would warrant the application of . . . equit[y]." *Trans-Spec Truck Serv.*, 524 F.3d at 320 (quotation marks omitted). They argue fraudulent concealment. *See* Docket No. 205, ¶ 23.

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), and it is accordingly "incumbent upon the plaintiff 'to plead with particularity the facts giving rise to the fraudulent concealment claim,'" *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 189 (1st Cir. 2006) (quoting *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1255 (1st Cir. 1996)). That "entails specifying in the pleader's complaint the time, place, and content of the alleged false or fraudulent representations." *Id.* (cleaned up).

In the amended complaint, Plaintiffs argue that their claims are "subject to equitable tolling, stemming from Defendants' knowingly and fraudulently concealing the facts alleged [in the amended complaint]." Docket No. 205, ¶ 23. They allege that "Defendants knew of the wrongful acts set

Add. 198

[in the amended complaint], retained material information pertinent to their discovery, and continue to conceal them from [Plaintiffs] and their citizens." *Id.* "Plaintiffs did not know," they say, "and could not have known through the exercise of reasonable diligence, of its causes of action, as a result of Defendants' misrepresentations." *Id.* "For example," Plaintiffs state <u>in the opposition</u>, "a long-lasting strategy was that the Defendants 'collaborate[d] through a variety of formal trade groups and informal associations to promote "contrarian theories" emphasizing the uncertainty of climate science and oppose regulatory action.'" Docket No. 280, pg. 23 (quoting Docket No. 205, ¶ 362). Per Plaintiffs, "[t]his included Defendants funding and direction of front groups like the Global Climate Science Communications Team, which 'outlined a multimillion-dollar campaign to undermine public belief in the validity of climate science.'" *Id.* (quoting Docket No. 205, ¶ 407). And "[m]ore recently," allege Plaintiffs, "Defendants have found ways to funnel their donations to 'climate obstructionist organizations through third party, dark money organizations including Donors

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.
Page 107

Trust and Donors Capital Fund that obscure the identity of the donor.'" *Id.* (quoting Docket No. 205, ¶ 503).

Plaintiffs make it explicit that Defendants "violated the law by concealing and misrepresenting the risks associated with their fossil fuel products." Docket No. 280, pg. 24. In other words, "fraud in the sale of [fossil fuel products] underlies [the amended] complaint," but "there is no charge of affirmative conduct by [Defendants] intended to . . . deceive [Plaintiffs] into believing that [they] did not have a cause of action." *Berkson*, 743 F.2d at 56. At bottom, the allegations in the amended complaint, where the specificity needs to be, of <u>fraudulent concealment</u> as a statute of limitations matter are limited to the single conclusory allegation at Docket No. 205, ¶ 23. That is insufficient under Rule 9(b). *See Humana, Inc. v. Biogen, Inc.*, 666 F.Supp.3d 135, 146 (D. Mass. 2023) (RICO) ("The complaint . . . simply alleges in general terms that 'Biogen concealed its arrangements with CDF and TAF' and 'did this while certifying to Humana that it was following federal law.'"); *In re Niaspan Antitrust Litigation*, 42 F.Supp.3d 735, 748 (E.D. Pa. 2014) (antitrust)

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 108

("While plaintiffs do aver that defendants redacted specific dollar amounts in public filings, refused to disclose certain details about their arrangements, and falsely characterized the settlement agreements as procompetitive, these facts, even if true, are insufficient to establish that plaintiffs were actively mislead.").

And even if the allegations go to the fraudulent concealment claim and meet the Rule 9(b), fraudulent concealment does not apply. The First Circuit has harmonized fraudulent concealment in the RICO and antitrust contexts. *See Álvarez-Maurás*, 919 F.3d at 626. It has three requirements:

> 1) wrongful concealment by defendants of their actions; and 2) failure of the claimant to discover, within the limitations period, the operative facts which form the basis of the cause of action; 3) despite the claimant's diligent efforts to discover the facts.
> *Id.*

"The burden rests squarely on the party pleading fraudulent concealment." *Berkson*, 743 F.2d at 55. "If a claimant fails to establish the above elements, then the limitations period applies, and the claimant 'is charged with the knowledge of what he or she would have uncovered

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 109

through a reasonably diligent investigation.'" *City of Boston*, 765 F.Supp.3d at 41 (quoting *In re Celexa & Lexapro Mktg. & Sales Pracs. Litigation*, 915 F.3d 1, 15 (1st Cir. 2019)).

Here, assuming Defendants contributed to the 2017 storms and that they engaged in misrepresentations, by 2021, all the "telltale warning signs" were present that Plaintiffs suffered injury because of Defendants' alleged contribution to the severity of the 2017 storms. *Álvarez-Maurás*, 919 F.3d at 628 (quoting throughout *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir. 2002)). Even if they "did not know the criminal methods [Defendants] had employed," they "knew or should have known" who to sue and on what basis. *Id.* at 627–28.

Plaintiffs argue that "the 'mere affirmative act of denying wrongdoing may constitute fraudulent concealment where the circumstances create reliance upon such denial.'" Docket No. 280, pg. 25 (quoting *Kennedy v. Josephthal & Co., Inc.*, 814 F.2d 798, 802 (1st Cir. 1987)). "Be that as it may, what is determinative [here] is that, despite [any] stonewalling, there were enough warning signs to put [Plaintiffs] on notice

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 110

that something was seriously amiss." *Álvarez-Maurás*, 919 F.3d at 628.

In short, Plaintiffs knew or should have known of the numerous lawsuits and the reports linking Defendants to climate change and, in turn, climate change to storms, including in Puerto Rico, and any possible misrepresentations by Defendants do not change that conclusion. *See Álvarez-Maurás*, 919 F.3d at 627–28 (RICO) (finding no fraudulent concealment where customer knew of his injury—that funds had disappeared from his investment account—and even though he did not know the criminal methods allegedly employed to steal his money); *City of Boston*, 765 F.Supp.3d at 41–42 (RICO) (finding no fraudulent concealment even though Rule 9(b) was met and despite misrepresentations by ten defendant pharmacy benefit managers given the plaintiff's "actions to combat the opioid epidemic, combined with the widespread scrutiny and litigation concerning the role of [pharmacy benefit managers]"); *In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 138 F.Supp.2d 25, 29 (D. Me. 2001) (antitrust) (finding no fraudulent

inducement absent allegation of facts showing due diligence in discovering the defendants' alleged price-fixing conspiracy or reasonable reliance on the defendants' affirmative acts of concealment). *See also Berkson*, 743 F.2d at 55 (antitrust) (summary judgment) (rejecting the plaintiff's fraudulent concealment argument that he "lacked the requisite factual basis for filing an antitrust complaint though his suspicions were already aroused" and "only became aware of [the defendants'] specific misconduct in [the four years prior to the filing of claim] through a Wall Street Journal article").

As to Puerto Rico law, the statute of limitations is tolled "if—because of active or fraudulent concealment—a reasonable person would not have been able to discover the basis for the lawsuit." *Rivera-Ramos v. Román*, 156 F.3d 276, 282 (1st Cir. 1998). But "even assuming such culpable concealment, Puerto Rico law requires due diligence by the plaintiff in investigating suspicious circumstances." *Id.*

Even if Plaintiffs relied, as they claim, on statements by Defendants that concealed their connection to Plaintiffs' injuries, the public information was more than enough to

Add. 204

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 112

raise suspicion, and that in turn means they had to exercise due diligence in investigating. The fraudulent concealment doctrine thus does not save their Puerto Rico law claims. *See Estate of Alicano Ayala*, 263 F.Supp.2d at 319 ("Even if Plaintiffs were legitimately confused or assuaged, the easy access to public sources of information confirming the health hazards of smoking—including government reports, warning labels, and the health care industry—imposed on the Plaintiffs an obligation to at least investigate further.").

### c. A Few Final Matters

First, the R&R discusses equitable tolling under more general principles and there mentions "fraud and concealment." *See* 2025 WL 600430, at * 17–19. It found it applicable here, and Defendants object, *see* Docket No. 326, pgs. 36–42.

Plaintiffs consistently base their argument for equitable tolling on fraudulent concealment. *See, e.g.,* Docket No. 205, ¶ 23. Defendants also discuss fraudulent concealment in opposing equitable tolling. *See* Docket No. 235, pgs. 29–30. "Following the parties' lead," the Court

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 113

"address[ed] the matter primarily in terms of" fraudulent concealment. *Rivera-Gómez v. de Castro*, 900 F.2d 1, 2 n. 2 (1st Cir. 1990).

The outcome is no different under general principles of equitable tolling. The "litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). Plaintiffs meet neither requirement. Equitable tolling does not "rescue a plaintiff from his or her lack of diligence." *Abraham v. Woods Hole Oceanographic Inst.*, 553 F.3d 114, 119 (1st Cir. 2009). Plaintiffs "fail[ed] to act diligently [and thus] cannot invoke equitable principles to excuse that lack of diligence." *Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984). And the one possible argument for meeting the second requirement, "affirmative misconduct on the part of [Defendants that] lulled [Plaintiffs] into inaction," *id.*, fails for the same reasons fraudulent concealment does not apply. In all, Plaintiffs do not carry the burden of showing either diligence or

Add. 206

extraordinary circumstances, let alone both. *See City of Boston*, 765 F.Supp.3d at 43 ("The City's failure to exercise due diligence in pursuing its rights after the role of the [pharmacy benefit managers] in causing its harm was showcased in [a multi-district litigation] is fatal to its equitable tolling claim.").

Second, Plaintiffs argue that they, "as Municipalities of Puerto Rico, may limit application of the statute of limitations through Puerto Rico's autonomous Municipal Code, PRS ST T. 21 § 7181." Docket No. 280, pg. 27. There is no official translation of PRS ST T. 21 § 7181 or the case from the Puerto Rico Court of Appeals, *Caballer Velázquez v. Municipio Autónomo de Carolina*, 2014 WL 5343480, to which Plaintiffs cite in support of this argument in both the amended complaint, Docket No. 205, ¶ 22, and the opposition to the joint Rule 12(b)(6) motion, Docket No. 280, pg. 31.

By statute, "[a]ll pleadings and proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language." 48 U.S.C. § 864. And by local rule, "[a]ll documents not in the English language which are presented or filed, whether as evidence

or otherwise, must be accompanied by a certified translation into English which meets one of [four] criteria" listed in the rule. D.P.R. R. Civ. 5(c). This Court has a "duty to faithfully uphold the English language requirement" and will not consider Plaintiffs' argument. *United States v. Rivera-Rosario*, 300 F.3d 1, 8 n. 9 (1st Cir. 2002) (Torruella, J.). *See also In re Santana*, 2024 WL 5058554, at * 12 (Bankr. D.P.R. Dec. 10, 2024) (refusing to address arguments as to the same statute cited by Plaintiffs here for failure to provide a translation).

Third, Plaintiffs make the following argument in response to Chevron's seeking judicial notice for a "publicly-available engagement agreement between [Plaintiffs' law firm] and Plaintiff Municipality of Vega Baja" dated November 2022 and stating that two similar cases that were dismissed in 2018 were dismissed "last year," *see* Docket No. 239, pgs. 16–17. Plaintiffs argue that they have a "heightened duty to investigate and not bring forth frivolous litigation" and that this action "required more certainty and the mere retention of a law firm to investigate should not thwart a discovery tolling." Docket No. 280, pg. 28.

Going to a law firm can be significant even if no suit is brought due to, say, cost. *See GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 178 (4th Cir. 2007). In any event, this does not affect the conclusion that Plaintiffs were on notice in 2017. *See id.*; *González-Pérez v. Hospital Interamericano De Medicina Avanzada*, 355 F.3d 1, 4 (1st Cir. 2004) ("Often . . . there is a span of time during which the prospective plaintiff mulls over the injury and the tortfeasor's liability before initiating legal process. Under Puerto Rico's discovery rule, these two moments are distinct, and only the former has legal significance.").

Further, it appears that Plaintiffs admit they had notice but were cautious out of a concern for not bringing frivolous litigation. "[T]he decision to prosecute is particularly ill-suited to judicial review," *Wayte v. United States*, 470 U.S. 598, 607 (1985), and the Court sees no reason, even at Plaintiffs' invitation, to inquire into whether, as the Supreme Court noted in a somewhat different context, they exercised their "discretion . . . intelligently or wisely," *Myers v. United States*, 272 U.S. 52, 135 (1926). But if Plaintiffs admitted what it

Add. 209

appears they have admitted, that is yet another reason to rule they were on notice.

Fourth, Plaintiffs advance, this time in response to ConocoPhillips's pointing to its own Form 10-K filed with the Securities and Exchange Commission as notice to Plaintiffs, *see* Docket No. 237, pgs. 19–20, the following argument. "Any question," Plaintiffs assert, "as to whether [they] read such filings or whether a municipal representative would have seen such a filing in the course of its governmental duty would be questions of fact not ready to be assessed at this stage." Docket No. 280, pg. 25.

Plaintiffs cite to no authority that whether some particular official read a given document is relevant. Determinative here is that Plaintiffs should have known of who to sue and on what claims. And the weight of authority is on the other side of Plaintiffs' argument: in suits brought by state and local authorities, no court has focused on whether a particular official had notice. *See, e.g., City of New York v. Exxon Mobil Corp.*, 226 N.Y.S.3d 863, 883–84 (N.Y. Sup. Ct. 2025); *City of Boston*, 765 F.Supp.3d at 38–43; *Alaska*, 774 F.Supp.3d at

1159-67.

It is true, though, that, as Plaintiffs point out in advancing this and other arguments, *see* Docket No. 280, pgs. 22, 25, 28, the question of notice is often reserved for the jury. That is the case under federal law and under Puerto Rico law. *See Espada v. Lugo*, 312 F.3d 1, 4 (1st Cir. 2002); *Humana*, 666 F.Supp.3d at 144–46.

But that is no rule. On the contrary, "it is well settled in th[e] [First Circuit] that a motion to dismiss may be granted on the basis of an affirmative defense, such as the statute of limitations, as long as the facts establishing the defense are clear on the face of the plaintiff's pleadings." *Álvarez-Maurás*, 919 F.3d at 628 (cleaned up). *See also Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005) (applying Puerto Rico law). Indeed, amongst the cases where claims were dismissed for untimeliness at the motion-to-dismiss stage is one of the two cases to which Plaintiffs cite to argue against dismissal at this stage. *See Hoff v. Popular, Inc.*, 727 F.Supp.2d 77, 99 (D.P.R. 2010) (Gelpí, J.).

Where it has made comparisons between this and other cases, and it has done so as to all of the timeliness issues and claim types, the Court has cited to at least one case at the motion-to-dismiss stage: *Álvarez-Maurás* (RICO); *City of Boston* (same); *Marrero-Rolón* (same); *Alaska* (same); *Humana* (same); *Blenheim Capital Holdings* (antitrust); *DJ Mfg. Corp.* (same); *In re Niaspan Antitrust Litigation* (same); *In re Compact Disc Minimum Advertised Price Antitrust Litigation* (same); *Estate of Alicano Ayala* (Puerto Rico law); *M.R. (Vega Alta), Inc.* (same). And it has made it clear in the two instances that it provided an additional citation that was at the summary judgment stage—*Berkson*.

### 3. Conclusion as to the Merits

The joint Rule 12(b)(6) motion at Docket No. 235 is **GRANTED in part and MOOT in part**. It is granted as to Exxon, Shell, Chevron, BP, ConocoPhillips, and Motiva as to all claims and as to API and the RICO claims. It is moot as to Occidental, Rio Tinto, and BHP as to all claims and as to API and the federal antitrust and Puerto Rico law claims. BP's Rule 12(b)(6) motion at Docket No. 236 is **MOOT**.

Add. 212

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 120

ConocoPhillips's Rule 12(b)(6) motion at Docket No. 237 is **MOOT**. Chevron's Rule 12(b)(6) motion at Docket No. 239 is **MOOT**. Exxon's Rule 12(b)(6) motion at Docket No. 242 is **MOOT**. Shell's Rule 12(b)(6) motion at Docket No. 244 is **MOOT**. API's Rule 12(b)(6) motion at Docket No. 254 is **MOOT**. Motiva's motion at Docket No. 240 is **DENIED in part and MOOT in part**. It is denied as to Rule 12(b)(2) and Rule 12(b)(3). It is moot as to Rule 12(b)(6).

### D. Leave to Amend

Plaintiffs conclude their objections to the R&R with a "conditional request for leave to amend." Docket No. 323, pg. 28. "To the extent the Court finds the Complaint deficient in any regard," they "respectfully request dismissal without prejudice with leave to amend so that it may amend to cure any deficiencies." *Id.*

The Court has no view on the complaint. It has found the amended complaint deficient. It will not grant leave to amend again.

There being neither a motion by Plaintiffs for leave to file a second amended complaint nor "exceptional

circumstances," the Court is "under no obligation" to "invite [Plaintiffs], sua sponte, to further amend [their] complaint[]." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 735–36 (1st Cir. 2016). Plaintiffs "were put on notice of the deficiencies in the [amended] complaint by [not only] the motion[s] to dismiss," *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 247 (1st Cir. 2015), but also, and more importantly, the R&R. Plaintiffs did not seek leave or file a proposed second amended complaint. They thus failed to "exercise due diligence." *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 58 (1st Cir. 2006). And there is "no suggestion that amendment would be anything other than futile." *Fire & Police Pension Ass'n*, 778 F.3d at 247. Finally, the amended complaint was filed in November 2023. The objections to the R&R were filed in March 2025. Plaintiffs cannot "deliberately wait in the wings for a year and a half with another amendment to a complaint should the court hold the first amended complaint was insufficient." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 57 (1st Cir. 2008).

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 122

### V. CONCLUSION

The claims being barred by the applicable statutes of limitations, the Court has not examined the merits, or lack thereof, of the legal theories advanced by Plaintiffs. But the Court is not insensitive to the plight of the people of Puerto Rico resultant from the 2017 hurricanes. It is perhaps most often in dismissing a claim because of the applicable statute of limitations that judges are reminded that "it is the duty of all courts of justice to take care, for the general good of the community, that hard cases do not make bad law." *United States v. Clark*, 96 U.S. 37, 49 (1877) (Harlan, J., dissenting) (quoting throughout *East India Co. v. Paul*, 7 Moo. P.C.C. 111 (1849) (Lord Campbell)).

The Court's rulings are as follows:

A.  The R&R at Docket No. 315 is **ADOPTED in part**.

B.  Occidental's motion to dismiss at Docket No. 232 is **GRANTED in part and MOOT in part**. The motion is granted as to Rule 12(b)(5) and moot as to Rule 12(b)(2) and Rule 12(b)(6).

C.  The joint Rule 12(b)(2) motion at Docket No. 234 is

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 123

**GRANTED in part, DENIED in part and MOOT in part**. It is granted as to Rio Tinto and BHP as to all claims and API as to the federal antitrust and Puerto Rico law claim. It is denied as to Exxon, Shell, BP, Chevron, ConocoPhillips, Motiva. It is also denied as to API and RICO. It is moot as to Occidental.

D. The joint Rule 12(b)(6) motion at Docket No. 235 is **GRANTED in part and MOOT in part**. It is granted as to Exxon, Shell, Chevron, BP, ConocoPhillips, and Motiva as to all claims and as to API and the RICO claims. It is moot as to Occidental, Rio Tinto, and BHP as to all claims and as to API and the federal antitrust and Puerto Rico law claims.

E. BP's Rule 12(b)(6) motion at Docket No. 236 is **MOOT.**

F. ConocoPhillips's Rule 12(b)(6) motion at Docket No. 237 is **MOOT**.

G. The motion for judicial notice at Docket No. 238 is **GRANTED** as to judicial notice that the exhibits to the motion were publicly available and not for the truth of the matter asserted.

Add. 216

Municipality of Bayamón, et al.
v. Exxon Mobil Corp., et al.

Page 124

H.  Chevron's Rule 12(b)(6) motion at Docket No. 239 is **MOOT**.

I.  Motiva's motion at Docket No. 240 is **DENIED in part and MOOT in part**. It is denied as to Rule 12(b)(2) and Rule 12(b)(3). It is moot as to Rule 12(b)(6).

J.  The motion for judicial notice at Docket No. 241 is **MOOT**.

K.  Exxon's Rule 12(b)(6) motion at Docket No. 242 is **MOOT**.

L.  BHP's Rule 12(b)(6) at Docket No. 243 is **MOOT**.

M.  Shell's Rule 12(b)(6) motion at Docket No. 244 is **MOOT**.

N.  BHP's Rule 12(b)(2) motion at Docket No. 245 is **GRANTED**.

O.  Rio Tinto's Rule 12(b)(2) motion at Docket No. 246 is **GRANTED**.

P.  Rio Tinto's Rule 12(b)(6) motion at Docket No. 247 **MOOT**.

Q.  API's Rule 12(b)(6) motion at Docket No. 254 is **MOOT**.

Add. 217

R. Judgment will be entered dismissing all claims against Occidental, Rio Tinto, and BHP without prejudice.

S. Judgment will be entered dismissing the RICO claim against API with prejudice and the federal antitrust claim and Puerto Rico law claims against API without prejudice.

T. Judgment will be entered dismissing all claims against Exxon, Shell, Chevron, BP, ConocoPhillips, and Motiva with prejudice.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 11th day of September 2025.

S/ SILVIA CARREÑO-COLL
UNITED STATES DISTRICT COURT JUDGE

IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MUNICIPALITY OF BAYAMÓN, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>EXXON MOBIL CORP., ET AL.,<br><br>Defendants. | CIV. NO.: 22-1550 (SCC) |

## JUDGMENT

In view of the Omnibus Opinion and Order entered at Docket No. 407, this case is hereby **DISMISSED** as follows:

- All claims against Occidental, Rio Tinto and BHP are hereby **DISMISSED WITHOUT PREJUDICE;**

- The RICO claim against API is **DISSMISED WITH PREJUDICE;**

- The Federal antitrust claim and Puerto Rico law claims against API are **DISMISSED WITHOUT PREJUDICE;** and

- All claims against Exxon, Shell, Chevron, BP, ConocoPhillips and Motive are **DISSMISED WITH PREJUDICE**.

Each party shall bear their own costs and attorneys' fees.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 11th day of September 2025.

S/ SILVIA CARREÑO-COLL
UNITED STATES DISTRICT COURT JUDGE

Add. 219