# United States Court of Appeals
# for the First Circuit

_____

MUNICIPALITY OF BAYAMÓN, on behalf of themselves and others similarly situated; MUNICIPALITY OF CAGUAS, on behalf of themselves and others similarly situated; MUNICIPALITY OF LOÍZA, on behalf of themselves and others similarly situated; MUNICIPALITY OF LARES, on behalf of themselves and others similarly situated; MUNICIPALITY OF BARRANQUITAS, on behalf of themselves and others similarly situated; MUNICIPALITY OF COMERÍO, on behalf of themselves and others similarly situated; MUNICIPALITY OF CAYEY, on behalf of themselves and others similarly situated; MUNICIPALITY OF LAS MARÍAS, on behalf of themselves and others similarly situated; MUNICIPALITY OF TRUJILLO ALTO, on behalf of themselves and others similarly situated; MUNICIPALITY OF VEGA BAJA, on behalf of themselves and others similarly situated; MUNICIPALITY OF AÑASCO, on behalf of themselves and others similarly situated; MUNICIPALITY OF CIDRA, on behalf of themselves and others similarly situated; MUNICIPALITY OF AGUADILLA, on behalf of themselves and others similarly situated; MUNICIPALITY OF AIBONITO, on behalf of themselves and others similarly situated; MUNICIPALITY OF MOROVIS, on behalf of themselves and others similarly situated; MUNICIPALITY OF MOCA, on behalf of themselves and others similarly situated; MUNICIPALITY OF BARCELONETA, on behalf of themselves and others similarly situated; MUNICIPALITY OF CAMUY, on behalf of themselves and others similarly situated; MUNICIPALITY OF CATAÑO, on behalf of themselves and others similarly situated; MUNICIPALITY OF SALINAS, on behalf of themselves and others similarly situated; MUNICIPALITY OF ADJUNTAS, on behalf of themselves and others similarly situated; MUNICIPALITY OF ARROYO, on behalf of themselves and others similarly situated; MUNICIPALITY OF CULEBRA, on behalf of themselves and others

similarly situated;  MUNICIPALITY OF DORADO, on behalf of themselves and others similarly situated;  MUNICIPALITY OF GUAYNABO, on behalf of themselves and others similarly situated; MUNICIPALITY OF HORMIGUEROS, on behalf of themselves and others similarly situated; MUNICIPALITY OF JUNCOS, on behalf of themselves and others similarly situated;  MUNICIPALITY OF LAJAS, on behalf of themselves and others similarly situated; MUNICIPALITY OF MANATÍ, on behalf of themselves and others similarly situated; MUNICIPALITY OF NAGUABO, on behalf of themselves and others similarly situated;  MUNICIPALITY OF NARANJITO, on behalf of themselves and others similarly situated;  MUNICIPALITY OF UTUADO, on behalf of themselves and others similarly situated; MUNICIPALITY OF VILLALBA, on behalf of themselves and others similarly situated;  MUNICIPALITY OF COAMO, on behalf of themselves and others similarly situated;  MUNICIPALITY OF OROCOVIS, on behalf of themselves and others similarly situated; MUNICIPALITY OF VIEQUES, on behalf of themselves and others similarly situated;  MUNICIPALITY OF YABUCOA, on behalf of themselves and others similarly situated,

*Plaintiffs-Appellants*,

MUNICIPALITY OF SAN JUAN, on behalf of themselves and others similarly situated,

*Plaintiff*,

v.

EXXON MOBIL CORPORATION, SHELL PLC, f/k/a Royal Dutch Shell PLC; CHEVRON CORPORATION; BP PLC; MOTIVA ENTERPRISES LLC; OCCIDENTAL PETROLEUM CORPORATION, f/k/a Anadarko Petroleum Corp; BHP GROUP LIMITED; RIO TINTO PLC; CONOCOPHILLIPS COMPANY; AMERICAN PETROLEUM INSTITUTE; XYZ CORPORATIONS 1-100; JOHN AND JANE DOES 1-100,

*Defendants-Appellees*,

ARCH RESOURCES INCORPORATED, f/k/a Arch Coal, Inc., PEABODY ENERGY CORPORATION,

*Defendants*.

———————————————

Appeal from the U.S. District Court
for the District of Puerto Rico, No. 22-cv-1550-SCC
(The Honorable Silvia Carreño-Coll)

——————————————————————————————————

## DEFENDANTS-APPELLEES' JOINT RESPONSE BRIEF

——————————————————————————————————

Joshua D. Dick
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 393-8200
Facsimile: (415) 374-8451
jdick@gibsondunn.com

Lochlan F. Shelfer
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 530-4213
lshelfer@gibsondunn.com

Theodore J. Boutrous, Jr.
William E. Thomson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
tboutrous@gibsondunn.com
wthomson@gibsondunn.com

Roberto C. Quiñones-Rivera
Eduardo A. Zayas-Marxuach
Myrgia M. Palacios-Cabrera
MCCONNELL VALDÉS LLC
P.O. Box 364225
San Juan, PR 00936-4225
Telephone: (787) 250-2631
Facsimile: (787) 759-8282
rcq@mcvpr.com
ezm@mcvpr.com
mpc@mcvpr.com

*Counsel for Defendant-Appellee Chevron Corporation*
[*Additional counsel listed on signature page*]

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Defendants-Appellees state as follows:

Chevron Corporation has no parent corporation, and there is no publicly held stock corporation that owns 10% or more of Chevron Corporation's stock.

This statement is submitted solely for the purpose of complying with Rule 26.1 and is submitted without waiver of any defense, affirmative defense, or objection.

> /s/ *Theodore J. Boutrous, Jr.*
> Theodore J. Boutrous, Jr.
>
> *Counsel for Defendant-Appellee Chevron Corporation*

Exxon Mobil Corporation is a wholly owned subsidiary of ExxonMobil Holdings Corporation. No publicly held corporation owns 10% or more of ExxonMobil Holdings Corporation's stock.

This statement is filed solely for purposes of complying with Federal Rule of Appellate Procedure 26.1. This statement is not intended to operate as an admission of any factual allegation or legal conclusion and

is submitted subject to and without waiver of any defense, affirmative defense, or objection.

                  /s/ *Vicki Chou*
                  Vicki Chou

                  *Counsel for Defendant-Appellee Exxon Mobil Corporation*

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Motiva Enterprises LLC is a wholly owned subsidiary of Saudi Refining, Inc. and Aramco Financial Services Co. No publicly held company owns 10% or more of its stock.

                  /s/ *Tracie J. Renfroe*
                  Tracie J. Renfroe

                  *Counsel for Defendant-Appellee Motiva Enterprises LLC*

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee BP p.l.c. states that (i) it is a publicly traded corporation organized under the laws of England and Wales, (ii) BP p.l.c. has no parent

corporation, and (iii) no publicly held corporation owns ten percent or more of BP p.l.c.'s stock.[1]

/s/ *Diana E. Reiter*
Diana E. Reiter

*Counsel for Defendant-Appellee BP p.l.c.*

Defendant-Appellee American Petroleum Institute, ("API"), through the undersigned counsel and, pursuant to Federal Rule of Appellate Procedure Rule 26.1, certifies as follows: API has no parent corporation, and no publicly held corporation or other publicly held entity owns more than 10% of the stock of API.

/s/ *Brian D. Schmalzbach*
Brian D. Schmalzbach

*Counsel for Defendant-Appellee American Petroleum Institute*

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee ConocoPhillips certifies that it is a publicly traded corporation.

---

[1] Defendant-Appellee BP p.l.c. reserves all rights, including, but not limited to, defenses and objections as to venue, service, and personal jurisdiction. The filing of this Corporate Disclosure Statement is subject to and does not waive any such defenses and objections.

ConocoPhillips does not have a parent corporation, and no publicly held company owns more than 10% of its stock.

/s/ *Mark Fleming*
Mark Fleming

*Counsel for Defendant-Appellee ConocoPhillips*

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Shell plc (f/k/a Royal Dutch Shell plc) states that Shell plc is a public limited company incorporated under the laws of England and Wales. Shell plc does not have any parent corporations. As of August 11, 2026, Shell plc has not been notified by any publicly traded company that it owns 10 percent or more of Shell plc's issued share capital.[2]

/s/ *William David Sarratt*
William David Sarratt

*Counsel for Defendant-Appellee Shell plc (f/k/a Royal Dutch Shell plc)*

---

[2] Defendant-Appellee Shell plc reserves all rights, including, but not limited to, defenses and objections as to venue, service, and personal jurisdiction. The filing of this Corporate Disclosure Statement is subject to and does not waive any such defenses and objections.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT..............................................i

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT........................................................5

STATEMENT OF THE ISSUES...........................................................6

STATEMENT OF THE CASE .............................................................6

    A.    Climate Change Litigation Begins in the Early
           2000s. ........................................................................6

    B.    The Climate Cases Are Largely Unsuccessful.......................8

    C.    In November 2022, Plaintiffs File This Lawsuit
           Based on the 2017 Hurricanes. ...............................10

    D.    The District Court Dismisses Plaintiffs'
           Complaint. ..............................................................12

STANDARD OF REVIEW..................................................................17

SUMMARY OF ARGUMENT...............................................................17

ARGUMENT ..................................................................................19

    I.    The District Court Correctly Dismissed Plaintiffs'
        Claims for Damages Caused by the 2017 Storms
        as Barred by the Applicable Statutes of
        Limitations. ...........................................................19

        A.    Plaintiffs Brought Their Claims After the
            Applicable Limitations Periods Had Lapsed. ...............20

B. The Doctrine of Fraudulent Concealment Cannot Render Plaintiffs' Federal Claims Timely. ..................................................30

1. Plaintiffs Failed to Plead Fraud with Particularity. ...............................................34

2. Plaintiffs Could Have Discovered the Basis for Their Antitrust Claim with Reasonable Diligence During the Limitations Period. .............................................36

3. Plaintiffs Could Have Discovered the Basis for Their RICO Claims with Reasonable Diligence During the Limitations Period. .............................................43

C. The Discovery Rule Cannot Render Plaintiffs' Puerto Rico Law Claims Timely. ................51

II. Plaintiffs Forfeited Any Separate Claims for Damages Caused by Hurricane Fiona. ................................55

CONCLUSION ..................................................................................61

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agency Holding Corp. v. Malley-Duff & Assocs.*,
483 U.S. 143 (1987) ...................................................................... 21

*Álvarez-Maurás v. Banco Popular of P.R.*,
919 F.3d 617 (1st Cir. 2019) .......................... 21, 22, 28, 30, 31, 44, 50

*Am. Elec. Power Co. v. Connecticut*,
564 U.S. 410 (2011) .................................................................... 7, 26

*Arturet-Vélez v. R.J. Reynolds Tobacco Co.*,
429 F.3d 10 (1st Cir. 2005) ......................................... 21, 22, 23, 29, 52

*Berkson v. Del Monte Corp.*,
743 F.2d 53 (1st Cir. 1984) ........................ 31, 39, 40, 42, 43, 49, 51, 60

*Blenheim Cap. Holdings Ltd. v. Lockheed Martin Corp.*,
53 F.4th 286 (4th Cir. 2022) ........................................................... 60

*Bucks Cnty. v. BP P.L.C.*,
2025 WL 1484203 (Pa. Com. Pl. May 16, 2025) ................................. 8

*California v. Gen. Motors Corp.*,
2007 WL 2726871 (N.D. Cal. Sept. 17, 2007) .................................... 6

*In re Celexa and Lexapro Mktg. and Sales Practices Litig.*,
915 F.3d 1 (1st Cir. 2019) ............................................................... 33

*City & Cnty. of Honolulu v. Sunoco LP*,
153 Hawai'i 326, 537 P.3d 1173 (Haw. 2023) ................................... 10

*City of Boston v. Express Scripts, Inc.*,
765 F. Supp. 3d 31 (D. Mass. 2025) ................................................ 31

*City of Boston v. OptumRx, Inc.*,
169 F.4th 58 (1st Cir. 2026) ........................................... 32, 33, 39, 45, 56

*City of Charleston v. Brabham Oil Co.*,
2025 WL 2269770 (S.C. Com. Pl. Aug. 6, 2025) ........................... 9, 10, 30

*City of New York v. Chevron Corp.*,
993 F.3d 81 (2d Cir. 2021) ............................................................... 8

*Comer v. Murphy Oil USA, Inc.*,
  718 F.3d 460 (5th Cir. 2013)........................................ 7, 27, 38, 46, 54

*Epstein v. C.R. Bard, Inc.*,
  460 F.3d 183 (1st Cir. 2006) ...................................................35

*FirstBank Puerto Rico, Inc. v. La Vida Merger Sub, Inc.*,
  638 F.3d 37 (1st Cir. 2011) .....................................................17

*United States ex rel. Gagne v. City of Worcester*,
  565 F.3d 40 (1st Cir. 2009) .....................................................35

*Hartley Pen Co. v. Lindy Pen Co.*,
  16 F.R.D. 141 (S.D. Cal. 1954)................................................31

*State ex rel. Jennings v. BP Am. Inc.*,
  2024 WL 98888 (Del. Super. Ct. Jan. 9, 2024) ......................... 8, 9, 29

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997)..................................................22, 28, 61

*LaChapelle v. Berkshire Life Ins. Co.*,
  142 F.3d 507 (1st Cir. 1998) ..................................................22

*M.R. (Vega Alta), Inc. v. Caribe Gen. Elec. Prods., Inc.*,
  31 F. Supp. 2d 226 (D.P.R. 1998) ...........................................16

*Massachusetts v. EPA*,
  549 U.S. 497 (2007)................................................................27

*Mayor & City Council of Baltimore v. B.P. P.L.C.*,
  493 Md. 427, 353 A.3d 1142 (Md. 2026)...................................8, 9

*Mayor & City Council of Baltimore v. BP P.L.C.*,
  2024 WL 3678699 (Md. Cir. Ct. July 10, 2024) ...........................29

*Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. Red Apple
  Grp., Inc.*,
  710 N.Y.S.2d 48 (2000) ..........................................................31

*Native Village of Kivalina v. ExxonMobil Corp.*,
  663 F. Supp. 2d 863 (N.D. Cal. 2009)......................................26

*Native Village of Kivalina v. ExxonMobil Corp.*,
  696 F.3d 849 (9th Cir. 2012)....................................................8

*Platkin v. Exxon Mobil Corp.*,
  2025 WL 604846 (N.J. Super. Ct. Feb. 5, 2025) ...........................8

*Prentis Fam. Found. v. Barbara Ann Karmanos Cancer Inst.*,
266 Mich. App. 39, 698 N.W.2d 900 (Mich. App. Ct. 2005)...............31

*Rhode Island v. Shell Oil Prods. Co.*,
979 F.3d 50 (1st Cir. 2020) ........................................................3, 27

*Roder v. Equity One Inv. Fund*,
2026 IL App (1st) 231664-U ...........................................................31

*Sparkle Hill, Inc. v. Interstate Mat Corp.*,
788 F.3d 25 (1st Cir. 2015) .............................................................20

*Suncor Energy (U.S.A.), Inc. v. Cnty. Comm'rs of Boulder Cnty.*,
146 S. Ct. 1605 (2026)......................................................................10

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
401 U.S. 321 (1971)...........................................................21, 36, 40

**Statutes**

15 U.S.C. § 1 ............................................................................................5

15 U.S.C. § 15b........................................................................................20

18 U.S.C. § 1962.......................................................................................5

18 U.S.C. § 1964(c)...................................................................................5

28 U.S.C. § 1291.......................................................................................5

28 U.S.C. § 1331.......................................................................................5

28 U.S.C. § 1332(a)(1)..............................................................................5

P.R. Laws Ann. tit. 31, § 5298 (1990) ..................................................21

**Rules**

Fed. R. App. P. 4(a)(1)(A) ........................................................................5

Fed. R. Civ. P. 9(b)...............................................................33, 34, 35, 50

Fed. R. Civ. P. 10(c) ...............................................................................59

Fed. R. Civ. P. 15(c)(1)(B) .................................................................... 52

**Other Authorities**

Compl., *Cnty. of Marin v. Chevron Corp.*, No. CIV 1702586
(Cal. Super. Ct. filed July 17, 2017) .................................................... 26

Compl., *Cnty. of San Mateo v. Chevron Corp.*, No.
17CIV03222 (Cal. Super. Ct. filed July 17, 2017) ............................. 26

Compl., *Rhode Island v. Chevron Corp.*, 2018 WL 11585122
(R.I. Super. Ct. filed July 2, 2018) ...................................................... 28

Jiarui Chen et al., *How Much Have the Oil Supermajors
Contributed to Climate Change? Estimating the Carbon
Footprint of the Oil Refining and Petroleum Product Sales
Sectors*, Columbia Center on Sustainable Investment
(CCSI) (Mar. 2022) ............................................................................. 40

Petition for a Writ of Certiorari, *Suncor Energy (U.S.A.), Inc.
v. Cnty. Comm'rs of Boulder Cnty.*, 2025 WL 2367748
(U.S. Aug. 8, 2025) ............................................................................. 10

Timothy Cama, *Obama: 'Best Climate Scientists' Link
Hurricanes, Climate Change*, The Hill (May 28, 2015) ...................... 49

**INTRODUCTION**

The district court correctly dismissed Plaintiffs' lawsuit seeking damages allegedly caused by Hurricane María as time-barred. Plaintiffs originally filed their complaint in November 2022, seeking relief for injuries that—as the complaint makes clear—were open and obvious in 2017, when Hurricane María made landfall. By that time, the applicable one- and four-year statutes of limitations had long expired. Plaintiffs filed an amended complaint a year later in November 2023 based on the same theory. Plaintiffs fail to identify any circumstances preventing the timely filing of their complaint. This Court should affirm.

Plaintiffs' federal-law claims are governed by a four-year statute of limitations, and their Puerto Rico law claims are governed by a one-year limitations period. Plaintiffs' claims all accrued when Hurricane María struck Puerto Rico in September 2017, at which point they knew or should have known of their injuries and who allegedly caused them. In fact, Plaintiffs' own complaint cites numerous articles and reports that were published as early as September 2017, purporting to tie the 2017 storms in Puerto Rico to climate change and alleging that a supposed campaign of deception by energy companies was responsible for climate-

related harms.  And such allegations have been widely circulating for many years.

Over the past few decades, a number of other plaintiffs have filed a series of misconceived and baseless lawsuits against energy companies in attempts to hold them liable for injuries allegedly suffered as a result of global climate change.  A common feature of those lawsuits is the allegation that fossil-fuel companies supposedly engaged in a coordinated, decades-long campaign of deception to hide from the public the link between fossil-fuel products and global climate change, and that this alleged campaign of deception resulted in climate-related harms around the world, including hurricanes.  For example, a group of plaintiffs brought a suit *in 2005* alleging that energy companies had contributed to global warming, which they claimed increased the destructive capacity of Hurricane Katrina and thus caused damage to their property.  Plaintiffs' complaint post-dates and closely tracks the alleged facts, themes, and theories of these earlier climate-change lawsuits and other judicially noticeable sources, but identifies no reason for Plaintiffs' untimely filing.

Everything Plaintiffs needed to file their complaint was already in the public record years before they filed suit.  As this Court observed

years ago in another climate change-related case: "In 2018, faced with rising sea levels, … more frequent and severe floods, *tropical storms, hurricanes,* and droughts, Rhode Island sued, in state court, nearly every oil and gas company under the sun." *Rhode Island v. Shell Oil Prods. Co.*, 979 F.3d 50, 53-54 (1st Cir. 2020) (emphasis added), *vacated on other grounds*, 141 S. Ct. 2666 (mem.). Plaintiffs could have done the same within the limitations periods. The district court correctly concluded that Plaintiffs' filing of their claims *more than five years* after the 2017 storms was untimely.

Plaintiffs nevertheless claim that the district court should have held their claims to be timely because Defendants purportedly fraudulently concealed the existence of their claims during the limitations periods. They claim that they could not have discovered the basis for their claims until a study was published in 2022—the so-called "Chen Report"—purporting to quantify certain oil companies' contributions to climate change.

The district court correctly determined that Plaintiffs failed to plead with the required particularity any "fraudulent" conduct by Defendants that prevented Plaintiffs from learning of their claims within

3

the limitations periods. Even if Plaintiffs had satisfied this pleading requirement, they could have easily discovered the basis for their claims within the limitations periods with reasonable diligence. Their complaint's allegations demonstrate that the alleged basis for their claims was a matter of widespread public knowledge by September 2017. And Plaintiffs fail to explain why they needed a purported quantification of certain oil and gas companies' contributions to climate change in order to bring claims against a small subset of some of the largest fossil-fuel companies—several of which are not even mentioned in the Chen Report. Plaintiffs cannot render their claims timely by attributing unjustified significance to a single study published during the applicable limitations periods while ignoring the many sources of notice available to them years earlier—several of which Plaintiffs cited in their original complaint. Simply put, the Chen Report cannot save Plaintiffs' claims from the "overwhelming evidence of public knowledge of articles, reports, and cases making the connection between Defendants and Plaintiffs' claims" outside the limitations periods. Add. 179.

Lastly, Plaintiffs' new arguments about Hurricane Fiona do not change the result. Consistent with the amended complaint's focus on the

4

2017 hurricanes, Plaintiffs never argued before the district court that their claims were timely with respect to any harm caused by Hurricane Fiona. Plaintiffs' opening brief does not mention that they are raising this argument for the first time on appeal, nor do Plaintiffs explain why they should be absolved from the rule that issues not raised in the district court are forfeited on appeal. Plaintiffs' new Hurricane Fiona argument is forfeited, and this Court should decline to consider it.

Accordingly, the Court should affirm the district court's judgment.

## JURISDICTIONAL STATEMENT

The district court had federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs filed a civil action that brought federal anti-trust, 15 U.S.C. §§ 1 *et seq.*, and civil RICO, 18 U.S.C. §§ 1962, 1964(c), claims. The district court had diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because Plaintiffs and Defendants are citizens of different States and the amount in controversy exceeds $75,000. This Court has jurisdiction under 28 U.S.C. § 1291 because the district court entered final judgment dismissing all of Plaintiffs' claims on September 11, 2025, and Plaintiffs filed a notice of appeal on October 7, 2025, *see* Fed. R. App. P. 4(a)(1)(A).

**STATEMENT OF THE ISSUES**

1.      Whether the district court correctly dismissed the claims for damages caused by the 2017 storms as untimely.

2.      Whether Plaintiffs forfeited any separate claims for damages caused by Hurricane Fiona.

**STATEMENT OF THE CASE**

**A.      Climate Change Litigation Begins in the Early 2000s.**

For more than two decades, plaintiffs across the country have filed lawsuits seeking to recover from various energy companies and manufacturers for injuries allegedly suffered as a result of global climate change.

The earliest lawsuits unsuccessfully asserted state and federal nuisance claims against automobile companies for alleged contributions to climate change. *See, e.g.*, *California v. Gen. Motors Corp.*, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007) (dismissing complaint for nonjusticiability and for lack of jurisdiction).

The next wave of litigation targeted direct emitters of greenhouse gases, such as power companies. For example, a group of plaintiffs filed suit in 2005 "alleging that emissions by energy company [d]efendants

caused global warming, which increased the destructive capacity of Hurricane Katrina" and the harm it caused to their property. *Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460, 465 (5th Cir. 2013) (internal quotation marks omitted) (alterations accepted). But the effort to hold those entities liable for the alleged effects of climate change failed too. *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 429 (2011) (dismissing claims seeking abatement of alleged public nuisance of climate change because the federal common law that would otherwise necessarily govern interstate emissions was displaced by the Clean Air Act).

This latest round of climate litigation reaches even further back in the supply chain and targets companies that provide the raw material used by the direct emitters—that is, the fuel that billions of people and communities, including Plaintiffs themselves, depend on every day. These lawsuits claim that the energy companies whose products fuel the modern world are responsible for a sweeping array of alleged climate-related injuries everywhere on the planet. For example, in 2008, as *The New York Times* reported at the time, a village in Alaska sued to recover for harms allegedly resulting from "flooding caused by the changing

Arctic climate," seeking to hold companies like BP, Chevron, ExxonMobil, and ConocoPhillips "responsible for the impact of global warming." A-2178. That 2008 suit alleged, as have many others in the following years, that "[t]here has been a long campaign by power, coal and oil companies to mislead the public about the science of global warming," and that this purported campaign of deception had "contributed 'to the public nuisance of global warming by convincing the public at large and the victims of global warming that the process is not man-made when in fact it is.'" *Id.*; *see Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012) (affirming dismissal of lawsuit).

## B.     The Climate Cases Are Largely Unsuccessful.

In this latest round of climate litigation, an overwhelming majority of courts have dismissed these cases for failure to state a claim. *See City of New York v. Chevron Corp.*, 993 F.3d 81, 98, 100, 103 (2d Cir. 2021); *Mayor & City Council of Baltimore v. B.P. P.L.C.*, 493 Md. 427, 353 A.3d 1142, 1172, 1177-78, 1183-88 (Md. 2026) ("*Baltimore*"); *State ex rel. Jennings v. BP Am. Inc.*, 2024 WL 98888, at *9 (Del. Super. Ct. Jan. 9, 2024) ("*Delaware*"); *Platkin v. Exxon Mobil Corp.*, 2025 WL 604846, at *3-5 (N.J. Super. Ct. Feb. 5, 2025); *Bucks Cnty. v. BP P.L.C.*, 2025 WL

8

1484203, at *6-8 (Pa. Com. Pl. May 16, 2025); *City of Charleston v. Brabham Oil Co.*, 2025 WL 2269770, at *15-19 (S.C. Com. Pl. Aug. 6, 2025).

Several of these courts dismissed claims on statute-of-limitations grounds. For example, the *Delaware* court held that certain of the plaintiff's claims were barred by a five-year statute of limitations, which was not tolled because "the general public had knowledge of or had access to information about the disputes, regarding the existence of climate change and effects, decades prior to the expiration" of the limitations period. 2024 WL 98888, at *19. And the *Charleston* court held that similar claims were barred by a three-year statute of limitations because the plaintiff was on "reasonable notice of the facts giving rise to its claims" more than three years before it filed suit, and the continuing-tort doctrine did not apply. 2025 WL 2269770, at *14.

Courts have also dismissed many of these cases because they involved state-law claims seeking relief for the alleged effects of interstate and international greenhouse-gas emissions, which "fall squarely within the inherently federal areas of interstate pollution and foreign affairs" and are thus preempted and precluded by the federal structure of the U.S. Constitution and the federal Clean Air Act. *Baltimore*, 353 A.3d at

9

1175; *see Charleston*, 2025 WL 2269770, at \*2 ("join[ing] the 'growing chorus of state and federal courts across the United States, singing from the same hymnal, in concluding'" that such state-law claims are precluded by federal law). Indeed, the U.S. Supreme Court recently granted certiorari to review an outlier decision by the Colorado Supreme Court holding that state-law claims seeking remedies for interstate and international emissions are *not* precluded or preempted by federal law. *See Suncor Energy (U.S.A.), Inc. v. Cnty. Comm'rs of Boulder Cnty.*, 146 S. Ct. 1605 (mem.) (2026) (granting certiorari); Petition for a Writ of Certiorari, *Boulder*, 2025 WL 2367748, at \*I (U.S. Aug. 8, 2025); *see also City & Cnty. of Honolulu v. Sunoco LP*, 153 Hawai'i 326, 537 P.3d 1173, 1207-08 (Haw. 2023) (reaching decision similar to *Boulder*).

## C. In November 2022, Plaintiffs File This Lawsuit Based on the 2017 Hurricanes.

In November 2022, Plaintiffs here—nearly 40 Puerto Rico municipalities, purporting to represent a putative class of all Puerto Rico municipalities—filed yet another complaint seeking relief against energy companies for the alleged effects of climate change. A-79. Plaintiffs filed their amended complaint a year later in November 2023. A-335. In general, Plaintiffs' theory was that several energy companies "colluded

with each other" to "misrepresent risks posed by the carbon-based and fossil-fuel products they marketed and sold," actions Plaintiffs allege "ultimately led to hurricanes [Irma and María] in 2017 that resulted in extensive damages throughout Puerto Rico." Add. 95-96.

The 2017 storms were the clear focus of the amended complaint. The complaint describes Plaintiffs as "bringing this action … for the primary role that the Defendants' production, promotion, refining, marketing, and sale of fossil fuel-based consumer products played in causing the losses, deaths and destruction of property *resulting from the catastrophic storms of September 2017 and their aftermath*." A-338, ¶ 1 (emphasis added). And it alleges that reliance on "Defendants' misrepresentations … result[ed] in the devastating destruction from the *2017 Atlantic Hurricane Season* and the ongoing economic losses since 2017." A-339, ¶ 3 (emphasis added); *accord* A-340, ¶ 5 ("The 2017 Atlantic Hurricane season completely wrecked each Municipality's entire infrastructure.").

The amended complaint alleged fourteen counts against these energy companies, including four federal RICO claims, a federal antitrust claim, a series of tort claims under Puerto Rico law, and a claim for unjust

11

enrichment. A-566-625, ¶¶ 634-834. Each of the fourteen counts expressly and exclusively centers around the 2017 storms. *E.g.*, A-593-94, ¶ 735 (first federal RICO count alleging that Defendants prevented "Plaintiffs and their citizens from having the knowledge they needed to adequately prepare for the 'hotter and wetter' *storms that pummeled Puerto Rico in 2017*, causing damages and losses at the time and ongoing" (emphasis added)); *accord* A-594-605, ¶¶ 738, 754, 762 (remaining RICO counts); A-606, ¶ 767 (federal antitrust count); A-609-24, ¶¶ 781, 785, 796, 807, 817, 827, 832-33 (Puerto Rico law counts).

As to post-2017 events, the amended complaint expressly disclaimed "damages for future storms or catastrophes caused by Defendants' misconduct," A-344-45, ¶ 10, and discussed Hurricane Fiona only as an example of an event that "compounded losses" caused by Hurricane María. A-431-36, ¶¶ 278-91.

## D. The District Court Dismisses Plaintiffs' Complaint.

Defendants moved to dismiss Plaintiffs' claims because, among other reasons, the applicable statutes of limitations had lapsed. *See* Dkt. 235 at 11-17; *see also* A-2121; Dkts. 234, 236, 237, 239, 240, 242, 243, 244, 245, 246, 247 (additional motions to dismiss). Defendants also moved the

district court to take judicial notice of the existence of a multitude of reports and news articles—all of which were publicly available by September 2017—expressly tying the 2017 storms in Puerto Rico to climate change and alleging that energy companies had engaged in a campaign of deception that was purportedly responsible for climate-change-related injuries around the world. *See* A-2159.

The district court referred the motions to dismiss to a magistrate judge, who recommended dismissal of all the claims arising under Puerto Rico law and two of the four federal RICO claims for failure to state a claim. Add. 58, 83-90. The magistrate judge recommended denying the motions to dismiss the remaining two civil RICO claims and the federal antitrust claims because he believed that the statutes of limitations were tolled under the continuous-tort and equitable-tolling doctrines. Add. 35-41, 78, 91. The magistrate judge also took judicial notice of the fact that the articles and reports tying climate-related injuries to energy companies and their alleged campaign of deception had been published and/or made available online. Add. 34.

The district court adopted in part and rejected in part the magistrate judge's report and recommendation. It granted the motion for

judicial notice. Add. 171. And it adopted the magistrate judge's recommendation to dismiss all the Puerto Rico law claims. Add. 172. As the court noted, Plaintiffs did not object to the recommendation to dismiss the claims for common-law consumer fraud, conspiracy to commit common-law consumer fraud and deceptive business practices, and misleading practices and advertisements, nor do they do so on appeal. *See id.*; Pltfs. Br. 23 n.3.

The district court, however, rejected the magistrate judge's recommendation on the application of the statutes of limitations. After conducting an independent analysis of the complaint's allegations and publicly available information, the district court concluded instead that all remaining claims were barred by their respective statutes of limitations. *See* Add. 174. The court rejected the argument that Plaintiffs did not know "'which entities have a causal link to Plaintiffs' injuries and their respective market shares in the fossil fuel industry'" until the March 2022 publication of the Chen Report—which "addresses two entities not party to this suit" and "does <u>not</u> address four of the nine Defendants here." Add. 176-78. The court found that "[t]he injury and which entities to sue and on what basis were all readily apparent from

the coverage in the popular press, the court cases, and the reports," and that Plaintiffs were "not diligent" in waiting to bring their claims until 2022. Add. 185-86. And the court explained that Plaintiffs did not argue that their amended complaint in November 2023 "relate[d] back" to the original complaint filed in November 2022. Add. 177-78.

The district court also rejected every tolling argument Plaintiffs advanced. The court first concluded that the federal claims were not subject to the continuing-violation or separate-accrual rules because Plaintiffs failed to allege any predicate or overt act within the limitations period that caused them harm and sought recovery solely for injuries allegedly caused by the 2017 storms. Add. 186-95. For example, Plaintiffs "ma[d]e clear" in their amended complaint "that the racketeering activity preceded the 2017 storms." Add. 190. "And where [Plaintiffs] allege specific kinds of damage, it is … related to the 2017 storms." *Id.*

Likewise, Puerto Rico's continuous-tort doctrine could not save the Puerto Rico law claims because "[a] continuous tort is 'not a continuing harmful effect'" but continuing unlawful and injurious *conduct*, and Plaintiffs had alleged only the continuing harmful effect of the 2017

15

storms.  Add. 195-97 (quoting *M.R. (Vega Alta), Inc. v. Caribe Gen. Elec. Prods., Inc.*, 31 F. Supp. 2d 226, 240 (D.P.R. 1998)).  And equitable tolling (whether based on fraudulent concealment or otherwise) did not apply because, based on their own allegations, Plaintiffs "knew or should have known of the numerous lawsuits and the reports linking Defendants to climate change and, in turn, climate change to storms, including in Puerto Rico, and any possible misrepresentations by Defendants do not change that conclusion."  Add. 198-205; *see* Add. 206 ("The outcome is no different under general principles of equitable tolling.").

The district court also concluded that Occidental Petroleum was insufficiently served; that the court did not have personal jurisdiction over BHP or Rio Tinto as to any of the claims; and that the court did not have personal jurisdiction over API as to the federal antitrust and Puerto Rico law claims.  Add. 102, 134-43, 157.  But in view of its time-bar ruling, the court declined to reach Defendants' remaining grounds for dismissal, finding them moot.  Add. 212-13.

Plaintiffs appealed.  A-4407.

## STANDARD OF REVIEW

This Court's "review of a dismissal of a complaint on statute of limitations grounds is de novo." *FirstBank Puerto Rico, Inc. v. La Vida Merger Sub, Inc.*, 638 F.3d 37, 38 (1st Cir. 2011). This Court "will affirm the dismissal when the pleader's allegations leave no doubt that an asserted claim is time-barred." *Id.* (internal quotation marks omitted).

## SUMMARY OF ARGUMENT

I. The district court correctly dismissed all of Plaintiffs' claims seeking relief for the 2017 storms as barred by the applicable statutes of limitations. Plaintiffs' federal claims are subject to a four-year statute of limitations and their Puerto Rico law claims to a one-year statute of limitations. In light of the numerous articles, reports, and highly publicized lawsuits alleging a connection between Defendants' purported deception and injuries caused by climate change, Plaintiffs knew, or with the exercise of reasonable diligence should have known, in September 2017— *more than five years* before they filed their claims—of their injuries caused by the 2017 storms and whom to sue under their liability theory.

No potentially applicable doctrine excuses Plaintiffs' untimely filing of their complaint. Plaintiffs' deadline to file their federal claims was

not tolled under the fraudulent-concealment doctrine. Plaintiffs failed to plead with particularity any fraudulent conduct by Defendants that could have prevented them from discovering their claims within the limitations periods. And even if Plaintiffs *had* pleaded fraud with particularity, the complaint itself and judicially noticeable publications demonstrated that the basis for their claims was a matter of widespread public knowledge by September 2017, and Plaintiffs could have easily discovered it with reasonable diligence, notwithstanding any alleged misrepresentations by Defendants.

The district court properly dismissed Plaintiffs' Puerto Rico law claims seeking relief for the 2017 storms for the same reason. Regardless of whether their 2023 amended complaint relates back to the November 2022 original complaint, Plaintiffs had notice of their Puerto Rico law claims far more than one year before they filed their original complaint.

II. Plaintiffs' new argument that the district court should have separately analyzed timeliness as to Hurricane Fiona was never presented to the district court and is accordingly forfeited on appeal. Plaintiffs' opposition to Defendants' motion to dismiss mentioned neither Hurricane Fiona nor any damages caused by storms after Hurricane

María. Plaintiffs' forfeiture is consistent with the clear focus of the amended complaint, and each of its 14 claims, on the 2017 storms. And even if not forfeited, Plaintiffs' timeliness arguments fail on the merits. Hurricane Fiona provides no basis to reverse the district court's judgment.

## ARGUMENT

**I.   The District Court Correctly Dismissed Plaintiffs' Claims for Damages Caused by the 2017 Storms as Barred by the Applicable Statutes of Limitations.**

Plaintiffs filed their complaint on November 22, 2022—more than five years after Hurricane María struck Puerto Rico. To be timely, their federal-law claims must have accrued *no earlier than* November 22, 2018, and their Puerto Rico law claims *no earlier than* November 22, 2021. But, in fact, Plaintiffs' claims accrued *long before* those dates, in September 2017, because Plaintiffs knew or should have known by then of their injuries caused by the 2017 storms and whom to sue under their theory of

liability, and no doctrine excuses their untimeliness.[3]  Accordingly, the

district court correctly dismissed all of Plaintiffs' claims.

### A. Plaintiffs Brought Their Claims After the Applicable Limitations Periods Had Lapsed.

The parties agree that Plaintiffs' federal claims are subject to a

four-year statute of limitations and that their claims under Puerto Rico

law are subject to a one-year statute of limitations.  *See* Pltfs. Br. 28-29,

48.  The Clayton Act requires federal antitrust claims to be filed "within

four years after the cause of action accrued," 15 U.S.C. § 15b, and the

Supreme Court has adopted "the 4-year statute of limitations for Clayton

Act actions" as "the most appropriate limitations period for [civil] RICO

---

[3] In addition to rejecting Plaintiffs' fraudulent-concealment argument, the district court held that the continuing-violation rule, the separate-accrual rule, the continuing-tort rule, and general principles of equitable tolling did not apply and could not render Plaintiffs' federal or Puerto Rico law claims timely.  Add. 186-97, 205-07.  The court also held that it lacked personal jurisdiction to adjudicate Plaintiffs' RICO or Puerto Rico law claims against Rio Tinto and BHP and that it lacked personal jurisdiction to adjudicate the antitrust and Puerto Rico law claims against API.  Add. 167-68.  Plaintiffs have not challenged the district court's decisions on any of these issues in their opening brief with regard to Hurricane María, so they have waived any challenge to the district court's decisions on these issues.  *See Sparkle Hill, Inc. v. Interstate Mat Corp.*, 788 F.3d 25, 29 (1st Cir. 2015) ("[W]e do not consider arguments for reversing a decision of a district court when the argument is not raised in a party's opening brief.").

actions." *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987). An antitrust claim "accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). And civil RICO claims accrue "when a plaintiff knew or should have known of his injury[,] … even if the plaintiff is unaware of the precise acts of racketeering that caused the injury." *Álvarez-Maurás v. Banco Popular of P.R.*, 919 F.3d 617, 625-26 (1st Cir. 2019) (internal quotation marks omitted).

As for Plaintiffs' Puerto Rico law claims, because "the acts and omissions alleged in this action occurred before the effective date of the 2020 Puerto Rico Civil Code," the applicable limitations period is provided by "the 1930 Puerto Rico Civil Code." Pltfs. Br. 48 n.11. The 1930 Civil Code "has a one-year statute of limitations for tort claims," *Arturet-Vélez v. R.J. Reynolds Tobacco Co.*, 429 F.3d 10, 12, 14 (1st Cir. 2005) (citing P.R. Laws Ann. tit. 31, § 5298 (1990)), and such claims accrue upon "notice of the injury, plus notice of the person who caused it," *id.* (internal quotation marks omitted). "This does not require actual knowledge; it is enough that the would-be plaintiff had notice that would

21

have led a reasonable person to investigate and so uncover the needed information." *Id.* at 14.

"Granting a motion to dismiss based on a limitations defense is entirely appropriate when the pleader's allegations leave no doubt that an asserted claim is time-barred." *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998). Plaintiffs' complaint leaves no such doubt.

Plaintiffs alleged that they were injured by "the catastrophic storms of September 2017," A-338, ¶ 1, so "the clock began to run then" for their federal-law claims. Add. 184. With respect to their RICO claims, Plaintiffs "'knew or should have known of [their] injury'" in September 2017. Add. 182 (quoting *Álvarez-Maurás*, 919 F.3d at 625-26). And as for their antitrust claim, Plaintiffs again knew or should have "'known of the offense'" that allegedly injured them in September 2017. Add. 183 (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195 (1997)). The four-year statutes of limitations for Plaintiffs' federal claims thus lapsed in September 2021, more than a year before Plaintiffs filed their original complaint, and so their federal claims are untimely. For the same reason, Plaintiffs' Puerto Rico law claims accrued in September 2017, by which time they had "notice that would have led a reasonable person to investigate and

22

so uncover" both their injury and whom to sue (under their theory of liability), and the one-year statute of limitations on those claims lapsed in September 2018, many years before Plaintiffs brought this lawsuit. *Arturet-Vélez*, 429 F.3d at 14.

The district court correctly concluded that Plaintiffs had, at a minimum, *inquiry* notice long before November 22, 2018 (four years before they commenced this suit), and could have easily discovered the alleged basis for their federal and Puerto Rico law claims with reasonable diligence. Plaintiffs themselves explain that Puerto Rico entities in particular have long been aware of the concern that climate change would lead to harmful storms and hurricanes. For example, the original complaint relied on *a 2013 report* issued by the Puerto Rico Climate Change Council—which includes among its members scientists, researchers, and government officials, A-2266-71—that stated: "In Puerto Rico, the general public is primarily concerned about … the potential increase in the frequency and magnitude of storms and hurricanes, storm surges, floods, and coastal erosion" as a result of climate change. A-2274; A-154, ¶ 263 n.245 (citing report). This report explicitly identified "[s]torm surges" as "rapid-onset events" caused by

climate change that "pose substantial risks to many coastal communities of Puerto Rico." A-2277. And the complaint cited a *July 2015 report* published by the Union of Concerned Scientists, which stated that fossil-fuel companies had engaged in a "decades' long campaign … to deceive the American public by distorting the realities and risks of climate change," and that "these companies must stop sowing doubt and blocking progress, and must be held accountable for their share of responsibility for global warming and the damages already underway." A-2211-12; A-188, ¶ 375 n.364 (citing report).

Plaintiffs' complaint also cited national news articles published in September 2017 tying the storms in that month to the effects of climate change. For example, Plaintiffs' complaint cited a September 29, 2017 *Vox* article entitled "One of the Clearest Signs of Climate Change in Hurricanes Maria, Irma, and Harvey was the Rain." A-137, ¶ 209 n.187; *see also* A-147, ¶ 240 n.217 (citing September 23, 2017 *Washington Post* article tying storms to climate change); A-2180-96 (the articles). The *Vox* article stated that climate change is "warming up the ocean" and that Hurricanes Irma and María "plowed through unusually warm oceans this summer," which allowed them to "gai[n] strength quickly" and is

"part of why [Hurricane María] was so devastating" to Puerto Rico. A-2182, A-2188.

In addition, national news articles had been linking fossil-fuel companies to the alleged effects of climate change for many years. *The New York Times* published an article in September 2015 entitled "A Deep Dive Into What Exxon Knew About Global Warming and When (1978) it Knew It." A-2170-76. *The New York Times* also published an article in 2008 describing a suit brought by a village in Alaska against energy companies for the alleged effects of climate change, in which the village brought public nuisance and conspiracy claims analogous to those Plaintiffs brought 14 years later. A-2177-79. That article noted that the lawsuit alleged that "a long campaign by power, coal and oil companies to mislead the public about the science of global warming" had supposedly "contributed 'to the public nuisance of global warming by convincing the public at large and the victims of global warming that the process is not man-made when in fact it is.'" *Id.* The district court took "judicial notice" that all these documents "were publicly available reports and news articles." Add. 171; *see* Add. 179 ("The Court has taken judicial notice of numerous articles in the popular press and reports.").

Moreover, beginning in July 2017—over five years before Plaintiffs filed their complaint—dozens of state and local governments filed materially *identical* complaints alleging the same "deception campaign" by fossil-fuel companies. *See, e.g.*, Compl. ¶¶ 110-41, *Cnty. of Marin v. Chevron Corp.*, No. CIV 1702586 (Cal. Super. Ct. filed July 17, 2017); Compl. ¶¶ 110-41, *Cnty. of San Mateo v. Chevron Corp.*, No. 17CIV03222 (Cal. Super. Ct. filed July 17, 2017). As here, the complaints in all these cases alleged that the defendants "embarked on a concerted public relations campaign to cast doubt on the science connecting global climate change to fossil fuel products and greenhouse gas emissions, in order to influence public perception of the existence of anthropogenic global warming and sea level rise." Compl. ¶ 116, *Cnty. of Marin*, No. CIV 1702586.

Those lawsuits hardly stood alone—states and municipalities initially filed suits alleging a link between fossil fuels and climate change nearly two decades before this suit was filed, including in cases that reached the U.S. Supreme Court. *See, e.g.*, *AEP*, 564 U.S. at 418 (lawsuits filed in 2004); *Native Village of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 869 (N.D. Cal. 2009) (lawsuit filed in 2008), *aff'd*, 696 F.3d 849 (9th Cir. 2012). Some of these suits specifically sought to impose

liability on energy companies for injuries caused by hurricanes. For example, a group of plaintiffs filed suit in 2005, "alleging that emissions by energy company Defendants caused global warming, which increased the destructive capacity of Hurricane Katrina," and asserting "claims of public and private nuisance, trespass, negligence, unjust enrichment, fraudulent misrepresentation, and civil conspiracy against the companies." *Comer*, 718 F.3d at 465 (internal quotation marks and brackets omitted). The Supreme Court in 2007 had noted the existence of expert testimony that there was "a strong consensus that global warming threatens (among other things) a precipitate rise in sea levels by the end of the century" and that "rising ocean temperatures may contribute to the ferocity of hurricanes." *Massachusetts v. EPA*, 549 U.S. 497, 521-22 (2007) (internal quotation marks omitted). And this Court observed that "[i]n 2018, faced with … more frequent and severe … hurricanes …, Rhode Island sued … nearly every oil and gas company under the sun." *Rhode Island*, 979 F.3d at 53-54.

The claims in *Rhode Island* were based on substantially similar allegations of deception and failure to warn, including virtually identical allegations that Defendants "engaged in a coordinated, multi-front effort

to conceal and deny their own knowledge" and "persistently" deceive "customers, consumers, regulators, the media, journalists, teachers, and the public about the reality and consequences of the impact of their fossil fuel pollution" that appear in the complaints in both cases. *Compare* A-98, ¶ 56, *with* Compl.¶ 1, *Rhode Island v. Chevron Corp.*, 2018 WL 11585122 (R.I. Super. Ct. filed July 2, 2018).

Confronted with this "overwhelming evidence" of public awareness of the connection between fossil fuels and global warming—as well as the alleged campaign of deception by energy companies—the district court correctly concluded that Plaintiffs' "injury and which entities to sue and on what basis were all readily apparent from the coverage in the popular press, the court cases, and the reports" long before either the one- or four-year limitations periods preceding the November 2022 filing of the complaint. Add. 179-86. Plaintiffs' RICO claims accrued in September 2017 because that was when they "knew or should have known of [their] injury." *Álvarez-Maurás*, 919 F.3d at 625. Their antitrust claim accrued at the same time because they knew or should have known of the alleged misconduct that injured them. *Klehr*, 521 U.S. at 195. And Plaintiffs'

Puerto Rico law claims also accrued at that time because they had sufficient "notice of the[ir] injury" and of "who," under their theory of liability, "caused it … that would have led a reasonable person to investigate." *Arturet-Vélez*, 429 F.3d at 14.

The district court's decision was consistent with the conclusions reached by other courts in similar climate-change suits. For example, the court in *Delaware* held that similar climate claims were barred by a five-year statute of limitations because "the general public had knowledge of or had access to information about the dispute[s] regarding the existence of climate change and effects" "decades prior" to the end of the limitations period. 2024 WL 98888, at *19. The trial court in *Baltimore* dismissed a climate claim as barred by a three-year statute of limitations because "[t]he statements and allegations made in the complaint make it clear that Baltimore was well aware of Defendants' alleged conduct before 2015 when it could have reasonably discovered a 'wrong' committed by Defendants." *Mayor & City Council of Baltimore v. BP P.L.C.*, 2024 WL 3678699, at *15 (Md. Cir. Ct. July 10, 2024). And the court in *Charleston* held that similar claims were barred by a three-year statute of limitations because the plaintiff was on "reasonable notice of the facts

giving rise to its claims." 2025 WL 2269770, at *14. Because Plaintiffs were on notice of the bases for their claims more than four years before they filed their original complaint, the district court correctly dismissed both Plaintiffs' federal-law and Puerto Rico-law claims as barred by the applicable statutes of limitations.

**B.    The Doctrine of Fraudulent Concealment Cannot Render Plaintiffs' Federal Claims Timely.**

Plaintiffs do not deny the pervasive public awareness of Defendants' alleged campaign of deception nor the widespread public awareness of the alleged connection between fossil fuels and climate-related harms—including harms caused by hurricanes. Instead, Plaintiffs raise only a single argument in support of their assertion that their federal claims are timely: the doctrine of fraudulent concealment. Pltfs. Br. 28-42; *see supra* n.3.

The doctrine of fraudulent concealment may be invoked to toll the statute of limitations for antitrust and civil RICO claims "during such time that the perpetrator purposefully and successfully conceals his or her misconduct from its victim." *Álvarez-Maurás*, 919 F.3d at 626. To establish fraudulent concealment, a plaintiff must "establish three elements: (1) wrongful concealment by defendants of their actions; and

(2) failure of the claimant to discover, within the limitations period, the operative facts which form the basis of the cause of action; (3) despite the claimant's diligent efforts to discover the facts." *Id.* The burden to establish these elements "rests squarely on the party pleading fraudulent concealment." *Berkson v. Del Monte Corp.*, 743 F.2d 53, 55 (1st Cir. 1984).

*Critically*, courts consistently hold that the doctrine of fraudulent concealment does not apply when information in the public record provides notice of the basis for a plaintiff's claims. For example, the District of Massachusetts held that the doctrine of fraudulent concealment did not toll the City of Boston's claims, including a RICO claim, concerning the opioid epidemic because, "despite Defendants' misrepresentations," there was "no doubt" that the City "knew or should have known of its injuries." *City of Boston v. Express Scripts, Inc.*, 765 F. Supp. 3d 31, 42 (D. Mass. 2025) (internal quotation marks omitted).[4] The City of Boston

---

[4] *E.g.*, *Roder v. Equity One Inv. Fund*, 2026 IL App (1st) 231664-U, ¶ 46 ("[F]raudulent concealment does not toll the statute of limitations if the party could have discovered the alleged impropriety through a reasonable inquiry of public records."); *Prentis Fam. Found. v. Barbara Ann Karmanos Cancer Inst.*, 266 Mich. App. 39, 698 N.W.2d 900, 907 n.2

did not appeal the dismissal of its RICO claim, *City of Boston v. OptumRx, Inc.*, 169 F.4th 58, 60 n.1 (1st Cir. 2026), and this Court affirmed the district court's "carefully reasoned opinion" and largely adopted its "cogent reasoning" dismissing the state-law claim, finding no need to replicate its "thoughtful analysis," *id.* at 60, 63.

That reasoning fully applies to Plaintiffs' federal claims. This Court explained that "the City had ample reason to know of [defendants'] wrongdoing and had ample means to discover the facts to support a claim" because "at least seventy-four lawsuits, all a matter of public record, were filed by other cities, towns, and counties" against the defendants, so that "[i]t is not plausible that the City was not aware of these prior litigations." *City of Boston*, 169 F.4th at 63. This Court also explained that "[t]he City's own complaint" cited a "Massachusetts

---

(Mich. App. Ct. 2005) (no fraudulent concealment where information "was discoverable from the outset from public records"); *Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. Red Apple Grp., Inc.,* 710 N.Y.S.2d 48, 49 (2000) (no fraudulent concealment where information "was a matter of public record that plaintiff could have been discovered by the exercise of ordinary diligence"); *see also Hartley Pen Co. v. Lindy Pen Co.*, 16 F.R.D. 141, 158 (S.D. Cal. 1954) ("Although intervener pleads neither the date of discovery nor the circumstances surrounding discovery of the alleged fraud, the facts of public record appear to have placed intervener on constructive notice well more than three years prior to action taken.").

government report" and "a publicly available article" published before the limitations period preceding the filing of the complaint. *Id.*[5]

Here, the district court correctly concluded that the doctrine of fraudulent concealment did not apply for at least three reasons.

*First*, the district court correctly concluded that Plaintiffs failed to allege with the particularity Rule 9(b) requires the facts giving rise to their fraudulent concealment claim or explain how Defendants could possibly have concealed the factual allegations that have long been a matter of public record. The district court's rejection of Plaintiffs' fraudulent-concealment argument can be affirmed on that basis alone.

*Second*, with respect to Plaintiffs' antitrust claim, the district court correctly concluded that the doctrine of fraudulent concealment could not apply because Plaintiffs could have easily discovered the necessary factual basis for that claim—Defendants' allegedly injurious conduct—by

---

[5] While Plaintiffs seek to confine the *City of Boston* decision to Massachusetts law, arguing that the Massachusetts fraudulent-concealment statute is narrower than the federal doctrine, Pltfs. Br. 40 n.8, that distinction does not exist. The federal doctrine reaches the same place: a plaintiff who fails to establish diligence "is charged with the knowledge of what he or she would have uncovered through a reasonably diligent investigation." *In re Celexa and Lexapro Mktg. and Sales Practices Litig.*, 915 F.3d 1, 15 (1st Cir. 2019).

September 2017.  They did not require the 2022 Chen Report, which did not even discuss the misconduct Plaintiffs allege forms the basis of their claims and addressed a different set of companies than the ones Plaintiffs sued.

*Third*, with respect to Plaintiffs' RICO claims, the district court correctly determined that fraudulent concealment did not toll the claims given Plaintiffs only needed to have notice of their injuries, which they had no later than September 2017—immediately after Hurricane María struck and caused widespread damage.  Moreover, even though notice that climate change may have contributed to Hurricane María and Plaintiffs' injuries was not required for Plaintiffs' RICO claims to accrue, the alleged factual basis for that causal link had long been a matter of public record by 2017.

### 1. Plaintiffs Failed to Plead Fraud with Particularity.

The district court correctly determined that Plaintiffs failed to allege fraudulent concealment with particularity as Federal Rule of Civil Procedure 9(b) requires.  Add. 200.  Rule 9(b) requires a party "alleging fraud" to "state with particularity the circumstances constituting fraud," and "it is incumbent upon the plaintiff 'to plead with particularity the

facts giving rise to [a] fraudulent concealment claim.'" *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 189 (1st Cir. 2006). "It is well-established that '[t]his rule entails specifying in the pleader's complaint the time, place, and content of the alleged false or fraudulent representations.'" *Id.*

Plaintiffs did not even attempt to do so. Plaintiffs' complaint contains only the generic and conclusory allegations that their claims are supposedly "subject to equitable tolling, stemming from Defendants' knowingly and fraudulently concealing the facts alleged herein" and that Plaintiffs "could not have known through the exercise of reasonable diligence, of [their] causes of action, as a result of Defendants' misrepresentations." A-348, ¶ 23. Such "'[c]onclusory allegations … are not sufficient' to satisfy Rule 9(b)." *United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 45 (1st Cir. 2009). Plaintiffs "fail[ed] to explain the time, place, content or significance of the 'facts' that [Defendants] allegedly concealed" or explain how any alleged misrepresentations that have long been a matter of public record could have deprived them of "the means to detect the alleged fraud." *Epstein*, 460 F.3d at 190.

The district court thus correctly concluded that Plaintiffs failed to plead fraud with the particularity required by Rule 9(b).

### 2. Plaintiffs Could Have Discovered the Basis for Their Antitrust Claim with Reasonable Diligence During the Limitations Period.

The doctrine of fraudulent concealment does not apply to Plaintiffs' antitrust claim for the independent reason that they could have discovered with reasonable diligence the "act[s] that injure[d]" them. *Zenith*, 401 U.S. at 338. The district court correctly determined that Plaintiffs could have discovered Defendants' allegedly injurious campaign of deception within the limitations period because "Plaintiffs knew or should have known of the numerous lawsuits and the reports linking Defendants to climate change and, in turn, climate change to storms, including in Puerto Rico," notwithstanding "any possible misrepresentations by Defendants." Add. 203.

a. As explained above, *see supra* at 24, Plaintiffs' original complaint cited a 2015 article claiming that energy companies should be held accountable for climate-related injuries because they purportedly conducted a deception campaign designed to obscure the connection between their products and such harms. *See* A-188, ¶ 375 n.364. In addition, a February 2008 *New York Times* article quoted allegations that "[t]here has been a long campaign by power, coal and oil companies to mislead

36

the public about the science of global warming," which "contributed 'to the public nuisance of global warming.'" A-2178-79. A September 2015 *New York Times* article claimed that Exxon, "more than manufacturing doubt, exploited the real uncertainty in the science to frame an argument against moving to stronger instruments" to address the risks of climate change. A-2172-73. And several highly publicized lawsuits had been filed—including the 2008 suit reported in *The New York Times*—suing energy companies for allegedly causing climate-related injuries by concealing the risks of their fossil-fuel products. *See, e.g.*, A-2178-79.

Plaintiffs contend that none of these sources provided notice of Defendants' alleged misconduct, but their arguments fail. They attempt to discount the 2015 *New York Times* article purporting to describe in detail Exxon's internal research on climate change beginning in the 1970s on the ground that it was labeled an "opinion" piece. Pltfs. Br. 37; *see* A-2170-76. But Plaintiffs quoted in their complaint some of the same internal and public statements discussed in the *New York Times* article. *Compare* A-170, ¶ 315 (complaint discussing 1978 internal report), *with* A-2172 (*New York Times* article doing same); *compare* A-197-98, ¶ 405 (complaint discussing 1997 speech in Beijing), *with* A-2173 (*New York*

*Times* article doing same).  Plaintiffs cannot simultaneously rely on the underlying statements and disclaim the source that reported them.  And in any event, a single label appended to one article does not change the fact that Plaintiffs had notice of the very allegations they raised in their complaint, which placed them on inquiry notice.

**b.**  Plaintiffs also argue that the other lawsuits seeking relief from energy companies for climate-change-related injuries did not provide notice of their claims because many of the cases involved climate-related harms caused by "sea storms" and "increased extreme weather events," but not hurricanes (though a hurricane would appear to qualify as an "extreme weather event").  Pltfs. Br. 38.  And they dismiss a case that *did* specifically seek relief from energy companies on the ground that global warming "increased the destructive capacity of Hurricane Katrina," *Comer*, 718 F.3d at 465 (internal quotation marks and brackets omitted), because the case "was disposed of at the pleading stage," Pltfs. Br. 38.  In other words, under Plaintiffs' theory, a lawsuit would have to both (1) specifically involve a hurricane rather than a "sea storm" or any other climate-related "extreme weather event" and also (2) proceed past the pleadings to provide notice that Plaintiffs might have similar claims.

This manufactured rule bears no relationship to the law, which requires not factual proof but only sufficient notice to trigger "a suspicion of misconduct." *Berkson*, 743 F.2d at 56. Indeed, Plaintiffs' purported rule contradicts this Court's holding that a plaintiff had "ample reason to know of [defendants'] wrongdoing" because "at least seventy-four lawsuits" had been "filed" against the defendants on similar grounds. *City of Boston*, 169 F.4th at 62-63. This Court did not suggest the claims in those cases needed to proceed past the pleadings to constitute sufficient notice of alleged misconduct. That decision squarely applies here.

The district court thus correctly determined that "the public information was more than enough to raise suspicion" that Defendants had engaged in conduct that allegedly injured Plaintiffs such that their antitrust claim accrued long before November 22, 2018, and that accrual was not tolled by the fraudulent-concealment doctrine. Add. 204-05.

**c.** Plaintiffs next fall back on an even more tenuous and misplaced argument: that they somehow could not have discovered Defendants' allegedly injurious conduct until the March 2022 publication of the so-called "Chen Report." They claim that this report, which purported to quantify the contributions of certain oil companies to

climate change based on all steps in their supply chains, *"confirmed the extent* of the causal link" between the specific Defendants and climate change. Pltfs. Br. 35-36 (emphasis added). But the Chen Report was in no way necessary to trigger reasonable "suspicion" that Defendants had engaged in allegedly injurious misconduct for several reasons. *See Berkson*, 743 F.2d at 56.

*First*, the Chen Report never discusses Defendants' alleged "act[s] that injure[d]" Plaintiffs—the alleged "scheme to deceive the public about the effects of their products on climate change"—*at all*. *Zenith*, 401 U.S. at 338; Pltfs. Br. 1. Rather, it only purports to quantify "the carbon footprint of countries and companies along the oil value chain," with no discussion whatsoever of the alleged conduct that Plaintiffs claim injured them. Jiarui Chen et al., *How Much Have the Oil Supermajors Contributed to Climate Change? Estimating the Carbon Footprint of the Oil Refining and Petroleum Product Sales Sectors*, Columbia Center on Sustainable Investment (CCSI) (Mar. 2022) at 6, https://tinyurl.com/2ktuvruz. But Plaintiff's theory of liability is that Defendants engaged in a "scheme to deceive" about the link between fossil fuels and climate change that led to their injuries—something that is never discussed or

even mentioned in the Chen Report. That the Chen Report was not a meaningful development in Plaintiffs' theory of liability is reflected in the single citation to the Chen Report in a footnote of the original complaint. *See* A-97 n.17.

*Second*, to the extent Plaintiffs claim that the Chen Report allowed them to identify *which* energy companies engaged in misconduct that injured them, that argument is contradicted by the record. As the district court noted, the Chen Report "addresses two entities not party to this suit, Eni and TotalEnergies, and does <u>not</u> address four of the nine Defendants here, Rio Tinto, BHP, Motiva, and Occidental." Add. 178. If the Chen Report was really "what determined in Plaintiffs' eyes who to sue, this suit would have had half the named defendants it actually has." *Id.* Plaintiffs respond that they did not discover all Defendants' identities through the Chen Report, but only that it first informed them of certain Defendants' roles. Pltfs. Br. 35-36. But if that were so, Plaintiffs cannot explain why they did not sue two of the entities addressed in the Chen Report, one of which the district court noted appears to have "been doing business in Puerto Rico for more than a decade" through a subsidiary. Add. 178. As the district court recognized, Plaintiffs' reliance on the Chen

41

Report is nothing more than a made-for-litigation argument engineered as a gambit to escape the statute of limitations. *See* Add. 176-78.

*Finally*, Plaintiffs did not require "confirm[ation of] the extent of the causal link" between Defendants' fossil-fuel activities and climate change for their antitrust claim to accrue. Pltfs. Br. 35. Such information may be relevant to the attribution of any damages liability among the various Defendants, but a plaintiff does not require evidence of damages attribution for an antitrust claim to accrue, let alone rigorous scientific proof. Plaintiffs' antitrust claim accrued when a reasonable person would have developed "a suspicion of misconduct"—not "concrete" proof—and that occurred long before the publication of the Chen Report. *Berkson*, 743 F.2d at 56. And Plaintiffs provide no reason to think that diligent efforts would not have led them to file by 2021 the very complaint they filed later.

Whether the publicly available sources would suffice to *prove* that Defendants caused Plaintiffs' injuries, *see* Pltfs. Br. 38-40, is beside the point. A plaintiff need not obtain all the evidence it would need to prove its claim on the merits to reasonably suspect that it has a claim. The numerous sources in the public record were more than sufficient to

trigger the "suspicion" that Defendants might be responsible and an attendant "duty to exercise due diligence." *Berkson*, 743 F.2d at 56. And in suits like Plaintiffs', built on "suspicion[s] of misconduct" that are "purely conjectural," Plaintiffs still had a "duty to exercise due diligence in investigating whether the suspicions were well founded." *Id.* Plaintiffs' abject failure to exercise such diligence, *see infra* at 44-51, forecloses their arguments here.

Given the lack of connection between the Chen Report, the misconduct Plaintiffs allege, and the Defendants they sued, it is clear that the report was not necessary to provide the notice of their antitrust claim that had long been available in the public record.

### 3. Plaintiffs Could Have Discovered the Basis for Their RICO Claims with Reasonable Diligence During the Limitations Period.

Plaintiffs argue that they could not have discovered that their injuries were caused by climate change until studies were published in 2019 and 2021 that specifically "linked Hurricane Maria's intensity to climate change." Pltfs. Br. 36-37. They also claim that they required studies on "storms' rapid intensification" based on "anomalously warm sea temperatures," which they contend "has only recently emerged." Pltfs.

Br. 36-37. But Plaintiffs did not need these studies to have notice of their injuries, which were immediately obvious when the 2017 storms struck Puerto Rico. Because a plaintiff's "discovery of [its] injury, not discovery of the other elements of a claim," "starts the clock" for RICO claims, *Álvarez-Maurás*, 919 F.3d at 626, Plaintiffs incorrectly assert that they required notice of the *causes* of their injuries for their RICO claims to accrue.

In any event, Plaintiffs in fact had ample notice that their injuries may have been caused by climate change. There was extensive information in the public record tying the severity of weather events generally—and the 2017 storms specifically—to climate change, so Plaintiffs could, with reasonable diligence, have made the same allegations regarding the climate-related nature of their injuries in September 2017 or shortly thereafter. There were abundant "'telltale warning signs'" long before the publication of the studies Plaintiffs cite. *Álvarez-Maurás*, 919 F.3d at 628. Given that Plaintiffs' "own complaint" cited "report[s]" and "publicly available article[s]" that provided notice of their claims, and given that similar lawsuits, "all a matter of public record, were filed by

44

other cities, town, and counties" against Defendants, Plaintiffs had "ample means to discover the facts to support [their] claims" during the limitations period. *See City of Boston*, 169 F.4th at 62-63.

Plaintiffs' own complaint cited a September 2017 *Vox* article that stated that the "rising average temperatures" caused by "climate change" "are definitely an important element of huge storms like Harvey, Irma, and Maria." A-2188; *see* A-137, ¶ 209 n.187; A-148, ¶ 243 n.219 (citing article). The article also extensively quoted scientists and researchers at the National Oceanic and Atmospheric Administration and NASA for the proposition that the storms "went through a period where they gained strength quickly" because they "plowed through unusually warm oceans." A-2182, A-2188.

Plaintiffs also cited a September 2017 *Washington Post* article that linked the 2017 storms to climate change, arguing that "[t]he fingerprint of climate change is on every storm." A-2194. That article quoted a Weather Company researcher who stated, "We are seeing some of the hottest ocean temperatures in the planet in the western Caribbean Sea," which is "like rocket fuel for developing tropical cyclones." A-2195.

Further, Plaintiffs cited a 2013 report issued by the Puerto Rico Climate Change Council, which includes among its members several scientists, researchers, and government officials. *See* A-2266-71. That report stated: "In Puerto Rico, the general public is primarily concerned about … the potential increase in the frequency and magnitude of storms and hurricanes, storm surges, floods, and coastal erosion" as a result of climate change. A-2274. In addition, a group of plaintiffs had previously filed a lawsuit in 2005 "alleging that emissions by energy company [d]efendants caused global warming, which increased the destructive capacity of Hurricane Katrina." *Comer*, 718 F.3d at 464-65 (internal quotation marks and brackets omitted).

Thus, Plaintiffs' own complaint makes clear that scientists, researchers, and journalists had long been arguing that climate change was increasing the intensity of hurricanes. The complaint also made clear that scientists and researchers had been quoted in national news publications the same month as the 2017 storms explicitly linking the intensity of those storms in particular to climate change and explaining that their rapid intensification resulted from unusually warm ocean temperatures. Thus, the complaint contradicts Plaintiffs' claim that evidence

supporting those scientific theories did not emerge until several years later. *See* Pltfs. Br. 36.

In an attempt to discount this notice in the public record—and in their own complaint—Plaintiffs now cast aspersions on the sources that they themselves relied on in their original complaint. They claim that "pre-Maria" sources explaining that climate change and warming temperatures increase the severity of hurricanes in general did not provide notice because the sources did not apply that general principle to Hurricane María *specifically*. Pltfs. Br. 37. But that argument conflicts with Plaintiffs' own theory on appeal. On the one hand, Plaintiffs claim that they needed formal scientific studies linking climate change specifically to Hurricane María to discover their claims; yet on the other, they maintain that they did not need any formal scientific studies linking climate change to Hurricane Fiona *specifically* to seek relief for *that* storm. Instead, Plaintiffs alleged that the rainfall brought by Hurricane Fiona "fits a pattern of Climate Change" and cited a news article linking Fiona to climate change. A-432, ¶ 282 & n.303. Plaintiffs cannot have it both ways: if a news article and an asserted "pattern of Climate Change" suffice to plead a Hurricane Fiona claim, then the contemporaneous news

47

articles and scientific statements published in 2017 were more than sufficient to put Plaintiffs on notice of their Hurricane María claims years before they filed suit.

Plaintiffs also insist that the numerous 2017 articles they cited that *did* link the storms in that year to climate change did not provide sufficient notice either. Plaintiffs seek to discredit the 2017 *Vox* article linking Hurricane María to climate change and unusually warm ocean temperatures, which quoted multiple government scientists and researchers, because the article also "cited numerous tweets." Pltfs. Br. 37; *see* A-2180-91. And they claim that a 2017 *Washington Post* article linking the 2017 storms to climate change did not provide notice because, even though the article quoted "a hurricane climate specialist at NOAA" and "a research meteorologist at the Weather Company" in support, A-2193-96, the article was "associated with the 'Capital Weather Gang.'" Pltfs. Br. 37. These are not sound rationales for ignoring articles and reports that provided Plaintiffs notice that climate change may have contributed to their injuries, especially given that many of the articles or reports quoted or relied on scientists and researchers. This is especially the case when the relevant question is whether and when Plaintiffs were on

48

*inquiry notice* of their claims—not whether they had sufficient evidence to prove them at trial. *See Berkson*, 743 F.2d at 56. After all, inquiry notice only begins the limitations period; Plaintiffs then had the entire limitations period to investigate and develop whatever information they needed to actually file the complaint.[6]

Finally, Plaintiffs claim that "the U.S. government's current, official position is that climate change is not a danger to human health or the environment" and object that they are not "better able to tell truth from fiction than the federal government is." Pltfs. Br. 33. But President Obama said in 2015 that "the link between more extreme weather and climate change is undeniable," that "the world's best scientists have made a conclusive connection," and that "'[t]he best climate scientists in the world are telling us that extreme weather events like hurricanes are likely to become more powerful.'" Timothy Cama, *Obama: 'Best Climate Scientists' Link Hurricanes, Climate Change*, The Hill (May 28, 2015),

---

[6] Plaintiffs also assert that they could not have discovered the connection between their injuries and climate change because "[a] substantial portion of Americans do not believe climate change is real." Pltfs. Br. 33. But Plaintiffs themselves cited in their complaint a 2007 poll showing that "71% of Americans personally believed global warming was happening." A-220, ¶ 460.

https://tinyurl.com/ycy3yvxz. And President Trump's contrary position certainly did not dissuade Plaintiffs from filing their original complaint, nor does it prevent them from making their arguments now. Shifting governmental policy positions on the controversial issue of climate change based on changes in presidential administrations cannot eliminate the ample notice Plaintiffs had of the basis for their claims.

*      *      *

Because Plaintiffs could easily have discovered the alleged basis for their federal causes of action during the limitations period, they cannot establish that Defendants fraudulently concealed the existence of their causes of action. *Álvarez-Maurás*, 919 F.3d at 626. Plaintiffs have thus failed to plausibly allege fraudulent concealment under any standard, let alone with the particularity Rule 9(b) requires for allegations of fraud. It is not enough that Plaintiffs have sued Defendants based on a theory of alleged deception that occurred in the 1980s, 1990s, and early 2000s. *See* Pltfs. Br. 30-34. Those allegations go to the merits of their claims. To establish fraudulent concealment and avoid the statute of limitations, Plaintiffs needed to allege with particularity that Defendants "deceive[d] [them] into believing that [they] did not have a cause of action" and that

50

they could not have discovered the basis for their claims within the limitations periods. *Berkson*, 743 F.2d at 56 (internal quotation marks omitted). On this front, Plaintiffs fail. Indeed, because any alleged misrepresentations by Defendants cannot change the fact that "Plaintiffs knew or should have known of the numerous lawsuits and the reports linking Defendants to climate change and, in turn, climate change to storms," the district court correctly determined that the doctrine of fraudulent concealment did not toll the limitations periods for Plaintiffs' federal claims. *See* Add. 202-04.

### C. The Discovery Rule Cannot Render Plaintiffs' Puerto Rico Law Claims Timely.

Even though their Puerto Rico law claims are subject to a *one*-year statute of limitations, Plaintiffs argue that those claims are also timely under Puerto Rico's discovery rule because they purportedly could not have discovered the basis for their claims by November 22, 2021. This argument fails for the same reason Plaintiffs' argument concerning their federal claims fails: just as Plaintiffs had notice of the basis for their federal claims before November 22, 2018, the numerous articles, reports, and lawsuits in the public record certainly gave them notice of the basis for their Puerto Rico law claims before November 22, 2021.

The district court correctly noted that Plaintiffs did not argue that their amended complaint related back to the original complaint under Federal Rule of Civil Procedure 15(c)(1)(B).  Add. 177-78.  Nevertheless, Plaintiffs now protest that their amended complaint should be treated as relating back to the date of the original complaint for statute of limitations purposes.  Pltfs. Br. 43-49.  But the district court also correctly explained that Plaintiffs' claims were untimely "[r]egardless of" the relation-back issue because "there is overwhelming evidence of public knowledge of articles, reports, and cases making the connection between Defendants and Plaintiffs' claims, including as to Puerto Rico."  Add. 177-79.  Thus, even if the amended complaint related back to the original one, Plaintiffs' Puerto Rico law claims would still be time-barred.

Puerto Rico law "tolls the running of the statute until the claimant is on notice of her claim—that is, 'notice of the injury, plus notice of the person who caused it.'"  *Arturet-Vélez*, 429 F.3d at 14.  "This does not require actual knowledge; it is enough that the would-be plaintiff had notice that would have led a reasonable person to investigate and so uncover the needed information."  *Id.*  As explained above with regard to the federal-law claims, Plaintiffs had notice of their injuries and the basis

52

for their allegations that Defendants allegedly caused those injuries long before November 22, 2021.  *See supra* at 33-51.

Plaintiffs raise the same unpersuasive argument they make in support of their federal claims—*i.e.*, that they could not have discovered their Puerto Rico law claims until the 2022 Chen Report purported to quantify the carbon footprint of certain Defendants in this case.  Pltfs. Br. 48-49.  But again, as detailed above, *see supra* at 44-51, long before the publication of the Chen Report, Plaintiffs had notice of allegations that climate change, including the "unusually warm oceans" that it produced, contributed to "[t]he intensity of Hurricane Maria."  A-2180-96 (September 2017 articles).  They had notice that Defendants had been accused of working "for nearly three decades, … to distort climate science findings, deceive the public, and block policies designed to hasten our needed transition to a clean energy economy," and that this alleged "campaign of deception" made Defendants "responsib[le] for global warming and the damages already underway."  A-2211-12 (2015 report); *see also* A-2170-76 (2015 *New York Times* article making similar argument).  And Plaintiffs had notice that numerous plaintiffs across the United States had sued these same energy companies for harms allegedly

caused by climate change, including harms caused by the increased "destructive capacity of Hurricane Katrina." *Comer*, 718 F.3d at 464-65 (internal quotation marks and brackets omitted); *see* A-2177-78 (2008 *New York Times* article describing lawsuit by Alaskan village seeking relief for effects of climate change based on energy companies' alleged campaign "to mislead the public about the science of global warming").

Given that all this information was readily available to Plaintiffs, they did not need an additional study purporting to quantify certain energy companies' contributions to climate change to trigger their duty to diligently investigate the basis for their claims. The Chen Report is, at most, merely additive of notice that had already long been available in the public record. Plaintiffs cannot salvage their clearly time-barred Puerto Rico law claims by attaching outsized importance to a single later report, while ignoring the abundant notice of their claims that had accumulated in the decades prior.

\* \* \*

Because the district court correctly determined that Plaintiffs were on notice of the basis for their federal and Puerto Rico law claims long before the limitations periods preceding the filing of their complaint, the

Court should affirm the dismissal of their requests for relief based on the 2017 storms as barred by the applicable statutes of limitations.

## II. Plaintiffs Forfeited Any Separate Claims for Damages Caused by Hurricane Fiona.

The district court correctly understood Plaintiffs' amended complaint to allege that Defendants' "actions ultimately led to hurricanes in 2017 that resulted in extensive damages throughout Puerto Rico." Add. 95-96. The district court therefore analyzed the timeliness of the amended complaint's claims based on the 2017 hurricane season. Now on appeal, Plaintiffs present a new argument: that the district court's construction of the amended complaint "as asserting claims premised *solely* on 'hurricanes in 2017'" was in error, supposedly because the amended complaint "also seeks damages for subsequent storms like Fiona" in 2022. Pltfs. Br. 49.

The district court did not separately analyze timeliness based on claims for damages caused by Hurricane Fiona in 2022 because Plaintiffs never raised this argument before the district court. This Court, therefore, should not consider Plaintiffs' forfeited argument, either.

Plaintiffs never mentioned Hurricane Fiona or any other post-2017 storms in their opposition to Defendants' motion to dismiss. Dkt. 280.

Instead, Plaintiffs argued that Defendants' statute of limitations arguments failed for a host of other reasons: the discovery rule, class-action tolling, equitable tolling, fraudulent concealment, the continuing-violations doctrine, and their statuses as municipalities, among others. *Id.* at 6-18. But they made no mention of Hurricane Fiona, a storm in 2022, or indeed any specific injury that occurred after the 2017 storms. "As a newly raised argument, it is waived on appeal." *City of Boston.*, 169 F.4th at 63.

Attempting to rewrite history, Plaintiffs now point to their generic statement to the district court that they suffered "'continuing' and 'ongoing' losses." Pltfs. Br. 50 (citing Dkt. 280 at 6). But Plaintiffs' arguments about their continuing and ongoing losses did not involve Hurricane Fiona; rather, they invoked such losses to support their fraudulent concealment, equitable tolling, and continuing violation arguments *in support of their claims based on the 2017 storms*. *See* Dkt. 280 at 9 ("Plaintiffs allege that Defendants committed wrongful acts that caused the September 2017 hurricanes that ravaged the island of Puerto Rico. … Though 2017 is when the hurricanes and the physical harm to the island were visibly and physically incurred, the knowledge of how such injury

56

came about was not known at the time."). Neither do Defendants' joint briefs before the district court indicate that Defendants "understood that Plaintiffs' claims for relief … encompassed subsequent storms." Pltfs. Br. 50 (citing Dkt. 235 at 11 n.5). Defendants' joint motion to dismiss only mentioned "subsequent storms" in reference to its characterization of Plaintiffs' claims as regarding the losses "resulting from the catastrophic storms of September 2017 and their aftermath." Dkt. 235 at 11, n.5. And Defendants' joint reply mentions neither "subsequent storms" nor "Hurricane Fiona." *See* Dkt. 297.

The glaring absence of Hurricane Fiona from Plaintiffs' briefing before the district court is hardly surprising, as Plaintiffs' focus on the 2017 hurricane season is clear throughout the amended complaint. There, Plaintiffs describe themselves as "bring[ing] this action … for the primary role that the Defendants' production, promotion, refining, marketing, and sale of fossil fuel-based consumer products played in causing the losses, deaths and destruction of property *resulting from the catastrophic storms of September 2017 and their aftermath*." A-338, ¶ 1 (emphasis added). Plaintiffs allege that reliance on "Defendants' misrepresentations … result[ed] in the devastating destruction from the *2017 Atlantic*

*Hurricane Season* and the ongoing economic losses since 2017." A-339, ¶ 3 (emphasis added); *accord* A-340, ¶ 5 ("The 2017 Atlantic Hurricane season completely wrecked each Municipality's entire infrastructure."). Plaintiffs describe "The Deadly 2017 Hurricane Season" for nearly 20 pages of the amended complaint. *See* A-411-27, ¶¶ 237-70.

The allegations supporting each of the 14 counts in the amended complaint, too, exclusively center around the 2017 storms. For example, Count 4, the first federal RICO claim, describes Defendants as having prevented "Plaintiffs and their citizens from having the knowledge they needed to adequately prepare for the 'hotter and wetter' *storms that pummeled Puerto Rico in 2017*, causing damages and losses at the time and ongoing." A-593-94, ¶ 735 (emphasis added). In Count 5, the second federal RICO claim, Plaintiffs allege that "Defendants fraudulently concealed their knowledge that climate change would accelerate, subsequently increasing the rain and wind in Hurricane Alley and *causing the storms of September 2017*." A-594-95, ¶ 738. The same pattern holds true for the other two RICO counts, A-600-01, ¶ 754; A-604-05, ¶ 762; the federal antitrust count, *e.g.*, A-606, ¶ 767 ("This would have prevented the storms of September 2017."); and the remaining Puerto Rico law

claims, *id.* A-609-24, ¶¶ 781, 785, 796, 807, 817, 827, 832-33.  Indeed, the amended complaint mentions Hurricane Fiona only as an example of an event that "compounded losses" caused by Hurricane María.  A-431-36, ¶¶ 278-91.

Plaintiffs point to scattered phrases—"such as occurred in 2017 and since," "storms … thereafter," damages "continuing to this filing"—and to Paragraph 10's reference to "the losses" that Plaintiffs "suffered beginning with the hurricanes in September 2017 and all of the ensuing impacts upon them … including subsequent storms."  Pltfs. Br. 49-50 (citing A-344, ¶ 8(i); A-346, ¶ 14; A-357, ¶ 66; A-363, ¶¶ 78-79; A-365, ¶ 88; A-389, ¶ 184; A-553-54, ¶ 598; A-345, ¶ 10).  But Paragraph 10 *disclaims* "damages for future storms or catastrophes," and none of the other passing phrases pleads a claim.  As the district court held, "where Plaintiffs allege specific kinds of damage, it is … related to the 2017 storms."  Add. 190.

Nor does Rule 10(c) help.  *See* Pltfs. Br. 51.  Boilerplate incorporation of every preceding paragraph into every count supplies facts, not new

theories of injury; the counts define the claims, and each count's operative damages allegations are expressly tied to "the storms of September 2017."

Moreover, Plaintiffs' amended complaint contained an entire section titled "No Statute of Limitations Bars Plaintiffs' Claims." A-347-49, ¶¶ 20-25. Yet neither Hurricane Fiona nor any other post-2017 storm appears anywhere in that section. Instead, that section focuses on Plaintiffs' status as municipalities, equitable tolling, and fraudulent concealment. *Id.* The district court's construction of the amended complaint was thus entirely consistent with its plain text.

Finally, Plaintiffs' timeliness arguments fail on the merits in any event. The antitrust claim is not saved by an injury from Hurricane Fiona in 2022, as Plaintiffs nowhere in the complaint allege a specific overt act after 2017 that led to the subsequent 2022 storm other than the "unabated inertial consequence of the earlier events." *Berkson*, 743 F.2d at 55 (internal quotation marks and brackets omitted); *see Blenheim Cap. Holdings Ltd. v. Lockheed Martin Corp.*, 53 F.4th 286, 299 (4th Cir. 2022) (holding a 2021 claim time-barred where plaintiff "felt adverse impacts immediately" in "October 2016"). And the RICO claims remain untimely

because the amended complaint itself alleges that the supposed "racketeering activity preceded the 2017 storms," Add. 190 (citing A-596-97, ¶ 743), and does not allege a "'separable, new predicate act within a 4-year limitations period' that 'caused them harm over and above the harm that the earlier acts caused,'" *id.* (citing *Klehr*, 521 U.S. at 190).

## CONCLUSION

This Court should affirm the district court's dismissal of all of Plaintiffs' claims as barred by the applicable statutes of limitations.

Dated: August 11, 2026

Respectfully submitted,

By: /s/ *Theodore J. Boutrous, Jr.*

Theodore J. Boutrous, Jr.
William E. Thomson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
tboutrous@gibsondunn.com
wthomson@gibsondunn.com

Joshua D. Dick
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 393-8200
Facsimile: (415) 374-8451
jdick@gibsondunn.com

Lochlan F. Shelfer
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 530-4213
lshelfer@gibsondunn.com

Roberto C. Quiñones-Rivera
Eduardo A. Zayas-Marxuach
Myrgia M. Palacios-Cabrera
MCCONNELL VALDÉS LLC
P.O. Box 364225
San Juan, PR 00936-4225
Telephone: (787) 250-2631
Facsimile: (787) 474-9201
rcq@mcvpr.com
ezm@mcvpr.com
mpc@mcvpr.com

*Attorneys for Defendant-Appellee*
*CHEVRON CORPORATION*

By: /s/ *Diana E. Reiter*

Diana E. Reiter
ARNOLD & PORTER KAYE
SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689
diana.reiter@arnoldporter.com

John D. Lombardo
Sean O. Morris
ARNOLD & PORTER KAYE
SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017-5844
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
john.lombardo@arnoldporter.com
sean.morris@arnoldporter.com

Jonathan W. Hughes
ARNOLD & PORTER KAYE
SCHOLER LLP
4 Embarcadero Center, 14th Floor
San Francisco, California 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400
jonathan.hughes@arnoldporter.com

Eric Pérez-Ochoa
Luis A. Oliver Fraticelli
ADSUAR MUNIZ GOYCO
SEDA & PÉREZ-OCHOA, P.S.C.
P.O. Box 70294
San Juan, Puerto Rico 00936-8294
Telephone: (787) 756-9000
Facsimile: (787) 756-9093
epo@amgprlaw.com
loliver@amgprlaw.com

Sharlene Marie Malave-Vallines
ADSUAR MUNIZ GOYCO

By: /s/ *John Hueston*

John Hueston
Moez Kaba
Vicki Chou
HUESTON HENNIGAN LLP
523 West 6th St., Ste 400
Los Angeles, CA 90014
Telephone: (646) 930-4046
jhueston@hueston.com
mkaba@hueston.com
vchou@hueston.com

Christina G. Sarchio
DECHERT LLP
1900 K St. N.W.
Washington, DC 20006-110
Telephone: (202) 251-3465
Facsimile: (202) 261-3031
christina.sarchio@dechert.com

Mary Kim
DECHERT LLP
45 Fremont Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 262-4517
Facsimile: (415) 262-4555
mary.kim@dechert.com

Néstor M. Méndez Gómez
María D. Trelles Hernández
PIETRANTONI MENDEZ & ALVAREZ
LLC
Popular Center, 19th Floor
208 Ponce de León Ave.
San Juan, Puerto Rico 00918
Telephone: (787) 274-1212
Facsimile: (787) 274-1470
nmendez@pmalaw.com
mtrelles@pmalaw.com

*Attorneys for Defendant-Appellee*
*EXXON MOBIL CORPORATION*

SEDA & PÉREZ-OCHOA, P.S.C.
208 Ponce de Leon Ave, Ste 1600
San Juan, PR 00918
Telephone: (787) 281-1952
Facsimile: (787) 756-9093
smv@amgprlaw.com

*Attorneys for Defendant-Appellee BP P.L.C.*

By: /s/ *William David Sarratt*

William David Sarratt
DEBEVOISE & PLIMPTON LLP
650 California St
San Francisco, CA 94108
Telephone: (415) 738-5700
Facsimile: (415) 644-5628
dsarratt@debevoise.com

Maura Kathleen Monaghan
Alexander Costin
DEBEVOISE & PLIMPTON LLP
66 Hudson Blvd
New York, NY 10001
Telephone: (212) 909-6000
Facsimile: (212) 521-7759
mkmonaghan@debevoise.com
ajcostin@debevoise.com

Carlos A. Valldejuly-Sastre
José J. Colón García
O'NEILL & BORGES LLC
250 Muñoz Rivera Ave., Ste. 800
San Juan, Puerto Rico 00918-1813
Telephone: (787) 764-8181
Facsimile: (787) 753-8944
carlos.valldejuly@oneillborges.com
jose.colon@oneillborges.com

*Attorneys for Defendant-Appellee SHELL PLC (F/K/A ROYAL DUTCH SHELL PLC)*

By: /s/ *Tracie J. Renfroe*

Tracie J. Renfroe
KING & SPALDING LLP
1100 Louisiana Street, Ste 4100
Houston, TX 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290
trenfroe@kslaw.com

Oliver Peter Thoma
WEST WEBB ALLBRITTON & GENTRY PC
1515 Emerald Plaza, Ste 4100
College Station, TX 77845
Telephone: (979) 694-7000
Facsimile: (979) 694--8000
oliver.thoma@westwebblaw.com

Kenneth C. Suria-Rivera
ESTRELLA, LLC
PO Box 9023596
San Juan, PR 00902-3596
Telephone: (787) 977-5050
Facsimile: (787) 977-5090
kcsuria@estrellallc.com

*Attorneys for Defendant-Appellee MOTIVA ENTERPRISES LLC*

By: /s/ *Brian D. Schmalzbach*

Brian D. Schmalzbach
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219-3916
Telephone: (804) 775-4746
Facsimile: (804) 698-2304
bschmalzbach@mcguirewoods.com

Jeremiah J. Anderson
MCGUIREWOODS LLP
845 Texas Avenue, 24th Floor
Houston, TX 77002-2906
Telephone: (832) 255-6339
Facsimile: (832) 255-6386
jjanderson@mcguirewoods.com

Ramón Dapena
Iván Lladó
MORELL CARTAGENA & DAPENA
Ponce de León Ave. 273 Plaza 273, Ste 700
San Juan PR 00908 Puerto Rico
Telephone: (787) 723-1233
Facsimile: (787) 723-8763
ramon.dapena@mbcdlaw.com
ivan.llado@mbcdlaw.com

*Attorneys for Defendant-Appellee AMERI-
CAN PETROLEUM INSTITUTE*

By: /s/ *Mark C. Fleming*

Mark C. Fleming
Robert Kingsley Smith
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000
mark.fleming@wilmerhale.com
robert.smith@wilmerhale.com

Ricardo F. Casellas Sánchez
Heriberto J. Burgos-Pérez
CASELLAS ALCOVER & BURGOS,
P.S.C.
2 Tabonuco, Ste 400
San Patricio, PR 00968
Telephone: (787) 756-1400
Facsimile: (787) 756-1401
hburgos@cabprlaw.com
rcasellas@cabprlaw.com

*Attorneys for Defendant-Appellee
CONOCOPHILLIPS COMPANY*

66

# CERTIFICATE OF COMPLIANCE

1.    The foregoing brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,025 words, as determined by the word-count function of Microsoft Word 2019, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point New Century Schoolbook font.


Dated:  August 11, 2026           */s/ Theodore J. Boutrous, Jr.*
                                   Theodore J. Boutrous, Jr.

                                   GIBSON, DUNN & CRUTCHER LLP

                                   *Attorney for Defendant-Appellee Chevron Corporation*

# CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.


Dated: August 11, 2026

*/s/ Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr.

GIBSON, DUNN &
CRUTCHER LLP

*Attorney for Defendant-Appellee*
*Chevron Corporation*